UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

     - v -                       Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

       Defendant.

-------------------------------------------------- x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DOUGLASS MACKEY'S MOTION FOR A BILL OF PARTICULARS

 

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Douglass Mackey*

Tables of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

A.     *Alternate sources of information to provide notice are inadequate* . . .  4

B.     *Absent particulars, the Complaint appears to be*
       *wholly predicated on protected speech* . . . . . . . . . . . . . . . . . . . . . . .  10

C.     *Particulars are necessary to inform Mr. Mackey of the basis for*
       *the indictment and to protect him from constitutional prejudice* . . . . .  18

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

       - v -                                     Criminal Case No. 21-0080 (NGG)

DOUGLASS MACKEY,

        Defendant.

-------------------------------------------------- x

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
DOUGLASS MACKEY'S MOTION FOR A BILL OF PARTICULARS

Introduction

       The entirety of the conduct covered by the government's one-sentence indictment of Douglass Mackey appears to be constitutionally-protected speech. This Court has broad discretion to order the particularization requested by this motion:

- so that the Court may thereafter have an informed opportunity, on Mr. Mackey's anticipated motion to dismiss the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), to determine if this case should proceed [*see United States v. Smith*, 985 F. Supp. 2d 547, 561-62 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (holding that a district judge may address "a constitutional attack on an indictment . . . within the context of a Rule 12(b)(3)(B) motion")];

- to address the indictment's failure to provide *any* detail about the government's unprecedented use of Title 18, United States Code, Section 241 ("Section 241");

- to avoid surprise (and attendant disruption) at trial; and

- to protect Mr. Mackey's constitutional right to be free from double jeopardy.

While it appears that even minimal flesh on the indictment's skeletal recitation of Section 241's statutory language will reveal this case to be without valid basis, some particularization is

3

necessary to provide constitutionally-adequate notice of the basis for the charge.

The government's indictment of Mr. Mackey does nothing more than track the statutory language of Section 241, alleging that in the 60 days preceding the presidential election of 2016, he conspired to "injure, oppress, threaten and intimidate one or more persons in the free exercise and enjoyment" of their right to vote.  Indictment at Docket No. 8.  Anticipating the government's typical rejoinder to requested particularization that a defendant is obliged to educate himself about a barebones criminal charge from alternate available sources [*see e.g. United States v. Bortnovsky*, 820 F.2d 52, 574 (2d Cir. 1987)],  Mr. Mackey has reviewed the Complaint in this case [Docket No. 1 (the "Complaint")] and the government's relevant public statements and continues to review the government's discovery.  These alternate sources of information neither provide constitutionally-adequate notice nor do they reveal an apparently valid predicate for this case.  While a motion to dismiss will tee up Mr. Mackey's anticipated challenge to the validity of this prosecution, this motion seeks the particulars identified below in part so that his motion to dismiss and the Court's consideration thereof are efficiently and effectively focused.

A.      *Alternate sources of information to provide notice are inadequate*

On October 22, 2020, just a few weeks before the presidential election of 2020 (more than three months *before* the government's filing of Mr. Mackey's indictment on February 10, 2021, Docket No. 8), the United States Attorneys for the Eastern and Southern Districts of New York provided their respective constituents with telephone numbers to receive public complaints about voting-related fraud and identified members of their respective staffs (including Mr. Mackey's lead prosecutor) as "District Election Officers" overseeing complaints of "election

4

fraud and voting rights concerns."  The announcement, which trumpeted the United States Attorneys' consult with "Justice Department Headquarters in Washington," contained the following statement of federal criminal voting-related law:

> Federal law protects against such crimes as intimidating or bribing voters, buying and selling votes, impersonating voters, altering vote tallies, stuffing ballot boxes, and marking ballots for voters against their wishes or without their input.  It also contains special protections for the rights of voters, and provides that they can vote free from acts that intimidate or harass them.  For example, actions of persons designed to interrupt or intimidate voters at polling places by questioning or challenging them, or by photographing or videotaping them, under the pretext that these are actions to uncover illegal voting, may violate federal voting rights law.  Further, federal law protects the right of voters to mark their own ballot or to be assisted by a person of their choice (where voters need assistance because of disability or illiteracy).

Exhibit A.  This statement in 2020 of federal criminal voting-related law by the United States Attorneys for the Eastern and Southern Districts of New York (which also appears in at least one prior similar public announcement[1]) echoes the publicly-available "Federal Prosecution of Election Offenses, Eighth Edition,"[2] a 281-page compendium of voting-related criminal law and cases (including a chapter on Section 241) issued in December 2017 by the Election Crimes Branch of the United States Department of Justice's Public Integrity Section (to which one of the prosecutors in this case is assigned).

      Neither the United States Attorneys' statement of federal criminal voting-related law nor the Public Integrity Section's comprehensive compendium appears to cover the conduct of Mr. Mackey described by the allegations in the Complaint, discussed below.  Neither of these

---

[1] *See* Press Release, "*United States Attorneys Available To Receive Election Complaints,*" U.S. Department of Justice, SDNY, (June 22, 2020), available at *https://www.justice.gov/usao-edny/pr/united-states-attorneys-available-receive-election-complaints*-2

[2] Available at *https://www.justice.gov/criminal/file/1029066/download*

alternate sources of information available to Mr. Mackey to educate himself about the government's barebones indictment necessarily precludes application of Section 241 to a new set of facts.  It appears from other alternate sources of information available to Mr. Mackey, however, that the government may have thrown him into a lacuna acknowledged to be beyond the intended and applicable scope of federal criminal law by former President Barack Obama, United States Senators within the Second Circuit including Schumer, Clinton, Gillibrand, Leahy, and Blumenthal, other members of Congress, and public interest groups dedicated to protecting the right to vote.

    Beginning on Election Day in 2005, then-Senator Obama and Senator Schumer introduced the Deceptive Practices and Voter Intimidation Prevention Act (S. 1975, 109th Congress, First Session), which was subsequently introduced multiple times either by Senator Obama before he became President [*see* S. 4069, 109th Congress, Second Session; S. 453, 110th Congress, First Session) or other Senators.  The legislation was just recently re-introduced in 2021 as part of the For the People Act by Senators Cardin and Klobuchar (S. 1840, 117th Congress) and has been the subject of corollary legislation introduced in the House of Representatives.  *See e.g.* H.R. 1281, 110th Congress.  Despite multiple attempts over the past seventeen years, the proposed legislation has not been enacted.

    These bills have proposed (among other things) to make it a crime for any person, within 60 days before a presidential election, to communicate or cause to be communicated information about the time, place, or manner of a presidential election if such person knows such information to be false and acts with "intent to prevent another person from exercising the right to vote or from voting for the candidate of such other person's choice" in a presidential election.

*See e.g.* S. 453, Report No. 110-191 (Oct. 4, 2007) at 19. Exhibit B.

This *proposed* gloss on existing federal criminal voter-related law is intended to cover conduct thematically similar (though not identical) to the violation of Section 241 apparently alleged by the government in this case. A report of the Committee on the Judiciary issued by Senator Leahy on October 4, 2007, explained that the purpose of the proposed legislation is "to combat the decades-old practice of communicating intentionally false information in an effort to disenfranchise voters and to keep voters away from the polls." Exhibit B at 4. The Report provides examples of historical practices, typically targeting minority voters and not previously prosecuted under Section 241 or any other statute, which the legislation might cover if enacted, including:

- telephone calls to registered voters in Virginia advising that they could vote by pressing a number on their telephone keypad corresponding to their candidate of choice, and ending by advising them that their votes had been received, obviating any need to vote on Election Day [Exhibit B at 5];

- fliers circulated in Ohio's Franklin County (Columbus) in 2004 stating that, due to ''confusion caused by unexpected heavy voter registrations,'' Republicans should vote on Tuesday, and Democrats should vote on Wednesday [Exhibit B at 2];

- fliers circulated in predominantly African-American areas in Baltimore in 2002 showing the wrong election date and falsely stating that parking tickets must be paid before voting [Exhibit B at 4];

- fliers circulated in public housing communities in New Orleans in 2002 stating that voters could cast their ballots three days after the election ''if the weather is bad'' [Exhibit B at 2]; and

- recorded calls to registered voters in Virginia that falsely told the recipients of the calls that they were registered in another state and would face criminal charges if they voted locally [Exhibit B at 5].

Proponents of the proposed legislation recognized that its application could be

misused to prosecute constitutionally protected speech. They understood that a new law needs to be "narrowly tailored to avoid impinging on or chilling constitutionally protected speech" by limiting its application to communications specifically intended "*to prevent* another person from voting" [*see e.g.* Exhibit B at 6 (emphasis added)], not just "injure, oppress, threaten and intimidate" the free exercise of the right to vote as Section 241 currently provides. Some supporters of the bill opined that some of its intended scope may already have been proscribed, but acknowledged the uncertainty of the law in this area and wanted "clear and specific authority to prosecute efforts to deceive voters about the time and place and qualifications for voting." Exhibit B at 16.

Public interest groups have supported the proposed legislation, concluding that current law does not reach the types of disinformation identified in the Senate Report. The American Civil Liberties Union concluded that, "[i]f deceptive voting practices are not prohibited[,] many voters will be prevented from exercising their right to vote; . . . . [the proposed legislation] addresses these deceptive practices by holding people criminally and civilly accountable for tactics that are commonly intended to infringe minority communities' ability to vote."[3] The Brennan Center for Justice concluded that the proposed legislation "*would criminalize the knowing and intentional communication of false and misleading information about the time, place, or manner of elections.*" *"The Deceptive Practices and Voter Intimidation Prevention Act of 2007,"* The Brennan Center for Justice, Jan. 26, 2009[4] (emphasis added). The

---

[3] Available at *https://www.aclu.org/letter/aclu-letter-house-supporting-hr-1281-deceptive-practices-and-voter-intimidation-prevention*

[4] Available at *https://www.brennancenter.org/our-work/research-reports/deceptive-practices-and-voter-intimidation-prevention-act-2007*

People for the American Way concluded that existing law "may not currently criminalize all the deceptive practices we saw in the 2006 elections, including disinformation campaigns . . . . Such practices try to deceive voters into changing their votes, or voting on the wrong day, or by sending them to the wrong polling place . . . . We may not be able to stop dirty tricks in campaigns, but we can make it harder for them to succeed - and we can make the consequences very serious for those who carry them out." Exhibit B at 6-7.

Even the Department of Justice appears uncertain that any existing voter-related law embraces the charged conduct. Among the alternate sources of information available to Mr. Mackey to educate himself about the government's barebones indictment is a press report about this case sourced by multiple unnamed officials within the Department of Justice. *See "U.S. steps up pursuit of far-right activists in 2016 voter suppression probe,"* Reuters.com, May 26, 2021.[5] Reuters reported that federal prosecutors had "debated for years whether and how to pursue criminal cases against Americans suspected of disseminating false voting instructions to manipulate elections," recognizing potential constitutional and legal obstacles under current law:

> While some officials wanted to bring a multitude of charges, others felt it would be too difficult to bring a voter-suppression case based on online messaging, the people said. The hurdles include free-speech rights, the difficulty in establishing intent and the challenge of showing that anyone failed to vote because a specific person misled them.

Reuters may or may not have accurately reported about debate within the Department of Justice that preceded its unprecedented charge against Mr. Mackey. Multiple members of Congress and public interest groups dedicated to protecting the right to vote as described above, however, have concluded that a new law is necessary to prosecute even conduct thematically similar to the

---

[5] Available at *https://www.reuters.com/business/media-telecom/us-steps-up-pursuit-far-right-activists-2016-voter-suppression-probe-2021-05-26/*

9

apparently alleged conduct here, which had never before been prosecuted.

Even with a new law, members of Congress understand that protecting the First Amendment is more important than prosecuting disinformation about voting, requiring that a new law, at the very least, be "narrowly tailored" and require specific intent "to prevent" another person from voting (not just injure, oppress, intimate or threaten the free exercise of the right to vote) to have any chance of passing constitutional muster. *See e.g. Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted and perceived grievances left to fester because of the possible inhibitory effects of overly broad statutes"); *see also Nat'l Coalition on Black Civil Participation v. Wohl*, 498 F. Supp. 3d 457, 478 (S.D.N.Y. 2020) ("Although false statements that discourage people from exercising the right to vote could conceivably be exempted from First Amendment protection altogether, the Supreme Court has not crafted such an exception.").

B.      *Absent particulars, the Complaint appears to be wholly predicated on protected speech*

Defendants do not typically need look to the types of alternate sources of information cited above to understand an indictment against them. The indictment here, however, indisputably represents a new application of Section 241, for which the government's one-sentence charging language provides no detail at all. A complaint preceding an indictment can sometimes fill an indictment's gaps, but the Complaint in this case appears to be predicated wholly on protected speech outside the scope of Section 241. If there is more, the government should be required to say so;  if not, resolution of this motion will inform Mr. Mackey's anticipated motion to dismiss and, if this case is not dismissed, his preparation for and defense at

10

trial.

        The Complaint (and the indictment), like the proposed legislation described above, limits the charged conspiracy to the 60 days before Election Day in 2016 [Complaint at 1], an apparent attempt by the government to mimic a part of the proposed legislation discussed above and show that the allegation is tailored to Election Day and might therefore pass constitutional muster at least temporally.  The Complaint alleges that Mr. Mackey hosted Twitter accounts and appeared in online group chats using the pseudonym "Ricky Vaughn."  Complaint at 4-7.  "Ricky Vaughn" is the name of a fictional character portrayed by actor Charlie Sheen in the movie *Major League*, an American comedy from 1989 so popular that it spawned two (less successful) sequels.  *Major League* is the story of a new owner of the Cleveland Indians who schemes for the team to fail to permit the team's relocation and so hires castoffs like Vaughn, known as "Wild Thing" because of his colorful personality and tendency to throw wild pitches.[6]

        According to the Complaint, Mr. Mackey (as Vaughn) conspired with others through online messaging to create and upload allegedly deceptive images to his Twitter account that misrepresented, for example, that registered voters who supported former Secretary of State Hillary Clinton for President in 2016 could text their votes on their cell phones to a five-digit number and "[a]void the line" at a polling place on Election Day.  Complaint at 21-22.  The Complaint does *not* dispute any of the following facts that together help establish that Mr. Mackey's alleged conduct was constitutionally protected and outside the scope of even the proposed changes to current law:

- Mr. Mackey's alleged conspiratorial conduct was limited to online messaging and chats

---

      [6] Available at *https://en.wikipedia.org/wiki/Major_League_(film)*

with politically like-minded others;

• Mr. Mackey was not affiliated with nor employed by any organized group, and neither received nor expected to receive compensation for the alleged conduct; and

• There is no evidence that any registered voter (let alone a reasonable one) was actually *prevented* from voting and refrained from voting as a result of Mr. Mackey's alleged online conduct.

Despite the Complaint's allegations, alternate sources of information have expressed views of the charge in this case which are not apparent. For example, the Complaint alleges that 4,900 people in the United States texted the five-digit number provided in a purportedly deceptive meme. Complaint at 23. Based on that allegation, the *New York Times* reported that Mr. Mackey "tricked Democratic voters in 2016 into trying to cast their ballots by phone instead of going to the polls . . . in a futile effort to cast votes for Mrs. Clinton."[7] The Complaint, however, does not allege that anyone (let alone any reasonable registered voter) was tricked, or believed that their text actually constituted an official ballot for President, or otherwise did not actually vote if they intended to do so. While reporters sometimes get things wrong, reputable outlets like the *New York Times* almost always fact-check their reporting with prosecutors and federal agents off-the-record to confirm accuracy. In fact, William F. Sweeney, Jr., Assistant Director-in-Charge of the Federal Bureau of Investigation's New York Field Office, said in the government's announcement of this case that Mr. Mackey's conduct "amounted to nothing short of vote theft . . . .[which constitutes] illegal behavior."[8]

---

[7] *See* https://www.nytimes.com/2021/01/27/nyregion/douglass-mackey-arrested-far-right-twitter.html

[8] *See* https://www.justice.gov/opa/pr/social-media-influencer-charged-election-interference-stemming-voter-disinformation-campaign

Perhaps Director Sweeney exaggerated in describing this case, and perhaps the *New York Times* was insufficiently precise in its choice of words. But the skeletal state of the indictment prevents Mr. Mackey from concluding, as a matter of constitutional due process, that there is not more to this case than meets the eye. Mr. Mackey is entitled to know formally, in a way that binds the government, that he is *not* alleged actually to have tricked - - or, in the language of the proposed legislation - - *prevented* anyone from voting.

It is essential to Mr. Mackey's defense that the government do more than refer him to alternate sources of information. Compare the commonly-understood realities of (1) voting for President; and (2) Twitter and the Internet. As the United States Supreme Court noted just last year (long after the Internet rooted itself in daily American life), "every voting rule imposes a burden of some sort. Voting takes time and, for almost everyone, some travel, even if only to a nearby mailbox. Casting a vote, whether by following the directions for using a voting machine or completing a paper ballot, requires compliance with certain rules." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2338 (2021).

By contrast, "[i]f the Internet is akin to the Wild West, as many have suggested, Twitter is, perhaps, the shooting gallery, where verbal gunslingers engage in prolonged hyperbolic crossfire." *Ganske v. Mensch*, 480 F. Supp. 3d 542 (S.D.N.Y. 2020) (Abrams, U.S.D.J.) (dismissing claim of defamation based on tweets); citing *Brahms v. Carver*, 33 F. Supp. 39 192, 199 (E.D.N.Y. 2014) (Vitaliano, U.S.D.J.) (questioning reasonable reliance on statements "made on an internet forum where people typically solicit and express opinions, generally using pseudonyms"); *and Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.2d 32, 44 (1st Dep't 2011) ("The culture of Internet communications, as distinct from that of print media

13

such as newspapers and magazines, has been characterized as encouraging a 'freewheeling, anything-goes writing style.'").

It seems fanciful to believe that any reasonable registered voter who intended to vote for Secretary Clinton could truly have believed that texting a five-digit number advertised on a meme posted on the Internet could constitute casting an official ballot for President, at least without some requirement that identity be verified, or accompanied by the voter's electronic signature, or some other attendant formality. If it is the government's position that it need not prove reasonable reliance on Mr. Mackey's alleged conduct, evidence of the 4,900 texters was surplusage in the Complaint and is irrelevant [FRCRP 401] and unduly prejudicial with no true probative value. FRCRP 403. The absence of proof of any actual reliance is evidentiary support for Mr. Mackey's prospective defense that he did not specifically intend to injure anyone's right to vote because no one would expect a reasonable registered voter to rely on a tweeted meme on the Internet as soliciting an official ballot for President. In fact, unlike practices identified in the Senate Report specifically targeting ostensibly Democratic constituencies, Vaughn posted his meme to his Twitter account, the followers of which overwhelmingly shared his political views: the account showed actor Charlie Sheen wearing a cap that said, "Make America Great Again."

Any allegation that Mr. Mackey posted memes hoping for their further dissemination into cyberspace further suggests, without more, that the government's indictment is wholly predicated on political speech, the protection of which outweighs any interest in punishing even a true deception [*see e.g. Broadrick v. Oklahoma*, 413 U.S. at 612], and that any theory of guilt is at most consistent with a theory of innocence. *See e.g. United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (a conviction may be infirm if proof is as consistent with guilt as

14

innocence).  For example, the Complaint relies on purportedly conspiratorial statements (not necessarily spoken by Mr. Mackey) that a particular meme (acknowledged by the government as a means of expression intended to be "amusing," Complaint at 3), would *confuse* the"shitlibs" [Complaint at 11] and "[d]opey shitlibs" [Complaint at 17], *provoke* the "shitlib woman vote" [Complaint at 11], or constitute a "perfect psyops," meaning psychological warfare against supporters of Secretary Clinton.  Complaint at 12.

From these remarks, the Complaint infers a conspiracy to deceive registered voters, though they are consistent with a tactic known as  "owning the libs."  *See* Derek Robinson, *"How 'Owning the Libs' Became the GOP's Core Belief,"* Politico (Mar. 21, 2021)[9] at 2, 7, 16 ("owning the libs" "does not require victory as much as a commitment to infuriating, flummoxing or otherwise distressing liberals with one's awesomely uncompromising conservatism . . . . It's a spirit of rebellion against what people see as liberals who are overly sensitive, or are capable of being triggered, or hypocritical").  As noted in a comprehensive analysis of the right wing's use of social media and Twitter in 2016, right wing trolling can advance "a quasi-moral argument that, by trolling, they are exposing the hypocrisy, ignorance, and stupidity of the mainstream media." Alice Marwick & Rebecca Lewis, Media Manipulation and Disinformation Online, Data & Society Res. Inst. (2017)[10] (describing a troller with a following similar to Vaughn's as "strategically outraging the media through Twitter harassment and other shock tactics").

---

[9]  Available at *https://www.politico.com/news/magazine/2021/03/21/owning-the-libs-history-trump-politics-pop-culture-477203*

[10]  Available at *https://datasociety.net/pubs/oh/DataAndSociety_ MediaManipulationAndDisinformationOnline.pdf*

While "owning the libs" may be off-putting to some, it is protected by the First Amendment. The speech cited in the Complaint allows consumers in the marketplace of ideas to assess its value as provocation, satire, commentary, or otherwise, and, just as importantly, how its targets respond. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 271-72 (1964) ("To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy . . . . [E]rroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the breathing space that they need to survive."); *Farah v. Esquire Mag., 736 F.3d 528, 536–37 (D.C. Cir. 2013)* ("But it is the nature of satire that not everyone 'gets it' immediately. For example, when Daniel Defoe first published The Shortest Way with the Dissenters, an anonymous satirical pamphlet against religious persecution, it was initially welcomed by the church establishment Defoe sought to ridicule. See James Sutherland, English Satire 83-84 (1958). Similarly, Benjamin Franklin's 'Speech of Miss Polly Baker,' a fictitious news story mocking New England's harsh treatment of unwed mothers, was widely republished in both England and the United States as actual news."); *Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc.*, 886 F.2d 490, 494 (2d Cir. 1989) ("the keystone of parody is imitation. It is hard to imagine, for example, a successful parody of Time magazine that did not reproduce Time's trademarked red border."); *see also Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir. 1986) (Wilkinson, J., dissenting), *rev'd sub nom. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46,

(1988) ("Satire is particularly relevant to political debate because it tears down facades, deflates stuffed shirts, and unmasks hypocrisy.  By cutting through the constraints imposed by pomp and ceremony, it is a form of irreverence as welcome as fresh air.")

The government at a trial of this case may attempt to connect together pieces of Mr. Mackey's conversations with politically-compatible others to infer a specific intent to "injure, oppress, intimidate, and threaten" free exercise of the right to vote.  But alternate sources of information about this case described above suggest that Mr. Mackey can just as (if not more) readily show a different intent.  The First Amendment does not permit the government to choose, especially without clear legislative command, which citizens, let alone "verbal gunslingers engag[ing] in prolonged hyperbolic crossfire" [*see Ganske*, 480 F. Supp. 3d at 542], crossed a First Amendment line and are worthy of criminal jeopardy.  Perhaps the Department of Justice on January 22, 2021, two days into the Biden Administration when it filed its Complaint against Mr. Mackey [Docket No. 1], believed its cause to be righteous, but the precedent that could be set here could animate different applications of Section 241 in a hypothetical DeSantis or second Trump Administration.  If there is more to this case than Mr. Mackey's exercise of his right to free speech, the government should be ordered to say so.  *See United States v. Alvarez*, 567 U.S. 709, 722-23 (2012) ("Before exempting a category of speech from the normal prohibition on content-based restrictions, however, the Court must be presented with 'persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription' . . . . Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth. See G. Orwell, Nineteen Eighty-Four (1949) (Centennial ed. 2003).  Were this law to be sustained, there could be an endless list of subjects the National Government or the

States could single out.") (plurality opinion); *Sullivan*, 376 U.S. at 271 ("This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee.").

C.  *Particulars are necessary to inform Mr. Mackey of the basis for the indictment and to protect him from constitutional prejudice*

Mr. Mackey is not charged with a conventional crime like conspiracy to distribute controlled substances [21 U.S.C. § 841] or to commit robberies that affect interstate commerce [18 U.S.C. § 1951] where the underlying illegality is plain, and templates for similar prosecutions are plentiful and readily available. Here, if Mr. Mackey's alleged conduct truly violated laws that provide "fair notice of conduct that is forbidden or required" [*see FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)], the government needs to provide more than a sentence that tracks statutory language.

Mr. Mackey's counsel requested and the government declined to provide the following particulars [Exhibit C, Certification of Compliance with Local Rule 16.1]:

1.  In allegedly violating Section 241, was Mr. Mackey affiliated with or was he employed by any organized group, or, instead, did he allegedly conspire with others on Internet social media?

2.  Did Mr. Mackey allegedly conspire to injure, oppress, threaten, or intimidate any registered voter in the free exercise of the right to vote other than by allegedly posting the purportedly deceptive images identified in the Complaint to his Twitter account?

3.  Did Mr. Mackey actually injure, oppress, threaten, or intimidate any registered voter in the free exercise of the right to vote?

4.  What is the basis for venue?

Particulars should be ordered when "the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States v. Leonard*, 817 F. Supp. 286, 301 (E.D.N.Y. 1992); *United States v. Larracuenti*, 740 F. Supp. 160 (E.D.N.Y. 1990). A defendant must show that the requested particulars are necessary, and that he would be prejudiced without them. *See United States v. Payden*, 613 F. Supp. 800, 816 (S.D.N.Y. 1985) ("It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case.").

On the current barren landscape, Mr. Mackey has not been provided constitutionally adequate notice of the charge against him to prepare his defense. Without particulars, Mr. Mackey risks facing a moving target, where the government can shift the elements and proof of the offense to meet the defense as it sees fit. Further, a pretrial motion to dismiss will be unwieldy, requiring extensive briefing on especially weighty issues including freedom of speech, protected political discourse and satire, and notice of prohibited conduct sufficient to constitute due process. Given these circumstances, Mr. Mackey's apparent need to defend himself from exercising his constitutional right to free speech is itself undue prejudice requiring particulars.

The Complaint alleges that some unidentified number of the 4,900 texters used telephone numbers "belonging to individuals located in the Eastern District of New York" [Complaint at 23], but does not allege that any reasonable registered voter in this District (or anywhere else) was deceived into thinking that they had cast an official ballot for President. The

19

government rests on its unelaborated assertion of venue at its peril. *See United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014) (holding that "the era of mass interconnectivity" should not permit the government to assert venue without proper consideration of the crime's *locus delicti*).

Conclusion

For these reasons, Mr. Mackey's requested particulars should be granted.

Dated: March 16, 2022

*/s/ Andrew J. Frisch*
Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Douglass Mackey*