UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

    - v -                                                                    Criminal Case No. 21-0080
                                                 (NGG)

DOUGLASS MACKEY,

              Defendant.

-------------------------------------------------- x

REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
DOUGLASS MACKEY'S MOTION FOR DISMISSAL


Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Douglass Mackey*

September 6, 2022

# TABLE OF CONTENTS

I. There is No Venue in this District for this Prosecution ............................................................. 1
   A. The government erroneously conflates retweeted memes with direct electronic communications ........................................................................................................................ 1
   B. The government fails to establish that venue lies at "the location of the intended victims" ................................................................................................................................... 3
   C. The alleged conspiracy does not have substantial contact with this District .................... 4
   D. Pre-trial dismissal may be granted for lack of venue ......................................................... 5

II. The Response fails to show that Mr. Mackey and fair notice of the government's unprecedented expansion of Section 241 liability ............................................................................ 6
   A. Mr. Mackey had no fair warning that "disinformation" about voting violated the statute, nor that online conduct could be unlawful ................................................................................ 8
   B. The government mischaracterizes cases about police threats and theft as "deceptive speech" .................................................................................................................................... 9
   C. Concerns about fair warning are heightened here ........................................................... 10

III. Even if Section 241 Covers the Alleged Conduct, Applying It Here Violates the First Amendment ................................................................................................................................. 11
   A. Mr. Mackey had no fair warning that "disinformation" about voting violated the statute, nor that online conduct could be unlawful .............................................................................. 11
   B. Time, place and manner restrictions and restrictions on non-public forums cannot serve as precedent to criminalize online speech based on its content ................................................ 12

CONCLUSION ........................................................................................................................... 14

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anderson v. United States*,
  417 U.S. 211, (1974) ............................................................................................7

*Burson v. Freeman*,
  504 U.S. 191 (1992) .........................................................................................6, 13

*Ex Parte Siebold*,
  100 U.S. 371 (1879) ..............................................................................................6

*Ex Parte Yarbrough*,
  110 U.S. 651 (1884) ..............................................................................................6

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ................................................................................10, 11, 13

*Guinn v. United States*,
  228 F. 103 (8th Cir. 1915) .....................................................................................9

*Heffron v. Int'l Soc'y for Krishna Consciousness*,
  452 U.S. 640 (1981) ............................................................................................12

*Johnson v. TheHuffingtonPost.com, Inc.*,
  21 F.4th 314 (5th Cir. 2021) ..................................................................................3

*Minnesota Voters Alliance v. Mansky*,
  138 S. Ct. 1876 (2018) ............................................................................10, 12, 13

*Preferred Properties, Inc. v. Indian River Estates, Inc.*,
  276 F.3d 790 (6th Cir. 2002) ...............................................................................11

*Reno v. American Civil Liberties Union*,
  521 U.S. 844 (1997) ..............................................................................................2

*San Francisco Forty-Niners v. Nishioka*,
  89 Cal. Rptr. 2d 388 (1999) ...........................................................................12, 13

*Ulrich v. Stead*,
  161 F. Supp. 891 (W.D.N.Y. 1956) ......................................................................5

*United States v. Alvarez*,
  567 U.S. 709 (2012) ............................................................................................13

*United States v. Auernheimer*,
  748 F.3d 525 (3d Cir. 2014) ..................................................................................5

*United States v. Benson*,
  61 F.3d (7th Cir. 2009) .......................................................................................11

*United States v. Bradfield*,
  2000 WL 1033022 (6th Cir. July 18, 2000) ......................................................8, 9

*United States v. Bufalino*,
  518 F. Supp. 1190 (S.D.N.Y. 1981) .....................................................................3

*United States v. Callahan*,
  659 F. Supp. 80 (E.D. Pa.) ....................................................................................3

*United States v. Fernandez*,
  480 F.2d 726 (2d Cir. 1973) .................................................................................1

*United States v. Greer*,
  939 F.2d 1076 (5th Cir. 1991) ..............................................................................3

*United States v. Lanier*, 520 U.S. 259 (1997) ...........................................................8

*United States v. Lee*,

  6 F.3d 1297 (8th Cir. 1993) .................................................................................10
*United States v. Magleby*,
  420 F.3d 1136 (10th Cir. 2005) ......................................................................10, 11
*United States v. Melendez*,
  2004 WL 162937 (E.D. Mich. Jan. 20, 2004) ........................................................9
*United States v. Reed*,
  773 F.2d 477 (2d Cir. 1985) ................................................................................3, 4
*United States v. Rowe*,
  414 F.3d 271 (2d Cir. 2005) .....................................................................................2
*United States v. Royer*,
  549 F.3d 886 (2d Cir. 2008) .....................................................................................2
*United States v. Saavedra*,
  223 F.3d 85 (2d Cir. 2000) .......................................................................................4
*United States v. Shelley*,
  218 F.2d 157 (2d Cir. 1954) .....................................................................................5
*United States v. Stone*,
  188 F. 836 (D. Md. 1911) ........................................................................................7
*United States v. Tobin*,
  2005 WL 3199672 ....................................................................................................8
*United States v. Weston*,
  417 F.2d 181 (4th Cir. 1969) ....................................................................................7
*United States v Lange*,
  834 F.3d 58 (2d Cir. 2016) .......................................................................................2
*United v. Sutton*,
  633 F.2d 1013 (2d Cir. 1980) ...................................................................................5

Statutes

15 U.S.C. 78aa ..............................................................................................................2
18 USC § 2251(c)(2)(A) ...............................................................................................2
47 U.S.C. § 223(a)(1)(D) ..............................................................................................8
52 U.S.C. § 20511 .........................................................................................................7
52 U.S.C. § 20702 .........................................................................................................7
R.I. Gen. Laws Ann. § 17-19-46 ................................................................................10

**I. There is No Venue in this District for this Prosecution**

In its response to Mr. Mackey's motion to dismiss this case (the "Response"), the government does not dispute that neither Mr. Mackey nor any alleged co-conspirator engaged in any specific act within this District to further the charged conspiracy. The government does not identify a single registered voter in this District who failed to vote as a result of the charged conspiracy. The government does not deny that its theory of venue would permit this case to be brought in "every state and hamlet" in the United States. The government does not even attempt to refute concerns that its theory of venue risks "the appearance of abuses, if not abuses, in the selection of what may be deemed a tribunal favorable to the prosecution." *See United States v. Fernandez*, 480 F.2d 726, 731 (2d Cir. 1973). The government does not deny that it selectively shopped for an opportune venue for what appears to be a test case absent congressional action on the Deceptive Practices and Voter Intimidation Prevention Act.

Instead, the government claims that: (a) Section 241 defines a continuing crime for which venue is established wherever telecommunications are received; (b) venue is proper if at least some of a 241 conspiracy's theoretical victims can be found in the government's chosen district; and (c) such contacts qualify as substantial. Citing cases charging crimes predicated on interstate commerce, the government insists that it has the right to try Mr. Mackey despite failing to particularize an adequate basis for venue, and even though a charge predicated wholly on speech will itself chill a fundamental constitutional right, which is not a concern on charges like securities fraud and marketing child pornography.

**A. The government erroneously conflates retweeted memes with direct electronic communications**

The government claims that numerous cases demonstrate venue "based [on]. . . retweets" [Response at 28], but ***none*** of the authorities cited by the government involved posts on social

1

media posts, Twitter or otherwise. The government **cannot cite a single case** where criminal venue was established based on a "tweet," "retweet," or other broadly-accessible social-media content. The government cites *United States v. Ng*, No. 18-CR-538, Docket No. 84 (E.D.N.Y. Sept. 10, 2021) (Brodie, J); *United States v Lange*, 834 F.3d 58 (2d Cir. 2016); and *United States v. Royer*, 549 F.3d 886 (2d Cir. 2008); to show that "the use of a method of communication in furtherance of a criminal conspiracy or criminal act exposes the coconspirators to prosecution both where the communication was made and where it was *received*." Response at 26. The defendants in those cases, however, were charged with securities fraud, governed by 15 U.S.C. § 78aa, establishing venue where "any act or transaction constituting the violation occurred." *See, e.g.*, *Ng* at *41, 44l; *Lange*, 834 F.3d at 69; *Royer*, 549 F.3d at 894. These defendants also had direct communication and transactions aimed at specific individuals within the District. *See Lange*, 834 F.3d at 71-72 (describing calls and emails to individuals in the District); *Royer*, 549 F.3d at 894 (detailing messages to sent to seven paid subscribers in the District).

Likewise, the government's reliance [Response at 28] on *United States v. Rowe*, 414 F.3d 271 (2d Cir. 2005), which also involved direct server to server communication, is misplaced. An officer in the District directly "linked" to Rowe's password protected computer, which was only accessible to two people at one time. *Id.* at 273-74. Rowe was charged with "advertising to receive, exchange or distribute child pornography," requiring a showing under 18 U.S.C. § 2251(c)(2)(A) that his solicitation would be transported in interstate commerce. *Id.* at 278. A violation of Section 241 does not involve commerce at all.

Unlike an email or phone call which originates from Point A and is received by a recipient at Point B, social media posts (like those at issue here) appear on the internet with no

2

targeted recipients. *Cf. Reno v. American Civil Liberties Union*, 521 U.S. 844, 853 (1997) (the internet is a "platform . . . address[ing] . . . a worldwide audience"). Even in the civil context, where defendants do not have a constitutional right to proper venue, courts have rejected claims of venue based on online posts, which "would give us unlimited jurisdiction over virtual defendants." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 326 (5th Cir. 2021). The government's cases are thus inapposite and its arguments are unavailing.

### B. The government fails to establish that venue lies at "the location of the intended victims"

The government claims that because "the statute in question requires no overt act upon which venue would typically be based," venue can be "deemed appropriate based on the location of [the] object of the conspiracy: the location of intended victims of the misinformation." Response at 28-29. The government cites no authority for this claim because there is none. Even if Section 241 does not require proof of an overt act, Section 241 defines the crime as the conspiracy itself with no essential conduct beyond the illicit agreement. "Virtually all case law designates *the site of the defendant's acts* as the proper venue" for criminal defendants. *See United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985).[1] Even if Section 241 does not require an overt act in furtherance of the alleged conspiracy, it has an *actus rea* component like any other criminal law — and the Complaint alleges discrete acts: Mr. Mackey and/or alleged co-conspirators created memes, shared the memes with one another, discussed posting them to Twitter, and posted them. None of this conduct occurred in the Eastern District of New York.

If Mr. Mackey had tampered with ballot boxes, threatened voters, or engaged in other

---

1 While the language of Section 241 does not specifically require proof an overt act, some courts have required it. *See United States v. Greer*, 939 F.2d 1076, 1091 (5th Cir. 1991); *United States v. Callahan*, 659 F. Supp. 80, 84 (E.D. Pa.), aff'd, 826 F.2d 1057 (3d Cir. 1987) ("section 241 requires . . . at least one overt act."); *United States v. Bufalino*, 518 F. Supp. 1190, 1195 (S.D.N.Y. 1981) (holding that two "overt acts" were "clearly sufficient to support the government's charge of conspiracy" under Section 241). Even if proof of an overt act is required, Mr. Mackey's alleged act was the retweet, not the fortuity of where it landed.

3

conduct of the type historically prosecuted under Section 241, venue would not be in doubt. Instead, Mr. Mackey allegedly posted memes that were not addressed to or directed specifically at anyone in this District -— and did not actually disrupt voting *anywhere*. The government therefore fashions a novel theory of venue for a novel theory of criminal liability: if someone posts allegedly misleading memes about voting, he may be hauled into court in any district where the memes are accessible. No precedent supports such a sweeping approach.

The government finds support in *United States v. Reed*, 773 F.2d 477 (2d Cir. 1985), which found venue in multiple districts on a charge of obstruction of justice. Response at 30 n. 11. As part of a civil lawsuit in the Southern District of New York, Reed testified falsely at a deposition in California "pursuant to the Southern District's local rules and shielded by a protective order secured in that district." 773 F.2d at 483. The Second Circuit court held, unrelmarkably, that venue was proper in the court which issued the order, regardless of where the violation occurred, because the "'essential act of contempt is the disrespect shown to the order of the court.'" *Id.* at 481 (internal quotes omitted). By contrast, Section 241's essential conduct is the conspiracy, which occurred completely outside this District, but in the government's untenable view can be prosecuted anywhere. The government cannot even show that any alleged conspirator specifically intended to deceive any voter in this District or succeeded in doing so. The government itself alleged that the conspiracy sought to "best influence the election," specifically noting Mr. Mackey's alleged interest in influencing turnout in the swing state of Pennsylvania [Complaint at 11, 21], not any solidly Democratic state like New York or District like this one.

**C. The alleged conspiracy does not have substantial contact with this District**

The government notes that factors establishing substantial contacts are "(1) the site of the crime, (2) its elements and nature, (3) the place where the effect of the criminal conduct occurs,

4

and (4) suitability of the venue chosen for accurate factfinding." Response at 30 (citing *United States v. Saavedra*, 223 F.3d 85, 93 (2d Cir. 2000)). The government does not truly address the first three factors. Nor does it even attempt to refute (or even cite) *United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014), where the Third Circuit found no substantial contact where a defendant gained access to email addresses across the country through a cybercrime. *Id.* at 537.

Here, (1) the "site" of the alleged crime was the Southern District of New York and wherever Mackey's alleged co-conspirators (all outside this District) engaged in acts which constituted the crime; (2) the essential conduct was a conspiracy that did not take place in the Eastern District; and (3) no one in this District failed to vote, was hindered in voting, or was specifically targeted. As for the test's fourth factor, suitability of venue, no one identified or referenced in the Complaint appears to live in or near this District.

### D. Pre-trial dismissal may be granted for lack of venue

The government argues that courts typically "defer until trial a ruling on the propriety of the prosecution's choice of venue" [Response at 22], citing *United v. Sutton*, 633 F.2d 1013, 1022 (2d Cir. 1980). But *Sutton* merely stated that, "[a] trial court need submit the issue of venue to the jury *only when* the question is 'squarely interposed' by the defense." *Id.* at 598 (emphasis added). Courts in this circuit have long dismissed cases for lack of venue prior to trial. *See, e.g.*, *United States v. Shelley*, 218 F.2d 157, 158 (2d Cir. 1954); *Ulrich v. Stead*, 161 F. Supp. 891 (W.D.N.Y. 1956).

Even if courts "typically" defer to trial to test venue, this case is not typical for at least two reasons. *First*, the government has already been afforded an opportunity to particularize its basis for venue in this District, and it could not plead facts sufficient to establish it; unlike the typical case, the Court already has a complete record on venue. *Second*, a trial on the novel theory of criminal liability which the government is testing against Mr. Mackey itself risks a chill

5

to a fundamental constitutional right not raised in the typical case.

### II. The Response fails to show that Mr. Mackey and fair notice of the government's unprecedented expansion of Section 241 liability

Despite the long history of Section 241, it has never been applied to anything close to the allegation here: non-violent, allegedly-deceptive, otherwise-lawful political speech. Instead, criminal laws aimed at voter "intimidation and interference" are meant to "deal with only the most blatant and specific attempts to impede elections." *Burson v. Freeman*, 504 U.S. 191, 206–07 (1992) (internal quotations omitted). The Response does not truly address this argument. Section 241's past application to cases of otherwise criminal voter fraud and election corruption does not give fair notice that it prohibits otherwise lawful political speech.

Mr. Mackey's initial filing in support of this motion noted that the "government does not allege that posting purportedly deceptive memes about voting practices would be unlawful under any other statute." The defense's research unearthed no case where Section 241 criminalized otherwise-lawful speech. The government still fails to identify one. The government's failure to do so matters because Section 241 was enacted as part of the Enforcement Acts, passed in the late 1800s to address "***fraud, corruption, and irregularity*** which ha[d] frequently prevailed at ballot boxes." *Ex Parte Siebold*, 100 U.S. 371, 382 (1879) (emphasis added). Congress sought to "protect the act of voting [at] the place where it is done," and protect "the man who votes[] from personal violence or intimidation," by ensuring harsher penalties for criminal election interference. *See Ex Parte Yarbrough*, 110 U.S. 651, 661 (1884). Such a statute would provide fair notice that conspiring to steal ballots, alter candidate names, or threaten voters with violence at the polls is punishable — and the cases the government cites, unsurprisingly, involve exactly these kinds of already-criminal acts. But neither the legislative history of Section 241, nor the century of case law applying it, provide any notice of the radical expansion the government now

attempts: the use of Section 241 to criminalize nonviolent political speech allegedly uttered by a defendant in a tweet who otherwise violates no law.

The government tries to mask the novelty of this prosecution by citing a string of Section 241 cases that involved election-related conduct which was nonviolent, but still independently and obviously criminal. But cases such as *Anderson v. United States*, 417 U.S. 211, 212, (1974), and *United States v. Weston*, 417 F.2d 181, 183, 189 (4th Cir. 1969), were based on forged and illegal ballots and conspiracies to cast fake votes. It is common knowledge that forging ballots, destroying them, or conspiring as a municipal official to alter election results is illegal — and indeed this sort of electoral fraud and corruption is plainly illegal under federal law independent of Section 241. *See, e.g.*, 52 U.S.C. § 20511 (prohibiting the "procurement, casting, or tabulation of ballots that are known by the person to be materially false"); 52 U.S.C. § 20702 (criminalizing someone "who willfully steals, destroys, conceals, mutilates," ballots or election records). A federal statute enhancing penalties for this conduct, and underlying conspiracies to commit it, should not ambush Americans with new, unforeseen criminal liability. Mr. Mackey had no notice that his conduct might constitute a crime — because it did not.

Unlike the election officials in *United States v. Stone*, 188 F. 836 (D. Md. 1911), [Response at 7, 10, 12], Mr. Mackey was not a public official who criminally forged the results of the election he was entrusted to run. The government attempts to re-cast more than a century of election-fraud prosecutions as salvos against "disinformation" [*see* Response at 10], but the corrupt manipulation of ballots by election officials in *Stone* constituted the type of "corruption and fraud" which election statutes have long criminalized. *Stone* noted that the criminal acts there constituted "fraud or corruption at congressional elections," and described the defendant's ballot manipulation as a "fraudulent practice." *Stone*, 188 F. at 839-40.

The lack of otherwise unlawful conduct also distinguishes this prosecution from *United States v. Lanier*, which the government quotes [Response at 13] for the notion that fair warning can exist despite "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." 520 U.S. 259, 269-70 (1997). *Lanier* ruled that a state judge who had sexually assaulted women before his court had fair notice of a due process "right to be free from unjustified assault or invasions of bodily integrity." *Id.* at 263. The Court held that, even without clear precedent, sexually assaulting women before the court violated a "constitutional rule already identified in the decisional law . . . with obvious clarity to the specific conduct," in part because such obviously wrongful conduct lacks precedent precisely because no one would think to question its wrongfulness. *Id.* at 271. Mr. Mackey's alleged conduct cannot be so described. It is not a mere trifle that Section 241 requires that the government must "prove that the defendant acted with knowledge that his conduct was unlawful," *United States v. Bradfield*, 2000 WL 1033022 at *9 (6th Cir. July 18, 2000), which the government did not allege against Mr. Mackey in its Complaint.

**A. Mr. Mackey had no fair warning that "disinformation" about voting violated the statute, nor that online conduct could be unlawful**

The government relies heavily on *United States v. Tobin*, 2005 WL 3199672, 04-CR-216 (D.N.H. Nov. 30, 2005) — an out of state, unrecorded, district court case where the defendant was ultimately acquitted, and which involved an alleged predicate crime (violation of 47 U.S.C. § 223(a)(1)(D)) — to argue that the "novelty of the means employed" does not negate fair warning. Response at 14. The "novelty" of this prosecution, however, is not that Mr. Mackey "used the internet in furtherance of the conspiracy" as the Response suggests, but that the government seeks to use Section 241 to criminalize allegedly deceptive political speech

8

irrespective of the means he used to speak. Had Mr. Mackey conspired to use Twitter to threaten violence against those who wished to vote, he might have violated the statute, just like face-to-face threats. *Cf. Guinn v. United States*, 228 F. 103 (8th Cir. 1915). By contrast, for decades, instances of false information about voting procedures using traditional means such as phone calls and fliers have received significant media attention and calls for legislation — but no prosecutions. Def's Memo. at 19. The government's only response, in a footnote, is that "such conduct would, indeed, violate Section 241, just as the defendant's does." Response at 14-15 n. 6. But that footnote and this case constitute the first inkling, years after the alleged conduct, and in the face of congressional inaction on relevant legislation, and do not constitute fair warning.

### B. The government mischaracterizes cases about police threats and theft as "deceptive speech"

The government claims that two unpublished out-of-circuit cases, *United States v. Melendez*, No. 03-80598, 2004 WL 162937, at *2 (E.D. Mich. Jan. 20, 2004), and *Bradfield*, establish Section 241 liability for "false statements in search warrant affidavits" and demonstrate that the "defendant's assertion that Section 241 'has [n]ever been applied to speech alleged to constitute mere deception' is not correct.'" Response at 11 (citing Def.'s Memo. at 15). The government misstates the conduct which gave rise to criminal liability in both of those cases.

In *Melendez*, "officers unlawfully entered houses, kept property they found, [and] intimidated potential witnesses." In *Bradfield*, "officers would raid crack houses and 'keep for themselves some or all of the money that they discovered'" and engage in "intimidation of citizens [with] the use of firearms and body cavity searches." *Bradfield*, at *1. In both cases, officers falsified police reports that served to cover up other violations. *Id*. Rulings in these case that these officers violated Section 241 provides no "fair warning" that posting allegedly deceptive memes on Twitter violates the statute.

9

The Response's only actual reference to deception about voter procedures comes via *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018).  The language cited by the government, however, merely states, in a footnote, that "the State *may* prohibit" false information to deceive voters, not that such conduct is already prohibited.  138 S. Ct. at 1889 n. 4 [emphasis added].  A footnote in an opinion issued in 2018, two years *after* a defendant's alleged conduct suggesting that a hypothetical law might be constitutional does not create fair warning.[2]

**C.  Concerns about fair warning are heightened here**

The alleged speech at issue in this case is protected by the First Amendment.  Even if not, a statute must be read narrowly for the purposes of fair warning when political speech is implicated.  *See Grayned v. City of Rockford,* 408 U.S. 104, 108-9 (1972) ("fair warning" is heightened "where vague statute abuts on sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.:). Section 241 cannot be interpreted "too broad, because it would criminalize a great deal of conduct, some of it pure speech." *United States v. Lee*, 6 F.3d 1297 (8th Circ. 1993); *accord United States v. Magleby*, 420 F .3d 1136 (10th Cir. 2005).

The government attempts to separate *United States v. Lee*, 6 F.3d 1297 (8th Cir. 1993); and *United States v. Magleby*, 420 F.3d 1136 (10th Cir. 2005) on the grounds that they involved

---

[2] When addressing the First Amendment, the government pointed to New York and other state restrictions on providing false information related to elections. Response at 17-18. n. 9.  The government does not argue that these laws would criminalize Mr. Mackey's alleged conduct, nor did it point to any prosecution under a state law for such prosecution.  The language of N.Y. Elec. Law App 6201.1(d) (McKinney) is similar to Section 241 and a hypothetical case would raise the same issues.  The other laws cited by the government do not necessarily criminalize Mr. Mackey's alleged conduct, though the government quoted many of these statutes out of context to appear that they do.  For example, the government quoted Haw. Rev. Stat. Ann. § 19.3(12) as prohibiting "communicat[ing]...false information about the time, date, place, or means of voting" [ellipses and brackets in original].  "Communicat[ing]" came from the sentence "Any *advertisement* that is broadcast, televised, circulated, published, distributed, or otherwise *communicated*, including by electronic means, shall" [emphasis added].  The government quoted R.I. Gen. Laws Ann. § 17-19-46, as prohibiting "giv[ing] in any way...improper, false, misleading, or incorrect instructions or advice or suggestions of how to vote..." [ellipses and brackets in original].  Immediately afterwards, the statute continues "*by computer ballot in conjunction with the optical scan precinct count unit*."  These narrow laws have no applicability to this case.

10

allegedly threatening speech, as opposed to allegedly fraudulent speech. Response at 9. While the alleged speech at issue in this case is protected by the First Amendment, Mackey did not cite these cases to argue his alleged speech was protected, but for the proposition that Section 241 cannot be interpreted "too broad, because it would criminalize a great deal of conduct, some of it pure speech," *Lee*, 6 F.3d at 959, which requires the terms "to injure, threaten, intimidate, or oppress" to be read in a narrower "technical sense." *Magleby*, 420 F.3d at 1143. See also *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972) ("fair warning" is heightened "where a vague statute abuts on sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms.").

### III. Even if Section 241 Covers the Alleged Conduct, Applying It Here Violates the First Amendment

#### A. Mr. Mackey had no fair warning that "disinformation" about voting violated the statute, nor that online conduct could be unlawful

The government fails to address Mr. Mackey's core First Amendment argument: this prosecution violates and has a chilling effect on freedom of speech. Instead, the government focuses on unrelated types of speech and narrow restrictions on election-related speech. Much of the Response's discussion of the First Amendment identifies types of speech such as obscenity, bribery, and fraudulent commercial speech which are entitled to no or reduced First Amendment protection. Response at 15-16. The government does not claim that Mr. Mackey's speech falls within any of these established categories, and these precedents have no conceivable application to allegedly deceptive political speech (as is charged here).

The government tries to analogize *United States v. Benson*, 61 F.3d 718 (7th Cir. 2009), to Mr. Mackey's alleged conduct, but *Benson* addresses "false *commercial* speech, which receives no First Amendment protection." [emphasis added]. Similarly**,** the government cites *Preferred Properties, Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 798 n.5 (6th Cir. 2002), and

11

its discussion of the "verbal acts doctrine," which the government likens to "the Deceptive Images" because they were allegedly "a means to the end of infringing on individuals' right to vote" and thus beyond the First Amendment's protection. Response at. 15. The verbal acts doctrine and *Preferred Properties* itself have nothing to do with the First Amendment and instead address an exception to the Statute of Frauds for spoken words, which have no applicability here.

### B. Time, place and manner restrictions and restrictions on non-public forums cannot serve as precedent to criminalize online speech based on its content

The government heavily relies on restrictions in non-public forums or content neutral restrictions on the time, place, and manner of speech such as *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640 (1981). The government, however, does not suggest that Mr. Mackey's alleged speech was conducted in an improper place, manner, or time. Rather, the government objects to the *content* of the speech. The government cites *Mansky* ten times in its brief, but the only relevant dicta is one sentence, as in other cases in which the government finds comfort, in a footnote, hypothesizing that the government "may prohibit messages intended to mislead voters about voting requirements and procedures." 138 S. Ct. at 1889 n.4. A leading First Amendment scholars has described this as an "offhand[] remark[]" which the court may have meant to limit to "government-controlled space in voting locations."[3] *Mansky* explicitly holds that a "polling place . . . qualifies as a nonpublic forum" entitled to lesser free speech rights. 138 S. Ct. at 1886. Likewise, *San Francisco Forty-Niners v. Nishioka*, another case cited by the government [Response at 19] allowed restrictions on ballot initiative petitions, which it held was "a nonpublic forum, not the traditional public forum of unregulated political speech." 89 Cal. Rptr. 2d 388, 396 (1999).

---

[3]Eugene Volokh, *Are Douglass Mackey's Memes Illegal*?, Tablet Mag (Feb. 9, 2021), https://www.tabletmag.com/sections/news/articles/douglass-mackey-ricky-vaughn-memes-first-amendment.

As for the government's reliance on *Burson v. Freeman*, 504 U.S. 191 (1992), the Court addressed a "restricted zone" immediately outside a polling location, ruling unremarkably that the restriction required strict scrutiny and was "narrowly tailored" based on "a long history, a substantial consensus, and simple common sense . . . that some restricted zone around polling places is necessary" to prevent intimidation and fraud. 504 U.S. at 211.

In contrast to the nonpublic forum in *Mansky* and *Nishioka* and the narrow "restricted zone" in *Burson*, the government seeks to criminalize alleged deception on public forums based solely on content. Even if Mr. Mackey's alleged speech is not protected by the First Amendment, the government's attempt to expand Section 241 liability to apply to alleged falsehoods has a chilling effect.

A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct." *Grayned*, 408 U.S. at 114 (1972). Mr. Mackey's initial filing in support of this motion demonstrates that this prosecution is "unconstitutionally overbroad as applied." Def's Memo. at 20. The government does not directly address this point beyond stating that "the focus of this case is narrow and specific: the defendant's intentional spreading of false information calculated to mislead . . . voters about how, where and when to cast a vote in a federal election." Response at 19.

The government argues more generally that "deception injures other constitutional rights" is prohibited by the statute, without offering a limiting principle. Response at 11. Under the government's interpretation of Section 241, misleading memes designed to dissuade, or confuse, Americans engaging in any constitutionally-protected conduct such as enrolling their children in private school, owning a firearm, watching pornography in their own home, using birth-control or exercising myriad other liberties would potentially be criminal. This would transform Section

241 into a "weapon to a government broadly empowered to prosecute falsity." *United States v. Alvarez*, 567 U.S. 709, 734 (2012) (Breyer, J., concurring).

The term "disinformation" has no legal meaning, yet it appears in the headline of the government's press release announcing Mr. Mackey's arrest,[4] five times in the Complaint (including descriptions of alleged falsehoods which are unrelated to voting procedures, Def's Memo. at 23), and fourteen times in the Response. Many legislators and officials suggest that "disinformation" on social media is a grave threat. Many academics believe it requires rethinking First Amendment jurisprudence.[5]

Mr. Mackey brings up this context not to criticize any of these statements, but simply to show how the government's citation of other false statements on social media and frequent use of the term "disinformation" show that this prosecution is meant to chill speech online beyond that specific to voting procedures. Reasonable minds can disagree on how to respond to the proliferation of false information online. However, the government cannot contort Section 241 in the manner it proposes without chilling a broad range of constitutionally protected speech.

## CONCLUSION

For all of these reasons and those previously stated, this case should be dismissed.

---

[4] Press Release, US Dep't of J., "Social Media Influencer Charged with Election Interference Stemming from Voter Disinformation Campaign" (Jan. 27, 2021), https://www.justice.gov/opa/pr/social-media-influencer-charged-election-interference-stemming-voter-disinformation-campaign.

[5] *See, e.g.,* Emily Bazelon, The First Amendment in the age of disinformation, NY Times (Oct. 13, 2020); https://www.nytimes.com/2020/10/13/magazine/free-speech.html (describing numerous scholars who believe in response to online disinformation "that perhaps our way of thinking about free speech is not the best way").

Dated: September 6, 2022

/s/ Andrew J. Frisch
Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
afrisch@andrewfrisch.com

*Attorney for Douglass Mackey*