1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                    21-CR-080(NGG)
3   UNITED STATES OF AMERICA,
                                    United States Courthouse
4            Plaintiff,            Brooklyn, New York

5            -against-            October 26, 2022
                                    1:30 p.m.
6   DOUGLASS MACKEY,

7            Defendant.

8   ------------------------------x

9         TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
10             UNITED STATES SENIOR DISTRICT JUDGE

11  APPEARANCES

12  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
13                           271 Cadman Plaza East
                             Brooklyn, New York 11201
14                           BY:  ERIK DAVID PAULSEN, ESQ.
                                  F. TURNER BUFORD, ESQ.
15                           Assistant United States Attorneys

16                           DEPARTMENT OF JUSTICE
                             Criminal Division
17                           1331 F Street NW - Suite 300
                             Washington, DC 20004
18                           BY:  WILLIAM J. GULLOTTA, ESQ.
                             Assistant United States Attorney

19

20  For the Defendant:       LAW OFFICES OF ANDREW J. FRISCH, PLLC
                             40 Fulton Street - 17th Floor
21                           New York, New York 10038
                             BY:  ANDREW J. FRISCH, ESQ.
22
    Court Reporter:          LINDA D. DANELCZYK, RPR, CSR, CCR
23                           Phone:  718-613-2330
                             Fax:    718-804-2712
24                           Email:  LindaDan226@gmail.com

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

PROCEEDINGS 2

1          (In open court.)

2          (All rise.)

3          THE COURTROOM DEPUTY:  Criminal cause for oral

4    argument.  Beginning with the government please state your

5    appearances for the record.

6          MR. PAULSEN:  For the government, Your Honor, Erik

7    Paulsen for the United States Government.  I'm joined by

8    William Gullotta and Turner Buford.

9          THE COURT:  Good afternoon.

10          MR. FRISCH:  And for Mr. Mackey, Andrew Frisch, Your

11    Honor, good afternoon.  And Mr. Mackey is present.

12          THE COURT:  Good afternoon.

13          Good afternoon, Mr. Mackey.

14          Okay, please be seated everybody.

15          This is an -- this is oral argument on the defense

16    motion to dismiss, and so we'll begin -- we'll begin with

17    Mr. Frisch.

18          MR. FRISCH:  Your Honor, thank you.

19          There's a lot of things about this case that are

20    atypical, but there are three things that I think are

21    especially atypical as it relates to Mr. Mackey's motion to

22    dismiss.

23          First.  Unlike the lion's share of cases that talk

24    about venue, this Court ordered particulars on venue.

25          Second.  The government's responsive particulars

PROCEEDINGS                                    3

1    fall short of every test for venue, every analysis that has

2    ever been articulated to assure the bar from the Supreme Court

3    that venue is narrowly construed.  Whether we talk about

4    whether the conduct here qualifies as substantial, whether we

5    talk about whether the criminal statute's essential conduct is

6    committed in this district as opposed to ancillary

7    circumstances, the government's responsive particulars fall

8    short.

9              And here's the third thing which I -- which is that

10   we're assessing venue on unprecedented application of

11   Section 241.  And so, Your Honor, I think, well, what's the

12   relevance of 241 to the argument on venue, and it's this:

13             That because of the very nature of crimes like wire

14   fraud and mail fraud and securities fraud and violation of the

15   Hobbs Act, racketeering, distribution of contraband, the very

16   nature of these crimes typically favor permitting the

17   government to shoot its shot on venue because of the broad

18   concepts at issue, commerce, fraud, distribution, things of

19   that nature.

20             And so over the course of time, because of the

21   breadth of those concepts and the history and the practice of

22   how they've been applied, the government has earned deference

23   to be entitled to go to trial when those kinds of concepts are

24   played.

25             But this case is different.  The government somehow

PROCEEDINGS                                        4

1    finds room to argue that Mr. Mackey was on fair notice that

2    the alleged conduct was criminal when Senators Schumer and

3    Gillibrand and Klobuchar and Cardin and Obama, when he was a

4    senator, Ms. Clinton, when she was a senator, and all the --

5    and others have supported legislation precisely because they

6    don't believe conduct worse than this is covered.

7            And so under these circumstances where the crime --

8    the statutory crime is just a conspiracy, the crime is

9    complete when the conspiracy is consummated and no part of

10   that happened in this district, the government is not entitled

11   to the deference that it's entitled to more broad concepts

12   that engage in more typical cases based on commerce or

13   distribution or wire, mail and fraud, it's wire, mail and

14   securities fraud.  They haven't earned that deference here.

15   Here, venue needs to be narrowly construed and it doesn't

16   exist here.

17           The government's theory essentially is that there is

18   universal venue when there's something like a tweet, but

19   that's not the law and there's no support for that.  There

20   needs to be substantial conduct or the essential -- the

21   essential element committed in this district.

22           THE COURT:  Well, let me -- I understand that

23   argument.

24           Let me ask the government.  Starting with the

25   essential conduct test, what do you think the essential

PROCEEDINGS                          5

1    conduct elements identified in Section 241 that would apply to

2    this case?

3              MR. PAULSEN:  So, Your Honor, the government would

4    allege that the essential conduct here was a scheme to

5    distribute misinformation about how people could cast their

6    vote.  And so in this case, the government has several venue

7    arguments.

8              The first is that the tweets that were sent by this

9    defendant were sent electronically through the Eastern

10   District of New York as an act in furtherance of that scheme.

11             THE COURT:  And they were sent -- you're saying you

12   would prove at trial to the jury that they were sent through

13   the Eastern District of New York electronically?

14             MR. PAULSEN:  Yes, Your Honor.

15             As we mentioned in our brief, in the course of a

16   conspiracy, Second Circuit law states that an electronic

17   communication that's sent in furtherance of the conspiracy,

18   which passes through a district like the EDNY, does give you

19   venue.

20             In this particular case, the evidence indicates,

21   which we would need to prove by a preponderance for venue,

22   that Mr. Mackey was in Manhattan at the time, that the Twitter

23   servers that received the tweets and then processed them and

24   sent them back to the larger world, were on the other side of

25   the country, and those tweets would have had to pass through

1    the EDNY.  That is one of the four arguments that we would

2    make.

3               And so I don't believe that's an extension of any

4    particular novel venue argument.  The cases are legion in this

5    courtroom where venue is predicated on a relevant wire

6    communication or electronic communication or a wire of money

7    or some act in furtherance of a conspiracy that passes through

8    EDNY.

9               THE COURT:  All right.  Thank you.

10              Yes, go ahead.

11              MR. FRISCH:  Cases are legion where commerce is at

12   issue, or distribution is at issue, or one of the more typical

13   statutory definitions with which we deal.  That's where you

14   can argue that the phone call from point A to point B or a

15   communication from point A to point B or receiving some

16   contraband in a far away place bestows venue in that far away

17   place because it's commerce or it's the effect of a wire, mail

18   or securities fraud or it's the distribution of contraband

19   that's -- distribution of contraband.  That's not this case.

20              This case isn't --

21              THE COURT:  I understand that's not this case.

22              This case is about a tweet that was distributed, I

23   assume widely, that instructs the recipient of the tweet that

24   that individual can avoid the inconvenience of going to the

25   local polling place and can vote from home by texting Hillary

PROCEEDINGS                              7

1    at 2 -- at 59925.

2            Now that's -- that's -- we're dealing here not with

3    commerce, we're dealing here with a basic constitutional right

4    that is being affected, potentially, by these tweets.  And

5    tweets, you know, we're not around in 1870 when Congress

6    passed the Ku Klux Klan Act.

7            You know, we have to identify whether venue's proper

8    in 2022 regarding an activity, the right to vote, that is here

9    and now.

10           So, you know, you can make the argument that, you

11   know, it's the -- that there are all kinds of rights that are

12   attached to Congress.  But this isn't Congress, I grant you.

13   This isn't Congress.  This is something else.

14           But this is something even more critical than

15   Congress.  And the purpose of this, allegedly, was to affect

16   Hillary Clinton's election and it was distributed the day

17   before the election.

18           So there's no doubt that this was not -- this meme

19   was -- it would seem, at least they'll try to prove -- that

20   the government will try to prove, this meme was not a -- was

21   not a joke.  It wasn't made in -- to be humorous.  That it was

22   intended to be a way of lowering Hillary Clinton's numbers on

23   Election Day.

24           Is there any other -- is there any other explanation

25   for the -- for the appearance of this on that schedule?

1          MR. FRISCH:  Well, if I might, Your Honor.

2          Your Honor's question has three answers to it.

3          The venue answer, the 241 answer, and then whether

4     there's another interpretation of what's intended by the

5     memes.

6          Let me take them each at -- each one at a time.

7          THE COURT:  Sure.

8          MR. FRISCH:  Now matter how -- we can agree that all

9     constitutional rights that are arguably covered by Section 241

10    are important.  That's why they're constitutional rights.

11         But that doesn't mean there's universal venue in

12    every -- in every hamlet and state, for example, because an

13    electronic communication went from the place where the

14    conspirators are someplace else absent more.  That by itself

15    establishes there's no essential conduct in the Eastern

16    District of New York because --

17         THE COURT:  Why is that?  Wouldn't that be a

18    question to ask the jury to decide in the first instance if

19    the jury found that there was -- that your argument was

20    correct by a preponderance of the evidence, the case would be

21    over.

22         MR. FRISCH:  Yes, that is correct, and I think the

23    difficulty on the venue argument or perhaps the difficulty in

24    ruling on this part of the motion is that typically we give

25    the government the opportunity to go to trial and see if they

1    can prove it.

2              The problem with that here is that we know what

3    their proof is by virtue of the particulars.  We know there's

4    no essential conduct, and how do we know that?  Because the

5    statutory definition, it's a conspiracy.  That's the essential

6    conduct test.  We know that's not passed.  That's not met,

7    because the essential conduct is the conspiracy.  There may be

8    some other things that happened, but that doesn't bring it

9    within the essential conduct test.  So that brings us to the

10   substantial context test -- contact test.

11             This is not substantial.  And the one case that

12   addressed an anomalous situation is *Auernheimer*, which I'll

13   spell later for the court reporter, from the Third Circuit,

14   where while the Third Circuit doesn't apply the substantial

15   contact test, they -- they applied it to electronic

16   communications and said under the particular statutes there,

17   the crime was committed somewhere, even though the crime

18   reached into, I think it was the District of New Jersey, and

19   captured electronic information.  That was ancillary.  It was

20   insubstantial.

21             If there's a substantial contact text, by

22   definition, there has to be -- there has to be a place where

23   there are contacts in the context of the case that are

24   insubstantial.  And when you have a statute, the essential

25   conduct of which is a conspiracy without regard to what

1    happens thereafter --

2            THE COURT:  Well, you're entering the conspiracy at

3    the time that the actor or actors pressed the button and sent.

4    The conspiracy -- you know, it's a convenient way of

5    circumscribing the conspiracy to a moment in time.  And I'm

6    not sure this Court is going to be able to reach that

7    conclusion in this case.

8            But -- and I'm not sure that I would agree with the

9    Third Circuit, nor am I obligated to agree with the Third

10   Circuit, so I just point that out.

11           MR. FRISCH:  I understand Your Honor's point, and

12   what I would say to it is that it's not a question of whether

13   I'm truncating or restricting the conspiracy, it's whether

14   what happens, the receipt of a tweet in Brooklyn, is essential

15   conduct within the statutory definition of the crime.

16           I grant you things can happen that are arguably part

17   of the conspiracy.  But the essential conduct test looks at

18   the statutory definition and says, is this essential to

19   proving the crime or is it ancillary?  And if it's ancillary,

20   it may well be, as Your Honor says, part of the conspiracy,

21   maybe proof of the conspiracy.  It's simply not essential to

22   prove how the crime is -- is defined, and the words of the

23   crime.

24           THE COURT:  There's also case law that I think has

25   been brought to my attention that a third party acting on the

1    conspiracy, you know, is a part of the conspiracy, even

2    though -- and not an intended part of the conspiracy, it still

3    is part of the conspiracy.

4            I'm not saying I ascribe to that, but I think that's

5    the argument that's being made.

6            Let me just hear from the government on this issue.

7            MR. PAULSEN:  Yes, Your Honor.

8            THE COURT:  And then I want to move on --

9            MR. PAULSEN:  Sure.

10           THE COURT:  -- because we have plenty to talk about.

11           MR. PAULSEN:  Your Honor, as an initial matter, as

12   we mentioned in footnote 12 in our brief, the Second Circuit

13   has said the essential contact test does not have to be

14   applied when there's an act in furtherance of a conspiracy to

15   touch the district.  I'm not sure that needs to be addressed

16   here.

17           But I think it's worth stating that the acts in

18   furtherance that we are saying passed through the EDNY are not

19   incidental parts of the scheme.  They are the tweets in

20   question that have the misinformation.  And as Your Honor

21   points out, the government will allege that the purpose was

22   for that information to be forwarded onward and forwarded

23   onwards such that it would reach more people.

24           The conspiracy doesn't end at the moment that he

25   sends that.  The whole point of the conspiracy is that

1    information like this goes viral, gets spread, and so we would

2    say this is essential conduct to the conspiracy.

3            I would just add, Your Honor, I know Your Honor

4    wants to move off of venue, but the government has not tried

5    to put all its eggs in one basket.  On this matter we do

6    allege other avenues that we believe venue could be upheld.

7    One of them is the issue Your Honor just mentioned that if --

8    if the -- this information is spread with the expectation that

9    innocent third parties will find it and forward it onwards,

10   that could be an act in furtherance of the conspiracy.  Also,

11   case law is fairly clear that the receipt of information like

12   this, if that's what's intended, can grant venue as well.

13           And, Your Honor, we do make, I wouldn't call it a

14   universal venue argument, but in a situation like this, I

15   think it bears repeating that -- you mentioned a moment ago

16   that when the Ku Klux Klan Act was written Twitter didn't

17   exist, the internet didn't exist, telephones didn't exist.

18           This courthouse has seen cases where fraudulent

19   materials are sent out to -- by phone to various different

20   districts, 15, 20 districts, and the court and the Second

21   Circuit afterwards would hold that venue is appropriate in any

22   of them because they availed themselves of those many

23   districts.

24           We are in a unique spot where if the government's

25   allegations are true, which is -- would be held to be true for

PROCEEDINGS                                          13

1   this motion, if a scheme's intent is to spread something

2   everywhere, it strikes us that the defendant should reap what

3   he sows when it comes to venue.  And then I don't think it's

4   necessary for this case necessarily, because I think we have

5   other grounds for venue.

6              (Court reporter interrupts for clarification.)

7              MR. PAULSEN:  I wrote "slow" on my pad and I'm not

8   listening to myself.

9              But in a situation like this where the point was to

10  spread it everywhere, there's something odd to say that

11  despite wanting it to go everywhere, they are only subject to

12  venue in one spot.  The venue does not befit the aspirations

13  of the crime.

14             THE COURT:  I'll give you the last word on venue.

15             MR. FRISCH:  There's a reason why the Supreme Court

16  says that -- the one thing that hasn't changed over the last

17  150 years, if I have done my math right, I think that's right,

18  is that venue needs to be narrowly construed and it needs to

19  be focused on where the conduct occurred.

20             There is no such thing as universal venue,

21  especially on a statute which doesn't have commerce, it's the

22  conspiracy.  The conspiracy that happened here, the fact that

23  a tweet found its way to Brooklyn or Nassau or Suffolk is not

24  enough to create substantial, and certainly not essential

25  under the definition of the statute, and it is certainly not

PROCEEDINGS                                      14

1    substantial.

2              THE COURT:  Well, I'm not sure that the Supreme

3    Court, if it had a case such as this, would find one way or

4    another in the electronic age of how to reform venue or to

5    define venue in a broader context.  But it is clear that the

6    reach of the internet is so broad that the effects of

7    communicating by Twitter, for instance, can be extremely -- it

8    can also be extremely widespread.

9              So we're sort of in the new age.  And we have to

10   bear that in mind, and in a sense this is a case of first

11   impression, I think, in some ways, and I'll just grapple with

12   all these issues and do my very best.  Okay?

13             Can we go on?

14             MR. FRISCH:  We can go on to the next issue.  I'm

15   going to -- I am going to piggyback on something Your Honor

16   just said as I go into the next issue, which is the new age

17   concept.

18             THE COURT:  I'm not sure the Supreme Court will be

19   interested in new age issues.

20             MR. FRISCH:  Well, they might on this one, on this

21   next issue, and the reason I --

22             THE COURT:  Oh, you are now going into the next

23   issue, you are now moving on?

24             MR. FRISCH:  I was trying to make a clever segue,

25   but I --

PROCEEDINGS                               15

1          THE COURT:  All right.  Well, you've done enough, go

2     ahead.

3          MR. FRISCH:  It wasn't smooth.  But I am going to

4     try -- I'm going to press forward.

5          Here's what we know:  Congress doesn't believe that

6     conduct worse than this is covered by the existing language of

7     241.  This goes to the fair notice, fair warning to Mr. Mackey

8     about the alleged conduct.

9          It seems incongruous -- it seems incongruous that

10    the government says that Mr. Mackey was on fair notice and

11    fair warning that these alleged retweets are within the scope

12    of 241 when far more serious, what I'll call for purposes of

13    today, alleged misinformation are expressly cited by Congress

14    and multiple senators in support of what they say is an urgent

15    need for legislation that's narrowly tailored to address the

16    First Amendment to get at this.

17         For the last 17 years, at least the last 17 years,

18    beginning with Senator Obama in 2005, Congress has continued

19    to press this deceptive practices law.  It's been introduced

20    in the Senate and the House umpteen times by a variety of

21    different senators, I believe most recently Senators Klobuchar

22    and Cardin within the last two years.  It doesn't pass.

23         And I think the Senate and the House and Americans

24    generally would agree that the reason why this legislation is

25    being pressed is because there's a need for a remedy.  But the

PROCEEDINGS                                    16

1    reason it hasn't passed is precisely because of the difficulty

2    in threading a constitutional needle through the First

3    Amendment.

4              Whatever the reason is, it's hard to argue that

5    Mr. Mackey should have seen this alleged conduct to be

6    criminally prohibited when some of the great senators of our

7    time and over the past 15, 17 years don't see it that way.

8              I also think that Congress understands that the

9    government, and I mean all three branches of government, to be

10   a steward of the marketplace of ideas, and this gets back to

11   the question that I didn't answer the first time but I'll get

12   back to it now.

13             You can look at these memes, and you can take a

14   nefarious view of them and infer an intent to dissuade or

15   mislead a certain category of voters.  You can also see it as

16   satire or provocation.

17             The point is, and I think one of the reasons why

18   this legislation has been difficult to get through, is because

19   the way we do things in this country is we put these things

20   out there in the marketplace of ideas.  We don't allow the

21   government, certainly not the Executive Branch and certainly

22   not the Department of Justice in a criminal case, to be the

23   ministry of decorum, absent legislations, to be sure, or the

24   ministry of truth, where crossing the line is in the eye of

25   the beholder.

PROCEEDINGS                    17

1          THE COURT:  All right.  You know, looking at this,

2   your argument is, in part, that this could be viewed -- this

3   communication could be viewed as satire, like The Onion, that

4   it's some sort of a satirical presentation that people would

5   not take seriously, but apparently 4900 people saw this and,

6   at least according to the government, responded the day before

7   the election.

8          And there's a question of -- there's a question of

9   the timing and the idea that this is -- might be an -- serve

10  an educational, informational function, how would this serve

11  any of those functions logically, and isn't it a question for

12  the jury to decide what function it's serving, because I think

13  a jury could look at this -- maybe you can convince the jury

14  that it was satirical, or that it was simply informational, or

15  that it was a reminder to go vote.  But it is also possible

16  that a jury could find that the intent was to deceive and

17  to -- and to affect the outcome of the election in a manner

18  that was detrimental to our democratic norms.

19         I mean, I'm just wondering as someone who's actually

20  been involved in public service for a long time that the fact

21  that a few senators think that there's a -- that they need to

22  do something about this, I'm not convinced that I'm somehow

23  hamstrung because Congress can't pass a law.  They can't pass

24  a lot of laws, but that doesn't mean that the rights of

25  citizens are derogated because Congress hasn't been able to

1    put a finer point on something.

2             MR. FRISCH:  Well, I think it's a question -- excuse

3    me, three things.

4             Number one, I think it's a question of fair notice.

5    The reason we're talking about Congress and these senators and

6    the urgency with which they had pressed this legislation for

7    so many years is putting aside the underlying problem which is

8    crying out for a remedy, no question about that, is that they

9    don't think it's covered.  Most of them lawyers.  Most of them

10   politically savvy and sophisticated.  If they don't think that

11   the statute covers it, how can a citizen believe that this

12   alleged conduct is covered?  How can they have fair notice and

13   have fair warning when the people who run the country and do

14   legislation don't.

15            I take your point about the different

16   interpretations of this and whether it's satire or whether

17   it's not.

18            My point is that absent legislation that's narrowly

19   tailored, the government, certainly not the Department of

20   Justice, should be the ministry of decorum or the ministry of

21   proof on that question and require a criminal defendant to

22   explain themselves.

23            THE COURT:  Okay, I understand.  Let me just -- let

24   me hear from the government on it.

25            MR. PAULSEN:  Yes, Your Honor.

PROCEEDINGS                                    19

1            I think Your Honor's correct.  The fact that

2    Congress doesn't act on a thing I think does not suggest that

3    it's not illegal.

4            Senator Klobuchar, for example, on October 31st of

5    2017, about a year after the election, held a hearing on this

6    sort of conduct.  She grilled the CEO of Twitter and

7    confronted a three-by-two-foot picture of one of Mr. Mackey's

8    tweets, pointed at it and said, "This is illegal."  This was

9    in the context of attempting to pass additional tools that the

10   Department of Justice can use to deal with this pressing

11   issue.

12           The fact that the Congress has been consistently

13   trying to add tools to deal with this fairly baneful conduct

14   does not mean the existing tools can't reach it.  Congress is

15   frequently trying to add tools such that prosecutors can reach

16   conduct that's creating a problem.

17           THE COURT:  Has Congress passed -- I'm sorry.  Has

18   241 been used in the context of voting cases, to your

19   knowledge?

20           MR. PAULSEN:  Dozen upon dozens of times, Your

21   Honor.  It's -- frankly, it's probably the core issue that 241

22   has been used for.

23           The history of 241, Your Honor, is frankly a history

24   of it being expanded to different types of voting cases,

25   whether it's confusing ballots, or people interrupting

PROCEEDINGS                                    20

1    individuals trying to get to the poles, or destruction of

2    tallies.  I think that's, frankly, what 241 has frankly been

3    about.

4            We've mentioned a number of these cases in our

5    brief.  There's been a long line of cases starting with

6    *Yarbrough*, continuing to *Classic*, continuing to *Lanier*,

7    continuing with *Stone* before then, and *Tobin*, one of the more

8    recent ones that focus on voting.

9            Voting rights is one of the key considerations of

10   241, and I think it's relevant, Your Honor, for a fair warning

11   analysis.

12           I think some of what the defendant is doing here is

13   focusing on the means by which the conspiracy accomplished its

14   aim rather than the actual prohibition itself.  I think it's

15   beyond depth that the right to vote is a

16   constitutionally-protected right, and 241 is the tool that is

17   used to prosecute conspiracies to injure that right.

18           The ways in which individuals have conspired to

19   injure those rights have changed over time, they changed over

20   a hundred years, and we now in the modern age and it's

21   changing again.

22           But the reasonable person in the United States has

23   fair notice that the right to vote is important, and that

24   efforts to infringe it, into -- oppress it to injure it are

25   prohibited.  That -- the nuances and how they might do that

PROCEEDINGS                                    21

1   might change is to be expected, Your Honor.

2            THE COURT:  Well, all right, I think it's been well

3   briefed.

4            MR. FRISCH:  Can I say one point on that --

5            THE COURT:  Sure.

6            MR. FRISCH:  -- if I can respond to it, and I'll be

7   brief.

8            The answer to Mr. Paulsen's argument is in the very

9   comprehensive compendium of election fraud cases put out by

10  the office to which Mr. Gullotta belongs.

11           There is not a case like this in it.  There are

12  voting rights cases, but cases within 241, as it relates to

13  voting, have either language, which is intimidation, language

14  of intimidation, language of threat or physical acts, like

15  forging ballots or destruction of ballots.

16           And putting voting aside, there are cases, and the

17  government cites one, where there were false police reports.

18  It is an Eastern District of Michigan case where officers

19  created false police reports to cover up that they were

20  robbing drug dealers at gunpoint.  Those things are something

21  different than mere speech, which is not threatening, not

22  intimidating, and isn't a physical act.

23           And so while Your Honor is correct to ask the

24  question whether 241 covers voting, it does.  And while the

25  government is correct to point out the rich history of the

PROCEEDINGS                                    22

1    application of 241 to voting, it's never been used like this

2    before.

3              THE COURT:  Well, I think that the question is

4    whether a much more sophisticated approach to affect the

5    outcome of an election through fraud, that's alleged here, is

6    acceptable because there's no person standing with a gun at

7    the door of the school where the voting is taking place.

8              I think that -- you know, as I said at the

9    beginning, this statute has developed its application over the

10   years based upon changes in circumstances that could not have

11   been contemplated in 1870.  And, quite frankly, looking at

12   this from the standpoint of sophistication, one could argue, I

13   think that's what the government does, the government could

14   argue that this is a far more sophisticated means of

15   unlawfully affecting the constitutional right to vote.

16             So, you know, you're saying -- the defense is

17   saying, well, Congress hasn't done anything to make it clear,

18   but the government is saying that the statute is sufficient to

19   handle this type of nuance approach to manipulating, you know,

20   the system of voting, which is a constitutional right.

21             I mean that's really -- that's a large part of what

22   we're discussing here.

23             MR. FRISCH:  Well, if I may, Your Honor, this isn't

24   a question of the means.

25             If Mr. Mackey used electronics in some form to forge

PROCEEDINGS                                      23

1    ballots, I'm certain there's a way to do that, given

2    technology these days.  If he used electronics to destroy or

3    threaten or intimidate or do some of the things that plainly

4    are within Section 241's scope, he wouldn't stand on ceremony

5    and say, well, I -- I did it all electronically, therefore,

6    it's not covered.  It would be covered.

7              The problem here is that it's the nature of the

8    conduct, not the means.  The conduct is not previously, in

9    fact, never been applied.  The statute has never been applied

10   to this kind of conduct.

11             If you look, and we cited it in our reply papers, I

12   think it's in the main brief as well, the specific examples

13   that Congress had in mind that Congress believes are not

14   covered by the statute, which are far worse than this.  If

15   those things had been electronic or not, it wouldn't matter,

16   you know, giving -- saying if you come to vote, we're going to

17   arrest you for parking tickets or Republicans vote Tuesday,

18   Democrats vote Wednesday.  It is not whether it's the means or

19   not, yes, the means has changed and society has to adopt to

20   different methodologies, but that's not what this is about.

21             This is about speech.  Speech that's deceptive,

22   speech that's less severe or less problematic than the

23   specific examples on which Congress has not acted.

24             And, again, I understand the Court's concern about

25   the overall scope and the remedy for this, but apart from the

1    limited scope of Section 241, what's at the heart of the -- my

2    citing to Congress, Congress and the senators, is fair notice

3    and fair warning.  Because they don't believe more serious

4    conduct is covered by the statute.

5             It's hard to say that the citizen should believe

6    that a retweeted meme, however you want to interpret it, give

7    it a nefarious -- the most nefarious interpretation possible

8    or something more benign, that he or she should understand

9    that he has been fairly noticed or warned that this is

10   criminal conduct.

11            THE COURT:  Anything else?

12            MR. PAULSEN:  Your Honor, I addressed the fair

13   warning a moment ago, so I'll leave that as it is.

14            I would just note that I think the speech issue is a

15   bit of a red herring here.  Supreme Court case law is very

16   clear that when speech is used in service of a criminal act,

17   it doesn't get that same First Amendment protection.

18            When somebody sends out a scam, charitable flier

19   saying please donate to my charity but then takes the money,

20   even if they are commenting on political issues, that false

21   statement is -- is -- the government will criminalize it.

22            There's a very well-known Supreme Court case,

23   *Giboney*, which -- it's 336 U.S. 490, it's often cited for this

24   point.  It's a -- an old antitrust case in which during a

25   union fighting, one of the sides had picketers block the

1   company.  They -- free association that you would normally say

2   is protected speech.  But it was done in service of a scheme

3   to interrupt and violate an antitrust law.  And what the

4   Supreme Court says in that case:

5             "It has rarely been suggested that the

6   constitutional freedom for speech and press extends its

7   immunity to speech or writing used as an integral part of

8   conduct in violation of a valid criminal statute.  We reject

9   the contention now."

10            It's always been the case that speech that is used

11   to effectuate a criminal plan like this doesn't get covered.

12   That's why 1001 exists.  That's why perjury exists.  It's why

13   false statements laws exist.  It's why when somebody fills out

14   a form inaccurately to the government that doesn't count as

15   First Amendment.  That's why fraud cases and deceit cases

16   generally can be prosecuted.  This is a red hearing.

17            THE COURT:  All right, let's go on to the

18   First Amendment.

19            MR. FRISCH:  Can I just -- I think I just -- if Your

20   Honor would just permit me just to respond briefly to that.  I

21   won't -- I won't belabor it.

22            THE COURT:  Go ahead.

23            MR. FRISCH:  But the government is mixing apples

24   oranges and bananas.  There are certain types of speech that

25   are not permitted.  If it's commercial speech.  If it's based

1    on defrauding people financially.  If it's based on commerce.

2    There's -- if it's obscene.  If it's bribery.

3           There are number of examples.  If it's a 1001

4    violation, which the government cites.  There are a number of

5    ways in which that kind of speech is not permissible and can

6    be criminal.

7           But this, this information in the context of

8    politics, whether you --

9           THE COURT:  It's not politics.  Let me start with

10   this.  If proven, defrauding individuals of their

11   constitutional vote, it's not politics.  Whoever they want to

12   vote for, is not politics.  That's their business.

13          If the speech, you know, misstates a person's

14   views -- a politician's views and is, you know, a part of the

15   discourse.  But what is alleged here is that the, quote,

16   speech that is contained in this meme, that has been

17   presented, is intended to -- is intended to take away an

18   individual's right to vote by conveying the impression that by

19   responding to this electronically -- to vote electronically,

20   would register a vote for that -- for, in this case, a

21   presidential candidate.

22          I mean this isn't -- you know, money is one thing,

23   but a constitutional right is more sacred than money in the

24   view of many people, including this Court.

25          So I just point that out, and I think -- you know, I

1   don't want it to appear that the Court sanctions or would

2   agree that to deprive someone of a vote by engaging in some

3   sort of fraud would be -- would be, you know, less serious

4   than some sort of commercial speech violation.  That's all I'm

5   saying to you.

6            So I don't know whether you're right or you're wrong

7   on the ultimate outcome of this issue, but the right to vote

8   is sacred.  Many thousands of people have died to protect our

9   constitutional right to vote in a democratic republic.  I

10  don't think there's anything more important that is done by

11  the government than securing and protecting and promoting the

12  right to vote.

13           So we'll start on that, on that lofty claim.  So I

14  don't -- you know, the discussion of commercial speech, and

15  the discussion of some senators, who think that they can put a

16  finer point on something, doesn't mean that you're right, and

17  it doesn't mean that you're wrong.

18           I want to go on to the First Amendment issue.

19           MR. FRISCH:  May I, Judge?

20           THE COURT:  Go ahead.

21           MR. FRISCH:  So the right to vote is sacred, and so

22  is the right to free speech.  And the danger, notwithstanding

23  how a particular person could look at the alleged conduct

24  here, whatever it is, whether it's good, bad or indifferent,

25  accepting Your Honor's view, accepting a different view, the

PROCEEDINGS                                    28

1    problem with prosecuting it criminally is it makes the

2    government, and all branches of the government, especially the

3    Department of Justice, a ministry of decorum.  You know, on

4    what is pure speech, which is not independently a crime, which

5    is not independently a fraud, it's pure retweeted speech.

6            And maybe there are hypothetical situations, maybe

7    it's this one, where we can agree that this crosses the line.

8    But there could be someone else who looks at this and other

9    kinds of conduct that could be swept into this where we might

10   think it doesn't cross the line, but someone else might.

11           It's not the content, it's the right to say it.  And

12   that I think is why this is such a difficult issue for

13   Americans, not just for Congress but for all of us, because

14   we're watching the news everyday, we understand what's going

15   on, is that we're trying to balance and find a way of

16   accommodating a variety of sacred rights.  All of which we

17   hold here, one of which is the right to vote, one of which is

18   the right to freedom of speech.

19           While I understand the sentiments that Your Honor

20   has expressed, when we find ourselves in a criminal courtroom,

21   and someone facing jeopardy of liberty, more needs to be shown

22   about that speech than the fact that it was said.  It needs to

23   be tethered to one of those other things.  One of those other

24   types of speech that's prohibited.

25           As sacred as the right to vote is, the right to

1    freedom -- the First Amendment right is also so sacred that

2    sometimes we allow things to be said in the marketplace of

3    ideas.  Sometimes we allow things to be retweeted or tweeted.

4    Sometimes we allow these things because we have confidence as

5    Americans that if the debate is freely permitted to continue,

6    we'll figure it out.  We'll work it out.  We'll figure out

7    what's on the right side of the line and what's on the wrong

8    side of the line without resorting to criminal process, which

9    carries more risks than benefits.

10              THE COURT:  Well --

11              MR. PAULSEN:  Your Honor, you mentioned before the

12   importance of the right to vote.  One of the cases we cite,

13   *United States versus Benson,* a case which the right to vote

14   was weighed against the First Amendment rights, it notes that

15   the right to vote is the right that secures all other rights.

16   And in that case, the right to vote triumphed over the

17   First Amendment considerations.

18              I think defense counsel mischaracterizes the nature

19   of the speech here.  The government's allegations here are:

20   We are not saying that this scheme was meant to spread

21   disinformation about an issue, about policy, about a

22   politician, about anything of that sort, it's about process.

23   It is about trying to fool people out of voting, out of

24   exercising the franchise.  Not the choice they make once they

25   get there, it's the actual right to vote, which is the core

PROCEEDINGS                              30

1    heartland behavior for this particular -- for this statute.

2           I think what was being alleged here fits within that

3    framework that has been prosecuted by the Department of

4    Justice for over a hundred years.

5           THE COURT:  Anything else?

6           MR. FRISCH:  Two points.

7           One is that this case -- a case like this has never

8    been prosecuted before.  Number one.

9           Number two, I just want to correct for the record --

10   it's in the papers, I think Your Honor realizes it, but I just

11   want to state it to make sure -- that the 4900 people alleged

12   by the government are people, as I understand it, who

13   responded nationwide, I think I have that right, to the

14   retweeted meme.  But there's no proof that any of them were

15   registered voters, and there's no proof that anyone failed to

16   vote as the result of believing that an anonymous text would

17   qualify as a vote for President.

18          MR. PAULSEN:  And, Your Honor, I can speak to that

19   briefly.

20          We've provided information to defense counsel that

21   shows that when this tweet was sent out, and it indicated that

22   voters of a particular candidate could vote by text, various

23   individuals responded to try to put up warnings that this was

24   not actually real.  And so despite the fact that people still

25   texted in and this meme bounced around the internet, shortly

PROCEEDINGS                                    31

1   thereafter people got a response message saying this is --

2   this was not authorized by the campaign and things of that

3   sort.

4          The government is not prosecuting the effect of

5   this, we're prosecuting the conspiracy to do it.  And the --

6   we are -- we understand our burden, and we've been, I think,

7   clear with defense counsel about what the other issue is.

8          THE COURT:  Okay.  Thank you very much.  Very

9   interesting.

10         Thank you for coming up from Florida; is it?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  All right.

13         Anything else for today?

14         MR. PAULSEN:  No, Your Honor.  We're happy to answer

15   any questions you might have.

16         THE COURT:  I think I've heard and seen and read a

17   great deal about this, and I appreciate everyone's excellent

18   briefing, and so I will let you know.

19         MR. PAULSEN:  Thank you, Your Honor.

20         THE COURT:  Thank you very much.

21         MR. FRISCH:  Thank you, Judge.

22         MR. PAULSEN:  Your Honor, my colleague did mention

23   to me, I think we had excluded time up and to this date, and

24   so...

25         THE COURT:  Time is excluded until the -- until

PROCEEDINGS                                    32

1    decision, plus ten days.

2              Is that agreeable?

3              MR. FRISCH:  It is, Judge, of course.

4              MR. PAULSEN:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              Have a nice day everybody.

7

8              (Whereupon, the matter was concluded.)

9

10                    *     *     *     *     *

11

12

13   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

14

15      s/ Linda D. Danelczyk              October 30, 2022

16        LINDA D. DANELCZYK               DATE

17

18

19

20

21

22

23

24

25