1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        21-CR-80(AMD)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5              -versus-                 March 20, 2023
                                        9:30 a.m.
6   DOUGLASS MACKEY,

7              Defendant.

8   ------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                BEFORE THE HONORABLE ANN M. DONNELLY
10                  UNITED STATES DISTRICT JUDGE
                        BEFORE A JURY

11

12  APPEARANCES

13  For the Government:      UNITED STATES ATTORNEY'S OFFICE
                             Eastern District of New York
14                           271 Cadman Plaza East
                             Brooklyn, New York 11201
15                           BY:  ERIK PAULSON, ESQ.
                                  TURNER BUFORD, ESQ.
16                                WILLIAM J. GULLOTTA, ESQ.
                             Assistant United States Attorneys

17

18
    For the Defendant:       BY:  ANDREW J. FRISCH, ESQ.
19                           40 Fulton Street
                             New York, New York 10030
20

21
    Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
22                           Phone:  718-613-2268
                             Email:  RivkaTeich@gmail.com
23
    Proceedings recorded by mechanical stenography.  Transcript
24  produced by computer-aided transcription.

25

PROCEEDINGS                                    2

1                    (In open court.)

2            THE COURTROOM DEPUTY:  All Rise.  Criminal cause for

3    a trial, docket 21-CR-80 U.S. vs. Douglass Mackey.

4            State your appearances.

5            MR. PAULSEN:  Eric Paulsen for the United States,

6    joined by Turner Buford also from my office, William Gullotta

7    from the Department of Justice, and Shivani Parshad a

8    paralegal, also joined by Special Agent Liz Granberg, who is

9    dealing with our witnesses outside.

10           THE COURT:  Okay, good morning.

11           MR. FRISCH:  Your Honor, good morning.  For

12   Mr. Mackey, Andrew Frisch.  Mr. Mackey is standing to my left.

13   Good morning.

14           THE COURT:  Good morning.  Good morning, Mr. Mackey.

15           I know you're expecting Judge Garaufis this morning.

16   Judge Garaufis tested positive for COVID yesterday morning.

17   So I was able to switch my schedule around so you're stuck

18   with me.

19           I just a couple of things.  There is a tremendous

20   amount of writing in this case, I've done my best to review

21   all of it.  I know you filed a motion yesterday by, I don't

22   think it's anything we have to resolve today; is that correct?

23           MR. FRISCH:  That is correct, Judge, yes.

24           THE COURT:  I also just think, for people that are

25   observing, I don't think I'm telling you all anything you

PROCEEDINGS                                        3

1    don't know, but you can't record or livestream or tweet or

2    anything about this case.  I don't expect anybody is going to

3    do that, but if it were to happen you would be escorted out.

4              The other thing I noticed -- I don't think I've got

5    anything else to say.

6              I don't think any of you have tried a case in front

7    of me.  No special rules.  We like to keep things fairly low

8    drama.  For the rest of the trial we'll be over in our

9    courtroom, on the cellar side of the courthouse.  Given the

10   kind of last minute aspect of this we couldn't set things up

11   there.

12             Is there anything we need to raise before we bring

13   in the jurors?

14             MR. FRISCH:  Your Honor, I just wanted to make a

15   record about one thing and mention one other thing.  I filed

16   under seal last week a letter with Judge Garaufis that

17   addressed current events.

18             THE COURT:  Yes.

19             MR. FRISCH:  So that's on my mind and I wanted to

20   mention it to your Honor, make sure your Honor has seen that

21   letter.

22             The second thing this is just housekeeping.  This

23   morning when I got to court I noticed that with regard to

24   certain documents I may show witnesses on cross-examination I

25   didn't make a lot of copies of them.  So if you can bear with

PROCEEDINGS                               4

1   me today, tomorrow and deal with my one or two copies,

2   tomorrow I'll bring copies for the Court of what I might show

3   a witness on cross.

4              THE COURT:  That's great.  I take it most of these

5   things will be presented electronically; is that right?

6              MR. PAULSEN:  That's right, your Honor.

7              THE COURT:  Obviously, if we need to go old school I

8   think we've got the Elmo.

9              Did judge Garaufis address the motion that you

10  submitted?

11             MR. FRISCH:  The one under seal?

12             THE COURT:  Yes.

13             MR. FRISCH:  No, he didn't.  He didn't and I'm not

14  sure -- I filed the letter for obvious reasons in abundance of

15  caution, so we're all on the same page and it's on everyone's

16  radar.  I think it would have been premature on Friday when I

17  filed the letter.

18             THE COURT:  I think that's probably right.  Frankly,

19  I don't see a huge connection, but I take your point.  But I

20  think I don't see any reason for it to come up actually.  I'm

21  going to take that as I don't have to do anything about that

22  right now.

23             Is there anything before we bring the jurors in?

24             MR. PAULSEN:  No, your Honor.  I can give your Honor

25  a preview of what we're expecting for the next couple of days

PROCEEDINGS                              5

1    if that's useful to you.

2            THE COURT:  Well, sure.  I got your witness list.

3    Do you expect to fill the day today?

4            MR. PAULSEN:  So we have approximately 19 witnesses.

5    The anticipation was that today we would do a large number of

6    the smaller witnesses.

7            THE COURT:  Okay.

8            MR. PAULSEN:  We initially had them almost all cued

9    up for last Thursday, when the trial was going to start.  We

10   have, I think, as many as a dozen today that we hope to get

11   to.  If some for reason those move so quickly, we may need to

12   rest a little early because of that.

13           THE COURT:  That's okay.  I do generally like to

14   fill the day.

15           In terms of scheduling, I think I've been able to

16   put -- I have a few other matters of my own -- I think I've

17   been able to schedule most of them for lunch time, it

18   shouldn't really interfere with our trial schedule.  Generally

19   I like to go to five or 5:30.  If there a witness that we can

20   finish on a day, I'll try to do that, just to make the best

21   use of everyone's time.  I think that's probably it.

22           I think we can get going unless there is something

23   else you want to raise, Mr. Frisch.

24           MR. FRISCH:  Your Honor, thank you, but I have

25   nothing else.

PROCEEDINGS                          6

1           THE COURT:  I think we should get our jury.

2           (Jury enters the courtroom.)

3           THE COURT:  Good morning jurors.  We're about to

4    ready to begin the trial in the criminal case for which you

5    were selected as jurors.  I'm United States district Judge Ann

6    Donnelly.  I believe, I know you met, our courtroom deputy

7    Donna Greene.  Judge Nicholas Garaufis was scheduled to

8    preside over this trial, but unfortunately yesterday he tested

9    positive for COVID.  And so he's regrets very much that he's

10   not able to preside over the trial.  So that's what happened.

11          Also for the rest of the trial, after today, we'll

12   be meeting my courtroom, which is on this floor just on the

13   other side of the building, and Ms. Greene will tell you where

14   to go.

15          What I'm going to do now is give you some

16   preliminary instructions and also give you an -- we have to

17   first swear in the jurors.

18          THE COURTROOM DEPUTY:  Please stand and raise your

19   right hand.

20          (Jury panel sworn.)

21          THE COURTROOM DEPUTY:  You may be seated.

22          THE COURT:  I have a giant note on top of my

23   instructions to swear in the jury.

24          What I'm going to do now is give you some

25   preliminary instructions and just give you an overview of what

PROCEEDINGS                                                    7

1     you can expect during the course of the trial.

2              Your job as jurors is to administer justice in this

3     case according to the law and according to the evidence.  You

4     must carry out your duties as jurors with complete fairness,

5     impartiality, and without bias prejudice or sympathy for

6     either side, either for or against the Government or for or

7     against the defendant.

8              What I'm going to first do is give you a summary of

9     the charge.  I'm going to read the charge to you.  This is not

10    evidence.  The single count in the Indictment alleges that in

11    or about and between September 2016 and November 2016 both

12    dates being appropriate and inclusive within the Eastern

13    District of New York and elsewhere, the defendant Douglass

14    Mackey, also known as Ricky Vaughn, together with others

15    conspired to injure, oppress, threaten and intimidate one or

16    more persons in the free exercise and enjoyment of a right and

17    privilege secured to them by the Constitution and the laws of

18    the United States; to wit, the right to vote.

19             Mr. Mackey has pleaded not guilty to all of these

20    charges.  It is the Government's burden to prove Mr. Mackey's

21    guilt beyond a reasonable doubt, which I'll instruct you

22    further in my final instructions with respect to that charge.

23    As I'm sure Judge Reyes told you when you were selected as

24    jurors, the Indictment in this case is the document that

25    brings the case here to court, but it is just an accusation.

PROCEEDINGS                                          8

1    It is not evidence of anything.

2              The Government has the burden of proving each of the

3    essential elements of the charge beyond a reasonable doubt.

4    It's the purpose of this trial to determine whether the

5    Government has met this burden.  A defendant in a criminal

6    case does not have to proof innocence.  On the contrary, the

7    defendant is presumed to be innocent of the charge in the

8    Indictment.

9              One of your jobs as jurors is going to be to

10   determine what the facts are, and you'll base that

11   determination on the evidence.  You as jurors are the sole

12   judges of the facts.  You will then have to apply the law as I

13   give it to you to those facts.  You must follow the law as I

14   instruct you, regardless of whether you believe that the law

15   is sensible or whether you think the law should be something

16   else.

17             Because I am the judge of the law, I will make legal

18   rulings, including on objections when lawyers make them.  It

19   may be that I direct the parties to move along a little bit,

20   but don't assume that because I make a ruling that I have some

21   opinion about this case or about what your verdict should be.

22   I don't have any such opinion.  It may be during the

23   examination of a witness that I might ask a question, if I do

24   that it's either because I don't understand a question that

25   was asked or because I think something needs to be clarified

PROCEEDINGS                                    9

1    for you.  But don't assume that just because I ask a question

2    that it's particularly important or that I have some opinion

3    about the case.

4                   As judges of the facts, you will listen to the

5    evidence.  The evidence consists of the testimony of witnesses

6    on direct examination and cross-examination.  The evidence is

7    also any documents or exhibits that come into evidence.  And

8    then the third category of evidence is stipulations, any facts

9    on which the lawyers agree.

10                  There are some things that are not evidence and you

11   may not consider them.  What any lawyer says during the course

12   of the trial, whether it's in an opening statement or

13   summation or perhaps during an objection, that's not evidence.

14   Lawyers do have an obligation to make objections if they think

15   there is a reason to object.  So don't hold it against lawyer

16   if they object, that's part of their job.  If I overrule an

17   objection that means that I've determined that the question is

18   a proper one.  If I sustain an objection, it means that I have

19   determined that the question is not proper and you should

20   ignore the question.  It may happen during the course of an

21   examination that I sustain an objection and the witness

22   answers any way.  If that happens, I'll just tell you to

23   disregard the answer.

24                  Another thing that is not evidence is anything that

25   you've heard outside of the courtroom or seen outside of the

PROCEEDINGS                                    10

1    courtroom.  You must decide the case only on the evidence

2    that's presented here during the trial.  One of your tasks as

3    jurors will be to determine the credibility of the witnesses

4    who testify.  In other words, you'll be evaluating whether or

5    not you believe what the witness is saying.  You're going to

6    determine whether you believe the witness is telling you the

7    truth, whether the witness is lying, whether the person is

8    accurate, or whether the person has made an honest mistake.

9           There is no magical test to deciding whether a

10   witness is credible.  You all bring to this process your

11   common sense and you make these kinds of decisions very

12   frequently in your own lives when you're trying to decide

13   whether what someone is telling you is believable, not

14   believable, accurate, or inaccurate.  I'm going to suggest

15   some of the things that you could consider when you're law

16   listening to a witness's testimony.

17          What is the witness's demeanor; does the witness's

18   testimony make sense; does the witness have a reason or motive

19   to testify falsely; is the witness's testimony consistent or

20   inconsistent with other evidence or testimony; if there are

21   inconsistencies are they important and related to important

22   facts or are they minor and related to unimportant facts; has

23   the witness said something that's contradictory at another

24   time.  As I said, these are some the tests that you use to

25   determine the witness's credibility.

PROCEEDINGS                                            11

1          Because this is a criminal case there are three

2     rules that you must keep in mind.

3          First, the defendant is presumed innocent unless and

4     until the Government has proven him guilty.

5          Second, it's the Government that has the burden of

6     proof.  The defendant has no burden to prove his innocence or

7     to present any evidence.  He has no burden to put on a case or

8     to testify.  If he decides not to testify or not to put on any

9     evidence, you may not hold these facts against him.

10         And third, as I think I've said before, the

11    Government must prove the defendant's guilt beyond a

12    reasonable doubt.  I'll give you further instructions on this

13    concept later, but this is one of the things that makes a

14    criminal case different from a civil case.

15         I want to say a few words to you about your conduct

16    as jurors.  Because you are deciding this case only on the

17    evidence that's presented in the courtroom, you may not

18    conduct any independent research about anything having to do

19    with this case, not about the people that are involved, not

20    about the law, do not look up anything on the Internet or

21    anywhere else, don't research the lawyers or the witnesses or

22    the parties.  Don't try to find out any information about this

23    case from any source outside of the courtroom.  I would

24    imagine that Judge Reyes told you during jury selection that

25    there will undoubtedly be some press coverage about this case.

PROCEEDINGS                                    12

1    You must not read watch or listen to any reports in any form

2    about this case.  So if something were to come on the

3    television, turn the channel.  If you see anything in the

4    newspaper, don't read it.

5           Don't communicate with anyone about this case in any

6    way shape or form.  I am an old-fashioned person, I'm not

7    aware of all the forms of social media and ways that people

8    can communicate, but don't use any of them.  Not Twitter or

9    blogging or anything like that.

10          Related to that, you are not permitted to discuss

11   the case with anyone else during the trial.  Until you retire

12   to the jury room and deliberate, you're not permitted to talk

13   about this case.  That means you can't talk about it with your

14   friends and family, and it also means you can't talk about it

15   with your fellow jurors.  I would imagine that is sort of a

16   hard thing because this is the only thing that you have in

17   common.  It's probably quite tempting after a witness

18   testifies to share your thoughts about the witness, what the

19   witness said or to comment about something that happened in

20   court.  But you can't do that.  If you were to start talking

21   about the case before you have heard all of the evidence, or

22   before you heard my charge on the law, you would be

23   deliberating prematurely and our law does not permit that, so

24   don't talk about the case.

25          I'm sure Judge Reyes also told you that the lawyers

1    or the witnesses are not permitted to greet you in any way,

2    even if they see you in the hallway.  Don't think they are

3    being rude, it's just one of the rules, they are not permitted

4    to talk to you.  Do not allow anyone to talk to you about the

5    case.  You must report to Ms. Greene any effort by any person

6    to influence you improperly or to influence another juror

7    improperly.

8           Obviously related to all of this, you can't form an

9    opinion about the case until you've heard all of the evidence

10   and my charge on the law.  Keep an open mind until you start

11   your deliberations at the end of the case.

12          Everybody has got something to write with and a

13   notepad.  You may certainly take notes during the trial, if

14   you wish.  But if you do take notes, make sure that it does

15   not interfere with your ability to listen to the evidence.

16   Our court reporters are fantastic.  They take down all of the

17   testimony, and if you need to have some testimony read back at

18   the end of the trial or if you need to review it, that will be

19   available for you.  That's the accurate record of the trial.

20          If you do take notes, don't discuss them with anyone

21   before you begin your deliberations.  You're not going to be

22   permitted to take your notes home with you.  They will be

23   collected at the end of each day.  And if you decide that you

24   don't want to take notes, that's also perfectly fine.  But you

25   can't rely on anybody else's notes, because the notes are just

1  for the individual juror, just for you.  As I said, during

2  your deliberations you can request portions of the trial

3  transcript if you need to have your recollections refreshed

4  about testimony or evidence.

5          The last thing I'm going to do is give you a brief

6  overview of the trial.  The Government will make an opening

7  statement, which is really just an outline of the evidence to

8  help you understand the evidence as it comes in.  It's what

9  the Government expects the evidence to prove.  Defense counsel

10  may, but does not have to, make an opening statement.  Again,

11  the opening statements are designed for the parties to tell

12  you what they expect the evidence will prove.  After opening

13  statements, the Government will then put on its case and

14  present its witnesses and defense can cross-examine them.

15  Following the Government's case, the defendant may, but does

16  not have to, present witnesses or put on a case.  After all

17  the evidence is in, the lawyers will have the opportunity to

18  address you again in closing arguments.  After that I will

19  instruct you on the law and then you will retire to deliberate

20  and reach your verdict.

21          I think we're ready to begin with the opening

22  statement by the Government.

23          MR. BUFORD:  Good morning everyone.

24          The defendant, Douglass Mackey, tried to steal

25  people's right to vote in the 2016 election presidential

1    election.  He did it by spreading a fraud that was designed to

2    convince people that new technology would enable them to cast

3    their vote by text message, even though, as the defendant well

4    knew, that was not a valid way to cast a vote.  The defendant

5    used the Internet, specifically the social media application

6    Twitter to mass distribute a series of phony digital fliers

7    that were carefully crafted to look like official campaign

8    advertisements, advising supporters about this new

9    text-to-vote technology, which the fraudulent advertisements

10   promised would allow people to save time, avoid the line, and

11   vote from home.  These fake campaign advertisements even

12   features a real text number set up to receive incoming

13   messages as votes that the defendant as his fellow fraudsters

14   hijacked from technology companies to make the scheme seem as

15   real as possible.

16          We all expect people to do and say whatever in the

17   heat of a hard-fought election.  Attacks, maybe even

18   misleading attacks, on candidates, issues, Government

19   officials, the media, it's all generally fair game because

20   it's all, at some level, designed to change people's minds.

21          The evidence in this case will show that when the

22   defendant sent these fraudulent campaign advertisements, he

23   wasn't interested in changing minds, he was interested in

24   taking from people their right to make their own choice.  He's

25   interested in stealing the right to vote itself.  That's where

OPENING STATEMENTS - MR. BUFORD                16

1   the defendant's conduct crossed the line and that's what this

2   case is about:  The defendant's participation in a coordinated

3   attack on the right to vote.

4           Members of the jury, my name is Turner Buford.

5   Along with my colleagues, Eric Paulsen, Bill Gullotta, Special

6   Agent Liz Granberg, and paralegal Shivani Parshad, we

7   represent the United States in this case.

8           You'll learn in this case the defendant did not use

9   his real name online, instead he went by the name Ricky

10  Vaughn.  Under the name Ricky Vaughn, the defendant built up a

11  large and loyal following on social media, especially on

12  Twitter, where you'll learn the defendant's followers, the

13  people actively watching his account, numbered in the tens of

14  thousands.

15          The evidence in this case will show that in the

16  run-up to the 2016 election, presidential election, the

17  defendant fully committed himself to using the influence of

18  his Ricky Vaughn account to secure the election of his

19  preferred candidate, President Donald Trump.  To that end the

20  defendant worked tirelessly to distribute through his Ricky

21  Vaughn accounts messaging and content that he believed would

22  advance the cause of Donald Trump; or alternatively, weaken

23  the position of Donald Trump's opponent, Hillary Clinton.

24          You'll learn the defendant's posts were often

25  controversial, designed to push people's buttons.  And

1    sometimes relied on deception, doctored and manipulated

2    photographs.

3          The evidence will show the defendant was highly

4    skilled in using social media, especially Twitter to push the

5    messages he wanted to move.  The defendant knew how to tailor

6    his messages and content to have the maximum impact, and he

7    mastered certain technical features of Twitter that you'll

8    learn about in this trial to turbo charge his posts, cause

9    them to be distributed well beyond his own followers,

10   cascading waterfalls across the Internet.

11         The defendant was well aware of his skills.  And

12   when a media laboratory the Massachusetts Institute of

13   Technology, MIT, concluded the defendant was one of the most

14   influential people commenting on the 2016 election, keeping

15   company with the likes of Newt Gingrich at MSNBC News, the

16   defendant bragged about it.  He then added a reference to the

17   MIT study to his online profile.

18         The defendant worked hard to achieve this online

19   influence.  But what you'll learn in this trial is that the

20   Government's investigation uncovered, the defendant was not

21   working alone.  The defendant belonged to multiple private

22   online groups with other influential Twitter users.  The

23   members of these groups agreed among themselves to use various

24   strategies to try to sway the 2016 election in favor of Donald

25   Trump through the use of social media, including through the

OPENING STATEMENTS – MR. BUFORD                 18

1   use of images and messages that were designed to demoralize or

2   confuse the opposition.  One of these groups was even called

3   the War Room.  The members of these groups workshopped various

4   media images, making them as compelling as possible, agreed on

5   the images and messages that were likely to go the furthest

6   and have the greatest affect.  And coordinated the timing of

7   the distribution of these messages through their accounts.

8   The idea being, if they all simultaneously launched it, it

9   would go further than if they launched it on their own

10  schedules.

11          You'll learn the members of these groups recognized

12  the defendant as the one, by virtue of his influence, who had

13  the ability to reach the widest audience.  If you wanted

14  something to have an affect, to get noticed, to gain media

15  coverage, the defendant was the man to see.

16          Almost all of the content of these groups put out

17  was not illegal.  To be sure, a lot of it relied on deception.

18  For example, it they would send out doctored photographs of

19  celebrities to make it look like they supported certain

20  candidates, they would send out fake campaign posts to make it

21  seem like candidates taken unpopular positions.  This kind of

22  content may strike you as outrageous, silly, somewhere in

23  between.  But politics in America is a rough and tumble

24  business.  And the freedoms we all enjoy require healthy

25  tolerance of stuff like this.

1          The evidence will show, there came a time when the

2    defendant in these groups trained their sites not on a

3    particular issue or candidate, but rather on the mechanics of

4    voting, the time, place, and manner by which a voter could

5    actually register a vote.  This is where their operation

6    turned criminal.

7          They hatched a plan to trick voters, not out of

8    their political support for person or idea, but out of their

9    right to actually cast a ballot.  This wasn't about changing

10   votes, it was about vaporizing them, making them disappear,

11   diverting from the ballot box into the void where they would

12   never be counted.  When the defendant targeted the right to

13   vote itself, he committed a federal crime.

14         Here's how it worked.  A series of fake campaign

15   advertisements were created and passed around the members of

16   these groups.  These fake campaign advertisements were

17   carefully put together to look like official statements from

18   the Hillary Clinton campaign.  They copied the Hillary Clinton

19   campaign logo.  They mimmicked the typeface and font used by

20   the Clinton campaign.  And the fake advertisements advised

21   voters that they could text the word Hillary to a number

22   displayed on the false of advertisements to register their

23   votes.  You'll learn in this trial that the number was real

24   and set up to receive incoming messages.  So anyone who tried

25   to cast their vote this way would see their message go through

1    without any technical issues.  You'll learn that political

2    campaigns and businesses use this same technology to

3    communicate information to supporters and customers; a fact

4    that made these phony fliers seem legitimate.  The fake

5    campaign ads even featured a disclaimer in fine print on the

6    bottom, that voting by text was not available in places like

7    Guam and Puerto Rico.

8              The evidence will show that he release of these fake

9    campaign ads were times so they would flood the Internet

10   shortly before election day, when there was little time for

11   them to be taken down or debunked.

12             As the 2016 election came down the home stretch, you

13   will learn that the defendant's Twitter account was sometimes

14   suspended forcing him to open up new accounts to reconnect

15   with his followers in these online groups.  But the evidence

16   will show that when the critical moment arrived, when these

17   take campaign ads began to circulate, the defendant stood

18   ready to play his part and he knew what he was to do, the part

19   he was most suited to play by virtue his influence.  He took

20   these fake campaign ads and blasted them as far as he could

21   send them, using his accounts.  When he did so, he broke the

22   law.

23             For his conduct the defendant is charged with one

24   count, entering into a conspiracy against the rights of

25   others, in this case, the right to vote.

OPENING STATEMENTS - MR. BUFORD          21

1          Conspiracy is just a legal term for criminal

2     agreement.  In this case, the evidence will show that the

3     defendant agreed with others to interfere with people's free

4     exercise of their right to vote.

5          So how do we prove that the defendant committed this

6     crime beyond a reasonable doubt.  The evidence in this case

7     will consist primarily of witness testimony and documents.

8          First with respect to witnesses.  You'll hear from

9     witnesses who saw the scheme play out in realtime and acted

10    quickly to counter.  Specifically one witness who saw the fake

11    campaign advertisements to start to spread across Twitter and

12    promptly reported them to Twitter management.

13         You'll hear from a campaign worker who observed the

14    fake ads mushrooming up across the Internet, and took action

15    to make sure that anyone who saw them would know they were

16    fake.

17         You'll hear from the owner of the technology company

18    that controlled the text number featured on the fake campaign

19    ads tell you he was surprised to find out that his number had

20    been hijacked.  He will tell you his company put in place an

21    automatic response message to anybody who tried to text their

22    vote; meaning, the text you would get back the message telling

23    them this was not real.  Thereby, effectively foiling the

24    scheme just as it was getting started.

25         That brings us to the documents you'll see.  In this

1    case you'll get a chance to look inside these online groups to

2    which the defendant belonged.  You'll see the defendant's own

3    communication, both the ones he sent publicly and the ones

4    that he sent to his fellow group members.  You'll see in those

5    communications the defendant believed that the election was

6    going to be very close and the key to success was the turnout

7    or lack thereof of certain demographic groups.  You'll see the

8    development of various groups that tried to influence the

9    election.  You'll see the members of these groups working

10   together to identify or find content, strategize how to get it

11   to the widest possible audience.  You'll see the members of

12   the group conclude, the best way to reach people, is to have

13   the defendant send it.

14           You'll see these same techniques apply to the

15   criminal text-to-vote scheme.  Techniques that culminated in

16   the defendant's sending out a series of fraudulent campaign

17   advertisements designed to fool people into forfeiting their

18   most protected right, the right to vote.  The right that makes

19   all other rights possible.

20           Members of the jury, at the end of this case we'll

21   have a chance to speak with you again.  When we do, we'll ask

22   you to render the only verdict that is consistent to the

23   evidence you'll see and hear, a verdict of guilty.  Thank you.

24           THE COURT:  Thank you.

25           Mr. Frisch, do you wish to make an opening

1   statement?

2            MR. FRISCH:  Your Honor, I do.  Thank you.

3            Ladies and gentlemen, good morning.  Why would

4   someone see two memes and share them on Twitter?  Twitter, two

5   clicks.  Why would someone see and share two memes that

6   suggested you could vote for president of the United States

7   anonymously without giving your name.  You could vote for

8   president of the United States without proof that you're

9   registered to vote.  You could vote without proof that you're

10   a citizen of the United States.  You could vote without proof

11   that you're old enough to vote.  You could vote more than

12   once, from the same number.  You could vote twice.  Twelve

13   times, if you wanted.  You could just keep texting.  You could

14   vote multiple times, but each time from a different phone.  No

15   limit how many different times you can text or how many

16   different phones you can use.  You can vote without disclosing

17   where you live, not what voting precinct, not what

18   neighborhood, not what city, not what state.

19            You could vote without any regard to the electoral

20   college.  Now, the electoral college is not easy to

21   understand, even for people who closely follow elections, but

22   it's common knowledge that we vote for president by state.

23   There are blue states and red states and purple states, the

24   ones in between.

25            The candidates campaign by state.  They mostly focus

OPENING STATEMENTS – MR. FRISCH                    24

1    on the swing states, the purple states, like Wisconsin and

2    North Carolina.  People sometimes stay up late on election

3    day, sometimes past midnight, watching CNN or Fox or MSNBC;

4    not to see who carried blue states like New York, but who

5    carried the swing states, the purple states.

6            According to these two memes, doesn't matter what

7    state you're from.

8            All of these things suggested, all of it, you can

9    vote anonymously, without proof that you're registered,

10   without proof that you're a citizen, without proof that you're

11   old enough, you can vote, you can text as many times as you

12   want from different phones if you want, it doesn't matter what

13   states you lived in, what your voting precinct is.  All of it

14   suggested in the name of Hillary Clinton.  And for a

15   presumptive constituency of hers, women, women of color.

16           And why, if it's your intent to trick voters, why

17   would election day, a full week away on November 8, 2016,

18   November 8.  Why would you share the two memes late on

19   November 1st, one of which says you have to wait a full week

20   to text, allowing a full week November 1 to November 8, giving

21   the Clinton campaign, the media, Clinton supporters online

22   plenty of time to react.

23           If your intent is to trick voters, why not do it on

24   the morning of election day?  The day before.  Why give things

25   a full week to unravel?

1          You will see at this trial that the answer is that

2    these two memes were not shared to trick anyone.  The

3    Government at this trial is not required to show that anyone

4    was tricked; but no one was tricked.  Maybe someone,

5    somewhere, could conceivably have been tricked -- anything is

6    possible -- but there is no evidence of it.  So why would

7    someone share these two memes on Twitter?  Two quick clicks.

8          Ladies and gentlemen, everyone in the United States

9    has the right to remain silent, to say nothing.  It's the

10   Government's idea to charge you with a crime, it's on the

11   Government to prove it, to back it up with proof.  The person

12   charged need not say a word.  If the person charged, the

13   defendant, remains silent and says nothing, a jury may not

14   hold it against him.  It's the constitutional right to remain

15   silent.  Quite the opposite, a jury in a criminal case must

16   hold the Government to its burden to prove guilt beyond a

17   reasonable doubt, beyond a reasonable doubt.

18         But ladies and gentlemen, the Government in this

19   case cannot prove guilt by any standard, any standard.  And we

20   are not staying silent.

21         I speak in this courtroom for Doug Mackey.  Doug,

22   will you please stand up?

23         When the Government is all done putting on its case,

24   Mr. Mackey will have an opportunity to put on our case.

25   Mr. Mackey will stand up again, as he is now, he will walk to

1    the witness stand, state his name loud and clear and swear in

2    to tell you the truth, and he tell you that he had no intent

3    to trick anyone.  We will explain to you why it is so

4    important for you to understand why no one was tricked.  Thank

5    you.

6            Late on November 1st -- remember election day is

7    November 8 -- on November 1st Mr. Mackey shared the two memes.

8    By November 1st, 2016, when Mr. Mackey shared these two memes,

9    memes like these were already going viral from days before.

10   They were already going viral by the time Mr. Mackey shared

11   the memes.  The Clinton campaign had already begun taking

12   action about these types of memes.

13           On November 3rd, 2016, that's two days after

14   Mr. Mackey shared the two memes -- this is five days before

15   election day -- the media was reporting about these memes.

16   CNN, Buzzfeed, MSNBC.  It had been a big national news story.

17           (Continued on next page.)

18

19

20

21

22

23

24

25

1    MR. FRISCH:  What will the evidence show that

2    Mr. Mackey said upon seeing all of this news coverage about

3    the two memes that he shared on the internet?  Was he

4    disappointed that this purportedly grand plan, this purported

5    criminal conspiracy had failed?  Had been scuttled.  Was he

6    upset?  No.  I expect that you will see from the Government's

7    evidence that this is what he said.  That feeling when you

8    haphazardly post a meme and it winds up on cable television.

9    That feeling when you haphazardly  post a meme and it wind s

10   up on cable television.  Haphazardly.  That feeling.  Mr.

11   Mackey did not share these memes as part of some grand plan,

12   some sort of criminal  conspiracy to trick anyone.  That's not

13   what this was about.

14           By November 1st, the evidence will show Mr. Mackey

15   was well-known on Twitter through this avatar, Ricky Vaughn.

16   Ricky Vaughn was a fictional baseball player from the old

17   movie Major League portrayed by the actor Charlie Sheen.  In

18   the movie Major League, Ricky Vaughn was known as the wild

19   thing.  Because in the language of baseball, his pitches were

20   wild.  His pitches went all over the place.  You might say he

21   pitched haphazardly.  His avatar, the picture you saw on his

22   tweets, was Charlie Sheen in a red MAGA hat.  Ricky Vaughn's

23   popularity took Mr. Mackey by surprise.  He was born in

24   Washington, D.C. and grew up mostly in Vermont.  His dad at

25   one time worked for a senator from Vermont, and so Mr. Mackey,

1  as a kid, grew up at home hearing about politics.  After

2  college, Mr. Mackey moved to New York and had a job for a

3  while working as an economic analyst, but the work was not to

4  great interest to him.  From Mr. Mackey's apartment in

5  Manhattan, he opened his Twitter account as Ricky Vaughn.  He

6  started tweeting  mostly about politics .  Of surprise to Mr.

7  Mackey, people in the Twittersphere paid attention to him.

8  People were  listening to what he had to say, really for the

9  first time.  By contract in Mr. Mackey's work as an economic

10  analyst, economic analyst, he was now doing something that

11  gave him a sense of purpose, a sense of meaning.  Ricky Vaughn

12  went viral.  Mr. Mackey developed a following, he was popular.

13  As Mr. Mackey put it, as you will see, I believe, in one of

14  the Government's exhibits, he never set out to be a leader,

15  but he had been a leader online.  He had become a famous

16  online personality.

17          Now, by February 2016, remember, this is now eight

18  months.  February  2016, eight, months before Election Day, a

19  PHD researched named Eric Chu, C-H-U.  Eric Chu from MIT, the

20  well-known research university in Boston, Dr. Chu and his

21  colleagues analyzed how the digital revolution and the rise of

22  social media had changed everything in presidential elections.

23  It used to be that the official campaigns of the major

24  candidates controlled the messages.  Controlled the media

25  messages.  It used to be that it was the major campaigns that

1    worked everyday to influence traditional media like CNN,

2    influenced the days media coverage.  Political operatives of

3    the campaigns would go on television and debate which

4    candidate won the day.  Who was in charge of the news cycle

5    that day.  Whose story was being told, which candidate was on

6    message, highlighting strengths.  Who was off message, losing

7    the narrative.

8           For the political operatives  of the candidates, it

9    was political combat.  They actually, sometimes called their

10   offices war rooms.  Social media changed everything in

11   presidential elections.  With the rise of social media in just

12   the last 10 to 15 years, literally anyone can speak their mind

13   and be heard on the internet.  Literally anyone can go viral.

14   Your neighbor, your daughter, your son.  Anyone with a laptop.

15   Dr. Chu's study explains why candidates from Bernie Sanders to

16   Donald Trump could bypass traditional media and become viable

17   candidates by using social media without paying anyone.  The

18   candidates had armies of people with laptops supporting them.

19   Dr. Chu and his team analyzed social media and concluded that

20   Ricky Vaughn, again, we're talking February 2016, eight months

21   before the election.  Ricky Vaughn had become more influential

22   than television personalities like Jimmy Fallon, Stephen

23   Colbert, and Glenn Beck.  Roseanne Barr and Lou Dobbs were

24   among familiar people that retweeted Ricky Vaughn.  You'll see

25   a chat in the Government's evidence, and if the Government

1    doesn't show it to you, I will, that Ricky Vaughn became as

2    popular on Twitter as Cher.  Social media had changed the

3    world so much by February 2016, eight months before the

4    presidential election of 2016, that the man seated across the

5    room from you had as much influences as Cher.  And Mr. Mackey

6    ran with it.

7         Almost every day in 2016, Mr. Mackey posted or sent

8    hundreds of tweets, messages, and memes of all sorts.

9    Everyday Mr. Mackey was and is a strong political

10   conservative, and his tweets, and messages, and memes

11   supported the candidacy of Donald Trump.  Whatever any of us

12   may think about the candidates in 2016; Hillary Clinton or

13   Donald Trump, it's not a crime to vigorously support your

14   candidate of choice.

15        Before Mr. Mackey became famous, there was a term on

16   the internet for the way he used twitter.  You'll see this

17   term in this evidence, Mr. Mackey did not come up with this

18   term.  It's a term on Twitter.  Now, forgive me in advance for

19   using a bit of profanity , but the term of that preexisted

20   Ricky Vaughn was shit posting.  It means what it says.

21   Posting stuff.  It was posting on social media deliberately

22   provocative or off-topic comments in order to distract from

23   the main conversation, to get attention, to go viral.  Don't

24   pay attention over there, look over here.  Not something

25   clandestine or a secret criminal conspiracy, but precisely for

1    the purpose of calling attention  to yourself.  Listen to me,

2    look at me.  A lot of it was online trash talking.  Juvenile,

3    immature, sometimes vulgar like teenagers playing pickup

4    basketball in the park.  Constant trash talk, talking stuff.

5    Posting stuff with the hope that something would catch on and

6    go viral, get attention, get under one's skin, distract from

7    the main conversation.  Put your opponent off his game.  Kind

8    of like the rap battles we sometimes see or celebrity roasts

9    where the whole idea is to shock.

10          Presidential campaigns in the United States have

11   always been rambunctious, and the digital age and social media

12   have made it more rowdy because it's to disturb.  Everyone is

13   fighting for attention, everyone wants to go viral.  You may

14   like what you see online, you may not like what you see

15   online, but the First Amendment to the United States

16   Constitution is freedom of speech.  We tolerate all kinds of

17   speech we like, speech we don't like.  We let people speak.

18   Because from speech, the truth emerges.  The marketplace of

19   ideas.  Even things in bad taste, even things that effect.

20          Here are some examples that you will see that my

21   friends at the prosecution table do not claim are illegal.

22   You will see from the Government's evidence, I think,

23   Photoshopped pop music stars wearing MAGA hats.

24   Justin Bieber.  Iggy azalea.  Here's one.  Lana Del Ray.

25   Anyone that listens to even a little Lana Del Ray, or maybe a

1   had lot, knows that she's no fan of Donald Trump.  Some posts

2   attempted to be more serious.  During the presidential

3   campaign in 2016, critics of Hillary Clinton said she would be

4   to militaristic if elected president.  She would un dually

5   involve the United States in new wars around the world.

6          To make the point, there were memes about young

7   women in combat overseas.  Young women drafted to fight wars

8   overseas.  Our children, our daughters would be drafted for

9   combat.  Whatever you may or may not think, if you even

10  thought about it, Hillary Clinton had her views on foreign

11  policy.  Even the Government doesn't claim these memes were

12  illegal.

13         You will hear about things that Mr. Mackey said;

14  some serious, some not.  Some offensive.  But whatever your

15  reaction as you hear his views; whether you agree or disagree,

16  whether his vows were right or wrong, whether he was a great

17  thinker or a Neanderthal caveman, you will see that none of it

18  is proof of a conspiracy to trick voters.

19         A criminal conspiracy on people in online chat

20  rooms?  When people online chatted about these memes voting by

21  texts and such, when these people alleged to be coconspirators

22  online chatting about vote by text, Mr. Mackey was not there.

23  Mr. Mackey was not there.

24         But there's more.  When these people in these chat

25  rooms testify about voting by text, those memes were not the

1    same ones that Mr. Mackey shared on Twitter.  Mr. Mackey saw

2    the two memes in this case and shared them after other memes

3    that already begun going viral days before.  Watch the

4    Government's evidence, watch their presentation very carefully

5    and watch to see if the Government is trying to force a square

6    peg into a round hole.  If the Government is mixing and

7    matching things that don't fit.

8           Here's what I mean.  Mr. Mackey posted lots of

9    stuff.  Stuff posting.  Mr. Mackey understood that memes could

10   go viral, that you could hijack a hashtag and make a meme go

11   viral.  Mr. Mackey chimed in about the Photoshopped pop stars

12   in MAGA caps and memes about Hillary Clinton's foreign policy.

13   But there's nothing no the Government's chats that Mr. Mackey

14   did more than see and share the two memes as part of stuff

15   posting, precisely to call attention to himself.  Distract

16   from the main conversation, get under the skin of the other

17   side, get the other side off message.  That feeling when you

18   haphazardly post a meme and it winds up on cable television.

19          One witness I expect the Government may call is one

20   of these online alleged coconspirators.  Here's something

21   interesting about this witness.  He will testify to you

22   without giving you his name.  He's going to testify using a

23   pseudonym, his Twitter avatar, I'm not sure.  But was  known

24   online as Microchip.  Mr. Mackey and Mr. Microchip don't know

25   each other.  Their only contact with each other was online,

OPENING STATEMENTS – MR. FRISCH          34

1    and in the Twittersphere, that's it.  To this day, Mr. Mackey

2    and Mr. Microchip have never met.  Mr. Mackey will meet

3    Microchip for the very first time when you do, when Mr.

4    Microchip walks into this courtroom to testify.  And you will

5    see at this trial why Mr. Mackey cannot be held responsible,

6    let alone criminally responsible, for what goes on in the mind

7    of a complete stranger on the internet, an anonymous stranger

8    online.

9              And this.  We all face difficult challenges during

10   the course of our lives.  Sometimes challenges arise that are

11   so difficult, so excruciatingly difficult, we are almost

12   paralyzed by the difficulty.  We can try putting it of and

13   buying time and more time and hoping it all just goes away.

14   But there comes a time that you cannot put it off any longer.

15   At these defining moments in our lives, the moments that

16   define us forever, for our kids, our families, for ourselves.

17   Some of us have the courage and the confidence and the faith

18   to face the challenge, to stand up, to stand up for ourselves

19   to have the courage and the confidence and the faith that the

20   truth will prevail.  Like Doug Mackey is doing right now.

21   Ours, you will see at this trial, lack the courage and the

22   confidence and the faith even to stand up in public and say

23   their name.

24             In response to these memes, 4,900 –– about 4,900

25   texts were registered to the number that the Government just

1    told you about.  Here's some important things about that.  I'm

2    going to stay the first one twice.  About 99 percent of the

3    approximate 4,900 texts came after the media began covering

4    the memes.  That is after Twitter took the memes down and

5    after the media began reporting about the memes.  I'm going to

6    say that again.  Approximately 99 percent of the approximate

7    4,900 texts came after the media began reporting the memes

8    after it became a national news story.  Some texted more than

9    once.  One of them texted 12 times.  Two texts said Hillary

10   Clinton for prison.  Some texted just to see what would

11   happen.  Not one registered voter saw any of these various

12   memes and failed to vote because of them.  And there's no

13   evidence that anyone texted anything as a result of the two

14   specific memes that Mr.  Mackey saw and shared that there's no

15   registered voter.  His two clicks.  Mr. Mackey, when he

16   testifies, will tell you that he last appeared online as Ricky

17   Vaughn in April, 2018 .  Five years ago.  He last stuff posted

18   in April 2018.  Five years ago, when he moved to Florida,

19   where he met and now lives with his wife.  When Mr. Mackey

20   stands up to testify, he will tell you that he and his wife

21   are expecting their first child and it's too early to know if

22   it will be a boy or girl.  Whatever views Mr. Mackey had

23   seven years ago about anything; about women, or anything else,

24   he will tell you had nothing to do with the two memes , the

25   two clicks.

1           The Government and I agree about a lot in this case.

2    We have signed stipulations, that is, agreements between us,

3    agreements that Doug Mackey was Ricky Vaughn.  There's no

4    dispute of that.  Mr. Mackey lived in Manhattan in

5    November 2016, that is, he tweeted as Ricky Vaughn from

6    Manhattan.  And not from here, the Eastern District of New

7    York.  There's no dispute about it.  One of the memes posted

8    late on November 1st expressly said that voters could text to

9    vote, but only seven days later on November 8th, no dispute

10   about that.  And you will see on these stipulations, these

11   agreements, the name of this case.  It is not United States

12   versus Twitter.  It is United States versus social media.  We

13   are not here to decide whether to regulate speech on the

14   internet or how to regulate speech on the internet consistent

15   with the First Amendment; freedom of speech.  We are not here

16   to redo the presidential election and vote for Hillary Clinton

17   or Donald Trump based on new information.  The name of this

18   case is United States versus Douglass Mackey .  We are here to

19   determine if the Government has the proof to back up its claim

20   that one person, Doug Mackey, is guilty of participating with

21   others in a criminal conspiracy by sharing two memes, two

22   clicks.

23           At criminal trials, prosecutors sometimes refer to

24   the defendant and the defendant's lawyer without using their

25   names.  The prosecutors may refer to me as the defendant's

OPENING STATEMENTS - MR. FRISCH                    37

1   lawyers or defense counsel, and that's fine.  I am

2   Mr. Mackey's defense counsel and my name doesn't matter.  But

3   Mr. Mackey is the defendant in this case because the

4   Government charged him and made him the defendant.  So every

5   time one of my friends refers to the defendant, please

6   remember that they are referring to Doug Mackey who is

7   innocent unless and until these prosecutors  back up their

8   charge with proof of his criminal guilt.

9            Behind me are five employees of the Federal

10  Government.  At my table it will be me and Mr. Mackey, except

11  when Ms. Tannenbaum, who you met in jury selection does not

12  have class and is able to be here.  Mr. Mackey and I cannot

13  compete with their resources or their numbers.  The Government

14  will show you charts with bells and whistles that look smooth

15  and sleek.  But for Mr. Mackey and me, it's okay that they

16  have more resources and more numbers.  It's okay because you

17  will see at this trial that Mr. Mackey and I have the truth.

18  Thank you very much for listening.

19            THE COURT:  Thank you, Mr. Frisch.

20            Are you ready to call your first witness?

21            MR.  BUFORD:  Yes, your Honor.  I'd like to move the

22  podium, if that's all right.

23            THE COURT:  It's fine.  Can you do it -- it's fine

24  to have the jury here.  It's not going to take that much time,

25  is it?

1           MR.  BUFORD:  It won't take that much time.

2           THE COURT:  Okay.  Go ahead.

3           MR.  BUFORD:   Your Honor, the Government calls

4    Robert McNees.

5           (Witness takes the witness stand.)

6    **ROBERT MC NEES**, called as a witness, having been first duly

7    sworn/affirmed, was examined and testified as follows:

8           THE COURTROOM DEPUTY:  Please, state and spell your

9    name for the record.

10          THE WITNESS:  Robert McNees.

11          THE COURTROOM DEPUTY:  Thank you.  You may have a

12   seat.

13          THE COURT:  Okay, Mr. McNees, a couple of things

14   before we begin.  First of all, I just want to make sure that

15   everybody in the jury box can hear you and everybody  in the

16   courtroom.  So make sure you're using the microphone.

17          Also, please don't speak too quickly.  Our court

18   reporter takes down everything that we say and we don't want

19   to make their jobs too hard.  Kind of along the same lines,

20   just let which ever lawyers is asking the question finish

21   before you start talking so you're not talking over each

22   other.  Again, it makes it hard for the court reporter.

23          If there's something that you don't understand or

24   want to have repeated, let me know and I'll instruct the

25   lawyers to do that.  And just do your best to answer only the

1    question that you're being asked, okay?

2              THE WITNESS:  Okay.

3              THE COURT:  All right.  Go ahead.

4              MR. BUFORD:  Thank you, your Honor.

5    DIRECT EXAMINATION

6    BY MR. BUFORD:

7    Q    Good morning, Mr. McNees.

8    A    Good morning.

9    Q    What do you do for a living?

10   A    I am a professor of physics.

11   Q    Where do you work?

12   A    Loyola University in Chicago.

13   Q    How long have you been there?

14   A    I began my job there in 2009.

15   Q    Do you live in the Chicago area?

16   A    I do.  I live in Chicago.

17   Q    Do you have any social media accounts?

18   A    I do.  I have accounts on Twitter, Facebook, Instagram,

19   Mastodon, and maybe a few others that I don't recall.

20   Q    What's Mastodon?

21   A    Mastodon is a social media service.  It's like a

22   federated network.  It's a collection of servers that know how

23   to speak to each other.  You can make posts and they show up

24   on all of the different servers.

25   Q    Generally speaking, what do you use your social media

1   account s for?

2   A    A variety of things.  I talk about science and science

3   history, this time of year, I talk a lot about basketball, I

4   tall about politics, stories  in the news.  Photos that I've

5   taken.  My dog.

6   Q    Does your use of social media vary by account?  In other

7   words; do you use certain accounts for some things, other

8   accounts for others?

9   A    Yeah.  I, for instance, use Facebook less than the other

10  services.  And I mostly use it to keep up with family and

11  older friends.  I tend to be more active on Twitter and

12  Mastodon.  Instagram, I mostly just post occasional  photos of

13  Lake Michigan, or my dog, or stuff like that.

14  Q    You mentioned you had a Twitter account.  For how long

15  have you had that account?

16  A    I think I started it in 2008.

17  Q    Can you tell us, generally, what's your understanding of

18  the services that Twitter offers to its users like you?

19  A    Twitter lets you upload short posts.  Then it collects

20  them and people can see them.

21  Q    What kind of content can you post on Twitter?  Is it just

22  text?

23  A    You can post text, but you can also attach images or

24  videos.  It offers other services that I don't use as much,

25  like the ability to participate in voice chats, things like

ROBERT MC NEES – DIRECT – MR. BUFORD                    41

1    that.

2    Q     Are you familiar with a term followers on Twitter?

3    A     Yes.

4    Q     What does that mean, in your experience?

5    A     Followers are people that have essentially subscribed to

6    your account.  When you post something, your followers see it.

7    Everyone  has a timeline and their timeline is, at least one

8    of their timelines is made up of posts from people they

9    follow.  That they're subscribed to.

10   Q     What do you use Twitter for primarily?

11   A     Twitter primarily if you're talking about science,

12   science history, basketball, sometimes politics.  Pictures,

13   photos I've taken.

14   Q     I want to direct your attention now  to the fall of 2016.

15         Were you using your Twitter account at that time?

16   A     I was.

17   Q     What was your Twitter user name or handle at that point?

18   A     It's the same as my last name, McNees.

19   Q     Has that user name been the same throughout the time that

20   you've had Twitter?

21   A     My user name, yes.

22   Q     About how often were you using Twitter in the fall of

23   2016?

24   A     Daily.

25   Q     Did you have followers on Twitter during that time?

ROBERT MC NEES – DIRECT – MR. BUFORD                42

1   A     Yes, I did.

2   Q     Do you recall approximately how many?

3   A     I don't remember the exact  number.  More than 1,000

4   maybe less than 10,000.  I don't recall exactly.

5   Q     Were you following the presidential election in the fall

6   of 2016?

7   A     Yes, I was.

8   Q     Did you have a preferred candidate?

9   A     Yes, I did.

10  Q     Who was that candidate, at least, in the general

11  election?

12  A     In the general election I was supporting Hillary Clinton.

13  Q     Did you use Twitter to follow the 2016 election?

14  A     I did.  I followed stories about the election.  I looked

15  at what campaigns were saying.

16  Q     Had you observed anything from the Clinton campaign as

17  far as posts or Twitter during the time you were watching the

18  election?

19  A     Yes, I had seen a number of posts from both the candidate

20  and from the campaign.

21  Q     Did there come a time shortly before Election Day

22  relating to how people could vote in the 2016 election?

23  A     Yes, I saw a post suggesting that people could vote by

24  texting with their phones.

25  Q     Did you observe one such image or multiple such images?

McNees – Direct – Buford                    43

1    A    I observed several such images.

2              MR. BUFORD:  I'd like to show, for the witness only,

3    what's been marked for identification as Government exhibit

4    720.

5              (The above-referenced exhibit was published to the

6    witness.)

7    Q    Professor McNees, can you see that on your screen?

8    A    Yes, I can.

9    Q    Do you recognize that?

10   A    I do.

11   Q    Without necessarily telling us the specific content, can

12   you tell us, generally, what it is?

13

14

15   A    It appears to be a screen shot of a post with an attached

16   image like the one I mentioned before, suggesting that people

17   can vote by text.

18   Q    Did you take this screen shot?

19   A    I believe so.

20   Q    Does Government Exhibit 720 fairly and accurately

21   represent the image that you saw on Twitter?

22   A    Yes, it does.

23             MR.  BUFORD:  Your Honor, we would offer Government

24   Exhibit 720.

25             THE COURT:  Any objection?

1          MR. FRISCH:  No, your Honor.

2          THE COURT:  Okay.  That's in evidence.

3          (Government Exhibit 720, was received in evidence.)

4          MR.  BUFORD:  And if the Court will permit...

5          THE COURT:  Sure.  Ladies and gentlemen, I just

6    want to tell you that generally with pieces of evidence that

7    anything that comes into evidence you will be able to review

8    during your deliberations.  So it's not going to be a

9    one-shot-deal.  You will be able to see them once you're back

10   in the jury room.

11   Q    Professor McNees, looking first at the top of this

12   exhibit, there's writing that says Publius Gaius, and an at

13   sign the Ricky Vaughn.

14          What did you understand that to mean when you saw

15   it?

16   A    The at Ricky Vaughn is the username associated with the

17   account.  And then the Publius Gaius is a screen name that the

18   user can select that appears next to their avatar along with

19   their posts.

20   Q    Had you ever noticed tweets or posting from this user

21   before you observed this one?

22   A    I believe that day I had seen some other posts by that

23   user.

24   Q    Looking at the image below the username, can you tell us,

25   generally, what we're looking at here?

1  A     This is an image of a black woman holding an African

2  Americans for Hillary Clinton sign, and there 's texts that

3  says avoid the line, vote from home, text Hillary from 59925.

4  Vote for Hillary and be a part of history.  There's a, what

5  looks like a Hillary Clinton logo on the bottom left corner.

6  And then at the bottom, there's a, sort of, fine print text

7  that says must be 18 or older to vote.  One vote per person.

8  Must be a legal citizen of the United States.  Voting by text

9  not available in Guam, Puerto Rico, Alaska or Hawaii.  Paid

10 for by Hillary for president 2016.

11 Q     And looking at the top of the image, there's some writing

12 that says number sign I'm with her, and number sign, go

13 Hillary.

14        What was your understanding of these notations?

15 A     Those are hashtags on Twitter, which is a way of making

16 sure that a post is organized according to a theme that other

17 people might use the same hashtag.  And when you click on it,

18 you can see a timeline of other posts with that hashtag.  It's

19 a way of making your posts visible of people that might be

20 following a specific issue or topic.

21 Q     Are hashtags independently searchable on Twitter; in your

22 experience?

23 A     Yes, they are.

24 Q     Had you seen any of these hashtags before you saw this

25 image?

1  A    Yeah I, had seen I'm with her as, you know, a slogan of

2  the Hillary Clinton campaign, so often attached to posts about

3  the candidate.  Go Hillary is pretty generic, but I believe I

4  had seen that as well.

5  Q    You testified earlier that your preferred candidate was

6  Hillary Clinton; is that right?

7  A    Yes.

8  Q    Had you seen campaign advertisements or announcements

9  from her campaign on Twitter?

10 A    Yes, I had.

11 Q    How did this image compare with advertisements that you

12 had seen from the Clinton campaign?

13 A    I would say it's visually similar.  Sort of, the graphic

14 entity.  You know, the logo is there.  It reminded me of them.

15 Q    Looking at the bottom left of the exhibit, there's a date

16 and time there.  What did you understand that to be?

17 A    Posts on Twitter are time stamped.  So that would have

18 been the date of the post and the time that it was posted.

19 I'm not sure in which time zone it refers to.

20 Q    I believe you testified that you took a screen shot of

21 this tweet.  Do you recall approximately when you took that

22 screen shot?

23 A    I would say either the afternoon of the 1st or maybe the

24 morning of the 2nd.  I don't recall which one.

25 Q    There's also a  notation at the bottom which says 36

McNees – Direct – Buford                    47

1    retweets and 65 likes.  What did you understand that to mean?

2    A    A retweet on Twitter is when you see a post and you like

3    to make sure your followers see it.  So you click a button

4    that says retweet, and then it is shared with your followers

5    just like your post would be.  So when that screen shot was

6    taken it had been retweeted 36 times.  The 65 likes, there's

7    also a button that you can click, which is like.  Which I

8    don't think directly shares it with your followers, but maybe

9    has an impact on Twitter's algorithm for what appears.  And

10   certainly you have a record of the post you liked, so you can

11   go back and see them.

12   Q    I believe you testified that you saw other images similar

13   to this one?

14   A    Yes, I did.

15          MR.  BUFORD:  I'm going to show for the witness only

16   what's been marked for identification as Government

17   Exhibit 721.

18          (The above-referenced exhibit was published to the

19   witness.)

20   Q    Do you recognize this?

21   A    Yes.

22   Q    Again, without necessarily describing the specific

23   content, can you tell us generally what it is?

24          THE COURT:  I'm going to ask.  Do you have any

25   objection to this going in?

1          MR. FRISCH:   I have no objection.

2          THE COURT:   All right.  This will be in evidence.

3    What it is, 721 ?

4          MR.  BUFORD:  Yes, your Honor.

5          THE COURT:   It will be in evidence, but you can

6    continue to ask questions about it.

7          (Government Exhibit 721, was received in evidence.)

8    Q    Professor McNees, looking at the top of this image,

9    what's your understanding of who distributed this image over

10   Twitter?

11   A    The same account as the previous image.  At the Ricky

12   Vaughn.

13   Q    And looking at the writing preceding by the number signs,

14   are these hashtags again?

15   A    Yes.  The first one is the I'm with her hashtag, and the

16   second one looks like it was an attempt at the go Hillary

17   hashtag, but there's a space between the go and Hillary.  So

18   the hashtag would just be go.

19   Q    What's your understanding of the effect of that space

20   between the go and the Hillary?

21   A    The hashtag has to be complete characters with no spaces.

22   So if you are clicking on the go Hillary hashtag, you wouldn't

23   see this post.  But if you clicked on a go hashtag, you would.

24   Q    Going back out to look at the image, do you speak

25   Spanish?

1   A     I do not.

2   Q     Even without speaking Spanish, did you form an

3   understanding as to the meaning of the content of this image?

4   A     I assuming it was the same content as the previous image.

5          MR.  BUFORD:  Your Honor, if the court will permit

6   we can read a stipulation.

7          THE COURT:  Sure.  You don't have to read every word

8   of it, but you can read the substance.

9          MR. BUFORD:  Understood, your Honor.  Thank you.

10         This is marked as Government Exhibit 900 and reads

11  in substantive part.  If called as a witness at trial, Francis

12  F. Ontoria, a federally certified court interpreter, employee

13  of the U.S. Attorney's Office, will provide the following

14  translation of the Spanish  language statements and  the image

15  contained in Government Exhibit 721.

16         In the upper left of the exhibit, save time, avoid

17  the lines, vote from home or work.  In the upper right; let's

18  make history, men and women together, dash H.

19         In the middle left, send an SMS writing quote

20  Hillary to number 59925 this November 8th.

21         Bottom, to vote is a requirement to be at least

22  18 years old.  One vote per person.   Is required to be a

23  legal citizen of the United States.  Text voting is not

24  available in Guam, Puerto Rico, Alaska, or Hawaii, and it is

25  paid for by Hillary -- add paid for by Hillary for president,

1   2016.

2              It's agreed that the translation  above is a true

3   and accurate English translation of the above text in

4   Government Exhibit 721 and it's signed by the parties.

5              THE COURT:   Okay.  I think I mentioned in my

6   opening instructions that one of the types of evidence you'll

7   hear is stipulations between the parties.  This is one of

8   those.  Go ahead.

9   Q    Similar to the question before, how did this image

10  compare to other images that you had observed that you

11  understood to have been released by the Clinton campaign?

12  A    It reminded me of the visual that I had seen from the

13  campaign.  The colors and texts, the general layout, the use

14  of the logo.  You know, fine print disclaimer text at the

15  bottom.

16  Q    Did you take a screen shot of this image when you saw it?

17  A    I did.

18  Q    Do you recall approximately when you did that?

19  A    Either the afternoon of the 1st or the morning of the

20  2nd.

21             MR.  BUFORD:  I'd like to show for the witness only

22  what's been marked for identification as Government

23  Exhibit 722.

24             THE COURT:  Do you object to this?

25             MR. FRISCH:  I do not object to this.

1        THE COURT:  This will be 722 in evidence.

2        (Government Exhibit 722, was received in evidence.)

3   Q    Looking at the top of this exhibit, can you help orient

4   us to what we're looking at here?

5   A    Yes.  This is a tweet by a different account.  At

6   Nia4_Trump that has been retweeted by the at Ricky Vaughn

7   account.

8   Q    What is the username of the Nia user?

9   A    @NIA4_Trump.

10  Q    And there's text there that begins with the at sign the

11  Ricky Vaughn.  Can you read that for us?

12  A    At the Ricky Vaughn, thanks for spreading the word.

13  Hashtag MAGA, hashtag I'm with her, hashtag vote.  Hillary

14  from home, save time and avoid the line.

15  Q    And can you read for us the fine print at the bottom of

16  the image?

17  A    Yes.  It says must be 18 or older to vote.  One vote per

18  person.  Must be a legal citizen of the United States.  Vote

19  by text not available in Guam, Puerto Rico, Alaska or Hawaii.

20  Paid for by Hillary for president 2016.

21  Q    If we -- what's your understanding of a retweet?

22  A    A retweet is when you see a post by another user and you

23  want to share it with the people that follow your account.  So

24  you click a button that says retweet and then it appears in

25  their timeline as if a post by you would appear in their

1    timelines.

2    Q     Just to understood the sequence.  What's your

3    understanding  of who originally tweeted this image out in

4    this exchange?

5    A     In this exchange, it looks like it was tweeted by the at

6    Nia for Trump account.  And the at Ricky Vaughn at the

7    beginning of the tweet is tagging the at the Ricky Vaughn

8    account so they would see it.  And then at the Ricky Vaughn

9    retweeted the post.

10   Q     When you say tag, what do you mean by that?

11   A     Including the username with the at sign in the post, the

12   person who is mentioned gets a notification from Twitter that

13   they have been mentioned.  If it begins with the username like

14   it does here, at the Ricky Vaughn, then only people that

15   follow both accounts would see it at first.  And then once

16   it's retweeted, everyone that follows the at the Ricky Vaughn

17   account would see it.

18   Q     And there are three hashtags in this text exchange; is

19   that correct?

20   A     That's correct.

21   Q     Those are number sign MAGA, number sign I'm with her, and

22   number sign vote; is that correct?

23   A     Yes, that's correct.

24   Q     There's some numbers at the very bottom of the image that

25   say 109 and 139.  What's your understanding of those numbers?

1    A     The 109  next to that symbol meant that it had been

2    retweeted 109 times.  The graphics and interface used by

3    Twitter changed over the years, but at  the time I think that

4    was the sign they used for retweets.  The 139 is the number of

5    times it had been liked.  It's a non-standard icon because I

6    had modified my computer to display it differently.

7    Q     But your understanding is that represented likes?

8    A     That's correct.  139 likes.

9    Q     And similar to the other question.  How did this image

10   compare with other images that you observed on Twitter that

11   you believe to be put out by the Clinton campaign?

12   A     You know, it was the same visual colors, text layout,

13   picture of the candidate, has the logo on the bottom right

14   corner.  Has the sort of disclaimer text that I had seen from

15   other images released by the campaign.  Paid for by Hillary

16   for president, 2016.

17   Q     Did you take a screen shot of that when you saw it?

18   A     I did.

19   Q     Do you recall approximately when?

20   A     Either the afternoon of the 1st or the morning of the

21   2nd.

22   Q     Professor McNees, what, if anything , did you do in

23   response to seeing these images?

24   A     I collected some of them and submitted a report to

25   Twitter.  And then, I also posted about it suggesting that

1    other people report it.

2    Q     Why did you do that?

3    A     Because I don't think that it is appropriate to spread

4    disinformation about how to vote before an election.

5    Q     Do you recall approximately when you reported the images

6    to Twitter?

7    A     I believe I reported them on the afternoon of the 1st.

8    Q     After you reported the images to Twitter, did you

9    continue to see similar images on Twitter?

10   A     Yes, I did.

11          MR.  BUFORD:  I'd like to show for the witness only

12   what's been marked for identification as Government

13   Exhibit 727R.

14          THE COURT:  I'm going to ask again.  Is this

15   something that you object going into evidence?

16          MR. FRISCH:  I haven't seen it yet.

17          THE COURT:  Oh, okay.  It's fine if you do.  I

18   thought we could save some time.

19          MR. FRISCH:  I have no objection, Judge.  Thank you.

20          THE COURT:  That will be in evidence.  Tell me

21   again.

22          MR.  BUFORD:  It's 727 .  We're going to mark it R,

23   your Honor.

24          THE COURT:  Okay.

25          (Government Exhibit 727R, was received in evidence.)

McNees – Direct – Buford                    55

1    Q    Professor, McNees, can you tell us, generally, is this a

2    tweet that you sent out?

3    A    Yes, it is.

4    Q    When did you send the tweet out?

5    A    It looks like I sent it out on November 8, 2016.

6    Q    We'll talk about your message in a moment, but does the

7    tweet consist of two images that you captured and included in

8    the tweet?

9    A    It does.  There's text and then two images that I

10   attached to the tweet.

11   Q    Looking first at the image on the left, does this appear

12   to be substantially  the same image as the one we looked at in

13   Government Exhibit 722?

14   A    That is right.  It's the same image shared by a different

15   account.

16   Q    Is there a hashtag associated with the image?

17   A    There is.  There's a hashtag Election Day.

18   Q    Now looking at the image on the right, what is this?

19   A    That is a tweet by another account that has either

20   attached a screen shot of a tweet by the at the Ricky Vaughn,

21   or it might be a quote tweet, which is an option.  It's like a

22   retweet, but it lets you attach your own text above the tweet.

23   Q    And there's an at sign Hillary Clinton.  Do you see that?

24   A    Yes.

25   Q    What's your understanding of what that meant?

1   A      That would be tagging Hillary Clinton's Twitter.  The

2   account.

3   Q      And there 's text underneath that.  What does that say?

4   A      It says don't forget to vote tomorrow.  Avoid long lines,

5   just text your vote for Hillary.  Only one vote per phone.

6   Hashtag, looks like it's supposed be I'm with her, but they

7   left an H out.  So I'm wit her.

8   Q      Underneath that, is there what looks to be another tweet?

9   A      There is.

10  Q      Within the same image on the right, sorry.  What's your

11  understanding of this?

12  A      Yes.  I'm having a hard time -- the text is a little

13  blurry.  Looks like it was tweeted by someone with a screen

14  name -- sorry, this one.  It likes like it's a tweet by

15  someone with the screen name Fountainhead.  The text says

16  Hillary voters get to vote text via text, but Trump supports

17  have to go to the polls, not fair.  Hashtag I'm with her,

18  hashtag Hillary.  And then there is another image it says vote

19  early, text Hillary to 59925 today.  The blue background with

20  stars and a black and white photo of Hillary Clinton on the

21  right.  And the bottom left corner there's a Hillary Clinton

22  logo and is it says in larger text than before, paid for by

23  Hillary for president.  And then there's smaller disclaimer

24  text underneath that I can't read.

25              (Continued on the next page.)

R. MC NEES - CROSS - MR. FRISCH                    57

1    DIRECT EXAMINATION

2    BY MR. BUFORD:

3    Q    Zooming back out to look again at the entire tweet that

4    you sent, why did you send this tweet out on November 8th?

5    A    It was Election Day and I was still seeing tweets with

6    images encouraging people to vote by text.

7    Q    And why was that a concern to you?

8    A    I don't think that people should spread disinformation

9    about how to vote.  Giving someone instructions about how to

10   vote that aren't true would mean that their vote wouldn't

11   count.

12             MR. BUFORD:  Your Honor, may I have one moment.

13             THE COURT:  Sure.

14             (A brief pause in the proceedings was held.)

15             MR. BUFORD:  No further questions.

16             THE COURT:  Cross-examination.

17             MR. FRISCH:  Sure, Judge.

18   CROSS-EXAMINATION

19   BY MR. FRISCH:

20   Q    Professor, good morning.

21   A    Good morning.

22   Q    I'm Andy Frisch and I'm here with Mr. Mackey.

23             You and I have never met, correct?

24   A    No the that I'm aware of.

25   Q    We're talking, as far as you can recall, we are talking

R. MC NEES – CROSS – MR. FRISCH                    58

1    for the first time with each other, correct?

2    A    That's correct.

3    Q    Can I ask Ms. Pershad to call up 721 in evidence.

4         I think you testified you're not a fluent Spanish

5    speaker, but do you see that in the bottom middle it says,

6    would you agree with me that says November 8th in the red?

7    A    Well, I don't speak Spanish, but that's what it looks

8    like.

9    Q    All right.  Fair enough.

10        And this particular meme you saw on November 1st,

11   correct?

12   A    I believe so.

13   Q    And the other meme which was 7/20.

14        MR. FRISCH:  Ms. Pershad, can I impose on you for

15   720.

16   Q    This one you saw on November 1st?

17   A    I believe so.

18   Q    Now, you said that you reported these --

19        You can leave that up for a moment --

20        You reported these to Twitter the afternoon of

21   November 1st, correct?

22   A    I believe that's correct.

23   Q    And when you say "the afternoon," fair to say you mean

24   some time no later than 6:00 p.m. on November  1st?

25   A    I don't recall the exact time.

R. MC NEES - CROSS - MR. FRISCH                    59

1   Q     Well, I'm sorry, I didn't mean to talk over you.

2         Go ahead I'm sorry.

3   A     I don't recall the exact time.

4   Q     But was it -- do you recall that it was before 6:00 p. m.

5   or not?

6   A     I don't recall that.

7   Q     Do you recall that you received a response from Twitter,

8   the initial response from Twitter, when you complained about

9   it?

10  A     I recall receiving a response from Twitter.

11  Q     And do you recall that you received a response from

12  Twitter on November 1, 2016, at 5:14 p.m?

13  A     That's not the time I recall but I don't know if that's

14  correct or not.

15  Q     Let me somehow -- let me mark for identification -- let

16  me use the Government's number.

17        Let me show just for your eyes only 3500-RN-2.  And

18  I' m going to direct your attention to the middle of the page

19  the timestamp and I'm going to ask you if it refreshes your

20  recollection that you received a response from Twitter on

21  November 1st at 5:14 p.m.?

22  A     Okay.

23  Q     Okay.  Thank you.

24        My question is, feel free if you need to look

25  anything you to.

R. MC NEES – CROSS – MR. FRISCH                60

1              My specific question is:  Does looking at this

2     specific document refresh your recollection that you received

3     a response to your complaint that you received a response from

4     Twitter on November 1, 2016, at about 5:14 p.m.?

5     A    Yeah, I received an acknowledgement that I had submitted

6     a report.

7     Q    And the acknowledgement was 5:14 p.m., correct?

8     A    Yes, that's what it looks like.

9     Q    And the meme we just saw a moment ago, which I think was

10    720, you testified on direct that that was -- that that had a

11    timestamp on it of 4:34 p.m. November 1st, correct?

12    A    Yes, that's correct.

13    Q    So you complained to Twitter about that meme within an

14    hour of its posting as far as you can tell, right?

15    A    Yes.

16              MR. FRISCH:  Ms. Pershad, if you can call up 727.

17              I may have asked you to call up the wrong number.  I

18    apologize.  Okay.  We'll take that down -- thank you --

19    anyhow.  I will go back and correct the numbers.

20    Q    Even after Twitter acknowledged your complaint on

21    November 1, 2016, at about 5:14 p.m., you saw memes a week

22    later on Election Day November 8, 2016, correct?

23    A    Yeah, I think so.

24    Q    Is it your testimony that you saw a meme on November  8th

25    that had that avatar for Ricky Vaughn, is that your testimony?

R. MC NEES – CROSS – MR. FRISCH                61

1    A    Can you show me the image?

2    Q    On the bottom of 727.

3         MR. FRISCH:  May I consult with the Government to

4    see if I can get my right number.

5         THE COURT:  Sure.

6         MR. FRISCH:  Thank you.

7         (A brief pause in the proceedings was held.)

8         MR. FRISCH:  I'm sorry, I apologize.

9         THE COURT:  Mr. Frisch, can I ask you also to slow

10   down just a little bit.

11        MR. FRISCH:  Sure.

12        THE COURT:  Okay.  Thanks.

13   Q    So if you can now look again at 727.  And if I asked you

14   this question just now forgive me.  But on this 727, which you

15   testified you saw on November 8th, do you see any reference on

16   here to Ricky Vaughn?

17   A    No, I don't see any of that image.

18   Q    All right.  Thank you, sir.

19        Now, prior to seeing the memes, the meme on

20   November 1, 2016, at about 4:34 p.m., have you been aware of

21   Ricky Vaughn?

22   A    Prior to when?

23   Q    November 1, 2016, at 4:34 p.m.?

24   A    I think earlier that day, I had seen things from Ricky

25   Vaughn.

R. MC NEES – CROSS – MR. FRISCH                    62

1   Q    Had you --

2             Were there memes of this sort about voting by text?

3   A    No, I had seen other posts.

4   Q    And when you saw those other posts, did you look for

5   other things that he had posted?

6   A    I think I just saw the user's timeline which had other

7   things they were posting.

8   Q    And is that how you came to see the meme that we just

9   looked at, Government Exhibit 720?

10  A    I believe it is.

11  Q    So, in other words, you saw it because you were looking

12  for things posted by Ricky Vaughn; is that right?

13  A    I was looking at things posted by Ricky Vaughn.

14  Q    Now, other than seeing this post on November  1, 2016,

15  previously, had you seen other memes about vote to text on

16  Twitter?

17  A    I don't recall.

18  Q    But you might have?

19  A    I don't know.

20  Q    Do you recall that you reported memes other than the ones

21  about which you testified here today?

22  A    I don't recall what else I reported.

23  Q    In any event, it appeared to you that the memes we've

24  looked at were an intentional impersonation of the Clinton

25  campaign; is that your testimony, correct?

R. MC NEES - CROSS - MR. FRISCH                    63

1    A    That's what it looked like.

2    Q    Have there been occasions where you have used your

3    Twitter account to report violations of other types of rules?

4    A    Yes.

5    Q    Have you done that once or more than once?

6    A    More than once.

7    Q    More than a dozen times?

8    A    Possibly.

9    Q    So let me show you what I've marked before I do that who

10   is Jabari Parker, J-a-b-a-r-i.

11   A    I don't recall.

12   Q    Let me show what you I've marked for identification as

13   Douglass Mackey Exhibit 1 for your eyes only and ask if it

14   refreshes your recollection, if you've seen it before.

15        MR. BUFORD:  Your Honor, I don't know if the witness

16   can see it.  We can't see it here.

17        THE COURT:  We're working on it.

18        It's not our home courtroom.

19        MR. BUFORD:  Understood.

20   Q    The only question I have right now is:  Can you see that

21   on your screen?

22   A    I can now, yes.

23   Q    Okay.  Do you recognize that as a something you posted on

24   Twitter?

25   A    Looks like my account.

1          MR. FRISCH:  I offer it.

2          THE COURT:  Any objection?

3          MR. BUFORD:  No objection, your Honor.

4          THE COURT:  All right.  That will be is that

5     Defendant's 1.

6          MR. FRISCH:  Yes, Your Honor it is.

7          THE COURT:  That's in evidence.

8          MR. FRISCH:   Thank you.

9          (Defendant's Exhibit 1 was marked in evidence as of

10    this date.)

11    Q    So this is something you posted on Twitter this Mackey

12    Exhibit 1, correct?

13    A    It looks like it, yes.

14    Q    That's your name on top, Robert McNees?

15    A    Yes.

16    Q    Is that a picture of one of your dogs in the past?

17    A    It's a picture of my current dog.

18    Q    Your current dog.

19          And it says, "Due to Jabari Parker endorsing a

20    product in violation of NCAA rules."

21    A    Yes.

22    Q    Do you see that?

23    A    Yes.

24    Q    And the NCAA is the organization that makes rules for

25    college basketball?

1   A     It is.

2   Q     Let me show you for your eyes only for identification

3   Mackey Exhibit 2.  And let me see if I can zoom in on that to

4   see the whole thing.  Take a moment, take a look at that,

5   please.

6             THE COURT:  Have you had a chance to look at this?

7             THE WITNESS:  Yes, I have.

8   Q     Professor, do you recognize this as something you posted

9   on he Twitter?

10  A     Yeah, it looks like my account.

11            MR. FRISCH:  I offer No. 2.

12            MR. BUFORD:  Objection.

13            THE COURT:  Can I see the parties at the side for a

14  minute with the court reporter.

15            (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                              66

1            (Sidebar conference.)

2            THE COURT:  What's your objection?

3            MR. BUFORD:  So this particular post, your Honor, it

4    appears to be a reference to NCAA rule violations as opposed

5    to Twitter rules violations.

6            I think the fact that he may have reported other

7    Twitter violations to Twitter may have some relevance, but the

8    fact that he is commenting on a possible NCAA rules violation

9    seems of no relevance to us.

10           THE COURT:  I must say to  escapes me.

11           MR. FRISCH:  So there's a number of these that he's

12   admitted to and I'm not going to  go into all of them that we

13   found.  But I want to make the point that the professor is

14   somebody who has a tendency to -- it's that somebody who --

15   he's put his credibility on and the Government's witness

16   credibility in play putting in his opinion of what's a

17   violation and what's intentional impersonation, what should be

18   taken down.

19           What I want to do is show another one of these,

20   finish this, not beyond this one, to point out that this is

21   something he does generally and he doesn't just see this Ricky

22   Vaughn thing and say Oh, my God this is a violation.  I want

23   to put it in some perspective.

24           THE COURT:  That doesn't -- I'll permit it.

25           Let me say something, though, because I forgot to

1  tell you guys all this before you started.

2          So if you don't object, or you don't object to

3  something, I prefer to save the all this fascinating

4  foundation questions.  I mean, just because we can move it

5  along a little faster but I don't want to put you on the spot

6  that way.

7          MR. FRISCH:  I also don't want to object and say "no

8  objection."

9          THE COURT:  We can save a little time that way.

10         And the second thing is that, it's not a big deal

11  yet, just for future, and it has nothing – – it's not a big

12  deal, but if you have a lot of documents, I'm not a big fan of

13  reading every single word in the document.  Maybe you weren't

14  even planning on doing that but I usually tell people that

15  before because if the document's in evidence, you'll be able

16  to use it for whatever reason you want and that's the end of

17  my lecture.

18         Go ahead.

19         MR. BUFORD:  Your Honor, I just want to renew my

20  objection to the specific exhibit because, again, I think he's

21  commenting not on Twitter rules but on NCAA rules.  It's

22  sports comment, there's no relevance.

23         THE COURT:  It's not particularly relevant.  I also

24  don't think it's prejudicial.

25         Do you have something else that's a complaint to

1    Twitter as opposed to NCAA?

2              MR. FRISCH:  I think so.  I have to go look at what

3    I have.

4              THE COURT:  It's fine if you want to use this.  Is

5    this the last one you're going to use?

6              MR. FRISCH:  It is now.

7              THE COURT:  Okay.  All right.

8              And then the only thing is this should be

9    Defense A because you use letters, they use numbers.  It's too

10   confusing.

11             MR. FRISCH:  I typed up all my exhibits with

12   numbers.

13             THE COURT:  We'll fix it.  The only other thing is I

14   think we need to give them a break at some point.

15             Do you have a lot more with this witness?

16             MR. FRISCH:  I was going to say that at an

17   appropriate time if we can take a bathroom break, I appreciate

18   it.  I have bit more maybe we can get through this and get him

19   off the stand.

20             THE COURT:  Great so we'll switch it to Defense A

21   and B.  Thank you.

22             (End of sidebar conference.)

23             (Continued on the next page.)

24

25

1              (In open court.)

2              THE COURT:  The objection is overruled.  But that's

3    should be just as my courtroom deputy reminds me.  This should

4    be defense exhibit A and this one is B I think; is that right.

5              MR. FRISCH:  Correct, Judge.

6              THE COURT:  Go ahead.

7              (Defense Exhibit A & B, were received in evidence.)

8    BY MR. FRISCH:

9    Q    Just to finish up with this one.  This was an example --

10             MR. FRISCH:  Withdrawn.

11   Q    In this tweet, be you were making the point that Duke had

12   violated the rules of college basketball by attempting to

13   recruit the basketball player Stefan Curry when he played for

14   Davidson University; is that right?

15   A    I don't recall the actual post but that's what it looks

16   like.

17   Q    That's your name at the top with the photograph of your

18   current dog, right?

19   A    Yes.

20   Q    Okay.  Thank you.

21             And I'm not going to go through more of these, but I

22   think you testified a moment ago that these are not the only

23   examples of times that you've tweeted about a violation of

24   this rule or that; true?

25   A    Can you repeat the previous question about violation of

1    rules?

2    Q    These aren't the only examples of times that you posted

3    about violations of various rules, true?

4    A    Yes.  These are posts messaging violations of rules.

5              THE COURT:  I think he's just asking you if there

6    were other times that you did that as well.

7              THE WITNESS:  I'm sure.

8    Q    Okay.  Thank you, Professor.

9              Now, after you --

10             MR. FRISCH:  Withdrawn.

11   Q    Initially, you received a response from Twitter that the

12   post, the one that we saw posted November  1, 2016.

13   Initially, Twitter responded to you by telling you it was not

14   a violation of Twitter's rules; is that correct?

15   A    That's correct.

16   Q    And you posted that response from Twitter, correct?

17   A    Yes.

18   Q    And you recall that you posted it, I won't hold you to

19   the exact time, put you posted it some time on the morning of

20   November 2, 2016?

21   A    Yes, I believe so.

22   Q    And in response to that post, the media picked it up;

23   correct?

24   A    That is correct.

25   Q    In fact, your post of Twitter's response to your

R. MC NEES – REDIRECT – MR. BUFORD                71

1  complaint was shared widely by the media, correct?

2  A    Yes.

3  Q    And news stories were written about these memes, correct?

4  A    That is correct.

5  Q    And these news stories began on November 2nd, correct?

6  A    I don't recall exactly when they began but maybe.

7  Q    In any event, as of November 2, 2016, your understanding

8  was that misinformation about voting was not illegal, correct?

9          MR. BUFORD:  Objection.

10         MR. FRISCH:  Your Honor, I have nothing else,

11 Professor, thank you.

12         THE COURT:  Any redirect?

13         MR. BUFORD:  Yes, Your Honor.

14 REDIRECT EXAMINATION

15 BY MR. BUFORD:

16 Q    Professor McNees, in your response to your complaint from

17 Twitter, you were asked some questions about Twitter's initial

18 response; is that correct?

19 A    Yes, that's correct.

20 Q    What was Twitter's ultimate position with respect to

21 whether these posts were in violation of their rules?

22 A    I was told that they were a violation of the rules and

23 they would be taken down.

24 Q    Who told you that?

25 A    Jack Dorsey who was the head of Twitter at the time.

R. MC NEES - RECROSS - MR. FRISCH                72

1    Q    How did you hear that from Jack Dorsey?

2    A    He directly responded to my tweet.

3    Q    I'd like to show for identification what's been marked as

4    Government Exhibit 726.

5              MR. BUFORD:  It's for the witness only unless

6    there's an objection?

7              MR. FRISCH:  There's no objection.

8              THE COURT:  That will be 726 in evidence.

9              (Government Exhibit 726, was received in evidence.)

10   Q    Professor McNees, looking at the top, is this Jack

11   Dorsey's response to you?

12   A    Yes, it is.

13   Q    And in the second row, is that another response from Jack

14   Dorsey?

15   A    Yes, it is.

16   Q    In response to your other complaints to Twitter had you

17   ever received a personal message from Jack Dorsey?

18   A    Not that I recall.

19             MR. BUFORD:  No further questions, your Honor.

20             THE COURT:  Any re-cross?

21             MR. FRISCH:  One question.

22             THE WITNESS:  Can I ask it from here?

23             THE COURT:  Of course.

24   RECROSS-EXAMINATION

25   BY MR. FRISCH:

1   Q    If we can keep 726 op the screen.

2              Is it correct that you received this from Mr. Dorsey

3   also on November 2nd of 2016?

4   A    I don't recall if it was that day or the next.  I don't

5   recall.

6              MR. FRISCH:  Fair enough.  Your Honor, thank you.

7              THE COURT:  Okay.  Anything else from the

8   Government?

9              MR. BUFORD:  No, Your Honor.

10             THE COURT:  All right.  Thank you so much,

11  professor, you can step down.

12             (Witness leaves the witness stand.)

13             THE COURT:  Now, ladies and gentlemen, I usually

14  give you a break earlier a little earlier than.  We got

15  started later but I think we'll it take now.  Just a

16  ten-minute  break.  Please don't talk about the case at all

17  but we'll see you back in about be ten minutes.

18             *** Proceedings COURTROOM DEPUTY:  All rise.

19             (Jury exits courtroom.)

20             COURTROOM DEPUTY:  You may be seated.

21             THE COURT:  Anything before we break?

22             MR. BUFORD:  Not from the Government.

23             MR. FRISCH:  No.

24             THE COURT:  See you in a few minutes.

25             (A recess in the proceedings was taken.)

R. MC NEES - RECROSS - MR. FRISCH                    74

1           THE COURT:  Ready for the jurors.  Are we going to

2    fish finish the witness by lunch.

3           MR. PAULSEN:  What time is lunch?

4           THE COURT:  1:00.

5           MR. PAULSEN:  I think so.

6           (A brief pause in the proceedings was held.)

7           COURTROOM DEPUTY:  All rise.

8           (Jury enters courtroom.)

9           COURTROOM DEPUTY:  You may be seated.

10          THE COURT:  All right.  Welcome back, everybody.

11   We're ready to proceed.

12          Are you ready to call your next witness?

13          MR. GULLOTTA:  Yes, Your Honor.

14          The Government calls Ms. Jessica Morales Rocketto.

15          (Witness takes the witness stand.)

16   **JESSICA MORALES ROCKETTO**, called as a witness, having been

17   first duly sworn/affirmed, was examined and testified as

18   follows:

19          COURTROOM DEPUTY:  Thank you.  Please state your

20   name for the record.

21          THE WITNESS:  Jessica Livoti, and also Jessica

22   Morales Rocketto.

23          THE COURT:  I just want to make sure everybody can

24   hear you so you've got the microphone there, look like it's in

25   the right position.

1          Also, try not to speak too fast.  Our court reporter

2   takes down everything you say and if we race along it makes

3   their job harder.  Same thing when a lawyer is asking you

4   questions, just let the person finish talking before you start

5   talking.  Again, so it does make the court reporter's job too

6   difficult.

7          If there is a question you don't understand or want

8   to have it repeated, just let me know.  And just do your best

9   to answer only the question that you're being asked, okay?

10          THE WITNESS:  Okay.

11          THE COURT:  Go ahead.

12          MR. GULLOTTA:  Thank you, your Honor.

13   DIRECT EXAMINATION

14   BY MR. GULLOTTA:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    What date city and state do you live in?

18   A    Washington D.C.

19   Q    And are you currently employed?

20   A    Yes.

21   Q    What do you do for a living?

22   A    I'm the Chief of Moonshot Strategies for an organization

23   called Equis.

24   Q    What Equis?

25   A    We are an organization dedicated to understanding and

1   increasing the Latino vote and Latino influences belonging in

2   the United States.

3   Q     What do you do as Chief of Moonshot Strategies?

4   A     It's a fun title.  It means that I run a portfolio that

5   works to build a bunch of different programs that helps

6   increase voter participation and increase influence and

7   belonging the way Latinos see themselves.

8   Q     How long have you been at Equis?

9   A     I started there officially in January of last year and I

10  had a consulting agreement with them before that.

11  Q     For whom did you work in 2016?

12  A     Hilary for America.

13  Q     What is Hillary for America?

14  A     Hilary Clinton's presidential campaign.

15        THE COURT:  I'm going to ask you to bear in mind to

16  slow down a little bit, okay?

17        THE WITNESS:  Yes.

18        THE COURT:  All right.  Go ahead.

19  Q     Where was the office located where you worked for Hillary

20  for America?

21  A     In Brooklyn, just across the street.

22  Q     What did you do for the campaign?

23  A     I was the digital organizing director.

24  Q     And can you summarize for the jury your responsibilities

25  as the digital organizing director?

1  A     Yes, so I worked in our Brooklyn headquarters on our

2  digital team.  I had a very large portfolio.  So sort of, in a

3  simple terms as I can, one part of my job was our state

4  digital program.  So we had a staff who worked in states and

5  ran digital programs there.  So I helped manage and hire all

6  those staff.

7          The second is what we would have called constituency

8  programs.  So Latinos for Hillary, Women for Hillary, or

9  Veterans for Hillary.  We had programs designed to speak

10 directly to those types  of voters.  And, of course, also

11 visualize those shall types of supporters who are very

12 excited.  And so, I managed the programs kind of associated

13 with that.  And then also, anything kind of related to

14 organizing and technology.  So organizing is about getting

15 volunteers and supporters to engage with the campaign.

16          So donate, make phone calls, and, of course, vote.

17 Our technology work included lots of different tools we made

18 many, many different tools.  One of the pieces that was a very

19 large part of that portfolio was our SMS program.

20          THE COURT:  SMS?

21          THE WITNESS:  SMS is text messages.

22          THE COURT:  Okay.

23 Q     Thank you.

24          Did the campaign use SMS or text technology in the

25 areas of voter protection, voter information?

J. ROCKETTO - DIRECT - MR. GULLOTTA          78

1    A     Yes.  So that last portfolio, some of the tools that we

2    did were related to voter protection and voting protection was

3    also as to pertains to the internet and technology it was also

4    in any portfolio.  SMS text message was a huge part of the

5    campaign and the work that we did.  It was a major strategy

6    that we used and text is an immediate form of communication.

7    You send a message to gets right into somebody's inbox, is has

8    a very high read rate.  99 percent of text messages are

9    received and read.

10         So, as you can imagine, we are trying to talk to

11   voters immediately, text message is very important.  That way

12   it was very important for our Get Out the Vote strategy or

13   GOTV which is the end of the election.  And, of course, any

14   Get Out the Vote Strategy includes voter protection, SMS was a

15   part of that.

16   Q     Thank you.

17         Did you find that many people had questions about

18   voting, the mechanics of voting, how to do it in 2016?

19   A     Yes.  So, on our digital voter hotline, which included

20   social media as well as text, we answered over 600,000 voter

21   protection questions.

22   Q     And what were some of most common questions during the

23   lead up to the election?

24         MR. FRISCH:  Objection.

25         THE COURT:  I'll sustain it as to form.

1        Do you want to direct your -- well, do you want to

2    just ask her a more focused question?

3    Q    Okay.  What was some of the most common information the

4    campaign provided to people with questions about the election?

5    A    Yes.  Lots of people think voting is one decision:  Who

6    should I vote for?  Voting is actually a lot of different

7    decisions.  It's almost like ten different decisions.  Who

8    should I vote for is like the very last decision that you make

9    as you vote.  You're trying to figure out --

10       THE COURT:  So I'm just going to stop you for once.

11       I think the question is the type of information.

12   Was the question the most common type of information?

13       MR. GULLOTTA:  Correct.

14       THE COURT:  If you could focus that, that would be

15   great.

16       Go ahead.

17   A    We would answer lots of different questions.  Very common

18   ones include, kind of, what  I would say are basic

19   information.  When can I vote?  Where can I vote?  What time

20   can I vote?  When is election day?  We spent a lot of time

21   answering those types of questions, of course, in addition to

22   many others.

23   Q    And is that information that the campaign provided by

24   text message?

25   A    Yes.  So one of the things that we would do is people who

J. ROCKETTO – DIRECT – MR. GULLOTTA          80

1   use the vote keyword would get kind of a series of messages.

2   We would say a conversation that enabled them to ask any

3   questions they had and then for us also to give them important

4   voting information.

5   Q    Okay.  What's a keyword?

6   A    Yes.  So, for our purposes, the SMS list was a broadcast

7   SMS list.  That means that you --

8               THE COURT:  So sorry to interrupt you.

9               Could you just -- if you could just tell us what a

10  keyword is first, and then if counsel needs to ask you some

11  more background information he'll do it.  It makes it easier,

12  okay?

13              THE WITNESS:  Yes.

14              THE COURT:  Great.  Go ahead.

15  A    A keyword is a message or is a, sorry, it's a little bit

16  hard to explain but I'm explaining around.

17              When you are opting into a list, you send a message.

18  The message that you send to opt in is a keyword.  So "Vote

19  Hillary," and you send it to our short code, so our phone

20  number.

21  Q    Okay.  I was just going to ask you that what's a short

22  code?

23  A    Yes.  So a short code is think of it like your phone

24  number but it's a little bit different than a phone number.

25  It's a few numbers in that's the number when you are opting in

J. ROCKETTO – DIRECT – MR. GULLOTTA          81

1    but you are text.

2    Q    Do you remember if Hillary for America used a particular

3    short code?

4    A    Yes, we have a unique short code which is very important

5    that way.

6                THE COURT:  What is it?  Do you remember what it

7    was?

8                THE WITNESS:   Yes, 47246.

9                MR. GULLOTTA:  Thank you.

10               (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J. ROCKETTO - DIRECT - MR. GULLOTTA          82

1    BY MR. GULLOTTA:

2    Q    So if someone texted a keyword to that short code, that

3    was how you're describing a person would opt in?

4    A    Yes, you have to opt in.  So we can't send you any

5    messages unless you opt in, you send a keyword that opts you

6    in.  So not everything opts you in, keywords opts you in, and

7    that enables us to send you messages.  You the person who is

8    trying to opt in would send the message to 47246.

9    Q    If the person had not yet opted in, how would a person

10   know what number to send a keyword to and what keyword to use?

11   A    Probably they wouldn't.  It's very important that you

12   only send messages to people who opt in.  So one of the ways

13   that you find out is we would tell people, text keyword to

14   47246.  We're constantly asking people, we constantly wanted

15   people to opt in.

16   Q    How would you do that or share that message where?

17   A    Lots of different ways, events, campaign, social media

18   channels, Facebook and Twitter, on our website, sometimes

19   candidates or surrogates would say it out loud, basically

20   anywhere we could possibly say it because we wanted as many

21   people to opt in as possible.

22   Q    During the course of the campaign how many people

23   subscribed to receive text messages?

24   A    We had over a million subscribers.

25   Q    And the campaign used multiple keywords?

1   A    A lot of different keywords.  It's a long campaign, but

2   also when you send a keyword that groups you within a specific

3   set of information.  Vote is voting information.  Debate would

4   be like getting messages about debate and debate performance.

5   Q    Did the campaign use electronic software to sort of

6   organize the responses to these keywords?

7   A    Yes.  So we had a vendor, Mobile Commons, and we were

8   able to send all of our messages via Mobile Commons.

9   Q    Would Mobile Commons log into the software and determine

10  what the outgoing message would be or is that something the

11  campaign did?

12  A    The campaign determined all messages.  You have to go

13  through a lengthy approval process.  And there were people who

14  worked on the campaign team, so I ran the SMS program and the

15  day-to-day person.  The person would log in, and literally

16  send the messages was Lloyd Cotler.  Lloyd was a campaign

17  embed from Mobile Commons.

18  Q    In your experience with the campaign, how affective and

19  important was the SMS or the text message program?

20           MR. FRISCH:  Objection.

21           THE COURT:  Overruled.

22           Was that an important part of the campaign?

23           THE WITNESS:  Yes, definitely, it was a major

24  strategy that we used.

25  Q    Why is that?

1    A    Actually it was a lot about the type of communication and

2    the voters.  We were extremely interested in engaging with

3    voters who used mobile technology.  African American and

4    Latino voters are more likely to use text message than anyone

5    else.  Also younger voters love text message, that's the

6    primary way that they communicate.

7            But not only that, as I said, text is an immediate

8    form of communication.  So unlike say e-mail or social media

9    or websites, which may or may not show up in your inbox, you

10   may or may not see it in your feed, text messages immediately

11   are delivered to your phone and people look at their phones

12   all the time all day.

13   Q    Okay.  Thank you.  During the course of the 2016

14   campaign, did you learn there were fake graphics going around

15   and informing people they could text their vote?

16   A    Yes.

17   Q    Do you remember approximately when you learned about

18   that?

19   A    It was definitely at the very end during the GOTV period.

20   In my recollection very, very close to what we would call GOTV

21   weekend, the kind of like final days of when voting is heavy.

22   Q    How did you learn about it?

23   A    I don't remember the exact first moment.  But I do

24   remember being, seeing the graphics and having conversations

25   about those graphics with my employees and with my superiors.

J. ROCKETTO – DIRECT – MR. GULLOTTA                85

1   Q    Do you recall what the graphics looked like?

2   A    Yes.  One of them -- there were multiple graphics.  One

3   of them was African American woman.  It said you could text

4   your vote for Hillary.  And then another one was in Spanish

5   with a Latina looking woman.  It also said that you could

6   text, specifically, it said you could text to vote.

7   Q    I'd like to show what you is previously admitted and

8   marked as Government Exhibit 720.  Do you recognize this image

9   on your screen?

10  A    Yes.

11  Q    Is this one of the graphics that you just described that

12  you saw?

13  A    Yes.

14  Q    What did you think when you saw this graphic?

15  A    It's a very, like sneaky, graphic.  It's designed to look

16  like it came from the campaign, but it's not from the

17  campaign.

18  Q    What about it makes it look like it came from the

19  campaign?

20  A    There is a lot of different things actually, which is one

21  of the reasons why I would say that it's sneaky.

22          THE COURT:  Could I see the parties at the side with

23  the court reporter for a second.

24          (Continued on the next page.)

25

SIDEBAR CONFERENCE                    86

1            (Sidebar conference.)

2            THE COURT:  If you can avoid asking like terribly

3   open-ended questions to this witness.

4            MR. GULLOTTA:  I was trying not to lead her.

5            THE COURT:  I think you can lead a little bit.

6   Because she has a lot to say, which is fine, but we're never

7   going to finish.

8            MR. GULLOTTA:  Okay.

9            THE COURT:  Things like, 'what did you think about,'

10  that is probably going to prompt a rather long answer.

11           So you don't object to a little bit of leading, do

12  you?

13           MR. FRISCH:  My style generally is not to object

14  unless I absolutely have to.

15           THE COURT:  That's an excellent style.

16           THE COURT:  Let's see if we can tailor it a little

17  bit.

18           (End of sidebar conference.)

19           (Continued on the next page.)

20

21

22

23

24

25

1           (In open court.)

2           THE COURT:  Sorry for the interruption.  Go ahead.

3           MR. GULLOTTA:  Thank you, your Honor.

4    BY MR. GULLOTTA:

5    Q    Looking at Government Exhibit 720, is there a hashtag

6    towards the top, above the image?

7    A    Yes.

8    Q    Do you recognize that hashtag?

9    A    Yes:  I'm with her.

10   Q    Is that one of the ones that the campaign used?

11   A    Yes, that was like our official hashtag.  That's what we

12   used on every communication, almost like a joke, everyone was

13   saying:  I'm with her.

14   Q    Thank you.  If we can see the full exhibit again.  Is

15   there anything about the colors used in this image that make

16   it look similar to what the campaign was using?

17   A    Yes.  There are -- this is designed to look like what we

18   did.  This sort of like box style with the red was very

19   reminiscent of campaign imagery.

20   Q    Down on the bottom left is a logo.  Is that the logo that

21   the campaign used or does it resemble it?

22   A    It's designed to look like the campaign's logo.  I would

23   say a really good copy of it.  It's not exactly right, but I

24   only know that because I looked at it for like two years

25   straight.

1   Q    Thank you.  Are there any logos other than that in this

2   image that are reminiscent of campaign logos?

3   A    Yes.  In the picture, that picture it's not exactly the

4   logo, but I think, again I know that only because I spent a

5   lot of time talking about and looking and working with logos,

6   but that is designed to look like the 2008 Hillary logo.

7   Q    How about the font?  Does the font resemble the fonts

8   used by the campaign?

9   A    Yes.  It looks -- it's again not exact, but I don't think

10  anyone else would know that that didn't work on it.  That's

11  designed to look like the way we did our fonts.

12  Q    I see on the bottom there is a disclaimer, is that

13  something that the campaign would use?

14  A    So this is one of the things that is most confusing about

15  this image and also what really --

16          MR. FRISCH:  Objection.

17          THE COURT:  I think the question is:  Is that

18  something the campaign would use?

19          Is that the question?

20          MR. GULLOTTA:  Yes.

21          THE COURT:  Is that the kind of thing that the

22  campaign or that kind of disclaimer would be used in

23  communications that were from the campaign?

24          THE WITNESS:  Well, you only use something like this

25  when it's a paid ad.

1          THE COURT:  Okay.

2          THE WITNESS:  That's not an accurate disclaimer.

3          THE COURT:  Okay.

4          THE WITNESS:  There are regulations associated with

5     disclaimers.  Most notably I would say, all disclaimers must

6     be inside a box and they must have a certain font size.  This

7     is not that size.

8               And the reason I said it's confusing is social media

9     graphics do not need disclaimers.  It's not an ad.  So this

10    is, it says it's paid for by Hillary For President 2016 -- or

11    2015, but that's not the name we would have used in the

12    disclaimer.

13              Again I think the only way you know this is if you

14    have to deal with this.  Most people don't have to deal with

15    this.

16         THE COURT:  That's the question.  Forgetting about

17    the details of this particular one, is this the kind of

18    thing -- forget about whether this is whether the right

19    language -- is this the kind of disclaimer that a legitimate

20    ad might have, depending on if it met all of those

21    requirements that you said?

22         THE WITNESS:  It's definitely designed to look very

23    close to a legitimate ad.

24         THE COURT:  Okay, next question.

25    BY MR. GULLOTTA:

1   Q    Can we take a look at Government Exhibit 721, which was

2   previously admitted.  Do you recognize this image?

3   A    Yes.

4   Q    Is this one of the graphics you saw during the campaign?

5   A    Yes.

6   Q    Again, can you describe whether the colors or the font or

7   any of the iconography that you thought resembled the

8   campaign's true design image?

9   A    Again, the colors are close to our colors.  That kind of

10  box style with the text inside, we were doing that a lot.

11  That's close to our logo.  And of course, the only people who

12  put the logo on stuff was the campaign.  And then this text in

13  the right is, it says 'dash H', that's how we signed text

14  messages from Hillary throughout the campaign.  The 'dash H'

15  that meant it was a message from Hillary.  Obviously we saved

16  those for special times messages from her.

17  Q    You take a look at Government Exhibit 722.  Do you

18  recognize this image?

19  A    Yes.

20  Q    Is that another one that you saw during the same time?

21  A    Yes.  This is the one that is most jarring to me.  It

22  looks, this is really, really designed to look like a campaign

23  image.

24  Q    Okay.  Can we put 720 back up?  After you saw these

25  images, what was your reaction to them?

1  A    This is -- there are tons of red flags to me.  Of course

2  the number one biggest red flag is you can't text to vote.

3  You can't do that.

4  Q    Did it appear that these graphics were designed to reach

5  certain groups?

6  A    Yes, I mean, on this image the African American part, the

7  picture is of a black woman.  On the other image in Spanish,

8  two Spanish speakers, with the picture of a person who looks

9  to be Latina.  That looks like you're talking to black voters

10 and to Spanish speaking or Latina voters.

11 Q    What did you do after you saw these?

12 A    So we were -- we had a conversation, Lloyd and I, had a

13 conversation about the images.  And you have to make a

14 decision about what to do about something like this, it's our

15 job to respond to things like this.  In our case, we decided

16 to take it up to our bosses, Jenna and Teddy.

17 Q    Why did you do that?

18 A    Well, lots of -- during GOTV there are so many

19 incidences.  In this case, this felt like a very important

20 incident, something that we wanted to be sure that we flagged

21 early.  And something that we wanted to be sure we made people

22 aware of, particularly because it's very confusing and you

23 cannot text to vote.  Our job is to get people to vote.  So

24 there is something that appears to be telling people that they

25 are allowed to do an act that they cannot do, that's a big

1    concern to us.

2    Q    So I imagine at this, especially at this point in the

3    campaign, there are a lot of issues coming up that require

4    your attention.  Do you always bring them to Jenna and Teddy,

5    to your bosses?

6              MR. FRISCH:  Objection.

7              THE COURT:  Overruled.

8    A    Definitely not.  During GOTV it's a fire hose, so much

9    information is coming at you, there are a lot of problems.

10   Just like with any job, I think if you're taking something to

11   your boss, you better make sure it's a big deal and it's

12   something you care about it.  This is not only incidents of

13   voting suppression that we encountered during that time, but

14   this was one that we felt, like, it was very important to

15   bring up to them.

16   Q    In looking at these images, did the campaign produce

17   images like this, obviously not exactly like this, but did the

18   campaign produce graphics that contained information that

19   voters could use to prepare for the election?

20   A    Yes, very often.

21   Q    After you spoke with your supervisors, did the campaign

22   take additional action to respond to these?

23   A    Yes.  When we spoke to Teddy and Jenna, our bosses, we

24   came up with a game plan.  So one of the things that we did

25   was to bring in the comms team and to make sure that the comms

MORAL – DIRECT – MR. GULLOTTA                    93

1   teach was alerted, then they could also alert the media.

2              THE COURT:  Does comms comps mean communication?

3              THE WITNESS:  Yes, the communication team.  So

4   people who are in charge, talking to the media.

5   Q    Did Lloyd take any steps in response to these images?

6   A    I don't remember everything that Lloyd did, as I said

7   before, there is a lot of stuff.  So this wasn't the only

8   problem I was dealing with.  Anything that we would have done

9   next would have been very much in Lloyd's purview, he was the

10  person who would have seen the ball down the field to make

11  sure this was dealt with appropriately.

12  Q    Do you recall physically where you were when you saw

13  these images?

14  A    Yes, in our Brooklyn headquarters.

15  Q    After responding to these and viewing them for the first

16  time, did you see these graphics covered in the news anywhere?

17  A    Yes.  There were a lot of articles that said things like

18  you --

19             MR. FRISCH:  Objection.

20             THE COURT:  Sustained.

21             It's fair to say there was news coverage; is that

22  right?

23             THE WITNESS:  Yes.

24             THE COURT:  Next question.

25  BY MR. GULLOTTA:

MORAL – DIRECT – MR. GULLOTTA                94

1   Q    After the election was over, did you take additional

2   steps in relation to having seen these images?

3   A    Yes, we did.

4   Q    Did you notify Facebook, Twitter, anybody else about this

5   issue?

6   A    At the end of the campaign, we were in regular dialogue

7   with social media platforms.  In particular, there was a lot

8   of information swirling about Facebook at the time and what

9   kind of interference social media had had.  We choose two

10  issues to highlight to Facebook.  I don't remember the other

11  one because I wasn't engaged with it, but the other issue that

12  got highlighted was this one, these graphics.

13  Q    Is that because the campaign was concerned about the

14  affect this might have on voters?

15  A    Yes.

16           THE COURT:  Next question.

17  Q    Did you think this was funny when you saw it?

18           MR. FRISCH:  Objection.

19  Q    That there was anything funny about it?

20           MR. FRISCH:  Objection.

21           THE COURT:  Overruled.

22           Did you think it was a joke, I think is the

23  question.  Or did you think it was like a parody or something

24  like that?

25           THE WITNESS:  No, not a joke; not funny; not a

1   parody.

2          THE COURT:  Next question.

3          MR. GULLOTTA:  Can I have a moment, your Honor?

4          THE COURT:  Sure.

5          MR. GULLOTTA:  No further questions.

6          THE COURT:  Cross-examination.

7          MR. FRISCH:  I have one question, may I stand here?

8          THE COURT:  Yes.

9   CROSS-EXAMINATION

10  BY MR. FRISCH:

11  Q    Do you recall that Mr. Cotler first took action about

12  what we've seen or the types things that we've seen on

13  October 29, 2016?  Do you recall that was the date when he

14  first took action?

15  A    I don't.

16         MR. FRISCH:  I have nothing else.  Thank you, Judge.

17         THE COURT:  Anything else?

18         MR. GULLOTTA:  Nothing further.

19         THE COURT:  You can step down.

20         (Whereupon, the witness was excused.)

21         THE COURT:  I think we can get another witness in

22  here.

23         MR. GULLOTTA:  The Government calls Lloyd Cotler.

24         (Witness takes the witness stand.)

25  **LLOYD COTLER**, called as a witness, having been first duly

LLOYD COTLER – DIRECT – MR. GULLOTTA                96

1    sworn/affirmed, was examined and testified as follows:

2               THE COURTROOM DEPUTY:  State your name for the

3    record.

4               THE WITNESS:  Lloyd Cotler.

5               THE COURTROOM DEPUTY:  Have a seat.

6               THE COURT:  Just a few things before we begin.  Just

7    don't speak too quickly, first of all, because our court

8    reporter is taking everything you say down.

9               And I do want to make sure everybody can hear you,

10   make sure you're using the microphone.

11              Related to that is, whichever lawyer is asking

12   questions let that person finish talking before you start

13   answering, because it makes it too difficult otherwise.

14              Please only just answer the question that you're

15   being asked.  If there is a question that someone asks you

16   that you want to have repeated or you don't understand, just

17   let me know.

18              Go ahead.

19              MR. GULLOTTA:  Thank you, your Honor.

20   DIRECT EXAMINATION

21   BY MR. GULLOTTA:

22   Q    Good afternoon, Mr. Cotler.

23              In what city and state do you live?

24   A    San Francisco, California.

25   Q    Are you currently employed?

LLOYD COTLER – DIRECT – MR. GULLOTTA          97

1   A     Yes.

2   Q     Who is your employer?

3   A     Self-employed.

4   Q     What do you do for a living?

5   A     I'm a text message marketing consultant.

6   Q     How long have you been a text messaging marketing

7   consultant instants?

8   A     I've been a consultant on my own for three years.  I've

9   been in the text message marketing industry for 13.

10  Q     For whom did you work in 2016?

11  A     For the early part of 2016 I worked for Upland Mobile

12  Commons, then for the Hillary campaign starting in the spring

13  of 2016.

14  Q     Where was your office with the campaign?

15  A     Right across the street, here in downtown Brooklyn.

16  Q     Were you also living in Brooklyn at the time?

17  A     Yes.

18  Q     What did you do for the campaign?

19  A     I was the SMS campaign manager.

20  Q     Can you describe your responsibility as a SMS campaign

21  manager?

22  A     Sure.  I did everything that fell under text message

23  marketing, so organizing, fundraising, voter contact,

24  engagement, rapid response.  All the kind of things the

25  campaign does, just by text message.

LLOYD COTLER – DIRECT – MR. GULLOTTA          98

1   Q    Did the campaign communicate with supporters about voting

2   information by text message?

3   A    Yes.

4   Q    Did the campaign post calls to action to get people to

5   opt in to their short code?

6   A    Yes.

7   Q    Where would the campaign post those calls to action?

8   A    Everywhere, the principles would speak it out loud at

9   rallies or events.  We did a lot of social media acquisition,

10  e-mail, in-person events, everywhere basically.

11  Q    Including Twitter?

12  A    Yes.

13  Q    What company provided the text message software platform

14  for the campaign?

15  A    Upland Software.

16  Q    That's where you used to work?

17  A    Yes.

18  Q    Who on the campaign was responsible for communicating

19  with people who opted in to the SMS message campaign?

20  A    Me, I guess.  I drafted the messages, I managed the

21  platform.  There were other layers of approval, stuff like

22  that, but me primarily.

23  Q    Would you decide which keywords to use, things like that?

24  A    I would propose, I would propose them, they would get

25  approved; but, yes.

LLOYD COTLER - DIRECT - MR. GULLOTTA          99

1    Q     Then did you decide on what language, what message would

2    be sent out to someone who texted in a particular keyword?

3    A     Again yes, I would draft them, they would go through

4    several layers of approval, I would set it up.

5    Q     Did the campaign use particular hashtags?

6    A     On Twitter do you mean?

7    Q     On social media.

8    A     Probably.  I didn't have any hand in writing tweets or

9    anything like that.  I assume, yes, I assume so, yes.

10   Q     Thank you.  In the lead-up to the election, did you learn

11   about a text-to-vote graphic going around social media?

12   A     Yes.

13   Q     How did you learn about it?

14   A     I don't remember exactly.  I don't remember exactly how

15   it came to my attention.

16   Q     Did you see it yourself, any of these graphics?

17   A     Yes.

18   Q     What do you recall about the graphics that you saw?

19   A     The two in particular I remember, one was a graphic of an

20   African American woman with a text-your-vote for Hillary call

21   to action on it.  And one was in Spanish, with the same kind

22   of language but in Spanish.

23   Q     Did the graphics in these images resemble campaign

24   graphics?

25   A     They were -- they -- yes, they looked like campaign --

LLOYD COTLER - DIRECT - MR. GULLOTTA          100

1    not exactly, but yes, they looked like campaign images.

2    Q    Not perfect copies but similar?

3    A    Yes.

4    Q    What did you think when you saw them?  Were you

5    concerned?

6    A    Yes.  I don't remember exactly, but yes.  They were

7    clearly not ours.  And I don't think, to the best of my

8    knowledge, you can't vote by text message.  Certainly we were

9    concerned about those being up there.

10   Q    Was your concern that they resembled campaign iconography

11   or your concern that people might view this and actually

12   believe it and try to vote by text?

13            MR. FRISCH:  Objection to form.

14            THE COURT:  Overruled.

15            Were either of those your concerns?

16            THE WITNESS:  Both for sure.

17   Q    Thank you.  Was there a short code, do you remember, in

18   the graphics that you saw?

19   A    Yes.

20   Q    Was it the campaign's short code?

21   A    No.

22   Q    Do you know the campaign's short code?

23   A    47246 was the campaign's short code.

24   Q    Do you recall where you were when you saw the

25   text-to-vote graphics?

LLOYD COTLER - DIRECT - MR. GULLOTTA                101

1   A     I don't remember exactly, I presume in the office.  It

2   was a week before the election, I was in the office for quite

3   a bit.

4   Q     What did you do after seeing them?  Did you bring them to

5   anyone's attention?

6   A     I don't remember exactly.  I'm sure I would have flagged

7   them for my boss, my boss's boss.  Then I contacted our rep in

8   Upland Software about it as well.

9   Q     Who was the rep?

10  A     Ty Chesley.

11  Q     What did you ask Mr. Chesley to do?

12  A     I asked him to get in touch with the vendor who operated

13  the short code that the fake messages were purporting to be

14  on, to have that removed and have some action taken.

15  Q     Okay.  So you were able to identify who was actually the

16  owner or the user of that short code?

17  A     I was able to identify the -- in 2016 you were allowed to

18  share short codes among multiple entities.  So I wasn't able

19  to identify the lessee or the -- that particular account, but

20  I was able to identify the software that had leased the short

21  code on behalf of multiple clients.

22  Q     Who was that?

23  A     A company iVision Mobile.

24  Q     After you contacted Mr. Chesley at Upland, do you know if

25  they took any steps to address these fake graphics?

LLOYD COTLER - CROSS - MR. FRISCH          102

1    A    They told me that they contacted iVision.  I wasn't part

2    of any of those conversations, but they did tell me they were

3    in contact with iVision about it.

4              MR. GULLOTTA:  Can I have a moment, your Honor?

5              THE COURT:  Sure.

6              MR. GULLOTTA:  No further questions.

7              THE COURT:  Any cross-examination?

8              MR. FRISCH:  Thank you.

9    CROSS-EXAMINATION

10   BY MR. FRISCH:

11   Q    Mr. Cotler, good afternoon.  I'm Andy Frisch.  I'm here

12   with Mr. Mackey.

13             You and I have never met; is that correct?

14   A    That's correct.

15   Q    A moment ago you testified that you contacted Mr. Chesley

16   of iVision; is that right?

17   A    No, Mr. Chesley worked for Upland Software.

18   Q    I see.  He in turn contacted iVision, correct?

19   A    I don't know if he personally did it, but --

20   Q    His company did?

21   A    Yes.

22   Q    Do you remember, do you recall that you reached out to

23   Mr. Chesley on October 29, 2016?

24   A    Yes.

25   Q    Do you recall someone who worked for the campaign, the

LLOYD COTLER - CROSS - MR. FRISCH                    103

1  Clinton campaign, Amy Karr?

2  A     Yes.

3  Q     Was at least one of her jobs to monitor social media?

4  A     Yes, I believe so.

5  Q     In fact, her job was to keep up with what was going on on

6  various forms of social media, correct, as you understood it?

7  A     Yes.

8  Q     Among the things that she looked at, among the social

9  media that she monitored on behalf of the Clinton campaign,

10 was something called Reddit; is that correct?

11 A     I don't know the particulars of her day-to-day work, but

12 sure, I imagine.

13 Q     And have you heard something called 4chan?

14 A     Yes.

15 Q     Was it your understanding at the time that one of the

16 things she did for the Clinton campaign was monitor something

17 called 4chan?

18 A     Yes.

19 Q     She probably -- withdrawn.

20        In any event, it was your understanding that it was

21 her job on behalf of the campaign to monitor media or

22 networks, if that's the right word, along the lines of 4chan

23 and Reddit, correct?

24 A     That's my understanding, correct.

25        MR. FRISCH:  Nothing further.

PROCEEDINGS                    104

1      THE COURT:  Any redirect?

2      MR. GULLOTTA:  No.  Thank you, your Honor.

3      THE COURT:  Thank you so much.  You can step down.

4      (Whereupon, the witness was excused.)

5      THE COURT:  I think, rather than squeeze one more

6  person in, I think now is a good time to take our break.

7  We'll come back at 2:15 p.m.

8      I'm going to repeat this every time, but I repeat

9  because it's very important.  Don't talk about the case at

10  all.  Don't look up anything about the case.  Don't let anyone

11  approach you.  But do have a good lunch.

12      One other thing I forgot to tell you was, you should

13  do whatever Ms. Greene tell you to do.  Have a great lunch.

14      (Jury exits the courtroom.)

15      THE COURT:  Everybody can have a seat.

16      If you have an idea, how many witnesses do you think

17  you'll have this afternoon?

18      MR. PAULSEN:  Your Honor, we're moving a little bit

19  slower than we probably thought we would be moving.  We have

20  as many as 12 lined up, I think we could get to maybe eight

21  done.

22      THE COURT:  All right.  I'm not holding you to

23  anything.  We'll see where we get.

24      Anything that anybody wants to put on the record

25  before we break for lunch?

PROCEEDINGS                                     105

1          MR. FRISCH:  No.

2          THE COURT:  I'll see you at 2:15.

3          (Lunch recess.)

PROCEEDINGS                                    106

1            (Afternoon session.)

2            (In open court.)

3            COURTROOM DEPUTY:  All rise.

4            THE COURT:  Please be seated.

5            All right.  Just one thing before we start.  Do we

6    have everybody?  Just one thing before we start.  The one

7    thing I think we're still waiting from you all is a proposed

8    verdict sheet.  So if you can get that to me.  I think Judge

9    Garaufis scheduled a charge conference for tomorrow after the

10   court day, so if I have all of that before hand, I can study

11   up.  Okay?  Anything before we bring the jurors in?  No, okay.

12           (Jury enters the courtroom.)

13           THE COURTROOM DEPUTY:  You may be seated.

14           THE COURT:  Good afternoon ladies and gentlemen.  We

15   are ready to resume with the Government's case.  Are you ready

16   to call your next witness?

17           MR.  GULLOTTA:  Yes, your Honor.  The Government

18   calls Ti Chesley.

19           (Witness takes the witness stand.)

20   **MATTIAS CHESLEY**, called as a witness, having been first duly

21   sworn/affirmed, was examined and testified as follows:

22           THE COURTROOM DEPUTY:  Please, state and spell your

23   name for the record.

24           THE WITNESS:  Mattias Chesley.

25           THE COURTROOM DEPUTY:  Thank you.  Have a seat.

MATTIAS CHESLEY - DIRECT - MR. GULLOTTA          107

1          THE COURT:  All right, Mr. Chesley.  Just a couple

2     of things.  First, I want to make sure you don't speak too

3     quickly.  Our court reporter is taking down everything that I

4     say, and it makes her job too hard if you talk too fast.

5          Same thing.  Don't talk over which ever lawyer is

6     asking you a question.  Just let them finish the question.

7     You have the microphone there, you can move it up if you need

8     to.  Because I do want to make  sure that everyone can hear

9     you.

10          I'd also like you to do your best just to answer the

11     question that you're  being asked.  And if something isn't

12     clear or you want to have it repeated, just let me know, okay?

13     Go ahead.

14          MR.  GULLOTTA:  Thank you, your Honor.

15     DIRECT EXAMINATION

16     BY MR. GULLOTTA:

17     Q    Good afternoon, Mr. Chesley.

18     A    Good afternoon.

19     Q    In what city and state do you live?

20     A    I live in Chicago, Illinois.

21     Q    Are you currently employed?

22     A    I am.

23     Q    Who is your employer?

24     A    S&P Global.

25     Q    What do you do for S&P Global?

MATTIAS CHESLEY – DIRECT – MR. GULLOTTA          108

1    A     Lead an account management team.  We support a software

2    product focused on climate risk.

3    Q     Who did you work for in 2016?

4    A     I worked for a company called Upland Software.

5    Q     What was your role in Upland Software?

6    A     Also leading an account management team.  My title was

7    director of customer success.

8    Q     Just briefly describe what Upland Software does?

9    A     Sure.  Yeah, Upland Software was a provider of various

10   cloud software platforms.  The platform that I helped with was

11   a mobile messaging software platform.

12   Q     Is that the same thing as text messaging?

13   A     Exactly.

14   Q     In 2016, did Upland have a customer called Hillary for

15   America?

16   A     Yes.

17   Q     And what was Hillary for America?

18   A     Political campaign.

19   Q     What services did Upland provide for Hillary for America?

20   A     Text messaging to support the campaign.

21   Q     Are you familiar with a company called iVision Mobile?

22   A     Yes.

23   Q     What is iVision Mobile?

24   A     It was mother mobile messaging company.  They have their

25   own platform similar to the platform we were supporting.

MATTIAS CHESLEY - DIRECT - MR. GULLOTTA          109

1   Q    If the fall of 2016, do you recall learning about a

2   text-to-vote graphic that was  going around social media?

3   A    I do.

4   Q    How did you learn about that?

5   A    It was an e-mail from my contact, Lloyd Cotler, at the

6   Hillary for America campaign.

7   Q    And do you recall on what date you received an e-mail?

8   A    I don't recall the exact date.  But I believe it was in

9   November of 2016.

10           MR. GULLOTTA:    Okay.

11           If I can ask Ms. Partia to show just the witness

12   Government's Exhibit 3500-TC-3-B.

13           (The above-referenced exhibit was published to the

14   witness.)

15   Q    Would it refresh your recollection to take a look at the

16   e-mail?

17   A    That refreshes my recollection.

18           MR. GULLOTTA:  Can we scroll to the bottom?  Page

19   five.

20   A    Yes.

21   Q    Did you have a chance to review it?

22   A    I have.

23   Q    And having reviewed that e-mail, do you recall now when

24   you were notified about this text-to-vote graphic?

25   A    Yes.  It was Saturday, October 29th.

1    Q     Did you see one  of these graphics yourself?

2    A     I did.

3    Q     What did you remember about it?

4    A     I remember that the branding was really notable to me.

5    It was clearly designed to replicate some of the branding from

6    the Hillary for America campaign.  And then the other thing

7    that was really notable was that it had a, it had words on it

8    suggesting that you can vote by text.

9    Q     In your role at Upland, had you seen graphics that were

10   produced by the campaign?

11   A     I had.

12   Q     When you saw this text-to-vote graphic that you

13   described, did you think it was a joke?

14   A     Absolutely not a joke.

15   Q     Was there a short code listed in the graphic?

16   A     There was.

17   Q     Was it the short code being used by Hillary for America?

18   A     It was not.

19   Q     Did you learn who was using that short code?  Who it was

20   registered to?

21   A     I never -- at the time I didn't learn who the end user

22   was.  But it was, my understanding was that  it was registered

23   to iVision.

24   Q     So after learning about the short code and seeing the

25   graphic, what did you do?  Did you reach out to iVision ?

MATTIAS CHESLEY - DIRECT - MR. GULLOTTA          111

1    A    I did, yeah, I reached out to my contact at iVision to

2    ask if he knew about it and if there was something that he

3    could do.

4    Q    Who was that?

5    A    His name is Omer Samiri.

6    Q    Who did you and Mr. Samiri do with respect to these

7    text-to-vote graphics that were using that short code?

8    A    So I think he initially said he would take care of it.

9    And then we reached out again and asked if he could put a

10   response message saying that, sort of, clarifying to anybody

11   who might text in that it wasn't actually the Hillary Clinton

12   campaign.

13   Q    Okay.  So this would be a message triggered by someone

14   that sends in this key word?

15   A    Exactly.  So they would see that advertisement, you know,

16   on Twitter and they would text in and then it would be

17   something, you know, clarifying that they weren't actually

18   opting into the Hillary for America campaign.

19   Q    Why did you want to do that?

20   A    Because the ad was sort of branded to suggest that they

21   would be opting into the campaign when, in fact, they would

22   not be.

23   Q    Did the graphic make it appear that someone who texted

24   that keyword would actually be voting as opposed to opting

25   into a campaign?

1   A    Correct.

2   Q    Was that your concern?

3   A    That was my concern.

4   Q    Did you let the campaign know that you and Mr. Samiri had

5   come up with a solution, so to speak?

6   A    Yeah.  We let my contact at the Hillary for America

7   campaign know that we put up that redirect message.

8   Q    And after setting up this, sort of, automated warning,

9   did you continue to see these graphics in media cover, social

10  media, anywhere else?

11  A    Yeah.  I saw it again in a Mashable article.  I believe

12  later that year, shortly thereafter.

13  Q    And this article was covering this issue with the

14  text-to-vote graphics?

15  A    Exactly.

16          MR. GULLOTTA:  I have no further questions, your

17  Honor.

18

    OFFICIAL COURT REPORTER

19

20          THE COURT:  All right.  Cross-examination?

21          MR. FRISCH:  I have no questions.

22          THE COURT:  Thank you so much, you can step down.

23          (Witness leaves the witness stand.)

24          THE COURT:  Are you ready to call your next witness?

25          MR. GULLOTTA:  Yes, your Honor.  The Government

1   calls Omer Samiri.

2              (Witness takes the witness stand.)

3   **OMER SAMIRI,** called as a witness, having been first duly

4   sworn/affirmed, was examined and testified as follows:

5              THE COURTROOM DEPUTY:  Please, state and spell your

6   name for the record.

7              THE WITNESS:  Omer Samiri.

8              THE COURTROOM DEPUTY:  Thank you.  Have a seat.

9              THE COURT:  All right, Mr. Samiri.  Before we begin,

10  I just want to give you a couple of instructions.  First thing

11  is I do want to make sure everybody can hear you, so make sure

12  that you're using the microphone.  I also want to make sure

13  that our court reporter's life isn't too difficult, so make

14  sure that you don't speak too fast.

15             And along those same lines, whenever a lawyer is

16  questioning you, just let the person finish talking.  Don't

17  talk over the person.  Also, you should do your best to answer

18  only the question that you're being asked, and if there's

19  something that you would like to have repeated or that you

20  don't understand, just let me know, okay?

21             THE WITNESS:  Yes.

22             THE COURT:  All right.  Go ahead.

23             MR. GULLOTTA:  Thank you, your Honor.

24  DIRECT EXAMINATION

25  BY MR. GULLOTTA:

OMER SAMIRI – DIRECT – MR. GULLOTTA                114

1    Q    Good afternoon, Mr. Samiri.

2    A    Good afternoon.

3    Q    Are you currently employed?

4    A    I am.

5    Q    Who is your employer?

6    A    IVision Mobile.

7    Q    In what city and state is iVision Mobile located?

8    A    Los Angeles, California.

9    Q    Can you briefly summarize what iVision Mobile does?

10   A    iVision Mobile provides businesses and organizations with

11   software for text messages and marketing communications.

12   Q    And without identifying any specific customers, can you

13   describe or categorize your typical customer base?

14   A    Sure.  We work with clients across a variety of different

15   industries, including health care, hospitality, retail,

16   dining, and we do everything from digital loyalty, to coupons

17   and alerts and promotions.

18   Q    And this is all via text messages?

19   A    Correct.

20   Q    What do you do for iVision?

21   A    I'm the CEO.

22   Q    How long have you worked for iVision ?

23   A    Since 2006.

24   Q    Were you the CEO the whole time?

25   A    I was.

1    Q      Are you one of the founders of the company?

2    A      I do.

3    Q      You know what a short code is?

4    A      Yes, I do.

5    Q      What's a short code?

6    A      A short code is typically a 4 to 6, or 5 to 6 digit

7    abbreviated phone number that's used for commercial messaging

8    in the United States.

9    Q      Does iVision lease or register for short coat?

10   A      We do have short codes leased, yes.

11   Q      And how does one go about leasing a short code?

12   A      Typically through the common short code administration.

13   There's a lease process and there's a provisioning process to

14   get it approved with the carriers.

15   Q      How many short codes does iVision lease currently,

16   approximately?

17   A      In the 40 or so range.

18   Q      In 2016, did iVision have a relationship with a company

19   called Upland Software?

20   A      Yes, we did.

21   Q      And what was that relationship with Upland?

22   A      Upland was our messaging aggregator, and they handled the

23   connection with the cell phone carriers for the messaging.

24   Q      In 2016, did iVision lease the short code 59925?

25   A      Yes.

1   Q     Do you still have that short code?

2   A     Yes, we do.

3   Q     In preparation for this case, did you look at iVision

4   records relating to that short code; 59925?

5   A     Yes, I did.

6   Q     Around election time, so October November of 2016, were

7   any of iVision's customers using the short code 59925?

8   A     Yes.  Many were.

9   Q     Multiple customers?

10  A     Mm-hmm.

11  Q     How does that work?  How do multiple customers use the

12  same short code?

13  A     By setting up what's called a keyword that identifies in

14  the system how to route messages.  So when somebody texts in a

15  specific key word belonging  to that customer, the system

16  would then route that message to that client's account.

17  Q     Okay.  So if a grocery store is using that short code and

18  they set  up a keyword apple, anyone who sends in the key word

19  apple, their message is going to get routed to that customer

20  's account?

21  A     Yes, that's correct.

22  Q     But another customer would use the key word sneaker and

23  then anyone who texts in the word sneaker, that message is

24  going to get routed to that second customer's account?

25  A     Yes, that's correct.

1    Q     Around this time; October, November 2016, did you learn

2    that someone that was not an iVision customer was sharing a

3    graphic with your short code in it?

4    A     Yes, we did.

5    Q     How did you learn about that?

6    A     We received an e-mail from Upland on October 30th, a

7    Sunday, informing us that someone  was using the short code to

8    promote a campaign that was not approved by the Hillary

9    campaign, and for us to look further into it.

10   Q     Who reached out to you from Upland?

11   A     Ty Chesley, who was our direct account rep.

12   Q     Did you see any of these graphics that were using your

13   short code?

14   A     Yes, I did.

15          MR. GULLOTTA:  Can we show Mr. Samiri, please,

16   Government Exhibit 720?

17          (The above-referenced exhibit was published to the

18   witness.)

19   Q     Do you recognize this image?

20   A     Yes, I do.

21   Q     Did you see this around fall of 2016?

22   A     Yes.

23   Q     What did you think when you saw this graphic?

24   A     Initially I suspected it was a client, and then after

25   doing research, we determined that the keyword Hillary did not

1    exist anywhere in our system.

2    Q    So no clients were using that keyword?

3    A    That's correct.

4    Q    Did you read the content?  I mean, did you look at the

5    image and see what it says?

6    A    Yes.

7    Q    Did you think this was a joke?

8    A    I didn't know how to take it, to be honest.  But I don't

9    know if I considered it a joke or not.

10   Q    What did do you after learning about this and seeing it?

11   A    Well, immediately we went on Twitter and started playing

12   some offense to reach out to the Twitter profiles that were

13   sharing this graphic.  To basically get them to remove the

14   posts.  And at the same time, we were also working with Upland

15   to address how were going to deal with it and what the next

16   steps were.

17   Q    How did you do that?  Did you search for your short code

18   on Twitter to find other instances of this image?

19   A    The short code wasn't easy to search because that's part

20   of graphics.  So unless people included that in their text, it

21   wouldn't have come up in a search.  But we were able to search

22   for key words within the context of the post.  And then also

23   Twitter accounts had tagged iVision Mobile on their commentary

24   regarding the posts, so it was easy for us to backtrack into

25   those posts; if you will.

OMER SAMIRI – DIRECT – MR. GULLOTTA        119

1    Q    So people on social media were figuring out that iVision

2    Mobile was, in some way, connected to this short code?

3    A    That's correct.

4    Q    Did that concern you?

5    A    It did because it portrayed that iVision Mobile was

6    somehow involved in this.

7    Q    Did you think this was a fake campaign ad when you saw

8    it?

9    A    I knew it wasn't real.  And so it was just a matter of

10   understanding who it was.  If it was not a customer, who it

11   was that was doing it.

12   Q    Is that why you were concerned about iVision  being

13   associated with this?

14   A    Yes.  We didn't want any punitive action taken on behalf

15   of the carriers to turn off the short code and adversely

16   affect our business.

17   Q    Okay.

18        So in addition to searching on social media or other

19   instances of images like this, what else did you do?

20   A    We monitored messaging activity into the system and then

21   on November 2nd , after a few days dealing with Upland and

22   determining the best way to approach it, we went and set up a

23   key word, Hillary, in the system.  That responded back to

24   people that did text in, informing them that the ad was not

25   supported by iVision Mobile or by Hillary for America.  And if

1  they wanted more information, they can text the real Hillary

2  for America for more details.

3  Q     Were you concerned that people might be falling for this?

4  As a way to warn them?

5              MR. FRISCH:  Objection.

6              THE COURT:   Sustained as to form.  Just don't lead.

7  What were some of your concerns about it?

8  A     There was a concern that people would think it was

9  legitimate.  I think given technology and innovation  and, you

10 know, it won't be outside the norm for something like this,

11 maybe, in the future to exist.

12 Q     Okay.

13            And I think you said you deployed the automatic,

14 sort of, warning on November 2nd.

15 A     That's correct.

16 Q     Did iVision receive inbound text messages with the

17 keyword  Hillary?

18 A     Yes, we did.

19 Q     To that short code, 59925?

20 A     That's correct.

21 Q     Does iVision keep records of the inbound text messages

22 that it receives?

23 A     Yes, we do.

24 Q     Did you review those records?

25 A     I did.

OMER SAMIRI - DIRECT - MR. GULLOTTA                121

1   Q    Approximately how many inbound text messages with the

2   keyword  Hillary did iVision receive?

3   A    There were about 5,600 inbound messages on behalf of

4   5,300 or so phone numbers.

5   Q    Did you produce records to the Government reflecting

6   iVision's data regarding inbound text messages?

7   A    Yes, we did.

8        MR. GULLOTTA:  If we can show Mr. Samiri Government

9   Exhibit 740, but just to Mr. Samiri.

10       (The above-referenced exhibit was published to the

11   witness.)

12       THE COURT:  Is this something that you're going to

13   object to, counsel?

14       MR. FRISCH:  I just have to see what it is.

15       MR. GULLOTTA:  Particularly if you can click on the

16   second tab.  Thank you.

17   Q    Mr. Samiri, do you recognize this document?

18   A    Yes, I do.

19   Q    Did you prepare it?

20   A    I did.

21   Q    And without going through all of the details of what's in

22   it, can you describe what this document contains ?

23   A    Sure.  It's a log of the received messages into our

24   system from the mobile subscribers that were texting in the

25   keyword Hillary to 59925.

*TONIANN LUCATORTO, RPR, RMR, CRR*

OMER SAMIRI – DIRECT – MR. GULLOTTA          122

1    Q    And this particular tab, is that a subset of the total

2    number of text messages that iVision received?

3    A    Yes.  This received log, which is the second tab, is

4    anybody that texted in after the keyword had been set up in

5    our system to handle our response.

6    Q    So when a keyword is set up in your system, does the

7    system automatically log information about the incoming  text

8    messages?

9    A    It logs –– our system automatically logs all information

10   on inbound messages.  But by assigning the keyword, we were

11   then able to route those messages to a specific account for

12   easier analysis and reporting on that keyword.

13   Q    Did you set up an account for this purpose because you

14   were tracking inbound text messages with the key word Hillary?

15   A    We just used an internal house account as opposed to

16   setting up a new account.

17   Q    If I could direct your attention to the first tab, which

18   is marked notepad file.

19        Again, without going through all of the lines of

20   data here, what is contained in this sheet?

21   A    This was our attempt query the system for everything else

22   in advance of setting up the keyword.  When people were

23   texting in and there was nothing in the system handling those

24   responses and routing those messages to a specific account,

25   they were just getting captured in the repository of received

*TONIANN LUCATORTO, RPR, RMR, CRR*

Samiri - Direct - Gullotta          123

1    messages.  And so this was our attempt to do a more manual

2    search within the data to find out people that texted in the

3    keyword Hillary to 59925.

4    Q     Before the automated response was set up primarily?

5    A     Primarily before, but it did capture some overlap of

6    after.  After the automated responses was set up, correct.

7    Q     With respect to the information in these two tabs that we

8    just went through, did you initially produce an Excel

9    spreadsheet that had the data in the received log and then you

10   produced a notepad file that had this data in it as well?

11

12

13   A     That's correct.

14   Q     And this sheet is a combination of those two files?

15   A     The --

16   Q     The entire Excel spreadsheet.

17   A     The entire spreadsheet is a combination of both files

18   reconciled together .

19           MR. GULLOTTA:   Your Honor, I move to admit

20   Government Exhibit 740.

21           THE COURT:  Any objection?

22           MR. FRISCH:  Your Honor, is the entirety, that is,

23   all of -- is the Government moving into evidence the entirety

24   of the document?  That is, all the tabs?  If that's the case,

25   I have no objection.

1          MR. GULLOTTA:   Yes.

2          THE COURT:  Okay.  What is that, 740?

3          MR. GULLOTTA:  Government 740.

4          THE COURT:  That's admitted into evidence.

5          (Government Exhibit 740, was received in evidence.)

6          MR. GULLOTTA:   Thank you, your Honor.  Can we

7    publish to the jury ?

8          (The above-mentioned exhibit was published to the

9    jury.)

10   Q    Let's begin with what is the second tab called received

11   logs, if we can scroll down to the bottom of the data.

12         What is the last line all the way on the left to the

13   left of column A?  What's the number there?

14   A    I'm sorry, which?

15   Q    To the left of column A?

16   A    5093.

17   Q    What does that number reflect?

18   A    That reflects the number of received messages once the

19   keyword had been set up in the system.

20   Q    Okay.  And this list, if we can scroll back to the top.

21   It begins with column headings, right?

22   A    There's a header row so it would be 5092.

23   Q    92, okay.  And can just explain for the jury just walk

24   through and summarize what's in each column?

25   A    Sure.  Column A would be the short code that they texted

1    into.  Column B would be the keyword, the word that was texted

2    in.  Column C is the mobile number that texted in, the

3    message.  Column D is the date.  Column E is the time.  The

4    time stamp of those messages, those are all Pacific time.

5    Column F is just isolating the day out of the date to allow

6    for easier summing of the data on column H and I.  And that's

7    what you see there in column H and I, is the number of text

8    messages on each of those dates, and then column K and L

9    represent the number of text messages for each of those phone

10   numbers.  Some having texted in more than once.

11   Q    Thank you very much.

12            Just to be clear, in column F which has the title

13   day, in line 2 it says 24.  So does that represent November

14   24th.

15   A    That's correct.

16   Q    And the line three below it has the number 14.  And so

17   that message came in -- and that represents November 14th,

18   correct?

19   A    Yes.

20   Q    So if we look through over to the right on columns H and

21   I, are these totals that you compiled?

22   A    Yes.

23   Q    And so I see next to -- on date in, the number 1.  So

24   that represents November 1st ?

25   A    That's correct.

Samiri – Direct – Gullotta                    126

1    Q    And you had testified that the automatic warning was not

2    put in place until November 2nd, correct?

3    A    Yes.

4    Q    Is that why there's a zero next to November 1st?

5    A    Yes.

6    Q    Then in column, I guess it's  line three, column H,

7    that's November 2nd?

8    A    Yes, this is.

9    Q    Do you remember what time of day the automatic warning

10   was sort of deployed?

11   A    Around 10:40-ish in the morning.

12   Q    Would that be Pacific time?

13   A    Pacific time.

14   Q    So after 10:40-ish in the morning Pacific time on

15   November 2nd, iVision received166 inbound text messages with

16   the word Hillary to short code 59925?

17          THE COURT:   Can I just ask a question?  Before you

18   put in the code Hillary, were text messages still coming in,

19   but they're just, there was just, you just didn't have it

20   assigned to that name yet?

21          THE WITNESS:  It wasn't designed to an account, so

22   those messages were  going to a general inbox, but not an

23   inbox to a user.  They were going into a database, but not

24   something that would be web accessible to log in.

25          THE COURT:   I see, okay.  Sorry about that, go

1    ahead.

2              MR. GULLOTTA:  That's okay.  Thank you, your Honor.

3    Q    So those messages that came in, we're going to get to

4    those in a moment.  They weren't, I think you said being

5    routed to any specific account?

6    A    That's correct.

7    Q    Until you set this one up?

8    A    Yes.

9    Q    Moving down to line four, the date in, in column H is

10   November 3rd; is that correct?

11   A    Yes.

12   Q    And there were 1274 inbound text messages with the

13   keyword Hillary to your short code?

14   A    That's correct.

15   Q    And then again moving down to November 4th, there  was

16   1602?

17   A    Mm-hmm, yes.

18   Q    Then it looks like it starts to taper off a little bit

19   from the 5th through November 8th, which was Election Day?

20   A    Yes, it tapers off.

21   Q    And then it's kind of a pretty severe drop off after the

22   8th, correct?

23   A    That's correct.

24   Q    If we can look -- well, actually.  Let's move over to

25   column K.  These are -- what's in column K?

1   A     The unique phone numbers that are represented in column

2   C.  Column C might show duplicates if people texted in more

3   than once and column K would the unique mobile numbers of that

4   list.

5   Q     What's column L?

6   A     Column L is the number of text messages sent in by those

7   unique phone numbers.

8   Q     So that first number beginning with area code (413) on

9   line, 2 that person texted Hillary to your short code eight

10  times?

11  A     Yes.

12  Q     And same thing going down.  Those are numbers that sent,

13  looks like multiple texts with that keyword to your short

14  code?

15  A     That's correct.

16  Q     If we can look at the tab at the bottom that's marked

17  notepad file.  And again, there's a lot of similarity, but if

18  you can walk through the columns and explain to the jury

19  what's in each of those columns?

20  A     Sure.  Column A would be the date in.  That the message

21  was received.  Column B would be the time stamp, also Pacific

22  time.  Column C is the mobile number.  Column D is the short

23  code and column E is the inbound message received.  Column G,

24  again, takes the date and column H sums up the number of

25  messages received for that particular date.  And then column J

1   would be the unique phone numbers and column K represents the

2   number of messages for those unique phone numbers.

3   Q    All right.  And then so if we do the same exercise with

4   columns G and H, it looks like according to your totals that

5   on October 29, iVision received 16 inbound texts with the

6   keyword Hillary?

7   A    That's correct.

8   Q    And then on the 30th, there were 11?

9   A    Yes.

10  Q    31st, 23?

11  A    Correct.

12  Q    And the 1st there were 23?

13  A    Correct.

14  Q    And now after the 2nd, moving down, your system has,

15  should be collecting the inbound texts with the keyword

16  Hillary, right, and logging them on that sheet we looked at

17  just a moment ago?

18  A    That's correct.

19  Q    So what are these -- what's represented here with these

20  numbers?

21  A    So the nature of how we obtain this data was a direct

22  call to the database where we had to essentially introduce

23  different variations of what people might have texted in to

24  try to aggregate all of the phone numbers that were part of

25  this campaign, if you will.  And so it was just the nature in

1    which the query was written to find those messages in the

2    database which cause some overlap on those days.

3    Q    Okay.  So in the received log that's happening

4    automatically through your software --

5    A    That's correct.

6    Q    -- keyword set up?

7    A    Yes.

8    Q    And with these numbers, this was a result of a more

9    manual search?

10   A    A very manual search.

11   Q    Do you recall after speaking with Mr. Chesley and

12   deploying the warning, the response, if you saw the graphics

13   we looked at before anywhere else?  Either in media

14   publications or on social media?

15   A    Media publications.

16   Q    And did you share those media publications on social

17   media to provide further warning to folks?

18   A    I did.  It was an effort not only to warn people, but

19   also to somewhat try to clear iVision  Mobile's name and

20   involvement.

21   Q    Again, because you were concerned your short code had

22   essentially been hijacked, correct?

23   A    Yeah.  The carriers are very quick to act, and so any

24   adverse action on the short code would have profound impact on

25   our business.  So we wanted to first and foremost put it out

1    there that we were not involved in this and we're doing

2    everything we could to com bat it.

3    Q    You said earlier  that multiple customers of yours were

4    using this short code, correct?

5    A    Yes.

6    Q    And so if -- would one of the things a carrier might do

7    be the shout down the use of your short code?

8

9

10    A    Yes.  That's exactly right.  By shutting  down the short

11    code, it would cease all messages and clients would be without

12    a solution and we would be out of business.

13            MR. GULLOTTA:  Understood.  Your Honor, if I can

14    have a moment.

15            THE COURT:  Sure.

16            MR. GULLOTTA:  No further questions, your Honor.

17            THE COURT:  Any redirect?

18            MR. FRISCH:  Yes, your honor.

19            THE COURT:  You can go ahead.

20            MR. FRISCH:  Thank you, Judge.

21    CROSS-EXAMINATION

22    BY MR. FRISCH:

23    Q    Mr. Samiri, good afternoon.  I'm Andy Frisch and I'm here

24    with Mr. Mackey.  You and I have never met before.

25    A    That's correct.

OMER SAMIRI - CROSS - MR. FRISCH          132

1          MR. FRISCH:  I just want to make sure that the

2    document in evidence, that I understand what is in evidence.

3    So if I can ask that we show Mr. Samiri 3500OS-7-E.

4          (The above-referenced exhibit was published to the

5    witness.)

6    Q    Can you see that, sir?

7    A    Yes.

8    Q    And is that part of the exhibit that the Government just

9    moved into evidence?

10   A    It appears to be, yes.

11         MR. FRISCH:  And if you could also show Mr. Samiri

12   3500OS-3-C.

13         (The above-referenced exhibit was published to the

14   witness.)

15   Q    I think a moment ago you referred to this essentially as

16   the notepad part of the exhibit; is that right?

17   A    Yes.  That's correct.

18   Q    And that's also part of the exhibit that was moved into

19   evidence,  correct?

20   A    Yes, it is.

21   Q    While this exhibit is on the screen, the first line of

22   this portion of the exhibit shows incoming texts or incoming

23   text on October  29, 2016; is that right?

24   A    That's correct.

25   Q    And then I want to show you 3500 OS-1-D.

1      (The above-referenced exhibit was published to the

2  witness.)

3  Q    And that's also -- and that's also part of the exhibit

4  that's in evidence, correct?

5  A    Yes.

6  Q    Thank you.  I just wanted to be clear it was, all of that

7  was in evidence.

8          I think you mentioned in your direct testimony that

9  there was media coverage of these memes or these postings; is

10  that correct.

11  A    That's correct.

12  Q    Do you recall that that media coverage began on or about

13  November 2, 2016?

14  A    I don't recall the exact date.

15  Q    Are you familiar with a publication or online news

16  service called Wired?

17  A    Yes, I am.

18          MR. FRISCH:  So if I can show you for identification

19  what is marked Government Exhibit 744.

20          (The above-referenced exhibit was published to the

21  witness.)

22          MR. FRISCH:  We can focus in if you can't read it.

23  If it's too big.  Thank you.

24  Q    Does this refresh your recollection that the date where

25  media coverage about these postings began was November 2,

1    2016?

2    A     This shows the date that I posted.  Doesn't necessarily

3    media coverage began.

4    Q     Do you remember, is this a posting that you that you made

5    yourself?

6    A     I did, yes.

7    Q     And do you recall from looking at this that what you

8    posted was for people to read about it in Wired?

9    A     Correct.

10   Q     And does that refresh your recollection that, at least as

11   of November 2, 2016, you had reason to believe that this was

12   being cover on Wired?

13   A     As of November 2nd, yes.

14   Q     Okay.  Thank you, sir.

15         You testified that there were a number of phone

16   numbers that texted Hillary multiple times, correct.

17   A     Correct.

18   Q     I won't hold you to the exact number, there's a lot of

19   numbers here.  But is it true that approximately 16 different

20   numbers texted Hillary more than once?

21   A     I think that number was closer to 100 and some odd phone

22   numbers that texted in more than once.

23   Q     There was one text, one phone number, that texted Hillary

24   about 12 times?

25   A     Correct.

OMER SAMIRI – CROSS – MR. FRISCH                    135

1   Q     Was that the largest number that came from any one

2   telephone number, as best that you can remember?

3   A     From what I recall, correct.

4   Q     Are you able to say from your work how many texts came in

5   before the afternoon of November 1, 2016?  And again, there's

6   a lot of numbers here and an approximation is fine.

7   A     It would be in the notepad file.  And I want to say maybe

8   under 100 came in before that date.

9   Q     Approximately?

10  A     Yes.

11  Q     And then I want to ask you:  Are you able to approximate

12  how many of the texts came in after November 2, 2016, say,

13  that afternoon?

14  A     It was several thousand, I believe.

15  Q     Would you agree with me that most of the texts that we're

16  talking about here came in after the afternoon of November 2,

17  2016; is that fair?

18  A     Yes.

19  Q     Now, the text that I showed you a moment ago for

20  identification, Government Exhibit  744, was that publically

21  posted?

22  A     Yes, it was.

23  Q     And it was publically posted by you or your company,

24  correct?

25  A     That's correct.

OMER SAMIRI – REDIRECT – MR. GULLOTTA        136

1    Q    Did that posting result in essentially a surgery of media

2    inquiries or a lot of media inquiries?

3    A    Not as a result of that posting, I don't believe.  I

4    think the media increase came as a result of the Wired

5    publication.

6    Q    Got it.

7          So the publication,  so the coverage of this by the

8    publication Wired, is it your view that that's what

9    precipitated  the surge in media coverage?

10

11

12   A    Perhaps.

13          MR. FRISCH:  Can I have one moment, Judge?

14          THE COURT:  Sure.

15          MR. FRISCH:  All right, Mr. Samiri.  Thank you very

16   much.  I have nothing further, Judge.

17          THE COURT:  All right, thank you so much.

18          Any redirect, Mr. Gullotta?

19          MR. GULLOTTA:  Just a quick redirect.

20   REDIRECT EXAMINATION

21   BY MR. GALLOTTA:

22   Q    Mr. Samiri, referring back to the data that you provided

23   from iVision, is it the case that most of the numbers texted

24   in the keyword Hillary only texted it in once?

25   A    Most of the numbers only texts once.

1    Q    Significant majority?

2    A    Significant majority, yes.

3    Q    And with respect to the cause of the surge in inbound

4    text messages, do you know for sure that it was the Wired

5    magazine or some other media publication?

6    A    I do not.

7    Q    Could it have been because somebody was sharing this on

8    Twitter?

9    A    Could very well be a result of the posts on Twitter.

10   OFFICIAL COURT REPORTER

11

12          MR. GULLOTTA:  Thank you, your Honor.  No further

13   questions.

14          MR. FRISCH:  I have nothing else.

15          THE COURT:  Okay, thank you so much.  You can step

16   down.

17          (Witness leaves the stand.)

18          THE COURT:  Are you ready for your next witness?

19          MR. BUFORD:  Your Honor, the Government calls

20   Michael Anderson.

21          (Witness takes the witness stand.)

22   **MICHAEL ANDERSON**, called as a witness, having been first duly

23   sworn/affirmed, was examined and testified as follows:

24          THE COURTROOM DEPUTY:  Please, state and spell your

25   name for the record.

MICHAEL ANDERSON – DIRECT – MR. BUFORD          138

1          THE WITNESS:  Michael Anderson.

2          THE COURTROOM DEPUTY:  Thank you.  Have a seat.

3          THE COURT:  All right, good afternoon Mr. Anderson.

4   I just want to give a couple of instructions before you start.

5   The first is just keep in mind that it's important that

6   everybody in the jury and everybody at both tables hear what

7   you have to say.  And to that end I'm going to ask you not to

8   speak too quickly.  Our court reporter takes down everything

9   that you say and if you're a fast talker, it makes it hard on

10  the court reporter.

11         Similarly, let whatever lawyer is asking you

12  questions finish talking before you start speaking so you're

13  not taking over each other.

14         Do your best to answer only the question that you're

15  being asked and if there's something you want to have repeated

16  or that you don't understand just tell me, okay?  All right,

17  go ahead.

18  DIRECT EXAMINATION

19  BY MR. BUFORD:

20  Q     Good afternoon, Mr. Anderson.  Are you currently

21  employed?

22  A     Yes.

23  Q     Where do you work?

24  A     Twitter.

25  Q     What's your current position?

*TONIANN LUCATORTO, RPR, RMR, CRR*

1  A    My current position is senior engineering manager for

2  core services.

3  Q    What kind of work does core services do?

4  A    We maintain many of Twitter's core services like the main

5  applications for serving tweets, for serving users and other

6  aspects of the exact.

7  Q    How long have you been at Twitter overall?

8  A    Nine years.

9  Q    Can you give us a sense of the positions you've held at

10 Twitter over those nine years?

11 A    I joined as an engineer contributing to our

12 experimentation team.  And then about five years ago I became

13 a manager on our growth team, working on, sort of, the user

14 experience and sign up.  About four months ago, I became the

15 lead for core services.

16 Q    From your work at Twitter, are you generally familiar

17 with how Twitter's technology works to provide services to its

18 subscribers?

19 A    Yes.

20 Q    I want to ask you about the location for Twitter's

21 servers.  Without necessarily giving us the specific address,

22 can you tell us where Twitter servers were located in the year

23 2016?

24 A    Yeah.  We had two data centers serving production

25 traffic.  One was based in Atlanta and the other was

MICHAEL ANDERSON – DIRECT – MR. BUFORD          140

1   Sacramento.

2   Q     If someone were to send a tweet in the year 2016, would

3   that tweet necessarily have gone through Twitter's servers in

4   either Atlanta, or Sacramento, or both?

5   A     Both.

6              (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. BUFORD:

2    (Continuing.)

3    Q    What about a direct message?  Would that similarly have

4    been routed through Twitter's servers through either Atlanta,

5    Sacramento or both?

6    A    Both.

7    Q    I would like to show for the witness only what has been

8    marked for identification as Government  Exhibit 201.

9            Mr. Anderson, are you familiar with this document?

10   A    Yes.

11   Q    Without necessarily telling us the specific contents, can

12   you tell us generally what it is?

13   A    Each row represents a tweet.  The doc I.D. is the tweet

14   I.D. that we track internally.

15   Q    In preparation for your testimony here today, did you see

16   a copy of this document?

17   A    Yes.

18   Q    Did you have a chance to compare it to Twitter's own

19   records with respect to these two tweets?

20   A    Yes, I did.

21   Q    Is the data in this document accurate to the best of your

22   knowledge?

23   A    Yes.

24           MR. BUFORD:  Your Honor, the Government offers,

25   Government Exhibit 201.

1          THE COURT:  Any objection?

2          MR. FRISCH:  No objection.

3          THE COURT:  All right.  201 in evidence.

4          (Government Exhibit 201, was received in evidence.)

5   Q    Mr. Anderson, I would like to direct your attention to

6   the first column  there.

7          I believe you just mentioned the document I.D.

8   number.  Can you tell us what that is?

9   A    Sure.  These are the unique I.D. assigned to any tweet.

10  Q    In preparation for your testimony today, well, let me ask

11  you this first.

12          Are you familiar with something called a client I.D.

13  number?

14  A    Yes.

15  Q    Can you tell us generally what that is?

16  A    Sure.  So every Twitter application is assigned a client

17  I.D.  So the iPhone app for Twitter has its own unique client

18  I.D., and any time you send a tweet or make a request to

19  Twitter with that application, we would know on the server

20  side that it was made with that kind of client.

21  Q    In preparation for your testimony here today, were you

22  able to compare these document I.D. numbers to the client I.D.

23  numbers on file at Twitter?

24  A    Yes.

25  Q    Starting with the document I.D. in the first row.  From

MICHAEL ANDERSON - DIRECT - MR. BUFORD          143

1    your review of the client I.D. associated with this document

2    I.D., what, if anything, can you tell us about how this

3    particular tweet was sent?

4    A    Yes.  This was sent from our Twitter web client so it

5    would be most likely from Twitter.com.

6    Q    And how would a user access Twitter.com?

7    A    Most easily through a desktop or laptop computer.

8    Q    And looking at the document I.D. in row No. 2, from your

9    comparison tip document I.D. with the associated client I.D.,

10   what can you tell us about how this particular tweet was sent?

11   A    Sent in 2016, it would have been sent from our mobile

12   website.  So mobile Twitter.com.

13   Q    And how to would a user access the mobile website?

14   A    It would have loaded by default if you were on a mobile

15   device like an iPhone or something.

16   Q    We can set this exhibit aside.

17            From your work at Twitter, are you familiar with

18   something called an orphan retweet?

19   A    Yes.

20   Q    Can you tell us generally what that is?

21   A    Yes.  So if you send a tweet and then I retweet it, and

22   then you delete your retweet, my retweet is orphaned because

23   the original tweet doesn't exist.

24   Q    What happens to an orphan retweet?

25   A    They get deleted periodically throughout the day since

1    there is nothing really left of them so we maintain those.

2              MR. BUFORD:  Your Honor, if I may have one moment?

3              THE COURT:  Sure.

4              MR. BUFORD:  No further questions, your Honor.

5              THE COURT:  Any objection.

6              MR. FRISCH:   May I have one moment?

7              THE COURT:  Sure.

8              MR. FRISCH:  Can I ask my questions from here?

9              THE COURT:  Sure.

10             MR. FRISCH:  Can I ask Ms. Pershad it put up 201 and

11   make it a little bit bigger.

12   CROSS-EXAMINATION

13   BY MR. FRISCH:

14   Q    Mr. Anderson if you look at the 1, 2, 3, fourth column,

15   it says "sent day and time."  Is that what Twitter's records

16   show as to the date and time that those particular things were

17   posted or sent?

18   A    The dates are accurate from what I at least reviewed .  I

19   don't recall I wasn't tracking the times.

20   Q    My question is:  Does this record -- does this record

21   reliably indicate what time or what time of day on

22   November 1st and November 2nd these two things were posted or

23   sent or whatever or transmitted.

24             Is the came time of day reliable on this document?

25   A    Is the question, is the time, like, if that's what we

M. ANDERSON – CROSS – MR. FRISCH                    145

1   record as the time is accurate?

2   Q    Can we infer from this document that that's the time of

3   day it was sent?

4   A    Yes.

5   Q    And is it Eastern Standard Time or some other time zone?

6   A    That I couldn't tell you.

7   Q    So if it says November 1, 2016, at 2134, that's military

8   time which I think is?

9            THE COURT:  9:34.

10           MR. FRISCH:  Thank you.

11           THE COURT:  I think that's right.  Yes.

12   Q    In any event, it could be 9:34 or 6:34 depending on which

13   time zone is recorded here, correct?

14   A    Yes.

15   Q    All right.

16           MR. FRISCH:  Thank you, sir, I appreciate it.  Thank

17   you.

18           THE COURT:  Anything else from the Government?

19           MR. BUFORD:  None.  Thank you.

20           THE COURT:  Thank you so much.  You can step down.

21           THE WITNESS:    Thank you.

22           (Witness leaves the witness stand.)

23           THE COURT:  Are you ready to call your next witness?

24           MR. PAULSEN:  Yes, your Honor.

25           The Government calls Mark Bertucci.

MARK BERTUCCI – DIRECT – MR. PAULSEN                146

1           (Witness takes the witness stand.)

2    **MARK BERTUCCI,** called as a witness, having been first duly

3    sworn/affirmed, was examined and testified as follows:

4                COURTROOM DEPUTY:  State your name for the record.

5                THE WITNESS:  Mark Bertucci.

6                THE COURT:  A couple of things.  I just want to make

7    sure everyone can hear you, so make sure the microphone's

8    available to you.

9                Don't talk too fast because the Court reporter has

10   to take down everything that you say.  If there's a question

11   that you don't understand, or you want to have repeated, just

12   tell me, and just do your best to answer only the question

13   that you're being asked.

14               All right?

15               THE WITNESS:  Sounds good.

16               THE COURT:  All right.  Go ahead.

17   DIRECT EXAMINATION

18   BY MR. PAULSEN:

19   Q    Good afternoon, Mr. Bertucci.

20   A    How are you doing?

21   Q    Where do you live now?

22   A    Chapel Hill, North Carolina.

23   Q    What are you doing down there?

24   A    I'm in grad school.

25   Q    Did you live in New York City at an earlier time?

MARK BERTUCCI – DIRECT – MR. PAULSEN            147

1    A    I did.  I spent about ten years in New York City.

2    Q    Did that include 2016?

3    A    It did, yes.

4    Q    During that time, did you know an individual named

5    Douglass Mackey ?

6    A    I did, yeah.

7    Q    Do you recognize him in the courtroom today?

8              MR. FRISCH:  Your Honor, I'll stipulate.

9              THE COURT:  Indicating the defendant.

10             Go ahead.

11   A    I do, yes.

12   Q    In what context did you know him?

13   A    I was his roommate.

14   Q    During that time, what did you learn about his

15   background?

16   A    From my understanding, he went to  Middlebury College in

17   Vermont.  I know he had a brother, at least one brother.

18   Q    How about athletic achievement.  Did you know anything

19   about that?

20   A    I believe he was on the cross country team at Middlebury.

21   Q    During the time you lived together, did you have internet

22   access in your apartment?

23   A    We did, yes.

24   Q    Do you recall what company you got it from?

25   A    Spectrum.

MARK BERTUCCI - DIRECT - MR. PAULSEN                 148

1   Q    Now, did you live with Mr. Mackey in the time --

2   approximate month or two prior to the 2016 election?

3   A    Yes.

4   Q    During that time did you know whether the defendant had

5   social media accounts?

6   A    Not that I was aware of, no.

7   Q    You never saw him using social media?

8   A    Not really, no.

9   Q    During the time you lived with him, could you generally

10  see what he was doing?

11  A    Besides just being at the apartment making dinner,

12  occasionally watching TV, not really, no.

13  Q    Did he spend a lot of time privately in the apartment?

14  A    I would say so, yes.

15           THE COURT:  Were you working at the time?

16           THE WITNESS:    I was, yeah.

17  Q    Go ahead.  Is it fair to say the defendant spent a lot of

18  time on his own in his room?

19  A    Yes.

20  Q    Now, do you recall a later time when you learned the

21  defendant's name was put in the news?

22  A    I do, yeah.

23  Q    Could you please tell me what you recollect?

24  A    I just know the -- I got a text from a roommate that we

25  shared in common.

MARK BERTUCCI – DIRECT – MR. PAULSEN          149

1          MR. FRISCH:   Your Honor, I object to what might be

2     hearsay.  I also object to the question.  I'm not sure of the

3     relevance.

4          THE COURT:  I'm sustaining the objection to the

5     question.

6          THE WITNESS:   Does that mean I answer the

7     question?

8          THE COURT:  No, sorry.  When I "sustained" you don't

9     have answer it.

10         Go ahead.

11    Q    Mr. Bertucci, did you know the defendant was the online

12    individual Ricky Vaughn?

13         MR. FRISCH:  Objection.

14         THE COURT:  Overruled.

15         Did you know that?

16         THE WITNESS:   I had no idea, no.

17    Q    Was that a surprise to you?

18    A    Definitely, yes.

19    Q    When you learned that fact, was there any indications to

20    you that that had been the case.  Any clue that you then, in

21    retrospect, realized?

22         MR. FRISCH:  Objection.

23         THE COURT:  Sustained.

24         MR. PAULSEN:  No further questions.

25         THE COURT:  Already.

MARK BERTUCCI - CROSS - MR. FRISCH                150

1          MR. FRISCH:  Can I ask from here?

2          THE COURT:  Yes.

3    CROSS-EXAMINATION

4    BY MR. FRISCH:

5    Q    Mr. Bertucci, good afternoon.

6          In this apartment that you shared, did you and Mr.

7    Mackey each have your own bedrooms?

8    A    We did, yes.

9    Q    Is it correct that you met him on Craigslist?

10   A    Yes.

11   Q    You posted  on Craigslist looking for a roommate?

12   A    I don't know if I posted.  I believe I found a posting

13   from...

14   Q    Got it.

15         But, in any event, you met on Craigslist and became

16   roommates that way, correct?

17   A    Yes.

18   Q    And fair to say you were roommates for about two, two and

19   a half years?

20   A    Yes.

21   Q    Fair to say during those two, two and a half years you

22   socialized , that is, went out to dinner or played basketball

23   maybe no more than once a month, once every two months; is

24   that fair?

25   A    We occasionally played basketball, yes.

1   Q    And so, other than being roommates, you socialized,

2   played basketball, went out to eat, about maybe once a month,

3   once every two months is that fair?

4   A    That might be a little more than we did socialize, I

5   would say.

6   Q    But it wasn't frequent, correct?

7   A    Yeah.

8   Q    It wasn't every day, correct?

9   A    Yes.

10  Q    Wasn't necessarily every week either, correct?

11  A    Correct.

12          MR. FRISCH:  All right.  Mr. Bertucci, thank you

13  very much.

14          THE COURT:  Anything else from the Government?

15          MR. PAULSEN:  Nothing further.

16          THE COURT:  You can step down.

17          THE WITNESS:  Thank you.

18          (Witness leaves the witness stand.)

19          THE COURT:  I want to give the jury a break at

20  around 3:45.  Can do we have another short witness?

21          MR. PAULSEN:  I think that's possible, your Honor.

22          THE COURT:  Let's give it will a shot.  Call your

23  next witness.

24          MR. PAULSEN:  Sure the Government calls Paul Nehlen.

25          (Witness takes the witness stand.)

PAUL NEHLEN - DIRECT - MR. PAULSEN          152

1  **PAUL NEHLEN,** called as a witness, having been first duly

2  sworn/affirmed, was examined and testified as follows:

3         COURTROOM DEPUTY:  State your name for the record.

4         THE WITNESS:  Paul F. Nehlen, III.

5         COURTROOM DEPUTY:  Have a seat.

6         THE COURT:  Few things before we begin.  I want to

7  make sure the jury can -- I'm over here -- I want to make sure

8  the jury can hear you, so I want to make sure you're using the

9  microphone.

10        THE WITNESS:   Okay.

11        THE COURT:  And please don't speak too quickly.  The

12  Court reporter has to take down your testimony and if you

13  speak too quickly to makes his hard job hard.

14        For the same reason, whichever lawyer's questioning

15  you, finish talking before you start talking so you're not

16  talking over each other.  If there's something that you don't

17  understand or want to have repeated, let me know and just do

18  your best to answer just the question you're being asked okay.

19        THE WITNESS:   Thank you.

20        THE COURT:  Go ahead.

21        MR. PAULSEN:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. PAULSEN:

24  Q    Good afternoon, Mr. Nehlen.

25  A    Good afternoon.

1  Q    Where do you currently live?

2  A    Delavan , Wisconsin.

3  Q    What did you do there?

4  A    I run a business that builds commercial water filtration

5  equipment.

6  Q    Okay.  I would like to ask you some questions about some

7  events that took place back in 2017 and '18?

8  A    Yes, sir.

9  Q    In the year 2017, were you aware of an individual who

10  went by the name Ricky Vaughn?

11  A    Yes, sir.

12  Q    What did you know about that individual?

13  A    Just a Twitter personality, like, a Trump supporter.

14  Q    Were you a Twitter user around that time?

15  A    I was.

16  Q    Okay.  Did you follow Mr. Vaughn or Ricky Vaughn?

17  A    I did.

18  Q    Were you eventually put in touch with the person who was

19  running that account?

20  A    Yes, sir, I was.

21  Q    How did that happen?

22  A    A reporter that had contacted me said that she would put

23  me in touch with him; that he was interested in talking to me.

24  Q    Okay.  What were you doing at that time?

25  A    I was running for Congress.

PAUL NEHLEN - DIRECT - MR. PAULSEN                154

1   Q    Where were you running for Congress?

2   A    In Southeastern Wisconsin.

3   Q    Did you get in touch with the individual who was running

4   the Ricky Vaughn account?

5   A    I did.

6   Q    How did that happen?

7   A    I was either given an e-mail or phone number somehow was

8   put in touch with him.

9   Q    Do you remember what your initial conversations were?

10  A    I was really just about -- he liked what I was working on

11  and believed what I was doing and, eventually, said that he

12  would like to help the campaign.

13  Q    Okay.  Do you remember at what point in your campaign you

14  were when this contact happened?

15  A    It was in the fall of that year.

16  Q    Now, these communications you had with the individual

17  known as Ricky Vaughn in what form were they?

18  A    Either by text message or e- mail.  I think we had maybe

19  one phone call.  One that I can remember.  Maybe more but

20  definitely one that I can remember.

21  Q    And you had Ricky Vaughan's phone number?

22  A    I did.

23  Q    You had Ricky Vaughan's e-mail?

24  A    Yes, sir.

25  Q    Now, when these conversations were happening, did you

PAUL NEHLEN – DIRECT – MR. PAULSEN          155

1   know the name of the real person who was Ricky Vaughn?

2   A    Not initially, no.

3   Q    Did you ever learn it?

4   A    I did.

5   Q    How did that happen?

6   A    He e-mailed  me from his e-mail that had his name on it

7   and he sent me a document, pitch document, for using a service

8   that he was representing.

9        MR. PAULSEN:  Your Honor, I would like to show the

10  witness, and only the witness, what's been marked for

11  identification as Government Exhibits  700 and 701.

12       THE COURT:  Okay.

13  Q    Mr. Nehlen , this is Government  Exhibit 700.  Do you

14  recognize this document?

15  A    I yes, sir.

16  Q    Is this the e-mail you referred to a moment ago?

17  A    It is.

18  Q    Okay.  And this --

19       MR. PAULSEN:  Ms. Pershad, can you show the

20  attachment and show the witness.

21  Q    Mr.  Nehlen, do you recognize this document?

22  A    I do.

23  Q    What is this?

24  A    This was a pitch that was sent to me with this Smart

25  Checker program.  It was supposed to increase the amount of

1    donations that I received on my congressional campaign.

2    Q    Okay.

3          MR. PAULSEN:  Your Honor, the Government moves

4    admission of 700, 701.

5          THE COURT:  Any objection?

6          MR. FRISCH:  I do.  May we approach?

7          THE COURT:  Sure.

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    157

1            (Sidebar conference.)

2            MR. FRISCH:  Is there more than one copy?

3            MR. BUFORD:  That I don't know.

4            MR. PAULSEN:  Is the cover e-mail?

5            THE COURT:  What year is this from?

6            MR. PAULSEN:  It's from 2017, October.

7            THE COURT:  What's the relevance?

8            MR. PAULSEN:  The relevance is that Mr. Nehlen is

9    the individual who revealed Ricky Vaughan's true identity as

10   Douglass Mackey to the world.  Were it not for Mr. Nehlen,

11   it's very likely he would not have been identified.

12           THE COURT:  What does this have to do with him?

13           MR. PAULSEN:  This is the one piece of evidence that

14   he received that actually had the defendant's name on it.

15           THE COURT:  Oh, I see.  But do we need the

16   substance of something that happened two years after in

17   evidence?  I think that's what the objection is.

18           MR. FRISCH:  Yes.

19           MR. PAULSEN:  At the very least, I think the actual

20   e-mail --

21           MR. FRISCH:  I don't have a problem with the e-mail.

22           MR. PAULSEN:  The Government's fine with just this.

23   We offered it for completeness.

24           THE COURT:  That's fine.

25           MR. PAULSEN:  He's going to talk about what their

1    interactions were.

2             THE COURT:  I think the e-mail is fine.  I don't

3    think there is a need for the rest of it.

4             MR. PAULSEN:  That's fine.

5             THE COURT:  Sounds like everybody agrees.

6             MR. FRISCH:  I also just don't want -- my

7    understanding with the e- mail, and will not go into what

8    about the substance of it is, is it's just to establish the

9    e-mail for your purposes.

10            MR. PAULSEN:  I was just going to ask him to

11   characterize what sort of conversations they had.  They

12   developed a relationship as Mr. Mackey was offering some

13   services to his campaign.  The details don't really matter to

14   us.

15            THE COURT:  I was going to say you can certainly

16   talk about what their interactions to the extent it is

17   relevant to this issue, but this isn't going to do it anyway.

18   So I don't think relevant details of what he's offering.  I

19   will say they don't seem particularly shocking to me but I

20   don't think they're relevant either.

21            So I think let's not snatch defeat from the jaws of

22   victory.

23            MR. PAULSEN:  Your Honor, just to prevent the

24   next --  there is a fairly anodyne contract.  They didn't

25   actually agree to this, this is the offer.

SIDEBAR CONFERENCE                    159

1          THE COURT:  But who cares, right?

2          MR. PAULSEN:  The only thing I wanted to say is that

3     Mr. Nehlen became quite disenchanted with Mr. Mackey.  That's

4     part of the reason he revealed his identity.  He was -- we are

5     going to treat that in pretty broad brush strokes.

6          THE COURT:  First of all, I don't think that matters

7     and I don't understand you to be asking to bring that out.  I

8     think if you can just cut to the chase that, I mean, I

9     suppose, I mean, was there some dispute about him not wanting

10    to be known?  I apologize I don't know every single detail

11    about this case, but is that an issue?  I know that was a

12    question before Judge Garaufis.

13         MR. PAULSEN:  The issue, your Honor, is that

14    Mr. Mackey was unknown to the world until this moment.  The

15    investigation into him only commenced when we actually learned

16    who he was.  Some of the delays which, frankly, Mr. Frisch

17    opened on about the delays are due in small part to the fact

18    that Mr. Mackey was no the flown.

19         THE COURT:  Right.  I don't think that anybody's

20    disputing that.  I just think the question is we don't need to

21    know all these details.

22         MR. PAULSEN:  Sure, your Honor.

23         THE COURT:  Great.  Thank you.

24         (Sidebar discussion concludes.)

25

P. NEHLEN - DIRECT - MR. PAULSEN          160

1          (In open court.)

2          THE COURT:  All right.  So I think Exhibit 700, the

3    first page is in evidence.

4          MR. PAULSEN:  Yes, your Honor.

5          THE COURT:  Okay.

6          (Government Exhibit 700, was received in evidence.)

7          THE COURT:  Next question.

8    BY MR. PAULSEN:

9    Q    So, Mr. Nehlen, I'm going to show it on the screen and

10   publish to the jury Exhibit 700.

11          This is the e-mail account that the individual you

12   knew as Ricky Vaughn e-mailed you from?

13   A    That's correct.

14   Q    Okay.  Now, the proposal came along with this; is that

15   right?

16   A    That's correct.

17   Q    Okay.  Did you enter into an agreement with Mr. Mackey?

18   A    I did not enter into the agreement that he proposed which

19   was for me to pay for that service.  I did not pay for that

20   service.  I gave him access to my Facebook account so he had

21   an administrator access for three months to my Facebook

22   account.

23   Q    Okay.

24   A    For my campaign.

25   Q    Without getting into the full details of what happened

P. NEHLEN - DIRECT - MR. PAULSEN          161

1   next, did there come a time when you became frustrated with

2   Mr. Mackey?

3   A    Yes.

4   Q    Yes.

5            MR. FRISCH:  Your Honor, I object and --

6            THE COURT:  Well, I'll sustain it as to form, but

7   was there a turn in your relationship with him?

8            THE WITNESS:    There was.

9            THE COURT:  All right.  Next question.

10  Q    What happened next Mr. Nehlen?

11  A    Well, really nothing.

12           THE COURT:  What did you do as a result of it?

13           THE WITNESS:  As a result of it, I revoked access to

14  the Facebook account.

15  Q    As a result?

16  A    And --

17           MR. FRISCH:  I'm sorry.  Your Honor, I object to and

18  ask that be struck.

19           THE COURT:  Can I see the parties at the sidebar?

20           (Continued on the next page.)

21

22

23

24

25

SIDEBAR CONFERENCE                    162

1        (Sidebar conference.)

2        THE COURT:  I probably misunderstood but I thought

3   everybody agreed that the fact that they parted company is

4   what leads to him telling everybody who he is.  I thought you

5   didn't object to that.  You just object to the --

6        MR. FRISCH:  My understanding is for whatever it's

7   worth, the Government wants to bring out that he revealed that

8   Ricky Vaughn was Doug Mackey.  As a result of your interaction

9   with Mr. Mackey, did you reveal Mr. Vaughn as Doug Mackey ,

10  that's it.

11       THE COURT:  I don't think there's anything wrong

12  with that.  He's already said they had a falling out.  There's

13  no problem with that, I guess.  You don't -- they had a

14  falling out.  I'll leave the Facebook thing in and then let's

15  just see what happens and then go what happened next.

16       MR. PAULSEN:  Your Honor, we're attempting not to

17  bring out his specific problem with the defendant and just

18  say:  As a result, revealed his identity.

19       THE COURT:  Right.  So I'm assuming you won't have a

20  problem if he just leads him through that if he says, as a

21  result of the falling out, did you then reveal his identity?

22       MR. PAULSEN:  That's fine.

23       THE COURT:  All right.  Good.

24       (Sidebar discussion concludes.)

25

```
 1              (In open court.)

 2    BY MR. PAULSEN:

 3    Q    Thank you, Mr. Nehlen.  I'm going to ask this again.

 4              As a result of that falling out that you

 5    characterized a moment ago, did you reveal the public identity

 6    of Ricky  Vaughn to be Douglass Mackey?

 7    A    Yes, sir, I did.

 8    Q    Where did you do that?

 9    A    On a social media page, Gab.  Social media network, I

10    guess.

11    Q    Were you then interviewed on a podcast on the same

12    subject?

13    A    I was.

14    Q    Who was that podcast with?

15    A    It was with Christopher Cantwell.

16    Q    Did you receive any backlash for this reason?

17    A    I did.

18    Q    What kind of backlash?

19              MR. FRISCH:  Your Honor, I object.

20              THE COURT:  Sustained.

21              MR. FRISCH:  I ask that the answer, the prior

22    answer, be struck.

23              THE COURT:  It's stricken.

24              MR. PAULSEN:  Which question, your Honor?

25              THE COURT:  The last question was that he revealed
```

1   it on social media and on a podcast, and then the backlash

2   question I sustained.

3          Okay?

4          MR. PAULSEN:  Understood, your Honor.  No further

5   questions.

6          THE COURT:  Cross-examination.

7          MR. FRISCH:  None.

8          THE COURT:  All right.  Thank you so much.  You can

9   step down.

10          THE WITNESS:  Thank you.

11          (Witness leaves the witness stand.)

12          THE COURT:  All right.  So it is 3:45, and so, I'm

13   going to  give you just about a ten-minute break.

14          Again, please don't talk about the case anything

15   about what you've seen or heard and obviously don't want

16   anyone to talk to you about the case but we'll see you in

17   about ten minutes.

18          COURTROOM DEPUTY:   All rise.

19          (Jury exits courtroom.)

20          COURTROOM DEPUTY:  You may be seated.

21          THE COURT:  All right.  So we'll just be in recess

22   for the next ten minutes or so.

23          How many more witnesses do you think?  I know you

24   said you had 12  lined up or something like that.

25          MR. PAULSEN:  Your Honor, we have, I think, as many

P. NEHLEN - DIRECT - MR. PAULSEN                165

1    as three or four more that we can offer.

2              THE COURT:  Okay.  All right.  That's what we'll do.

3              Anything before we break?

4              MR. FRISCH:  No.

5              THE COURT:  Okay.

6              (A recess in the proceedings was taken.)

7              THE COURT:  Anything before we bring the jurors in?

8              MR. BUFORD:  Not from the Government, your Honor.

9              THE COURT:  Let's get the jury, please.

10             (A brief pause in the proceedings was held.)

11             COURTROOM DEPUTY:  All rise.

12             (Jury enters the courtroom.)

13             COURTROOM DEPUTY:  You may be seated.

14             THE COURT:  All right, jurors.  We're ready to

15   continue.

16             Would you call your next witness.

17             MR. PAULSEN:  Yes, your Honor the Government calls

18   Amy Stephen.

19             (Witness takes the witness stand.)

20   **AMY STEPHEN**, called as a witness, having been first duly

21   sworn/affirmed, was examined and testified as follows:

22             COURTROOM DEPUTY:  Please state your name for the

23   record.

24             THE WITNESS:  Amy Stephen.

25             COURTROOM DEPUTY:  Have a seat.

AMY STEPHEN – DIRECT – MR. PAULSEN                166

1   THE COURT:  Okay.  Ms. Stephen, I'm just going to

2   give you -- I'm right over here.  It's okay, happens all the

3   time.

4   I'm going to give you a few preliminaries before

5   your testimony.

6   The first thing is I want to make sure the entire --

7   that all the jury and the people at both tables can hear you.

8   And I also want to make sure that you don't speak too quickly

9   because our court reporter has to take down everything that

10  you say.  I also am going to ask you to do your best just to

11  answer the question that you're being asked.  And if there is

12  something that isn't clear or you want to have repeated just

13  tell me, okay.

14  THE WITNESS:  Okay.

15  THE COURT:  Go ahead.

16  MR. PAULSEN:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. PAULSEN:

19  Q    Good afternoon, Ms. Stephen.

20  A    Good afternoon.

21  Q    Where do you live?

22  A    I live in a rural community between the Lincoln and Omaha

23  in Nebraska.

24  Q    What do you do professionally?

25  A    I'm a computer programmer, developer, database.  I work

*Anthony D. Frisolone, FAPR,  RDR, CRR, CRI, CSR*
*Official Court Reporter*

1    on databases and web development.

2    Q    I'd like to you ask some questions about some things that

3    took place or some occasions that took place back in 2016?

4    A    Yes.

5    Q    Back then were you on Twitter?

6    A    Yes.

7    Q    What names did you use when you were on Twitter?

8    A    For the most of the time that I was on Twitter, I used

9    the name Amy Stephen, my name.  And then I changed that to a

10   group Twitter account named Alt Right Info.

11   Q    Alt Right Info?

12   A    Correct.

13   Q    During the time that you were on Twitter in 2016, did you

14   have contact with another account that went by the name Ricky

15   Vaughn?

16   A    I did.

17   Q    Do you remember what account handle or name Ricky Vaughn

18   used?

19   A    Ricky Vaughn 99.

20   Q    Did you know the real person around the account?

21   A    I did not.

22   Q    Did you have public interactions with him, tweets and

23   retweets?

24   A    Yes.

25   Q    What about private communications and DMs or group DMs?

AMY STEPHEN - DIRECT - MR. PAULSEN                168

1    A    Yes.

2    Q    Did you ever meet him in person?

3    A    No.

4    Q    What about his voice, did you ever hear his voice?

5    A    I heard his voice, or at least what I thought was his

6    voice, once on a podcast.

7    Q    Okay.  Do you know the approximate time of that podcast?

8    A    It would have been after March  2016 and before the

9    election, some time in there.  That's about as narrow as I can

10   make it.

11   Q    Okay.  Did you meet with the Government to listen to

12   parts of that podcast?

13   A    I did.  Yesterday afternoon.

14   Q    Okay?

15        MR. PAULSEN:  Your Honor, may I approach.

16        THE COURT:  Yes.

17        (Approaching the witness.)

18   Q    Ms. Stephen, do you recognize the CD that I just gave

19   you?

20   A    I do.

21   Q    Is there a signature on that CD?

22   A    Yes, there is.  My signature.

23   Q    Did you put that signature after you listened to the

24   podcast and verified that that was your voice?

25   A    Yes, I did.

1  Q    And this is the podcast you did with the individual you

2  knew to be Ricky Vaughn?

3  A    That's correct.

4        MR. PAULSEN:  Your Honor, we're not moving admission

5  of this podcast at this point.

6        The Government doesn't have any further questions.

7        THE COURT:  All right.  Any cross-examination.

8        MR. FRISCH:  I do have a bit, Judge, yes.

9        THE COURT:  Okay.  I want to make sure I understand.

10       This is a podcast that you did?

11       THE WITNESS:    I was a guest on it.

12       THE COURT:  I see.  Okay.

13  CROSS-EXAMINATION

14  BY MR. FRISCH:

15  Q    Good afternoon, Ms. Stephen.

16  A    Good afternoon.

17  Q    My name is Andy Frisch, I'm here with Mr. Mackey.  You

18  and I have never met before, have we not?

19  A    No, we have not.

20  Q    This podcast in which you participated, do you recall

21  that it was closer to March 2016 than November 2016?

22  A    It probably was, yes.

23  Q    Do you recall that the exact date of it was, give or

24  take, I won't hold you to the exact date but it was about

25  March 20, 2016?

1    A    That could be.

2    Q    All right.  And this podcast, it wasn't just you and the

3    person you knew as Ricky Vaughn, there was at least one other

4    person participating; is that right?

5    A    There were a couple other people, I think maybe three

6    other people participating.  One was went by the handle

7    Dr. Illusion and then also his --  his podcast always had

8    another man whose name I don't remember.  He came in kind of

9    late in the podcast and then also Dr. Illusion's wife briefly

10   was in the podcast.

11   Q    All right.  And the full length of this podcast was,

12   again, I'm not holding you to with precision, but it was more

13   than two and a half hours; correct?

14   A    It was very long.

15   Q    All right.  And the purpose of podcast, it was

16   essentially a discussion of issues of the day; is that right?

17   A    Well, the initially the podcast was to be about an event

18   that happened to me on Twitter where I had been bullied for a

19   long period of time for talking to Ricky Vaughn.  But it

20   turned into more the kind of a discussion of the political

21   points of interest at that time.

22   Q    And that was essentially what was being discussed during

23   the course of that podcast, correct?

24   A    Correct.

25   Q    It was a respectful conversation --

1   A     It was.

2   Q     -- correct.

3         You found Ricky Vaughn to be thoughtful?

4   A     Absolutely.

5   Q     You found him to be insightful is that so?

6   A     I did.

7   Q     You found him on it respectful during the course of that

8   conversation?

9   A     Always.  He was always respectful with me.

10        THE COURT:  Are you planning to play any of this,

11   Mr. Frisch?

12        MR. FRISCH:  No, I'm not.

13   Q     In any event, as a result of that conversation, your view

14   was that -- did you have a sense of how old Mr. Mackey was or

15   Mr. Vaughn was at the time?

16   A     He was very young, age of my son.  In his maybe early to

17   mid-20s.

18   Q     And you considered him a good kid, fair to say?

19   A     I definitely.

20        MR. PAULSEN:  Objection, your Honor.

21        THE COURT:  Sustained.  Sustained.  The objection is

22   sustained.

23   Q     After or during that conversation, did you give him a way

24   for him to contact you in case he wanted to continue the

25   conversation?

AMY STEPHEN – CROSS – MR. FRISCH          172

1          In other words, you gave him your phone number?

2    A    My phone number was public on my Twitter account.  So

3    everyone had my phone number.  I was one of the first users of

4    Twitter and I came out of it talking with people in open

5    source communities and we were very public.  So I was always

6    myself and my phone number was in my bio.

7    Q    Any event, in addition to that, you encouraged him to

8    keep in touch with you?

9    A    Absolutely.

10   Q    All right.

11          MR. FRISCH:  Ms. Stephen, thank you very much.

12          THE WITNESS:   You're welcome.

13          THE COURT:  Any redirect?

14          MR. PAULSEN:  No, your Honor.

15          THE COURT:  All right.  Thank you so much.  You can

16   step down.

17          (Witness leaves the witness stand.)

18          THE COURT:  Ready to call your incomes witness?

19          MR. BUFORD:  Yes, your Honor of the Government calls

20   Jasmine Tolson.

21          THE COURT:  Okay.

22          (Witness takes the witness stand.)

23   **JASMINE TOLSON,** called as a witness, having been first duly

24   sworn/affirmed, was examined and testified as follows:

25          COURTROOM DEPUTY:  State your name for the record.

AMY STEPHEN – CROSS – MR. FRISCH                173

1          THE WITNESS:  Jasmine Tolson.

2          COURTROOM DEPUTY:  Thanks.  Have a seat.

3          THE COURT:  Ms. Tolson, I have a few things for you

4   before you begin.  You can sit down.

5          The first thing is we want to make sure that

6   everybody can hear you so you got the microphone there.  The

7   second thing is I want to make sure our court reporter can

8   take down everything you're saying so don't speak too quickly

9   and don't talk over anybody who is asking you questions.

10          And then if there is a question that you want to

11   have repeated or you don't understand just let me know and

12   then just do your best to answer only the question that you're

13   being asked, okay?

14          THE WITNESS:  Okay.

15          THE COURT:  Okay.  Go ahead.

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

JAIME TOLSON – DIRECT – MR. BUFORD                    174

1          MR. BUFORD:  Thank you, your Honor.

2     DIRECT EXAMINATION

3     BY MR. BUFORD:

4     Q     Good afternoon, Ms. Tolson.

5     A     Good afternoon.

6     Q     Are you currently employed?

7     A     Yes.

8     Q     Where do you work?

9     A     At Twitter.

10    Q     What is your position there?

11    A     I'm a senior associate on the legal operations team.

12    Q     Can you give us a sense of your day to day

13    responsibilities in that role?

14    A     I respond to information requests sent by law enforcement

15    via warrants, subpoenas, and court orders.  I look at user

16    accounts and provide the records associated that law

17    enforcement is requesting.

18    Q     How long have you been at Twitter?

19    A     Since 2020.

20    Q     Have you been in that same position since you started?

21    A     Yes.

22    Q     Prior to joining the company as an employee, did you use

23    Twitter yourself?

24    A     Yes.

25    Q     When did you first start using Twitter?

JAIME TOLSON – DIRECT – MR. BUFORD                175

1   A      In 2012.

2   Q      From your work at Twitter and your own personal use, are

3   you generally familiar with the types of services Twitter

4   offers its subscribers?

5   A      Yes, I am.

6   Q      Are you also familiar with Twitter's data retention

7   policies?

8   A      Yes, I am.

9   Q      What is needed to set up an account at Twitter?

10  A      A subscriber needs a name, e-mail, address, and/or phone

11  number.

12  Q      Once you have an account, can you choose a name to use on

13  Twitter?

14  A      Yes, you can choose a username.

15  Q      Does that have to be a real name?

16  A      No, it does not have to be.

17  Q      Can you also choose a profile picture?

18  A      Yes.

19  Q      Does it have to be a picture of yourself?

20  A      No, it does not.

21  Q      What kind of pictures can you use?

22  A      It can be practically anything a dog, a cat, a fish, a

23  building.

24  Q      Is a profile picture sometimes called an avatar?

25  A      Yes.

JAIME TOLSON – DIRECT – MR. BUFORD          176

1   Q    I want to talk about some services offered by Twitter

2   once a subscriber has an account and logs in, will they be

3   able to see something called a timeline?

4   A    Yes.

5   Q    What is a timeline?

6   A    A timeline is a series of real time tweets tweeted by a

7   user's followers on Twitter.

8   Q    What is a tweet?

9   A    A tweet is a short message that a subscriber or user can

10  make.  It consists of texts.  It can also consist of media

11  such as videos images or URL links as well.

12  Q    If a user posts a tweet, to whom is that tweet visible?

13  A    It's visible to the user's followers.

14  Q    Does one have to be a Twitter subscriber to view a

15  person's tweets?

16  A    No, they do not.

17  Q    If you're not a Twitter user, how do you see someone's

18  tweets?

19  A    You could go online and Google the person's username and

20  their timeline will come up.  Someone else could share the

21  tweet via screenshot.  They are pretty accessible.

22  Q    Can someone have a private Twitter account?

23  A    Yes.

24  Q    What is that?

25  A    When a person's Twitter account is private that means the

1  person has set their Twitter account so only their followers

2  can view their tweets.

3  Q    If that's true, could someone still Google the tweets and

4  see them publicly?

5  A    No.  It will show up as private.

6  Q    What is a retweet?

7  A    A retweet is when one user reposts another user's tweet

8  to their timeline.

9  Q    Can a Twitter subscriber who wants to retweet add

10 additional content to the original tweet when they retweet it?

11 A    Yes.  That's is called as a quoted tweet.

12 Q    You mentioned followers a couple of times.  If you're a

13 Twitter subscriber, can you choose to follow other Twitter

14 subscribers?

15 A    Yes.

16 Q    What does it mean to follow someone on Twitter?

17 A    You follow them, the content that they tweet out, so

18 their tweets, retweets will show up on your timeline as well.

19 Q    Are you familiar with the term impression as used by

20 Twitter?

21 A    Yes.

22 Q    What is an impression?

23 A    Impressions refers to like the interaction that a tweet

24 receives, such as the likes or retweets that a tweet has.

25 Q    Are you familiar with the term mention with respect to

JAIME TOLSON – DIRECT – MR. BUFORD        178

1   Twitter?

2   A     Yes.

3   Q     What is a mention?

4   A     It occurs when one user mentions another user using an @

5   symbol; so for example, @usernameXYZ.

6   Q     Can someone tag anyone at Twitter using the same @

7   symbol?

8   A     Yes.

9   Q     How?

10  A     Same example, where the use mentions the other user using

11  the @ symbol.

12  Q     Does Twitter offer direct messaging capability?

13  A     Yes, we do.

14  Q     Tell us how that works?

15  A     A DM or direct message, when one user sends a message to

16  another user, this can also be a group message as well.  So

17  when one user sends another message to another user, this is

18  all private message.

19  Q     Are direct messages public like tweets then?

20  A     No.

21  Q     Can a direct message include things besides textual

22  characters?

23  A     Yes.

24  Q     What can it include?

25  A     It can include photographs, videos, URL links as well.

1    Q    You just mentioned a direct message group, what is that?

2    A    It's just when there are multiple subscribers

3    participating in a private group message.

4    Q    Would this be similar to a group text chain or online

5    chat group?

6    A    Yes.

7    Q    Are direct message groups public on Twitter?

8    A    No, they are not.

9    Q    Would Twitter allow a user to search for a direct message

10   group?

11   A    No, that's not a function.

12   Q    How would a user who is not a member of a direct message

13   group become a member of a direct message group?

14   A    They would have to be added by a user that is already a

15   member of said direct message group.

16   Q    If a Twitter user is not logged into their Twitter

17   account, at the time when their account receives a direct

18   message can they still see that message when they next log in?

19   A    Yes, they will.

20   Q    Similarly, if a Twitter user member of a direct message

21   group, is not logged into their Twitter account when other

22   members exchange messages, will those messages still be

23   visible to the Twitter user who belongs to that group when

24   they log back in?

25   A    Yes, they will.

JAIME TOLSON – DIRECT – MR. BUFORD                    180

1    Q    Even though the user was not logged in when the messages

2    were sent, right?

3    A    Yes.

4    Q    Does Twitter retain copies of tweets sent from its

5    accounts subscribers?

6    A    Yes.

7    Q    What about copies of direct messages?

8    A    Yes.

9    Q    Does Twitter retain the copies of the content of these

10   direct message groups?

11   A    Yes, we do.

12   Q    Apart from whether a particular account actually received

13   a direct message, does Twitter track somehow whether the user

14   read that message?

15   A    No.

16   Q    Similarly apart from the contents of direct message

17   groups, does Twitter track whether a user actually read the

18   contents of a direct message group to which they belonged?

19   A    No, not to my knowledge.

20   Q    Can a Twitter user include links to websites in their

21   tweets?

22   A    Yes.

23   Q    Can they also include links in direct messages?

24   A    Yes.

25   Q    If the website to which the link in a tweet is deleted or

1   taken down, will the link still work in the tweet?

2   A    The link will still be visible in the tweet.  However,

3   it's not up to Twitter whether or not the link works to an

4   actual website.

5   Q    The same with a direct message?

6   A    Yes.

7   Q    What happens to a tweet if a user deletes it?

8   A    If a user deletes a tweet, it's held in our production

9   tools up to nine days, then purged by our system by after 14.

10  Q    What happens between day nine and day 14?

11  A    It's put inside of a cue to be erased.  It's no longer

12  available from our production tools.

13  Q    Does Twitter sometimes suspend the accounts of its users?

14  A    Yes.

15  Q    What happens if an account is suspended?

16  A    If an account is suspended, it's placed in a read-only

17  mode where users have limited access to the account.  They can

18  no longer tweet or retweet things or make likes.

19  Q    Does Twitter maintain records for a suspended account?

20  A    Yes.

21  Q    For how long?

22  A    It's based on Twitter policies.

23  Q    Will Twitter sometimes permanently suspend an account?

24  A    Yes, we do.

25  Q    What happens in that situation?

1    A    When an account is permanently suspended, the user loses

2    complete access to the account.  They can no lodger log in to

3    view timeline or messages.  And the use can no longer create

4    other accounts on Twitter.

5    Q    If a Twitter user is in the more limited suspension, will

6    Twitter sometimes grant access to that user for the purpose of

7    correcting whatever it was that may have led to the

8    suspension?

9    A    To my knowledge, if a user is just suspended, not

10   permanently suspended, they have access to their account but

11   just limited access.

12   Q    Can you explain what the limited access is?

13   A    They can still view their timeline, view their tweets,

14   and mentions and DMs, but can't interact on the platform.

15   Q    To go back where we were a moment ago.  In addition to a

16   deleted tweet, if a user deletes a direct message does Twitter

17   keep it or does that similarly get purged at a certain point?

18   A    It's available via our production tools up to 14 days

19   then erased and no longer available.

20          MR. BUFORD:  If I may have one moment?

21          THE COURT:  Sure.

22          MR. BUFORD:  No further questions.

23          THE COURT:  Any cross-examination?

24          MR. FRISCH:  Very little.  May I do it from here?

25          THE COURT:  Yes.

1    CROSS-EXAMINATION

2    BY MR. FRISCH:

3    Q    I'm Andy Frisch.  I'm here with Mr. Mackey.  You and have

4    never spoken before, correct?

5    A    Correct.

6    Q    Your knowledge of Twitter is both from your use of it as

7    from someone who tweets or had a Twitter account and from your

8    employment, correct?

9    A    That's correct.

10   Q    Is there a concept on Twitter of muting a group or muting

11   messages?  Does that term exist in Twitter?

12   A    Yes.

13   Q    What does that mean?

14   A    A mute is when a user can mute certain accounts or

15   messages from an account.

16   Q    What is the affect, if a user mutes, what is the affect

17   of that to the user?

18   A    The user no longer would get the same amount of -- like

19   the information won't come directly, they went get a ping, it

20   won't be directly given to the user, the information will

21   still be available just muted.

22   Q    Are there terms of service for Twitter or rules of the

23   road, so to speak?

24   A    Can you repeat that?

25   Q    When you sign on for Twitter, when a user signs on for

JAIME TOLSON – CROSS – MR. FRISCH                184

1    Twitter first time or opening an account, are there terms of

2    service that they are prompted to look at?

3    A     Yes.  Twitter refers to it as Twitter policies, yes.

4    Q     Is it the kind of terms of prompt where you have to

5    acknowledge that you've read them before you can go further

6    into Twitter or simply optional to look at it?

7    A     I can't speak to specifics of the sign on process in that

8    formality.

9    Q     You know there are terms of service but you're not sure

10   exactly what happens at the sign-in?

11   A     No, that's not directly what I deal with, no.

12   Q     Are you familiar with the terms of service generally

13   speaking, what the terms of service tell people who decide to

14   look at it?

15   A     Am I familiar in what?

16   Q     Do the terms of service include information about the

17   types of content to which users might be exposed to if they

18   use Twitter?

19   A     I'm not sure the specifics of what the terms of service

20   lists, but it does list the Twitter policies that users should

21   abide by by using Twitter.

22   Q     Do those policies tell Twitter users they may see content

23   that is inappropriate or inaccurate or offensive?  Do the

24   rules of the road or the terms of service tell users that they

25   may see that type of content?

JAIME TOLSON – CROSS – MR. FRISCH                    185

1   A    Again, I can't speak to the specifics.  The policies

2   vary, it just depends.

3                MR. FRISCH:  Thank you very much.

4                THE COURT:  Thank you.

5                Any redirect?

6                MR. BUFORD:  No, thank you.

7                THE COURT:  Thank you so much.  You can step down.

8                (Whereupon, the witness was excused.)

9                THE COURT:  Who is the next witness?

10               MR. BUFORD:  The Government calls Joel DeCapua.

11               (Witness takes the witness stand.)

12   **JOEL DE CAPUA,** called as a witness, having been first duly

13   sworn/affirmed, was examined and testified as follows:

14               THE COURTROOM DEPUTY:  State your name for the

15   record.

16               THE WITNESS:  Joel DeCapua.

17               THE COURTROOM DEPUTY:  Thank you.  Have a seat.

18               THE COURT:  Let me give you a few instructions

19   before you begin.  I want to make sure everyone can hear you.

20   It's equally important not to speak too quickly so the court

21   reporter can take everything down.  Related to that is just

22   don't talk over whichever lawyer is questioning you.  Do your

23   best to answer only the question that you're being asked.  If

24   you don't understand a question or you would like to have it

25   repeated, let me know.  Okay?

JOEL DE CAPUA – DIRECT – MR. BUFORD                186

1          THE WITNESS:  Okay.

2          THE COURT:  Go ahead.

3          MR. BUFORD:  Thank you.

4    DIRECT EXAMINATION

5    BY MR. BUFORD:

6    Q     Good afternoon.

7    A     Good afternoon.

8    Q     Are you currently employed?

9    A     I am.

10   Q     Where do you work?

11   A     The Federal Bureau of Investigation.

12   Q     What is your current position?

13   A     Special Agent.

14   Q     What is your current assign.

15   A     On squad CY3 New York field office.

16   Q     What is CY3?

17   A     We're responsible for investigating cyber crime.

18   Q     How long have you been in that role?

19   A     I think about eight months now in that specific role.

20   Q     You mentioned cyber crimes, what kind of work

21   specifically in that role?

22   A     Data breach, ransomware investigations, data brokering.

23   Q     When did you first start at the FBI?

24   A     It was August of 2009.

25   Q     Can you walk us through the positions you held at the FBI

1  since you started there until your current role?

2  A     Sure.  I started at Quantico, Virginia, as new agent

3  trainee, approximately six months.

4          Then assigned to the Newark field office where I

5  worked securities fraud and public corruption and other

6  white-collar crimes between 2010 and about 2014.

7          Then I took a transfer to the New York field office,

8  assigned to cyber crimes initially.  My first squad was CY2.

9  I was there from approximately 2014 to 2018.

10          Then in 2018 I took a promotion to Washington DC to

11  work at the cyber division, which is where I oversaw

12  investigations and I rated field offices and provided

13  resources.  I was there for a total of four and-a-half years.

14          Then recently, eight months ago, I came back to the

15  New York field office to work investigations.

16  Q     When you were in the cyber division, did you also

17  participate in something called the global investigations

18  (sic) and targeting unit?

19  A     Yes, the acronym GOTU, global operations and targeting

20  unit.

21  Q     What was that?

22  A     When I was at headquarters, it was two specific units.

23  First was major cyber crimes unit, I was there for 18 months.

24  Then I switched to the global operations and targeting unit,

25  which is another headquarter position, another supervisory

JOEL DE CAPUA – DIRECT – MR. BUFORD                188

1    role.  Where my job was to provide resources to case teams, to

2    initiate new investigations, and to generally provide expert

3    knowledge for people in the field offices who are working

4    cyber crime.

5    Q    As part of your job, have you participated in

6    computer-related investigations at the FBI?

7    A    I have.

8    Q    Approximately how many?

9    A    So the ones that I've personally been assigned to as case

10   manager, probably a couple dozens.  The ones I assisted in,

11   participated in, or oversaw in the dozens and dozens, probably

12   middle double digits; I don't know for certain.

13   Q    How many of those computer investigations involved the

14   Internet?

15   A    All of them.

16   Q    How many of those computer-related investigations have

17   involved the use of computers and the Internet in and around

18   the greater New York City area?

19   A    It's hard to put an exact number, but all the cases at

20   least when I was assigned in New York, a lot.

21   Q    What is your educational background?

22   A    I have a Bachelor's of arts and economics from DePaul

23   University.  And I have a Masters in science and accounting

24   from Indiana University.

25   Q    Do you hold any certifications related to your work on

JOEL DE CAPUA – DIRECT – MR. BUFORD          189

1   computer-related investigations?

2   A     I do.

3   Q     I want to ask you about a couple of certifications in

4   particular.

5           In 2015 did you receive a security essential

6   certification, or a GSEC certification?

7   A     I believe so.  It's on my resume.

8   Q     Would looking at your resume refresh your recollection?

9   A     It certainly would.

10          MR. BUFORD:  Ms. Parshad, can we pull up 3500JD2?

11          THE COURT:  Is he just checking the date?

12          THE WITNESS:  Yes.

13          THE COURT:  I think you can lead him if you want --

14   you've got the resume up there, all right.

15   A     March 2015 I earned the GS essential security

16   certification.

17   Q     Did you receive that from an entity called the global

18   information assurance certification?

19   A     I did.

20   Q     First off, what is the global information assurance

21   certification?

22   A     It's a body that does testing and certification for

23   network security certifications.

24   Q     Is it sometimes referred to as GIAC?

25   A     It is.

JOEL DE CAPUA – DIRECT – MR. BUFORD                    190

1    Q    Is it affiliated with SANS?

2    A    It is.

3    Q    What is SANS?

4    A    SANS is a training provider that offers training in

5    courses in cybersecurity.

6    Q    So what does it mean that you have a security essential

7    certification?

8    A    So it means I took a course of study from SANS, the

9    people that put on the training.  Then sat for a five-hour

10   test that to prove I met a certain knowledge threshold and was

11   awarded the certification.

12   Q    In 2016 did you receive from the GIAC a certified

13   intrusion analyst certification?

14   A    I did.

15   Q    Can you tell us what that is?

16   A    So the certification we just discussed was more of like

17   an intermediate level, very generalized certification.  This

18   one was a step up from that, that focuses more particularly on

19   Internet communications, network packets, how data moves from

20   one computer to another computer on a network, then being able

21   to look at that data and determine whether or not there is any

22   type of network security issues.

23   Q    Did you similarly have to sit for a test for this

24   certification?

25   A    I did.

JOEL DE CAPUA – DIRECT – MR. BUFORD                191

1   Q      You passed it?

2   A      I did.

3   Q      In 2017 did you receive a certification from the GIAC as

4   network forensic analyst?

5   A      I did.

6   Q      What does that mean?

7   A      Again, this is another certification exam that focused in

8   particular on monitoring network communications within a

9   network to determine if there is any type of malicious

10  activity.

11  Q      Did you similarly have to sit for a test for that

12  certification as well?

13  A      I did.

14  Q      You passed it a take it?

15  A      I did.

16  Q      Have you ever been qualified to testify as an expert

17  witness in federal court before?

18  A      I have.

19  Q      As part of your job, have you had to learn about various

20  web-based applications that transmit data through the

21  Internet?

22  A      Yes.

23  Q      Does that include web mail providers like gmail, hotmail?

24  A      It.

25  Q      What about social media applications like Facebook and

JOEL DE CAPUA – DIRECT – MR. BUFORD          192

1   Twitter?

2   A    Yes.

3   Q    As part of your job, have you had to become familiar with

4   the way data is transmitted over the Internet in the greater

5   New York City area?

6   A    Yes.

7   Q    How have you become familiar with it?

8   A    So initially it was before I was even assigned to cyber

9   crime.  I was assigned to securities fraud and investigations

10  market manipulation in 2014.  There became some questions as

11  to high-speed trading.  And something is that was very

12  relevant in that investigation was the latency of network

13  communications from one place to another place.  That's when I

14  began to learn about and understand the Internet

15  infrastructure that allows someone in Chicago to communicate

16  with someone in New York.

17  Q    As part of your job, have you continued to have knowledge

18  of how that works in the greater New York City area?

19  A    Yes.

20  Q    How important is it to your job to understand that?

21  A    It's very important.

22  Q    Are you familiar with the state of the data

23  infrastructure in New York City at this time?

24  A    Generally, yes.

25  Q    How about how it existed in the year of 2016?

JOEL DE CAPUA – DIRECT – MR. BUFORD                193

1    A    Again, general aspects, yes.

2         MR. BUFORD:  Your Honor, we would offer Special

3    Agent DeCapua as an expert in data transmission infrastructure

4    for the greater New York City area.

5         THE COURT:  Any objection to that?

6         MR. FRISCH:  No.

7         THE COURT:  So the agent will be deemed an expert.

8         I'll give you more instructions about how to

9    evaluate that in my final charge.  But basically what that

10   means is whenever somebody possesses some specialized

11   knowledge that the rest of us don't possess, they are

12   permitted to testify as an expert.  I'll give you more

13   instruction about that in my final charge.

14        Go ahead.

15        MR. BUFORD:  Thank you, your Honor.

16   BY MR. BUFORD:

17   Q    Special Agent DeCapua, are you familiar with the

18   application known as Twitter?

19   A    I am.

20   Q    Are you familiar with what a tweet is?

21   A    I am.

22   Q    I want to discuss with you a scenario involving a

23   hypothetical resident of the island of Manhattan in the year

24   2016.

25        If this resident were to send a tweet while on the

JOEL DE CAPUA – DIRECT – MR. BUFORD          194

1   island of Manhattan, and assuming the servers of Twitter are

2   not located on the island of Manhattan, from your knowledge

3   and experience, what route would the data containing the tweet

4   take to reach Twitter servers?

5   A     It depends on how the hypothetical person is connected to

6   the Internet.  If they were connected using a home ISP, such

7   as Verizon or AT&T, then that data would go from their

8   computer or their cellphone, if they are connected to the

9   WiFi.  And that specific tweet would leave as a network packet

10  and it will go to, first, the home router.  Then that data

11  packet would be sent to the Internet service provider, again

12  Verizon or AT&T, and from there it would take a series of hops

13  along intermediary, what we call routers, until it reaches its

14  final destination.

15        To go from the home router to the ISP's router it

16  would most likely be high-speed fiber optic cable.  To go from

17  the router located in New York City -- the router in Manhattan

18  to outside of Manhattan, it probably went through a fiber

19  optic cable that is laid underneath one of the bodies of water

20  around the island of Manhattan.  Many are through the

21  different tunnels the Holland Tunnel, the train tunnels they

22  have fiber optic cables running through them, also the

23  bridges.  So some of the bridges are wired with sending data

24  outside the island of Manhattan.  That would be the first way

25  if they are using home ISPs.

JOEL DE CAPUA – DIRECT – MR. BUFORD          195

1          If they were connected via a mobile phone data

2    network, then it would be a little different route.  First the

3    phone would connect to one of the mobile towers in Manhattan.

4    From there the packet containing the tweet would go to the

5    mobile tower and sent down to its base station, which again,

6    it would be routed out one of these fiber optic high-speed low

7    latency trunk lines that leave the island of Manhattan through

8    one of the bridges or tunnels.

9    Q    Just to clarify, in either of these two scenarios what is

10   the moment where the data packet actually leaves the island of

11   Manhattan?  What is the route that it takes to leave the

12   island?

13   A    It's going be through one of these fiber optic lines

14   running under one of the bodies of water surrounding

15   Manhattan.

16   Q    Apart from these two scenarios, the user is connected to

17   their own WiFi or through a cellular data network, is there

18   any other scenario to which the tweet could leave the island

19   of Manhattan?

20   A    Yes, so two scenarios.  The first one would be if for

21   some reason they are on their cellphone and near one of the

22   rivers and the data gets broadcasted not to a cellphone tower

23   located on the island of Manhattan but a cellphone tower

24   located in Brooklyn or Queens or the Jersey side.  This is

25   unlikely because there is tons and tons of cellular towers in

JOEL DE CAPUA – DIRECT – MR. BUFORD        196

1    Manhattan.  So something would have to go seriously wrong for

2    that to happen.

3            The only other way, if someone was using satellite

4    ISPs, such as a HughesNet or Viasat.  Which frankly is pretty

5    rare in Manhattan, normally it's more rural areas that don't

6    have ISPs.  In that case, the data would go to the home

7    router, then to the personal satellite dish where it would be

8    beamed via radio frequency to an orbiting satellite.

9    Q    In either of those two scenarios, would the data have to

10   pass over the waters surrounding Manhattan?

11   A    Yes.

12   Q    Why is that?

13   A    Satellite can be low orbit or geostationary, in terms of

14   Internet providers.  I don't think there was any low orbit

15   satellite Internet providers in 2016.  So in 2016 it would

16   have been either HughesNet or Viasat, which are both

17   geostationary satellites.  Geostationary are very high up, not

18   moving relative to the surface of the earth; highly unlikely

19   that one would be directly above the island of Manhattan,

20   which is a small place.  There is only a handful of these

21   geostationary satellites over the United States.  And more

22   likely than not, you see the satellite dishes won't be it

23   pointed straight up, they would be pointed off in the horizon,

24   the sky is a big place.  If you look at the narrow band of the

25   amount of degree that the satellite would have to be pointed

1    up, it's extraordinary unlikely that there will be a

2    geostationary satellite above the island of Manhattan.

3            Even if there were, the data would be hypothetically

4    straight up to the geostationary satellite, then it would be

5    sent to one of the base stations, where it would be very high

6    up and still cross the threshold of one of the bodies of water

7    that surrounds Manhattan.

8    Q    In the other scenario you described, where the

9    hypothetical cellphone user is close to the coastline of

10   Manhattan, rather than connecting to a cellphone tower in

11   Manhattan, the tweet jumps to a cellphone tower in New Jersey

12   Brooklyn or Queens.  There the network packet is still passing

13   over the waters surrounding Manhattan; is that correct?

14   A    Correct.

15           MR. BUFORD:  May I have a minute?

16           THE COURT:  Sure.

17           MR. BUFORD:  No further questions, your Honor.

18           THE COURT:  Cross-examination.

19           MR. FRISCH:  Just a bit.

20   CROSS-EXAMINATION

21   BY MR. FRISCH:

22   Q    Agent, good afternoon.

23   A    Good afternoon.

24   Q    I'm Andy Frisch.  I'm here with Mr. Mackey.  You and I

25   have never met, correct?

JOEL DE CAPUA – CROSS – MR. FRISCH          198

1    A    Correct.

2    Q    During your 13 or so years as an agent, not including

3    training, have you participated in interviews of witnesses?

4    A    I have.

5    Q    Have you prepared reports of interviews?

6    A    I have.

7    Q    Essentially the typical protocol is that an FBI agent

8    conducting an interview takes handwritten notes when

9    interviewing a witness, correct?

10   A    Correct.

11   Q    Those are ultimately, usually time permitting, typed up

12   into something we call a form 302; is that correct?

13   A    That's correct.

14   Q    As here, as an agent who testifies at trial, your prior

15   testimony is provided to defense counsel because you're

16   testifying, correct?

17          THE COURT:  Could I see the lawyers at the side with

18   the court reporter?

19          (Continued on the next page.)

20

21

22

23

24

25

1                (Sidebar conference.)

2                THE COURT:  I feel I lost the thread.  Does he have

3    reports?

4                MR. FRISCH:  You lost the thread with me?  I want to

5    establish a basic point of protocol given his experience as an

6    agent and all the things he knows so much about.  I have his

7    prior testimony.  It's been disclosed to me.

8                THE COURT:  Is there some concern that you haven't

9    gotten everything you're supposed to get?

10               MR. FRISCH:  Not from him.  I just wanted to

11   establish the basic protocol.  Two more questions on this.

12               THE COURT:  Any objection?

13               MR. BUFORD:  I mean --

14               THE COURT:  Technically you're making him your

15   witness, but I don't think that's the thing here.

16               MR. BUFORD:  Beyond the scope.

17               THE COURT:  Same.  It's fine as long as -- I was

18   wondering where we were going, that's all.  Sometimes I'm a

19   little new at this case.

20               (End of sidebar conference.)

21               (Continued on the next page.)

22

23

24

25

1          (In open court.)

2          THE COURT:  Go ahead.

3    BY MR. FRISCH:

4    Q    Agent, if an agent testifies at trial that agent's, for

5    example, any prior testimony that's relevant to the testimony

6    is provided to defense counsel, correct?

7    A    I was asked to provide transcripts of my prior testimony.

8    I'm not sure what the rule is.  I know it's written

9    statements, I think it's like prior testimony, but I'm not

10   100 percent sure.

11   Q    Fair enough.  Do you know that in the situation where an

12   agent testifies his or her interview reports are provided to

13   defense counsel if relevant to the case?

14          MR. BUFORD:  Objection.

15          THE COURT:  Do you know?  You don't have to -- do

16   you know what the answer to the question is, is my first

17   question.

18          THE WITNESS:  What is the question again?

19          THE COURT:  Ask him again.

20   BY MR. FRISCH:

21   Q    I'll ask it a different way.

22          This is not the first trial in which you've

23   testified, correct?

24   A    That's correct.

25   Q    In your experience, in other trials, that prior to your

PROCEEDINGS                                    201

1    coming to court, your prior testimony and interview reports

2    that you prepare in connection with the case were disclosed,

3    correct?

4    A     Yes.

5              MR. FRISCH:  Thank you, sir.  Thank you, Judge.

6              THE COURT:  Any redirect?

7              MR. BUFORD:  No, your Honor.

8              THE COURT:  Thank you so much.  You can step down.

9              (Whereupon, the witness was excused.)

10             THE COURT:  Do you have any other witnesses to call?

11             MR. PAULSEN:  We don't have any further witnesses.

12             THE COURT:  That's fine.  We made progress for

13   today.

14             I'm going to excuse you for the day.  Let me remind

15   you, don't look anything up on the Internet.  If there are

16   news reports of this case, don't listen to them, don't permit

17   anyone to talk to you about the case.  Don't talk to anyone

18   else about the case either amongst yourselves or with anyone

19   else.

20             The other thing that is, I'm sure it's obvious to

21   you, we can't get started until all of you are here in the

22   morning.  And I am very conscious of not wasting your time and

23   making the best use of your time while you're here with us as

24   jurors.  So please, be on time and then we'll get moving.

25             One thing I don't think I mentioned when we started

PROCEEDINGS                    202

1   is that I typically finish at 5:00 o'clock.  But if there is a

2   witness that we can finish, I will sometimes keep us past

3   5:00 o'clock to keep things moving.  But obviously we're

4   moving along very well.

5            I hope you all have a great night.  Listen to

6   Ms. Greene in terms of the -- listen to her about

7   everything -- but she'll tell you where to go tomorrow.

8            Have a good night we'll see you tomorrow.

9            (Jury exits the courtroom.)

10           THE COURT:  Everyone can be seated.  I don't know

11  what tomorrow is going to be like.  Anything I should be aware

12  of in terms of issues that are going to come up or anybody

13  want to raise anything?

14           MR. FRISCH:  Your Honor, there are two things

15  that -- there is one that I have not yet had an opportunity to

16  discuss with the Government, let me start with that one.

17           I hope to have time to memorialize this but I may

18  not; if so, with the Court's permission I'll argue it.  Here

19  is the issue.

20           The Government submitted under seal a letter dated

21  March 12, 2023.  Because it's under seal I don't want to speak

22  about its contents, but the issue that I want to raise with

23  the Court, at least give the Court preview that I intend to

24  raise it, has to do with the cooperating witness who I expect

25  will testify maybe later tomorrow afternoon or maybe Wednesday

PROCEEDINGS                    203

1    morning.  There is a combination of two issues.  I'm not quite

2    sure how to approach this because the situation is somewhat

3    unusual.

4              THE COURT:  Let me ask you, is there something you

5    have to raise that's not under seal?  If it's under seal, I'm

6    a little -- I don't know what it is, I haven't seen it yet.

7              MR. FRISCH:  Understood.  It's a combination of two

8    things.  It's the Government's letter under seal of March 12,

9    I'm not going to talk about that.

10             There is another issue which is in Judge Garaufis'

11   unsealed public order, which is docket 82.

12             THE COURT:  Which date is that?  I have them all

13   here.

14             MR. FRISCH:  March 8.  One of the issues, one of the

15   purported bases for the anonymity of the witness is ongoing

16   work that he's doing for the Government.

17             THE COURT:  Right.

18             MR. FRISCH:  My understanding, and the Government

19   will correct me if I'm wrong, a couple of things.  First of

20   all, the work that he's doing, he's doing anonymously, number

21   one.

22             Number two, my understanding is he's not being paid

23   for it.  The problem that I have is that while the details of

24   what he's doing may not be of any interest to the defense, the

25   nature of the relationship and the resulting bias that he may

PROCEEDINGS                                    204

1    have is very much of interest.

2              THE COURT:  May I ask, did Judge Garaufis rule on

3    this already?  It's not my intent to revisit --

4              MR. FRISCH:  It's not my intent to do so.  However,

5    in his ruling he said that this particular issue was subject

6    to being revisited during trial.  I believe that's at page 11,

7    page ten to one within his order.

8              THE COURT:  He preliminary granted leave to make a

9    renewed application if specific circumstances arise that

10   you're able to articulate a particular basis on which the

11   witness's work would be relevant beyond the general

12   proposition that there may be political or other motivations

13   behind the decision to cooperate.

14             So is there anything new that's come up?

15             MR. FRISCH:  There is nothing new that's come up.

16   However, here is my point --

17             THE COURT:  Right.

18             MR. FRISCH:  -- I know nothing about this.  I don't

19   have a basis to cross-examine this witness at all.  I don't

20   know how it started.  I don't know how much time he's spending

21   with the FBI.  I don't know anything about it.  My expectation

22   is, and maybe I'm wrong to have this expectation, that the

23   Government on direct examination will go into this to some

24   extent and I'll have a basis to understand the parameters of

25   the relationship, how it started, the degree of content,

PROCEEDINGS                              205

1    contact, the number of hours, all of that.  That is relevant

2    to my cross-examination of this witness on bias and his

3    relationship to the Government; otherwise, I know nothing

4    about him.

5             THE COURT:  I don't understand why you need to know

6    the nature of the work he's doing in order to cross-examine

7    him.  I think that's what judge Garaufis said.

8             MR. FRISCH:  I don't need to know the details, I

9    need to know how it came about.  I need to know how much time

10   he spends doing it.  I need to know what the degree of contact

11   he has with agents is.  I should be able to inquire that he's

12   not doing it for financial benefit, that's my understanding.

13   I'm raising this issue and not making the application

14   definitely right now.

15            THE COURT:  Just so I'm aware of it.

16            MR. FRISCH:  Just so you're aware of it.

17            In this context, I would ask the Court -- I'm not

18   going to go into it -- to take a look at the Government's

19   sealed letter in which they raise certain factual issues,

20   which I think are part of the mix that I'm going to ask the

21   Court to consider in determining how some relief can be

22   fashioned to allow the defense to confront this witness on his

23   ongoing relationship with the Government, understanding that

24   the particular details and the particular work probably

25   doesn't matter, but there is the scope of the relationship

PROCEEDINGS                                206

1   which I think is fair to go into.

2           THE COURT:  I just want to make sure I understand

3   the basis for the application.  Is it your position that there

4   is something that would affect his credibility simply because

5   he is in this relationship with law enforcement?

6           MR. FRISCH:  Yes, depending on what the -- depending

7   on some details about it.  When I say details, I don't mean

8   the nature of work.  I'm talking about the scope, the hours,

9   the number of agents, the contours.  I don't know anything

10  about it.

11          This is not like the typical situation.  I think the

12  case is Riverio, a drug informant who makes various undercover

13  buys.  That person's identity is kept secret so the person can

14  continue to make undercover buys.  I don't think anyone

15  disagrees this situation is highly unusual.

16          This is someone who was anonymous online.  And

17  someone who apparently is doing this work anonymously.  I'm

18  not sure I care what the work is, but as it stands right

19  now --

20          THE COURT:  You want to know why he started doing

21  it, is that it?

22          MR. FRISCH:  That's one thing I want to know.  I

23  want to know the scope of it.  When I say the scope, how many

24  hours is he spending, how many agents is he working for.

25          THE COURT:  Let me hear from the Government.  I'm

PROCEEDINGS                          207

1   not so sure, like I say, I have to look at the letter.  I'm

2   not so sure I see a credibility question here, but let me hear

3   from the Government in terms of what, if any, response you

4   have, to what is not an application it's just what counsel

5   wants me to be aware of, a concern that he has -- do I have

6   that right?

7           MR. FRISCH:  And to tee it up, so I give you your

8   Honor a little bit of lead time before I make a formal

9   application.

10          THE COURT:  All right.  Making a formal -- I guess

11  that's what I'm having a little trouble with.  It sounds like

12  you want more detail about what is happening, but I feel like

13  it's in a vacuum a little bit.

14          What do you have to say about that?

15          MR. BUFORD:  In light of Judge Garaufis' opinion, I

16  don't think that we're hearing anything specific that should

17  cause the Court to revisit what was previously said.  The

18  Government is aware of and has complied with its discovery

19  obligations with respect to any potential Brady or Giglio that

20  might exist as a result of the cooperating witness' work with

21  the Government.  And in the cases we've seen, that

22  representation is sufficient.

23          We do agree that the defense can inquire generally

24  about the fact that in addition to the anticipated testimony,

25  the witness is involved in other law enforcement activities

PROCEEDINGS                          208

1    because we think that goes to bias.  I'm not sure beyond

2    that -- I also agree it's fair to ask whether the cooperating

3    witness is being paid for the work that they are doing.  The

4    answer is no.  Beyond that, I'm not sure whether there is a

5    total of 50 investigative hours or five investigative hours

6    necessarily matters as far as credibility.

7              THE COURT:  Here is what I'm going to suggest.  I

8    reviewed Judge Garaufis' decision about this yesterday, which

9    is whey I was a little surprised to hear it come up again, but

10   I take the point.  If you can come to any accommodation

11   between yourselves about if there is additional detail that is

12   not going to endanger the witness, that's not going to impair

13   any current investigations, maybe you can come to some kind of

14   agreement if there is a general parameter how much of his time

15   this takes, things like that.

16             What I don't want to have happen, and that's why

17   I'll take a look it at more, I don't want to have -- I'm not

18   concerned about anybody doing something to jeopardize either

19   these unrelated investigations or the witness's safety, but

20   that's why I appreciate the preview now rather than -- is the

21   witness testifying tomorrow?

22             MR. BUFORD:  Probably not, but maybe depending on

23   how the schedule works out.

24             THE COURT:  So it's on my radar.  What I suggest is

25   you see -- tell them the kinds of things you're looking for

PROCEEDINGS                    209

1    and you may not get everything but maybe can you come to some

2    kind of agreement.  And of course I'll take a look at the

3    letter and reexamine Judge Garaufis' decision.

4              Anything else?

5              (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                                    210

1        MR. FRISCH:  And the only other thing, and I think

2   the Government and I agree on is there are a number of

3   essentially chats, messages and tweets.  The Government and

4   the defense have been working to narrow issues of dispute, and

5   in fact we have narrowed the issues of dispute, but there

6   remain a large  number.  At least a significant number.

7        THE COURT:  To what extent were any of these --

8   sorry to cut you off.  To what extent were any of these, these

9   are things that are left open in Judge Garaufis previous

10  decision?

11       MR. FRISCH:  That is correct.  And so I think I

12  certainly would want to be heard further in way of oral

13  argument or answering questions before your Honor rules.  I'm

14  sure the Government feels that way as well.

15       THE COURT:  Are these all of the things you

16  identified in the letter of last night.

17       MR. FRISCH:  They are them, but I think Judge

18  Garaufis reserved decision on a number of such other exhibits

19  on earlier applications.

20       THE COURT:  I think that's right.  I just wanted to

21  make sure there wasn't something else that isn't memorialized

22  someplace.  I know to the extent  that you can come to some

23  agreement on some of these things, I think the general lesson

24  to be taken from Judge Garaufis's decisions on these cases is

25  that you don't – – that there's a point at which certain

PROCEEDINGS                                211

1   things become cumulative, I can't remember what they are.  And

2   the caution to stay inside, with certain exceptions, the time

3   period that we're talking about here rather than having things

4   from two years earlier or two years later come in.  I think

5   that was the general view that he had on a lot of these

6   things.  Some of these messages, or tweets, or whatever they

7   are a little bit inflammatory, but I think they're relevant.

8   Some of them are relevant to the motivation that's alleged for

9   the particular conduct.

10          But I'm going to, I will look at, we have a list of

11  the things that are still left open and if there are thing

12  that's can't, that you can't agree about, let me know.  But I

13  do think it's a good idea to do it before whatever they are is

14  going to come into evidence.  So we're not running over to the

15  side every time.  I'm just trying to think of when.  I take it

16  some of them will come in tomorrow.

17          MR. PAULSEN:  Yes, your Honor.  So the current plan

18  is all of these materials come in through a summary witness.

19  I heard your Honor that you do not like it when witnesses read

20  things.

21          THE COURT:  Well it's boring for one thing and

22  nobody listens to it.  The thing is that it's in evidence.  I

23  mean, maybe some of these things aren't boring.  It depends on

24  what the document is.  I just, you know, I've had lawyers try

25  to start reading an entire contact.  I don't expect anything

*ToniAnn Lucatorto RPR, RMR, CRR*

PROCEEDINGS                              212

1    like that's going to happen.  I'm just thinking as a matter of

2    common sense.  When a document is in evidence, it's available

3    for you to use on your summations.  So I'm not going to keep

4    anybody from highlighting something that's significant.  I'm

5    just reminding you what you already know which is when it's in

6    evidence, you don't have to read every word.

7         MR. PAULSEN:  We understand that, your Honor.  In

8    this particular case we started with a very large universe of

9    relevant materials.  You're correct that Judge Garaufis issued

10   an opinion on which he gave us guidance in terms of timeframe

11   's.  When it came to the documents, he went page by page and

12   made a fairly granular decision.  The letter that Mr. Frisch

13   filed was on top of those decisions where we showed the Court

14   which things that we were fully redacting, which parts we

15   agreed to partially redact, and these are further questions

16   upon the reminders that were subject to that opinion.

17        THE COURT:  Right.

18        MR. PAULSEN:  We've talked again, we've talked as

19   recently as last night.  We consented to redact a few further

20   things, but the letter as I understand is is mostly things

21   we're not in agreement on anymore, or we think at some level

22   we've redacted enough.  Our concern is that it is all

23   electronic.  We can do some redacting in the courtroom, but

24   it's a little difficult to do it on the fly.  I don't know

25   what makes sense to your Honor, but the motion is joined to

PROCEEDINGS                       213

1    some extent.

2              THE COURT:  It's what?

3              MR. PAULSEN:  The motion is joined.  We're ready.

4              THE COURT:  Well, I mean, they're kind of ready.

5    I'm just hearing about some of them now but it's fine.  The

6    things that are still, I'll take a look at them tonight.  But

7    I think a lot of think has been aired in front of Judge

8    Garaufis and I don't intend to and I don't think anybody is

9    asking me to, to go back and re-decide something he's already

10   decided.  So I'll take a look at them.

11             Just in terms of the order of your witnesses.  Do

12   you know about at what time these things would be coming in.

13             MR. PAULSEN:  Yes, your Honor.  We would intend to

14   put in all of the smaller witnesses first and so Special Agent

15   Anthony  Cunder from our office who would be the summary

16   witness.  That I believe would be our longest witness.  He is

17   collecting materials from lots of different Twitter sources.

18   Those are all of the materials that are the subject of that

19   order, as well as some materials, like the reports that we

20   authenticated today.

21             THE COURT:  All right.  Well I think maybe something

22   that we can do is finish those smaller witnesses and then just

23   give the jury a little bit of extra time so maybe we can

24   hammer out -- I can decide what's still been left open and

25   obviously hear the defenses thoughts on whatever those things

PROCEEDINGS                                    214

1   are and yours as well.  So do you think 45 minutes would do

2   it?

3              MR. PAULSEN:  I think probably, your Honor.

4              THE COURT:  All right.  Okay.  So we can do that --

5   so just in terms of timing.  You think the morning for all of

6   the short witnesses?

7              MR. PAULSEN:  Your Honor, we have 1, 2, 3, 4, 5, 5

8   short witnesses are relatively short witnesses.  I think that

9   probably eat up most of the morning, if not the entire

10  morning.

11             THE COURT:  I think I'll give the jury a little bit

12  longer lunch and we can have that argument at 2 o'clock and

13  we'll have them come back at 2:45.  I think we're moving along

14  pretty well.  And just in terms of timing, I'm sure you

15  probably told Judge Garaufis and Judge Reyes, but I know you

16  said you're calling your client as a witness.  Are you

17  planning to call other witnesses as well?

18             MR. FRISCH:  The answer is currently no.

19             THE COURT:  Okay.  I'm just trying to figure out

20  timing.  But and the other thing we have scheduled for

21  tomorrow is to talk about the charge.  So but that will be

22  after the court date.  After the court day.  You know, at the

23  end of the day.  Just one second.

24             All right.  Ms. Greene reminds me that I have a plea

25  at lunch time tomorrow, but we can handle it.  So I think

PROCEEDINGS                                    215

1    we'll do what we have to do at lunch and then I'll just give

2    the jury a little bit of extra time.  Okay.  Anything else?

3              MR. FRISCH:  No.

4              MR. PAULSEN:  No, your Honor.

5              THE COURT:  All right.  So I'll see you tomorrow at

6    9:30.

7              (Proceeding concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2    WITNESS                                 PAGE

3

**ROBERT MC NEES**

4

DIRECT EXAMINATION     BY MR. BUFORD        39

5

CROSS-EXAMINATION      BY MR. FRISCH        57

6

REDIRECT EXAMINATION   BY MR. BUFORD        71

7

RECROSS-EXAMINATION    BY MR. FRISCH        72

8

9    **JESSICA MORALES ROCKETTO**

10   DIRECT EXAMINATION     BY MR. GULLOTTA      75

11   CROSS-EXAMINATION      BY MR. FRISCH        95

12

**LLOYD COTLER**

13

DIRECT EXAMINATION     BY MR. GULLOTTA      96

14

CROSS-EXAMINATION      BY MR. FRISCH       102

15

16   **MATTIAS CHESLEY**

17   DIRECT EXAMINATION     BY MR. GULLOTTA     107

18

**OMER SAMIRI**

19

DIRECT EXAMINATION     BY MR. GULLOTTA     113

20

CROSS-EXAMINATION      BY MR. FRISCH       131

21

REDIRECT EXAMINATION   BY MR. GULLOTTA     136

22

23   **MICHAEL ANDERSON**

24   DIRECT EXAMINATION     BY MR. BUFORD       138

25   CROSS-EXAMINATION      BY MR. FRISCH       144

**MARK BERTUCCI**

DIRECT EXAMINATION     BY MR. PAULSEN      146

CROSS-EXAMINATION      BY MR. FRISCH       150

**PAUL NEHLEN**

DIRECT EXAMINATION     BY MR. PAULSEN      152

**AMY STEPHEN**

DIRECT EXAMINATION     BY MR. PAULSEN      166

CROSS-EXAMINATION      BY MR. FRISCH       169

**JASMINE TOLSON**

DIRECT EXAMINATION     BY MR. BUFORD       174

CROSS-EXAMINATION      BY MR. FRISCH       183

**JOEL DE CAPUA**

DIRECT EXAMINATION     BY MR. BUFORD       186

CROSS-EXAMINATION      BY MR. FRISCH       197

```
 1              E X H I B I T S

 2    GOVERNMENT                              PAGE

 3    720                                      44

 4    721                                      48

 5    722                                      51

 6    727R                                     54

 7    726                                      72

 8    740                                     124

 9    201                                     142

10    700                                     160

11
      DEFENSE                                 PAGE
12
      A & B                                    69
13

14

15

16

17

18

19

20

21

22

23

24

25
```