UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

  - v -       Criminal Case No. 21-0080 (AMD)

DOUGLASS MACKEY,    *ORAL ARGUMENT REQUESTED*

     Defendant.

-------------------------------------------------- x


**REDACTED**
MEMORANDUM OF LAW IN SUPPORT OF DOUGLASS MACKEY'S
MOTION TO DISMISS THE INDICTMENT AND FOR ALTERNATE RELIEF



       Andrew J. Frisch
       The Law Offices of Andrew J. Frisch, PLLC
       40 Fulton Street, 17th Floor
       New York, New York 10038
       (917) 826-4668
       *afrisch@andrewfrisch.com*

       *Attorney for Douglass Mackey*


May 12, 2023

## TABLE OF CONTENTS

*Introduction* . . . . . . . . . . . . . . . . . 2

A.    *The Government's Willful Omissions to Judge Garaufis* . . . . . . . 8
      *about Mr. Microchip, a Witness Indispensable to Prove*
      *Guilt and to Admit Evidence Under Rule 801(d)(2)(E)*

B.    *The Government's Evidence Was Contradicted by Interviews* . . . . . . 15
      *It Failed Timely to Disclose and to Which it Refused to Stipulate*

C.    *The Evidence of Conspiracy was Legally Insufficient* . . . . . . . 26

D.    *Acquittal or a New Trial Is Required Because the Evidence* . . . . . . 29
      *Did Not Show a "Clearly Established" Violation of Section 241*

E.    *The Conviction Must Be Vacated Because* . . . . . . . . . 31
      *Venue Was Not Proper in This District*

*Conclusion* . . . . . . . . . . . . . . . . . 36

## Introduction

No view of the evidence at trial, let alone a rational one, supports the jury's verdict convicting Mr. Mackey of conspiracy, in violation of Title 18, United States Code, Section 241, which followed multiple notes reporting an apparent deadlock, an instruction over objection pursuant to *Allen v. United States*, 164 U.S. 492 (1896), and the Court's pocket denial of a mistrial upon pervasive media coverage beginning the eve of the verdict about the unprecedented indictment of former President Trump [*see* Docket No. 118 at 3], in whose full-throated support Mr. Mackey engaged in the alleged conduct.

Mr. Mackey was not present in chats when purported co-conspirators discussed and formulated the memes in question [GX 200-124 to 200-132 (GX 200-P-0001 to 200-Q-0005); GX 410-5 to 410-22; GX 430-44 to 430-64; *see* T 857 (the government conceding that "the defendant is not actually present when that conversation is happening")]; he never had any contact whatsoever with any of the purported co-conspirators outside of chats; and he neither directed the creation of the memes nor created any himself.  To the contrary, Mr. Mackey shared two memes on November 1, 2016, *different* from those formulated in the chats, which he found on 4chan, an Internet forum on which memes containing misinformation about voting had been appearing for months [*see, e.g.,* T 647, 825 (Stipulation, DX BB)]; and he re-tweeted a third, automatically forwarded to him by operation of Twitter on November 1, 2016, because the tweet mentioned his avatar, Ricky Vaughn.  *See* T 686-87.  The government's fanciful inference of conspiracy from these indisputable facts was obliterated by the reality established by the government's own evidence that Mr. Mackey shared the memes as part of constant daily "shitposting" in 2016:  the constant tweeting of provocative content meant to call attention to

3

himself, get under the skin of the Clinton Campaign, and distract from the main political conversation. *See, e.g.*, GX 200-E at 14 ("I am a higher ranked shitposter than the Democratic Party's official shitposting account, according to MIT."); GX 200-D at 13 ("[I]'ve sacrificed an entire slice of my life to shitposting."); GX 200-D at 27 (November 4, 2016: "my fans are very dedicated and they want to hear my voice and laugh at my trolls"); GX 200-O at 8 (November 4, 2016: "[that feeling when] you haphazardly post a /pol/ meme and it winds up on CNN"); GX 200-36 ("MIT-certified best po[]ster . . . I should put that in my bio."). Even apart from whether Mr. Mackey participated in a conspiracy, the government acknowledged the implausibility that any registered voter could truly believe that a vote for President could be cast by anonymous text [*see, e.g.*, T 484, 905], underscoring the defense of a pervasive shitposter that he could not plausibly have intended to trick voters, even if he acted alone.

The government attempted to fill its evidentiary void by interpolating earlier photo-shopped memes - - as well as discussions of demographics and turnout, the *sine qua non* of political campaigns - - all acknowledged by the government to be legal. *See, e.g.*, T 855-56. Such conduct, however, could not help establish Mr. Mackey's participation in a conspiracy in violation of Section 241, which he never joined. *See United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) (even if incriminating inferences are permissible, they are legally insufficient if the evidence gives equal or nearly equal circumstantial support to theories of guilt and innocence); *United States v. Tyler,* 758 F.2d 66, 68-70 (2d Cir. 1985) (despite the defendant's involvement in a drug sale, there was insufficient evidence of an agreement between the defendant and the dealer); *United States v. Nusraty*, 867 F.2d 759, 763-64 (2d Cir. 1989).

Apart from the government's manufacture of an unsupportable theory of

4

conspiracy, this case was grounded in prosecutorial cheating, which appears willful and deliberate.  The government presented incomplete information to Judge Garaufis in securing permission for Mr. Microchip to testify anonymously, as demonstrated herein, violating the letter and spirit of Federal Rule of Criminal Procedure 5(f) and *Brady v. Maryland*, 373 U.S. 83 (1963).  Mr. Microchip's consequent testimony was indisputably indispensable to (1) the government's purported proof of conspiracy [*see, e.g.*, T 845 (Government's summation:  "You know all this because Micro told you.")]; and (2) the government's purported proof of conspiracy independent of chats proffered pursuant to Rule of Evidence 801(d)(2)(E); *United States v. Margiotta*, 688 F.2d 108, 136  37 (2d Cir. 1982).

      The government otherwise played cat-and-mouse with due process, noticing the testimony of Jess Morales Rocketto as a representative of Hillary Clinton's 2016 Campaign for President (the "Clinton Campaign") at literally the eleventh hour (the Friday before jury selection), while simultaneously hiding reports of interviews of other representatives of the Clinton Campaign from the preceding two years who contradicted Ms. Rocketto - - and corroborated Mr. Mackey's defense.[1]  After trial began, when defense counsel inadvertently stumbled onto the trail of the government's willfully suppressed interviews, the government begrudgingly doled them out [*see* T 226-36], as if creating a record of prosecutorial candor.  But the Government produced the remainder of the reports only thereafter upon defense counsel's express demand [*see* T 408; Docket No. 106], evincing the type of *Brady* gamesmanship that has become untenably too common.  *See* Bennett L. Gershman, *Litigating Brady v. Maryland:*

---

[1]  Attached as Exhibit B is the government's email first noticing Ms. Rocketto as a witness on March 10, 2023, without disclosure of any of the reports of the government's interviews of other representatives of the Campaign between March 2021 and January 2023.

5

*Games Prosecutors Play*, 57 Case W. Res. L. Rev. 531, 565 (2007) ("since there is virtually no

accountability, liability, or punishment for *Brady* violations, prosecutors are encouraged to play

the game with impunity . . . . [Many] prosecutors "think about games to avoid compliance with

*Brady*, because there is nothing tangible to stop them.").  No prosecutors complying with their

constitutional duty on the facts of this case, especially with such distinctly meticulous command

of the evidence, could have missed that the most senior officials of the Clinton Campaign

contradicted Ms. Rocketto and otherwise understood distinctions between criminal

misinformation and shitposting.

        Rather than indulge prosecutorial rationalizations for dereliction of fundamental

constitutional duty, this Court should honor Rule 5(f) [*see, e.g., United States v. Triumph Capital

Group, Inc.*, 549 F.3d 149 (2d Cir. 2008) (Gleeson, U.S.D.J., sitting by designation); *United

States v. Mahaffy*, 693 F.2d 113 (2d Cir. 2012); *United States v. Nejad*, 521 F. Supp. 3d 438

(S.D.N.Y. 2021) (then District Judge Nathan)] and vacate the conviction and dismiss the

indictment based on the government's misconduct and the insufficiency of its evidence.  We

know with certainty that no other remedy will protect the right to due process because Mr.

Mackey could not have been convicted without the government's mischief, and none of the

legion of judicial pronouncements on this issue over decades - - and the United States Attorney's

and Department of Justice's own internal admonitions - - inhibited the conduct here.  *See Nejad,*

521 F. Supp. 3d at 450 ("It is imperative that prosecutors fulfill their constitutional and ethical

obligations with the same zeal with which they pursue convictions - - not reluctantly, not only

after prodding, and not with measured half truths.").

        Prosecutors in this Circuit need to be reminded with more than (at worst) an

occasional judicial frown or finger-wag - - ineffectual and tolerable costs of business as usual - - that bad decisions made in secret about Rule 5(f), if later fortuitously revealed, will be resolved with consequences about which Rule 5(f) expressly warns.  *See United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996) ("the government's failure to turn over exculpatory evidence in its possession is unlikely to be discovered and thus largely unreviewable"); *United States v Oxman*, 740 F.2d 1298, 1310 (3d Cir. 1984); Elizabeth Napier Dewar, *A Fair Trial Remedy for Brady Violations*, 115 Yale L.J. 1450, 1455 (2006) ("Defendants only rarely unearth suppressions.").  It is precisely the reluctance of judges to enforce *Brady* with meaningful remedies - - and an institutional tendency to circle wagons around prosecutors and not the presumptively-innocent people in their crosshairs - - that encourages and perpetuates the gamesmanship that Rule 5(f) was enacted to stop.  The government's misconduct is especially unforgivable in this case where, charitably speaking, the government's theory hung by a thread even without it - - as the jury's apparent deadlock (before an *Allen* charge) serves to confirm.

If the Court declines to dismiss this case in the face of the government's game-playing, it should at least make a full record for the Circuit and require each of the three prosecutors to provide "declarations under penalty of perjury" [*see Nejad*, 521 F. Supp. 3d at 442] about their roles in the untimely disclosures discussed herein.  This issue is too important to be treated as just another claim of error for the government to attempt to explain away.  *See id.* at 443 ("public confidence in the administration of justice depends also on public accountability.").  If a violation of Rule 5(f) and *Brady* is *ever* tolerable, the government's envelope-pushing theory of criminal liability on the facts of this case was far too tenuous to withstand it.

7

A.      The Government's Willful Omissions to Judge Garaufis about Mr. Microchip, a
        Witness Indispensable to Prove Guilt and to Admit Evidence Under Rule 801(d)(2)(E)

        On February 24, 2023, before trial, the government moved Judge Garaufis to

permit Mr. Microchip to testify anonymously and for related relief.  Docket No. 66.  Three days

later, on February 27, 2023, the government began making its disclosures pursuant to the Jencks

Act.  *See* Exhibit C (the government's email of February 27, 2023, advising that disclosures were

about to begin on a "rolling basis").  The government did not make its disclosures pursuant to the

Jencks Act for Mr. Microchip, however, until March 10, 2023 [*see* Exhibit D (the government's

email)], two days *after* Judge Garaufis, on March 8, 2023, granted the government's application

on Mr. Microchip's behalf.  *See* Docket No. 82 (Memorandum & Order).  While the coincidental

timing of the government's disclosures was not eyebrow-raising at the time, an inference of

prosecutorial dereliction of constitutional duty is now inescapable.

        The government's motion on behalf of Mr. Microchip was principally predicated

on the following representations:

        1.  Mr. Microchip "was a coconspirator of the defendant . . . [and] had communications
        with the defendant . . . including communications discussing the creation and
        dissemination of deceptive images concerning the time, place, and manner by which
        voters could cast a vote in the 2016 presidential election" [Docket No. 66 at 2-3];

        2.  Mr. Microchip "is presently involved in multiple, ongoing investigations and other
        activities in which he or she is using assumed internet names and "handles" that do not
        reveal his or her true identity" [Docket No. 66 at 2]; and

        3.  Mr. Microchip's true identity has never been publicly associated with any of his online
        monikers "notwithstanding the efforts of investigative journalists who have attempted to
        learn [his] identity."  Docket No. 66 at 2.

        By order dated March 8, 2023, Judge Garaufis granted the government's

application, finding the requested relief necessary under the circumstances, and specifically

noting the government's express representation that it had complied with its constitutional

obligations under *Brady* and *Giglio v. United States*, 405 U.S. 150 (1972).  Docket No. 82 at 10.

Two days *after* Judge Garaufis granted the government's application on behalf of

Mr. Microchip, the government disclosed its reports of interview of Mr. Microchip.  As

confirmed by Mr. Microchip when he testified at trial, the government's reports established the

following facts which the government had *not* disclosed to Judge Garaufis, which would have

put the government's application in a far different light:

1.      Mr. Microchip admitted to using heroin, methamphetamines, mushrooms, powdered cocaine, a testosterone steroid called Testogel, and had been addicted to painkillers, but testified that he used all of these substances during a "short period" in about 2002 or 2003, and that then FBI case-agent Meagan Rees was "incorrect" if her report of interview (attended by two of the three trial prosecutors (Messrs. Gullotta and Paulsen), GX 3500-M-13, filed as Exhibit E under seal), said that Mr. Microchip told the government that he "had previously used drugs from approximately 2002 or 2003 to 2014" [T 575-77];

2.      Mr. Microchip had debts to the Internal Revenue Service and in bankruptcy [T 564];

3.      Mr. Microchip feared that his self-employment as a mobile application developer would be jeopardized if his real name were ever publicly disclosed [T 479, 565; *see also* T 532-33];

4.      Mr. Microchip approached the FBI in 2018 to work for free and sought to continue to do so because the FBI provided him a "structure" that he deemed "valuable" [T 563-64];

5.      Mr. Microchip was not questioned about the conspiracy to which he pled guilty until April 2021, at least the fourth substantive discussion between the government and him or his lawyer, three months after Mr. Mackey's publicized arrest, and said:

• there was not any "grand plan" to stop people from voting;

• the participants in the chats were *not as organized* as many people believed;

• the focus was not on one message, it was pushing out as much content as possible; and

9

> • it had *not* been his intent to put specific groups of people in a box and stop that group from voting.

T 538-45.  In addition, contrary to the government's representation that Mr. Microchip "had communications with the defendant . . . discussing the creation and dissemination of deceptive images concerning the time, place, and manner by which voters could cast a vote in the 2016 presidential election" [Docket No. 66 at 2-3]; *there were no such communications.*

Nor was Judge Garaufis aware that Mr. Microchip, knowing that the government was about to make its application on his behalf (T 571-72), announced online two days before the government's application - - using the moniker "Microchip" (followed by a superscript "TM" apparently to signify his identify as the true Microchip) - - that he would no longer tweet as Microchip:

> Good night, I'm not coming back, this is my final tweet.  It's been fun.  I hope you have a good lives [sic], I wish we could've been more than e-friends, but this is the Internet after all.

DX P (February 22, 2023); T 572.  Within the weeks immediately preceding the government's application to Judge Garaufis, Mr. Microchip had posted the following tweets:

> 3,109 crazy tweets over two weeks.  What can I say?  I'm insane, on pills, don't shower, can barely take care of myself, hear voices, talk to the walls, and can predict the future.

DX X; T 588-89.

> I have the crazy . . . .

DX U; T 588.

> I'm now 36 hours into my Adderall . . . . marathon . . . .

DX R; T 577-78.

> I drink black rifle coffee, wear a fishnet trucker hat, have a Jesus tattoo, and inject

10

testosterone.

DX S; T 579.

My IQ is so high right now, you have no idea.

DX T 587.  Mr. Microchip also re-tweeted a meme of him holding a bottle of Adderall.  DX Q, T 573-74.  *Not one* of these tweets was *ever* disclosed by the government to Mr. Mackey, even as part of compliance with the Jencks Act;  the defense fortuitously found them (and others) a day or so before Mr. Microchip testified.

If the government did not actually know of these tweets, it should have.  *See* Gershman, *Litigating Brady v. Maryland* at 552 ("[there] are contexts in which a prosecutor, even if he lacks actual knowledge of the evidence, 'should have known' of the evidence.")  The government represented to Judge Garaufis that Mr. Microchip was "involved in multiple, ongoing investigations and other activities in which he . . . is using assumed internet names and "handles" that do not reveal his . . . true identity."  Docket No. 66 at 2.  Apart from the coincidence of the online nature of Mr. Microchip's volunteer work for the government and the means used by Mr. Microchip to disseminate the above-quoted tweets, the government interviewed Mr. Microchip repeatedly and exhaustively, questioning him about every conceivable kind of potentially discoverable conduct.  *See. e.g.,* GX 3500-M-13 at 6-12 (filed as Exhibit E under seal).  Even if the government was in the dark about these tweets, its motion to Judge Garaufis was made for Mr. Microchip's benefit, and the government is responsible for a cooperator's non-disclosures if not also under the principle of *respondeat superior* for cooperators, as here, in their actual employ.  *See generally Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022).  ████████████████████████████████████████

11

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

   But an inference of the government's actual knowledge of the tweets was amply warranted and drawn by the Court. At a sidebar to hear the government's objections to one of the above-quoted tweets, the Court said, "I'm sure they've seen it." T 587. Defense counsel (giving the prosecutors too much credit) disagreed with the Court, surmising that these prosecutors could not have known of these tweets and suppressed them. *See* T 587. With the benefit of reflection, however, especially in the context of the willfully suppressed reports of interviews of the Clinton Campaign, it seems unlikely that the tweet-compulsive and addictive Mr. Microchip, on his own, would have stopped tweeting on February 22, 2023, unless the government directed him to do so in advance of filing its motion on February 24, 2023. If the prosecutors directed Mr. Microchip not to tweet two days before the government filed its application, they necessarily knew he was tweeting - - and should have assured that Judge Garaufis had the full picture.

   The government's objection to DX R ("I'm now 36 hours into my Adderall . . . marathon"), the first of the above-quoted tweets offered, was curious. When asked by the Court if the government objected to admission of DX R when defense counsel offered it, one of the prosecutors said, "I don't see its relevance *just from reading the tweet*." T 577 (emphasis added). Apart from the oddity of a prosecutor claiming to see no relevance in his cooperator's apparent admission to an addiction just weeks before trial, the words "just from reading the tweet" could be interpreted as the words of a prosecutor attempting to coverup a willful non-disclosure by

pretending to be seeing the undisclosed item for the first time.

But whether "declarations under penalty of perjury" from the prosecutors [*see Nejad*, 521 F. Supp. 3d at 442] establish that their conduct was deliberate or careless, they did not tell Judge Garaufis (and did not disclose reports of Mr. Microchip's interviews until after Judge Garaufis granted the government's application) that there was (at least) reason to believe that Mr. Microchip was an addict [T 575-77]; was saddled with tax and bankruptcy debts [T 564]; volunteered to work for the government without pay because the FBI provided him a "structure" that he deemed "valuable" [T 563-64]; sought anonymity because he feared that his self-employment as a mobile application developer would be jeopardized if his identity were ever publicly disclosed [T 479, 565; *see also* T 532-33]; denied the government's claims of conspiracy and criminal intent [T 538-45] before the government reminded him [*see* T 595], and *never* discussed the alleged scheme to trick voters with Mr. Mackey.  The sweep of these non-disclosures undermines the credibility of Mr. Microchip's testimony elicited by the government on re-direct examination that he would have testified even if required to disclose his name.  T 597.  But even if true and not contrived to meet the exigencies of trial, the government failed to confirm even that morsel to Judge Garaufis.

Rule 5(f) and the principles of *Brady* require that favorable information be disclosed in time for its effective use.  *United States v. Gil,* 297 F.3d 93, 106 (2d Cir. 2002); *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001); *Leka v. Portuondo,* 257 F.3d 89, 101 (2d Cir. 2001); Model Rules of Prof'l Conduct R. 3.8(d) (2004) (requiring prosecutor to make timely disclosure); ABA Standards Relating to the Administration of Criminal Justice, Standard 3-13.11(a) (1992) (requiring disclosure "at the earliest feasible opportunity").  Evidence is

favorable if it is either exculpatory of impeaching.  *Mahaffy*, 693 F.3d at 27 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  The above-quoted tweets and admissions made by Mr. Microchip demonstrate that the government's motion for his anonymity was entirely or principally pretextual and hid Mr. Microchip's (and the government's) true agenda.

Had the government faithfully complied with its constitutional obligation, Mr. Mackey could have marshaled all the relevant facts in opposition to Mr. Microchip's anonymity, permitting Judge Garaufis, for example, to demand that Mr. Microchip appear for an *in camera* hearing or otherwise requiring the government to answer questions.  Instead, the government unfairly - - and unconstitutionally - - achieved the strategic benefit of securing its requested relief and putting it on Mr. Mackey to spot and untangle the mischief.  And without Mr. Microchip, the government would not have been able to press its curious claim of a "silent agreement" between strangers on the Internet [*see* T 510, 885] and would not have had *any* independent evidence of conspiracy on which to admit evidence pursuant to Rule 801(d)(2)(E), let alone the expansive basis used by the Court.  *See* T 788-89 (admitting "all of the statements offered in evidence," even if by "unidentified individuals who communicated with the defendant or with those individuals in relation to the charged conspiracy on Twitter, 4chan, or other messaging platform.").  *See United States v. Palermo,* 410 F.2d 468, 473 (7th Cir. 1969) (reversing in part because relevant information was not disclosed to the trial judge); *United States v. Lawler*, 413 F.2d 622, 627 n.4 (7th Cir. 1969) ("plac[ing] no special reliance on the unsubstantiated reference to the possible danger to the witness's safety"); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1145 (10th Cir. 2014) (the judge abused discretion in finding the need for secrecy).

The prejudice to Mr. Mackey is manifest.  The sweep of the government's willful

14

non-disclosures to Judge Garaufis is itself compelling evidence of the government's perceived necessity to secure Mr. Microchip's anonymity.  While the government's delayed compliance with the Jencks Act permitted Mr. Mackey to cross-examine Mr. Microchip effectively, its non-disclosures resulted in Mr. Microchip's anonymity, his consequent testimony about a "silent agreement" with a stranger on the Internet to establish a legally sufficient case against Mr. Mackey, and the government's predicate for admission of chats pursuant to Rule 801(d)(2)(E).

"The burden of persuasion is on the government, meaning that if 'the matter is so evenly balanced that [the judge] feels himself in virtual equipoise as to the harmlessness of the error,' the petitioner should prevail." *Lainfiesta v. Artuz,* 253 F.3d 151, 158 (2d Cir.2001) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 435 (1995); *see also Cotto v. Herbert*, 331 F.3d 217, 253 (2d Cir. 2003).  But if vacatur of the conviction or dismissal is deemed too drastic a remedy even for the government's deliberate or careless misleading of Judge Garaufis - - and considered in the context of the government's suppression of its interviews of the Clinton Campaign, discussed below, the Court's broad discretion to fashion a meaningful remedy includes striking Mr. Microchip's testimony and assessing the sufficiency of the evidence of conspiracy on this motion and the admissibility of co-conspirator statements without it.

B.     *The Government's Evidence Was Contradicted by Interviews*
       *It Failed Timely to Disclose and to Which it Refused to Stipulate*

Before trial, the government knew from its own evidence that Mr. Mackey in 2016 was a self-proclaimed shitposter.  *See, e.g.,* GX 200-E at 14 ("I am a higher ranked shitposter than the Democratic Party's official shitposting account, according to MIT."); GX 200-D at 13 ("[I]'ve sacrificed an entire slice of my life to shitposting."); GX 200-D at 27 (November

4, 2016: "my fans are very dedicated and they want to hear my voice and laugh at my trolls");

GX 200-O at 8 (November 4, 2016: "[that feeling when] you haphazardly post a /pol/ meme and

it winds up on CNN"); Exhibit A[2] (November 8, 2016:  "2016 was the Shitposting Election.  It's

been such a pleasure to be with you all."); GX 200-36 ("MIT-certified best po[]ster . . . I should

put that in my bio"); *see also* T 30-31, 33, 667.  Despite the reports on interview of the Clinton

Campaign, it did not disclose them.

If the prosecutors' exhaustive investigation of this case still left it confused about

the import of its interviews of the Clinton Campaign, Mr. Mackey's counsel spelled it out.  Mr.

Mackey gave pretrial notice [Docket No. 60, February 15, 2023] and supplemental pretrial notice

[Docket No. 72, March 2, 2023] of an expert in online media strategies of political conservatives,

Associate Professor George Hawley of the University of Alabama's Department of Political

Science, who would testify in substance

> My opinion is that a substantial number of political conservatives over at least the
> last ten years have used online media strategies to use social media as a means of
> provoking ideological opponents, exploiting natural fissures in opposition coalitions, and
> creating apparent controversies to generate coverage by mainstream journalists. Whether
> or not such strategies prove successful, proponents of these strategies use such strategies
> to advance their political ideology by online tactics such as provocation, derision,
> distraction, and creation of apparent disputes to get the attention of mainstream
> journalists.  These political conservatives attempt to create sideshows to dominate social
> media and mainstream coverage to create their own narratives and divert coverage from
> stories that might favor their opponents.

Docket No. 72; *see* Docket No. 60.  Despite this notice of Mr. Mackey's defense, the government

still made no disclosure of its reports of previously-conducted interviews of the Clinton

---

[2]  The government was aware of Mr. Mackey's tweet dated November 8, 2016, appended
hereto as Exhibit A, because it was produced as part of discovery.  Mr. Mackey and his counsel
did not realize until preparing this motion that the government did not offer it at trial.

Campaign conducted from March 2021 to January 2023.

Mr. Mackey's defense was again spelled out in opening statement when his counsel told the jury that Mr. Mackey would testify, in sum, that (1) through his Twitter avatar Ricky Vaughn, he shared hundreds of tweets, messages and memes everyday in 2016 during the presidential campaign as part of "shitposting" [T 30-31, 33]; (2) was not present during chats in which alleged coconspirators discussed voting by text; and (3) shared vote-by-text memes different from those formulated in those chats. T 32-33. Still no disclosures.

The government's first witness, Robert McNees, a tweet-savvy professor of physics at Loyola University, testified that, upon affirmatively seeking out tweets by Ricky Vaughn on about November 1, 2016, he found the two memes (that Mr. Mackey had found on 4chan, T 647) and was concerned by their "virtually similar" replication of Clinton graphics. He also testified that the use of the hashtag on the memes, "#imwithher," served to steer the memes to Clinton's supporters. T 45-48, 50-53, 62. As the ostensibly authoritative professor was testifying about his alarm upon finding the memes, the government continued to sit on reports of interviews from the Clinton Campaign that it was aware of pervasive shitposting (sometimes using that term) that had contaminated the very hashtag which alarmed Professor McNees and did not consider memes replicating Clinton graphics to be of sufficient concern to take decisive action. Yet the government still disclosed none of the reports.

The government's second witness was Ms. Rocketto. On March 10, 2023, the Friday before the start of jury selection, the government first identified Ms. Rocketto as a witness. Exhibit B (email from the government to defense counsel). Ms. Rocketto testified that she was the Clinton Campaign's digital organizing director; learned of vote-by-text memes using

fake graphics during the final days of the campaign; found the memes' misappropriation of the

Clinton Campaign's graphics and hashtag "#imwithher" to be such a "big deal" and so "jarring"

that "you have to make a decision about what to do about something like this."  T 76, 78, 84-85,

90-92.  Ms. Rocketto's enthusiasm for testifying was noted by the Court:  "If you can avoid

asking like terribly open-ended questions to this witness . . . . she has a lot to say, which is fine,

but we're never going to finish."  T 86, 79-80.

On defense counsel's subsequent cross-examination of Lloyd Cotler (a

representative of the Clinton Campaign called principally to testify to steps to remediate the

memes' reference to a short code for texting), defense counsel confirmed an unelaborated

statement in the government's report of Mr. Cotler's interview that a Clinton Campaign worker

named Amy Karr monitored social media, including 4chan [T 103], on which Mr. Mackey had

seen the memes that he then shared.  *See* T 647.

Only the following morning did the government provide defense counsel with

reports, but just of two interviews of one employee of the Clinton Campaign ("Employee One")

[*see* T 226-31], filed under seal herewith.  Contrary to the government's claim during colloquy at

trial, it did *not* turn over the reports of its interviews of representatives of the Clinton Campaign

after defense counsel's opening "because it seemed like he was interested in that," T 629, but

made limited disclosure of its two interviews of just Employee One after defense counsel's cross-

examination of Mr. Cotler without disclosing its reports of interviews of other representatives of

the Clinton Campaign.  The government's doling out of the reports of just Employee One

suggests the government's concern about fallout if defense counsel reached out to Employee One

and learned that s/he had been interviewed, not good faith compliance with Rule 5(f) and *Brady*.

18

Upon reviewing the reports of Employee One's interviews, defense counsel at that day's lunch recess requested that the government provide reports of any other interviews of representatives of the Clinton Campaign.  The subsequently-disclosed reports underscored Mr. Mackey's defense in multiple ways.  They contradicted Professor McNees and Ms. Rocketto; they helped prove Mackey's defense that memes of this sort were understood even by the Clinton Campaign to be part of ongoing shitposting, not the result of *anyone's* conspiracy to trick Clinton voters; and they supported the view that even senior officials of the Clinton Campaign did not take such memes seriously or at least sufficiently seriously to take action.  *See* T 484 (The government questioning Mr. Microchip:  "*State the obvious*, did you think this was a valid way of voting?") (emphasis added).

The Court responded to Mr. Mackey's complaints about the government's failure timely to produce all of this material by suggesting remedies short of a mistrial including a stipulation [T 630-31, but those remedies were either rejected by the government, impractical or inadequate.  As counsel advised the Court by letter just before summations [Docket No. 108], the government declined to call any additional witnesses on its case even if requested.  Mr. Mackey declined to call them himself or request that any witness be recalled:  the government's delayed disclosure irreparably corrupted the trial, impaired counsel's ability to frame Mr. Mackey's defense in opening statement armed with the information, and undermined the effectiveness of questioning any witnesses who would by then be specifically prepared for counsel's questioning.

With due respect, the government had two years to prepare for trial; forcing defense counsel to come to the government's rescue in a rush midway through a short trial rewards prosecutors for treating *Brady* as an obstacle to be navigated around, not a constitutional

19

imperative.  It is not incumbent on a defendant to save the government from the consequences of

its misconduct.  These reports of interview should have been disclosed beginning in March 2021

when the first of the Clinton Campaign witnesses was interviewed, but certainly no later than the

day before jury selection when the government first noticed its intent to call Ms. Rocketto in lieu

of the earlier interviewed Campaign witnesses.  The government began sitting on these reports

*two years before trial* when it interviewed the first of the non-disclosed representatives of the

Clinton Campaign and continued to keep them a secret notwithstanding evidence in its own

discovery about shitposting, Mr. Mackey's two pretrial notices of Professor Hawley's

prospective testimony, and defense counsel's opening statement.  It is unseemly and

constitutionally offensive for the government to attempt to shift blame for its mess to Mr.

Mackey or put it on him to clean it up.  *See Leka*, 257 F.3d at 101 (the longer a prosecutor

withholds evidence, and the closer to trial the disclosure is made, the less opportunity there is for

effective use).

Meanwhile, two meaningful remedies proposed by Mr Mackey were rejected:

(1) he be permitted to re-open to the jury and admit excerpts of the reports into evidence,

accompanied by an instruction that re-opening was a consequence of the government's belated

disclosures [Docket No. 106]; and (2) responding to the Court's suggestion, a stipulation

proposed by defense counsel [Exhibit F, filed under seal] which captured some exculpatory

highlights of the reports, which are all incorporated by reference herein in full and filed under

seal pursuant to the Court's order.  Exhibit G.

The government was not required to accept the proposed stipulation even if it might

have been a prudent way to fashion a remedy for its misconduct.  But the government then argued

inferences to the jury at odds with the very information it failed timely to disclose.  For example, the government argued that Ms. Rocketto and others "frankly ensured [t]hat the scheme didn't get off the ground, that it was foiled as it began" [T 838] by "getting in touch with the right people, and they were in a position to do something when it was necessary" [T 839]; "we know the campaign worried that people would be fooled by these . . . [Ms. Rocketto] took these to her supervisors because there were important to her" [T 905]; and "the fire department was on the scene putting out the fires when the defendant lit his match, but that doesn't excuse what he did."  T 913.

In addition, despite evidence corroborated by the Clinton Campaign supporting the reality that shitposting was a defining feature of the 2016 Presidential Election (as Mr. Mackey himself said in Exhibit A hereto), the government argued repeatedly that "none of this makes sense without a conspiracy."  T 866, 844, 848.  The government relied on Ms. Rocketto's testimony about the "#imwithher" hashtag, ignoring evidence of the hashtag's contamination from shitposting [T 836-38], and pressing inferences of alarm about dissemination of  Clinton graphics [*see, e.g,* T 836, 838], which did not alarm Ms. Rocketto's colleagues for them to take decisive action.

The Court's reasoning in denying Mr. Mackey's mid-trial motion for a mistrial [T 631-35] rewards and encourages prosecutorial gamesmanship.  Delayed disclosure, especially in a tenuous case as here, can be considered the equivalent of suppression, where the "belated disclosures may inflict [harm] not only on the ability of a defendant to receive a fair trial but also on the defendant's ability to effectively prepare for trial . . . [and] for a responsible lawyer to use the information with some degree of calculation and forethought."  Gershman, *Litigating Brady v. Maryland* at 561-62.

The Court's reasoning is also at odds with this Circuit's vigilance in policing *Brady* violations.  In *Mahaffy*, for example, as here, a judge denied relief on analogous facts.  The

defendants were convicted at a retrial of one count of conspiracy on the theory that they acted together to misappropriate their employers' confidential information.  After an adverse verdict following a retrial, the defendants fortuitously found multiple exculpating depositions attended by a member of the prosecution team.  The defendants argued, as described by the district judge in that case, that the depositions helped to undermine a basic premise of the government's case, that the information was confidential.  Similar to this Court's reasoning, the judge in *Mahaffy* found the new information to be much ado about nothing:  immaterial, not exculpatory when considered in context, and insufficient to negate evidence of criminal intent.  *United States v. Mahaffy, et al.*, 1:05-cr-00613 (JG) (E.D.N.Y. July 21, 2010) Docket No. 901.

The Circuit reversed, holding in substance that the district judge's reasoning misapprehended the value of the non-disclosed information.  A conviction must be vacated "upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Mahaffy*, 693 F.3d at 127 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006).  Even "[w]here suppressed evidence is inculpatory as well as exculpatory, and "its exculpatory character harmonizes with the theory of the defense case," a *Brady* violation has occurred.  *Mahaffy*, 693 F.3d at 130 (quoting *Triumph Capital*, 544 F.3d at 164).  If suppressed evidence is itself inadmissible, it is favorable if it "could lead to admissible evidence" [*Mahaffy*, 693 F.3d at 132 (quoting *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)], or "would be an effective tool in disciplining witnesses during cross-examination."  *Id.*  "*Brady* violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage.  When the government impermissibly withholds *Brady* material, its case is much stronger, and the defense

case much weaker, than the full facts would suggest." *Mahaffy*, 693 F.3d at 134 (quoting *Kyles v. Whitley*, 514 U.S. 419, 429 (1995) (internal quotation marks and punctuation omitted). *See* Gershman, *Litigating Brady v. Maryland* at 549 (quoting *Giles v. Maryland*, 386 U.S. 66, 100 (1967) (Fortas, J., concurring) ("The rogue prosecutor who wants to 'outwit and entrap [his] quarry' will almost always deliberately suppress Brady material, believing that it will probably never be discovered, but even if it is discovered . . . it is unlikely to be found material.  Even the ethical prosecutor knows he cannot lose this game and following her adversarial instincts, might reasonably determine not to disclose evidence that is obviously favorable to the defense.").

   While the government will endeavor to distinguish the facts of *Mahaffy*, it cannot distinguish application of its principles to this case.  Before Mr. Mackey's trial, the term "shitposting" appeared in a few tweets produced by the government.  *See, e.g.*, GX 200-E at 14; GX 200-D at 13.  The suppressed reports of interviews so corroborated and underscored Mr. Mackey's defense that it is a fair inference that the government might not have called Professor McNees or Ms. Rocketto in the first place had it timely disclosed the reports.  The government's chosen vessel for its selective slice of reality that misappropriation of the Clinton Campaign's graphics and hashtag "#imwithher" was such a "big deal" and so "jarring" to the Clinton Campaign that "you have to make a decision about what to do about something like this" [T 76, 78, 84-85, 90-92] was a witness so passionate about her position that the Court *sua sponte* sought to reign her in.  *See* T 79-80, 86.  The suppressed interviews showed that shitposting was understood by the media-expert Clinton Campaign to be such a hallmark of the election cycle of 2016 that the "#imwithher" hashtag was contaminated.

   The reports served to put the prosecution in a different light in contradicting the

enthusiastic Mr. Rocketto and in otherwise establishing that constant and random shitposting was a defining hallmark of the campaign, as Mr. Mackey himself tweeted on November 8, 2016, a week *after* he shared the memes on November 1, 2016.  Exhibit A (November 8, 2016:  "2016 was the Shitposting Election.  It's been such a pleasure to be with you all.").  The Clinton Campaign recognized that vote-by-text memes were pervasive on multiple places online for months before November 1, 2016; understood that they were not orchestrated by just one person or group but multiple layers of people; did not consider them a "big deal" (to use Ms. Rocketto's very words); people were "mocked" for taking them seriously; unlike the ostensibly authoritative Professor McNees, the Campaign did not deem it necessary to report such memes to Twitter (or the Department of Justice); and many senior officials (including the Campaign's chair who previously worked as Chief of Staff to a President, senior advisor to three Presidents, and a Professor of Law at Georgetown University) through their words and inactions contradicted Mr. Rocketto that "you have to make a decision about what to do about something like this."

       The Court's mid-trial view that the non-disclosure could be remedied short of a mistrial, most respectfully, missed the point.  Apart from the unfairness of forcing a defendant to re-calibrate his defense midway through a four-day trial in March 2023 after the government sat on reports of interview conducted between March 2021 and January 2023 - - and thereby affording the government the strategic advantage of a defense forced to scramble, the reports make reference to multiple memorializations of apparently relevant material which Mr. Mackey could have subpoenaed or staffers' observations about which he could have otherwise investigated, any of which might have led to even more relevant material or testimony.  The reports did not necessarily represent the universe of potentially exculpating material, but a

window into that universe, which included daily reports on platforms including 4chan and

Twitter, compilations of screenshots specifically from 4chan apparently including vote-by-text

memes; daily PowerPoint presentations about online trends apparently including purport voter

misinformation; records and recollections of the Campaign's "Rapid Response Team," which

monitored online misinformation, its "Audience Development Team," and dozens of researchers

that tracked online trends.  *See* Exhibit G.

      In upholding the verdicts in *Mahaffy*, the judge scolded the government:

> Even if the prosecutors are not sufficiently motivated, as they should be, by the
> defendants' interest in a fair trial, one would think the government's selfish interest in the
> integrity and durability of the convictions it obtains would induce it to consider its
> disclosure obligations on an ongoing basis . . . .

*United States v. Mahaffy, et al.*, Docket No. 901 at 12.  *Mahaffy* was tried in this District *twice*

more than a decade ago before the defendants in that case fortuitously discovered suppressed

material.  It is not a mystery to the defense bar why we are still wrangling about issues of this sort

in 2023, literally sixty years to the day (May 13, 1963) that *Brady* was decided.  *See* Gershman,

*Litigating Brady v. Maryland* at 565 ("since there is virtually no accountability, liability, or

punishment for *Brady* violations, prosecutors are encouraged to play the game with impunity . . .

. [T]he odds of not getting caught are stacked so heavily in the prosecutor's favor . . . . ").

      The governments misconduct (potentially) created a win-win situation.  Either the

trial would proceed and the suppressed reports would never be discovered, or, as here, defense

counsel might inadvertently stumble onto them, and the government would secure the strategic

advantage of making the defense scramble mid-trial and thereby lose the effectiveness of its

presentation in opening, its confrontation of witnesses, and an opportunity to use the material for

further investigation and pretrial subpoenas.  With due respect, any indulgence by the Court of the government's blame-the-defense arguments is precisely on what the government is counting and why we are still forced to clarify *Brady* sixty years after the Supreme Court ruled.  *See* Gershman, *Litigating Brady v. Maryland* at 563 ("A prosecutor's attempt to defeat a post-conviction *Brady* claim by arguing lack of prejudice simply duplicates the prosecutor's gamesmanship in concealing evidence from the defendant in the first place."); *id.* at 550 (citing *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006) (prosecutors who "play the odds" that their suppression of important evidence will be viewed in retrospect as immaterial run the risk that judges may "check-mate" them if the evidence comes to light during trial).

We urge the Court to consider the government's untimely disclosure of the reports of its interviews of the Clinton Campaign in the context of its non-disclosures to Judge Garaufis about Mr. Microchip, all in the context of the insufficiency of the government's evidence, discussed herein.  Mr. Mackey fortuitously found the suppressed information here, but most *Brady* violations live on in secret, undiscovered.  *See United States v. Starusko*, 729 F.2d 256, 265 (3d Cir. 1984) ("The 'game' will go on, but justice will suffer.").  This Court should capitalize on the fortuitous discovery of the exculpatory material in this case and act for Mr. Mackey, but far more, for the fair administration of justice in this Circuit.

C.   *The Evidence of Conspiracy was Legally Insufficient*

Before, during, and after the charged period of the conspiracy, Mr. Mackey boasted about his online leadership role, used tweets and memes to advocate openly for former President Trump and critique Secretary Clinton, and openly discussed (often in provocative language) everything from voter demographics and turnout to his suspensions from Twitter.  *See,*

26

*e.g.*, GX 200-0008 (January 9, 2016: "But still, I don't chicken out and hide my views"); GX 420-0014 (April 20, 2016: "[I] really like this idea [Lana Del Rey in a MAGA cap] . . . . we have to outmeme the bernie generation"); GX 421-0007 (April 22, 2016: "btw, I have an Iggy Azalea with a MAGA hat"); GX 430-0007 (May 7, 2016: "Can you remake it with the stats of when they didn't include Trump's name"); GX 430-0017 (May 12, 2016: "please help me to trend a new hashtag #inTrumpsAmerica"); GX 430-0021 (July 23, 2016: (Please contribute to tweet to #KaineAndUnable 2016, maybe we can trend it.").

        Notwithstanding Mr. Mackey's explicit tweeting, he inexplicably turned to telepathy to participate in a conspiracy with strangers on the Internet to violate Section 241. Thus, for example, though the government conceded that Mr. Mackey did not participate in the chats in which Mr. Microchip and others discussed and formulated the memes in question [T 857; *see* GX 200-124 to 200-132 (GX 200-P-0001 to 200-Q-0005); GX 410-5 to 410-22; GX 430-44 to 430-64], it argued [T 835] that he idiosyncratically "selected" different memes from 4chan (where memes of this type had been posted for months, T 825, DX BB) to further the "silent" agreement [T 886] which had been discussed in his absence. The government similarly argued that, when "Nia4_trump" mentioned Ricky Vaughn in a tweet containing a vote-by-text meme [GX 722], they both telepathically understood that it would be forwarded to Mr. Mackey by operation of Twitter [*see* T 686-87], and both telepathically understood that Mr. Mackey would then further the conspiracy by re-tweeting the meme.

        Thus, even if the defendant intended to trick voters despite all the evidence of shitposting and how "obvious" it was to the government that voters cannot cast votes for President via text [*se*e T 484, 905], evidence of Mr. Mackey's participation in a conspiracy to

violate Section 241 did not exist.  *See Tyler*, 758 F.2d at 68-70.  But even if the government's

hypothesizing is worthy of discussion, it qualified at most as an inference equal or nearly equal to

Mr. Mackey's shitposting.  *See Martinez*, 54 F.3d at 1043 (2d Cir. 1995).

      "[T]o be guilty of conspiracy the defendant must at least have had knowledge that

a common endeavor existed."  *Nusraty*, 867 F.2d at 763.  "[T]here must "be some evidence from

which it can reasonably be inferred that the person charged with conspiracy knew of the

existence of the scheme alleged in the indictment and knowingly joined and participated in it."

*United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984) (citing *United States v. Soto*, 716 F.2d

989, 991 (2d Cir. 1983)).  "Suspicious circumstances . . . are not enough to sustain a conviction

for conspiracy."  *Nusraty*, 867 F.2d at 763; *United States v. Young*, 745 F.2d 733, 764 (2d Cir.

1984) (rifle hidden in apartment and suspicious wealth and dealings showed only that the

defendant "was aware of the conspiracy and associated with some of its members, . . . [not] that

she was a knowing participant in it"); *Gaviria*, 740 F.2d at 183-84 (presence of cocaine in car

driven by defendant and her contact with co-conspirators were insufficient evidence of a knowing

agreement with the requisite specific intent).

      The government mixed apples and oranges in relying on Mr. Mackey's advocacy

for former President Trump and association with others, which it acknowledged was legal [*see,

e.g,* 867, 914], to infer criminal conduct.  While it may be permissible to rely on legal acts to

prove illegal ones, there was insufficient evidence that Mr. Mackey knew of the existence of the

scheme and knowingly joined it [*United States v. Gaviria*, 740 F.2d at 183], engaged in sustained

criminal conduct warranting an inference of conspiracy [*United States v. Calbas*, 821 F.2d 887,

892 (2d Cir. 1987)], or associated with others otherwise implicated in unlawful conduct

sufficient to prove knowing involvement.  *See, e.g., United States v. Rios*, 856 F.2d 493, 496 (2d

Cir. 1988); *Young*, 745 F.2d at 764.  Deference to the government's evidence does not attach

where a rational jury could not find guilt beyond a reasonable doubt.  *See United States v.

Yannotti*, 541 F.3d 112, 120 (2d Cir 2008) (articulating standard of review).

D.     *Acquittal or a New Trial Is Required Because the Evidence
       Did Not Show a "Clearly Established" Violation of Section 241*

        The Court should grant a judgment of acquittal, or at minimum a new trial,

because the evidence did not show a violation of Section 241.  On this issue, Mr. Mackey

respectfully incorporates by reference his prior arguments regarding the scope of Section 241 (*see*

Docket No. 43-1, at 13-28; Docket No. 50, at 6-14) and adds the following points.

        The Supreme Court has "limited" the "coverage" of Section 241 "to rights fairly

warned of," meaning those that were "clearly established" at the time of the conduct.  *United

States v. Lanier*, 520 U.S. 259, 267, 270-71 (1997).  This is the same standard that governs

qualified immunity in civil suits.  *Id.*  A judgment of acquittal is required because the evidence

did not show a violation of Section 241 - - let alone a "clearly established" one.

        Over its 150 year history, Section 241 has been applied in the voting context to

prohibit only two categories of conduct: coercive acts (*e.g.*, violence or threats), and ballot-box

fraud (*e.g.*, destroying votes or stuffing boxes).  It has never been applied to political

misinformation - - deceptive speech that is intended to influence or impede voting.  Yet such

misinformation is all the government sought to prove here.  That alone is grounds to conclude

that Mr. Mackey's conduct did not violate "clearly established" law.

        Moreover, expanding Section 241 to cover deceit would run afoul of every major

tool of statutory interpretation.  *First*, the statutory word "injure," particularly in conjunction with the other verbs in the statute, does not naturally mean "deceive."  *See United States v. Acosta*, 470 F.3d 132, 136 (2d Cir. 2006).  Instead, Congress consistently uses other words (*e.g.*, deceive, defraud, trick) when it wishes to capture such conduct.  *See, e.g.*, 17 Stat. 323 (1872) (Mail Fraud:  "That if any person having devised or intending to devise any scheme or artifice to defraud…").  *Second*, the history of the statute, as explained by the Supreme Court in *United States v. Bathgate*, affirms that Congress did not intend § 241 to reach everything "supposed[ly] injurious[] to … [the] freedom, honesty, or integrity of an election."  246 U.S. 220, 226 (1918). *Third*, reading the statute to cover political misinformation or other allegedly deceptive speech would vastly expand the statute's reach, criminalizing an enormous range of activity and routine political conduct - - all in the teeth of numerous canons of construction.  *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 410 (2010) (lenity); *Kelly v. United States*, 140 S. Ct. 1565, 1574 (2020) (federalism); *W. Virginia v. EPA*, 142 Ct. 2587, 2608 (major questions).

        In addition, reading Section 241 to criminalize misinformation would render it obviously overbroad under the First Amendment.  *See United States v. Williams*, 553 U.S. 285, 292 (2008).  The government's case rests upon construing Section 241 to include *anything* that *impedes* voting, including speech that deceives or discourages the exercise of that right.  But this construction would sweep well beyond the facts of this case, and cover any deceptive speech that is intended to cause someone not to vote, or to vote differently:  a senator accusing a presidential candidate of failing to pay taxes, a congressman running for office on a fake resume, or a man at a bar just spinning tales about a politician he dislikes.  Courts have struck down far narrower

30

statutes seeking to criminalize false speech.[3]  This is an *overbreadth* argument, because it is theoretically possible that a carefully drafted law that narrowly targets knowingly false speech about the time, place, and manner of elections could survive constitutional scrutiny.  But that is *not* Section 241 - - not on its face, and not on the government's view.  And the Court cannot save this prosecution by inventing limits found nowhere in statute, or reasoning that *this* fact-pattern could be constitutionally proscribed under some *narrower* law - - indeed, that is the whole point of the overbreadth doctrine.

For all these reasons, Mr. Mackey lacked "fair warning" that Section 241 criminalized his conduct.  *Lanier*, 520 U.S. at 265.  Put together, it was not "reasonably clear at the relevant time" that tweeting deceptive memes would make someone a "criminal" under federal law.  *Id.* at 267.  The Court should therefore order acquittal.  At minimum, the Court should order a new trial because the jury instructions erroneously adopted the government's overbroad reading of Section 241, defining its scope to forbid anything that may "hamper," "frustrate," "slow," or "prevent" (among other things) one's full ability to vote.  Docket No. 114, at 40-41.  Here too, Mr. Mackey incorporates by reference his arguments as to the jury instructions.  *See, e.g.*, Docket No. 96, at 2.

E.     *The Conviction Must Be Vacated Because Venue Was Not Proper in This District*

At the motion-to-dismiss stage, the Court rejected Mr. Mackey's arguments that venue was not proper, reasoning that the allegations in the indictment, accepted as true,

---

[3] *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (Stolen Valor Act); *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 476 (6th Cir. 2016) (law barring knowing dissemination of "false information" about candidates); *281 Care Comm. v. Arneson*, 766 F.3d 774, 785 (8th Cir. 2014) (same); *Comm. v. Lucas*, 34 N.E.3d 1242, 1257 (Mass. 2015) (same); *Rickert v. State Pub. Disclosure Comm'n*, 168 P.3d 826, 829-31 (Wash. 2007) (same).

supported several theories of venue.  Docket No. 54 at 8, 17.  The Court noted, however, that the government still "need[ed] to prove venue" at trial.  *Id.* at 11.  Mr. Mackey now incorporates his prior arguments regarding venue, *see, e.g.*, Docket No. 43-1, at 6-12; Docket No. 50, at 1-6, and adds the following arguments reinforcing that venue was not proved.

To establish that venue was proper, the government was required to prove that (1) "acts constituting the offense - - the crime's 'essential conduct elements' - - took place" in this district and (2) "the criminal acts in question bear 'substantial contacts' with" this district. *United States v. Ramirez*, 420 F.3d 134, 138-39 (2d Cir. 2005).  The government failed to make either showing.

*First*, the evidence did not show that any "essential conduct elements" took place in this district.  It is indisputable that Mr. Mackey and any co-conspirators did not commit essential conduct in this district; they did not, for instance, live in this district or post Mr. Mackey's November 2016 tweets from this district.  *See, e.g.*, Tr. 653:2-9.  Rather than proving such conduct, the government advanced the theory that venue was proper because the relevant posts were tweeted "into" this district, "viewed in" this district, or "passed through" this district en route to "Twitter's servers and beyond."  *See* Docket No. 114 at 29-30.  But that theory cannot justify venue.

As an initial matter, the evidence did not show that the tweets Mr. Mackey posted in November 2016 were sent "into" and "viewed in" this district.  At most, the evidence indicated that two Clinton Campaign staffers viewed text-to-vote graphics comparable to Mr. Mackey's prior to the election, but, especially given the strict standard for jurisdictional issues like venue, the government did not show that they viewed the memes in this district, let alone

32

that they viewed Mr. Mackey's particular tweets.  *See* T 100:24-101:1, 101:7-10, 102:22-24 (Mr. Cotler viewed "text-to-vote graphics," contacted a software vendor about them in October 2016, and "d[idn't] remember exactly" where he viewed them); T 84:13-25 (Ms. Rocketto saw "graphics" and "images" at the end of the "GOTV period").  And even if the staffers *had* viewed Mr. Mackey's tweets in this district, they did not commit any essential conduct because such viewing was not an "overt act" in furtherance of the conspiracy.  *See* Docket No. 114 at 29-30; *United States v. Kirk Tang Yuk*, 885 F.3d 57, 70 (2d Cir. 2018).

Moreover, venue cannot be justified on the sweeping theory that Mr. Mackey's Twitter posts were tweeted "into," "passed through," or were "viewed in" this district.  To ensure compliance with the Sixth Amendment, the Supreme Court has long held that venue provisions "should not be so freely construed as to give the Government the choice of a tribunal favorable to it."  *United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (quoting *Travis v. United States*, 364 U.S. 631, 635 (1961)).  That rule is even more critical today, because the "ever-increasing ubiquity of the Internet" amplifies the "'danger'" that the government will charge "cybercrimes" in any district it chooses.  *United States v. Auernheimer*, 748 F.3d 525, 541 (3d Cir. 2014).  Indeed, here the venue rules were construed "'so freely'" that the government could have prosecuted Mr. Mackey in any district with access to Twitter - - which is to say, every district in the country.  *See Brennan*, 183 F.3d at 147.  When someone posts a non-private tweet on Twitter, the post is viewable by both followers and non-followers alike in every district with access to the Internet [*see* T 176:12-21], and thus the government could readily present evidence that such posts are tweeted "into," "pass[] through," or are "viewed in" every district in the country, *see* Docket No. 114 at 29-30; *e.g.*, T 140:2-5 (tweets "pretty accessible" to anyone "online"), 176:12-

21 (tweets pass through Twitter servers in Atlanta and Sacramento).  The "[un]restrained" theory

employed here thus impermissibly "'g[a]ve the Government the choice of a[ny] tribunal.'"

*Brennan*, 183 F.3d at 147; *see United States v. Ramirez*, 420 F.3d 134, 146 (2d Cir. 2005).

           Authority in related contexts confirms that venue was not proper.  In particular,

the inquiry into specific personal jurisdiction is similar to the analysis of criminal venue, and

courts regularly hold that they may not exercise specific personal jurisdiction over individuals

whose social-media posts or other website publications were "accessible" in the forum but were

uploaded outside the forum.  *Lyons v. Rienzi & Sons, Inc.*, 856 F. Supp. 2d 501, 510 (E.D.N.Y.

2012) (Facebook); *see, e.g.*, *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 413  15 (S.D.N.Y.

2021) (LinkedIn); *Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021) (Twitter); *Saah

v. Levine*, No. 3:20-CV-01682, 2021 WL 3679305, at *6 (D. Conn. Aug. 19, 2021) (collecting

similar cases involving "online social media posts"); *Johnson v. TheHuffingtonPost.com, Inc.*, 21

F.4th 314, 318-19 (5th Cir. 2021) (website).

           The cases the Court cited in declining to dismiss for lack of venue, *see* Docket

No. 54 at 8-21, do not establish that essential conduct occurred in this district nor justify an

unrestricted approach to venue.  None of the cases involved social-media posts or other website

publications accessible nationwide.  Instead, the cases involved *direct point-to-point

communications* like phone calls, text messages, wire transfers, and emails.[4]  Unlike here, those

---

    [4] *See United States v. Rommy*, 506 F.3d 108, 122-23 (2d Cir. 2007) (phone calls); *United
States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (phone calls); *United States v. Kirk Tang Yuk*,
885 F.3d 57, 71, 74 (2d Cir. 2018) (phone calls and text messages); *United States v. Lange*, 834
F.3d 58, 72-74 (2d Cir. 2016) (phone calls and emails); *United States v. Royer*, 549 F.3d 886,
894-96 (2d Cir. 2008) (electronic messages); *United States v. Rowe*, 414 F.3d 271, 273-74, 279-
80 (2d Cir. 2005) (chatroom messages and transmissions between directly "linked" computers);
*United States v. Brown*, 293 F. App'x 826, 829 (2d Cir. 2008) (unpublished) (wire transfer);

cases involved *targeting* of specific districts, and so did not present the danger of licensing the government to select any district it wished.

*Second*, in all events, venue was not proper because the evidence did not satisfy the "substantial contacts" test established in *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1985). The evidence did not show that venue was warranted in this district based on "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding." *United States v. Tzolov*, 642 F.3d 314, 321 (2d Cir. 2011). After all, this district was not the "site" of any acts committed by Mr. Mackey or any co-conspirators, nor the "locus" of the charged conspiracy, *see id.*, which allegedly aimed to distribute memes "everywhere," T 17:9-10, 834:12. The evidence thus did not show "substantial contacts," let alone any "sense" that Mr. Mackey "chose[]" this forum. *United States v. Davis*, 689 F.3d 179, 186 (2d Cir. 2012).

Contrary to the Court's suggestion at the motion-to-dismiss stage, the "substantial contacts" test may not be ignored here on the ground that "'an overt act in furtherance of [the] criminal conspiracy has been committed in the district.'" *See* Docket No. 54 at 16-17, 21 (quoting *Kirk Tang Yuk*, 885 F.3d at 70). Even if that were the law (and it is not), the evidence did not show that Mr. Mackey or any co-conspirator (or non-conspirator) committed an overt act in this district. In sum, because venue was not proper, the conviction must be vacated and the indictment dismissed. *See United States v. Purcell*, 967 F.3d 159, 188, 198 (2d Cir. 2020).

---

*United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001) (wire transfers and faxes); *United States v. Kenner*, No. 13-CR-607, 2019 WL 6498699, at *5, *7-9 (E.D.N.Y. Dec. 3, 2019) (wire transfers and phone calls); *United States v. Ng Chong Hwa*, No. 18-CR-538 (E.D.N.Y. Sept 10, 2021), Docket No. 84-1 at 46-47 (wire transfers and telecommunications).

At minimum, the jury instructions regarding venue were erroneous, and that warrants a new trial. *First*, the instructions embodied the government's overbroad theory by, for example, instructing without qualification that "[v]enue lies in any district where electronic communications are sent or received and any district through which electronic communications are routed." Docket No. 114 at 29; *see also id* at 28-30. That is too sweeping, as explained above; it also failed to explain that such transmissions sent or received by non-conspirators supports venue only if the non-conspirators' actions foreseeably and materially further the conspiracy, *see United States v. Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003); *Lange*, 834 F.3d at 70. *Second*, the jury was never even instructed on the substantial contacts test. *See* Docket No. 114 at 27-30; Docket No. 115. For both reasons, the instructions prejudicially "'misle[d] the jury as to the correct legal standard or d[id] not adequately inform the jury on the law.'" *Kirk Tang Yuk*, 885 F.3d at 70. That too requires vacatur. *See Murray v. UBS Sec., LLC*, 43 F.4th 254, 262-63 (2d Cir. 2022).

## Conclusion

For all of these reasons, this case should be dismissed with prejudice or, alternatively, the conviction vacated.

*/s/ Andrew J. Frisch*
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(917) 826-4668
afrisch@andrewfrisch.com

*Attorneys for Douglass Mackey*