UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------- x

UNITED STATES OF AMERICA

      - v -                                          Criminal Case No. 21-0080 (AMD)

DOUGLASS MACKEY,

        Defendant.

-------------------------------------------------- x

REPLY MEMORANDUM OF LAW IN SUPPORT OF
DOUGLASS MACKEY'S POST-VERDICT MOTIONS

                                                    Andrew J. Frisch
                                                    The Law Office of Andrew J. Frisch, PLLC
                                                      40 Fulton Street, 17th Floor
                                                      New York, New York 10038
                                                      (646) 349-7660
                                                      *afrisch@andrewfrisch.com*

                                                      *Attorney for Douglass Mackey*

Table of Contents

*Introduction* . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.   *The Government Violated Rule 5(f) and Brady Causing Irreparable Prejudice* . 3

B.   *The Government's "Measured Half Truths" to Judge Garaufis* . . . . . . . . 12

C.   *The Evidence Did Not Show a Clearly Established Violation of Section 241* . . 16

D.   *Venue Was Not Proper in this District* . . . . . . . . . . . . . . . 16

*Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Introduction

The government's response to Mr. Mackey's post-verdict motions makes this case less about him and more about the rest of us. Even if institutional deference to the government serves to indulge prosecutorial envelope-pushing of insufficient inferences of conspiratorial agreement, it should never tolerate prosecutorial connivance to compensate for such insufficiency. For judicial deference to the government to be generally viable in this Circuit, judges must fashion meaningful remedies and unequivocally call out prosecutors when they betray judicial trust - - especially, as here, where they contrive to camouflage it and bait constitutional error.

A. *The Government Violated Rule 5(f) and Brady Causing Irreparable Prejudice*

The government's defense of its admitted evidence principally pivots precisely on exculpating material it deliberately suppressed, which "harmonize[d]" [*see United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012)] with each of the two separate components of Mr. Mackey's defense, each addressed to a separate element of the charged crime: (1) he neither conspired to commit a crime with Mr. Microchip, @nia4_trump, nor anyone else, nor was he even aware of any criminal agreement; and (2) his intent in sharing memes was to provoke and distract, not defraud.

Unlike most criminal conspiracies which go undetected until or after conspiratorial goals are realized, the social media used as the vehicle of the charged conspiracy here was monitored daily in realtime by multiple people employed by the Clinton Campaign with the savvy to understand what they were seeing, who were looking for vote-by-text memes, discussed and analyzed what they were seeing with colleagues as a "core" component of their

3

work for the campaign, created records of what they were seeing, and had the greatest possible incentive to take any remedial action deemed necessary.  As established by the reports of suppressed interviews, representatives of the Clinton Campaign observed firsthand or were otherwise aware of prevalent vote-by-text memes posted by multiple "individuals" (including on 4chan where the volume was "insane"), were not orchestrated by any one person or group, and did not appear coordinated.

Even aside from the potential results of pretrial defense investigation of the material in these reports, the exculpating facts contained therein thereby "harmonize[d]" with Mr. Mackey's defense, the bases for which included Mr. Microchip's own pretrial *denial* that dissemination of his vote-by-text memes was coordinated (*see* T 538-545), as well as the government's own evidence that two of the three memes at issue (found by Mr. Mackey on 4chan) were *different* than the ones discussed and formulated in chats (to which Mr. Mackey was not privy) of Mr. Microchip (with whom Mr. Mackey never otherwise interacted).  As to the third, Mr. Mackey received it by automatic operation of Twitter because it mentioned Ricky Vaughn [T 686-87], not by any conspirator's deliberate action, and had been tweeted by @nia4_trump, who *herself* had not been privy to Mr. Microchip's chats in which the memes were discussed and formulated (*see* GX 200-124 to 200-132 (GX 200-P-0001 to 200-Q-0005); GX 410-5 to 410-22; GX 430-44 to 430-64)), *herself* had no communications with *any* purported co-conspirator about *any* criminal agreement, and *herself* had apparently obtained it from the uncoordinated meming observed by the Clinton Campaign.

Rather than show @nia4_trump's participation in any conspiracy, the government's own evidence *disproved* it:  after @nia4_trump *rejoined* Mr. Microchip's

4

chatroom on November 8, 2016, *at 7:18 a.m.*, and reported to him that she had been suspended from Twitter for posting a vote-by-text meme, Mr. Microchip himself told her "I guess don't post those then" - - even though the polls had not yet opened (at 7:18 a.m.) on the very Election Day for which the purported object of the purported conspiracy was purportedly intended, as the very meme accompanying this Microchip-Nia exchange expressly suggested. *See* GX 400-0045 (appended hereto as Exhibit I). This single exhibit [GX 400-0045], even apart from other exculpating and impeaching facts - - introduced at trial and deliberately suppressed - - shows that the government's claim that Mr. Mackey knew of and participated in a conspiratorial agreement was bunk.

While true conspirators sometimes enter tacitly into criminal agreements, the government is required to advance at least *some* credible evidence - - let alone proof beyond a reasonable doubt - - that the charged conspirator knew about and knowingly joined the conspiracy. With apologies for redundant emphasis, **_no such proof exists in this case_**. The government cannot fairly ask the Court to strain to indulge prosecution-pushed inferences of Mr. Mackey's knowledge of and participation in a conspiratorial agreement while requiring Mr. Mackey to all but prove that suppressed interviews of witnesses who observed no coordination while watching in realtime were an irrefutable smoking gun. The Due Process Clause guaranteed that Mr. Mackey could present his defense upon informed pretrial investigation, *even if* the government's evidence was sufficient, and *even if* the government could prove guilt beyond a reasonable doubt at a fair trial. *See United States v. Mahaffy*, 693 F.3d at 134 (finding evidence at trial sufficient, but vacating convictions and remanding the case for a possible retrial because of the government's untimely disclosures); *United States v. Gil*, 297 F.3d, 93 103 (2d Cir. 2002)

5

("Where the evidence against the defendant is ample or overwhelming, the withheld Brady material is less likely to be material than if the evidence of guilt is thin.").

The government shifts blame to Mr. Mackey for not availing himself of the opportunity to call one of the interviewed witnesses during the then still-ongoing trial when the reports were belatedly produced upon demand, but exculpating disclosures of the type at issue here are required *pretrial* in time for effective use [*see Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001)] so that defendants can investigate, interview witnesses for themselves before deciding whether to call them, determine from investigation whether *other* witnesses exist and interview them, and, as here, subpoena records which Mr. Mackey learned mid-trial had been created by the Clinton Campaign about the very social media through which the alleged conspiracy was advanced so he could evaluate their value. *See Mahaffy*, 693 F.3d at 131 (*quoting Gil*, 297 F.3d at 104) ("items may still be material and favorable under Brady if not admissible themselves so long as they 'could lead to admissible evidence.'").

Representations of these prosecutors to this Court and their attendant dissembling leave them no wiggle room to deny that they fully appreciated the exculpatory value of the interviews *before* trial, and certainly no later than February 15, 2023, when Mr. Mackey noticed his defense through Professor Hawley's supporting testimony. Docket No. 60. During trial, the prosecutors told the Court that they disclosed reports when they "heard [defense counsel's] opening statement, *at the same time everyone did*, and he made something like that argument . . . . We turned *them* over *at that point* because it seemed like he was interested in that." T 629 (emphasis added). But the prosecutors had received notice of Mr. Mackey's defense more than a month earlier. The prosecutors could not plausibly (and do not) argue that disclosure of Mr.

Mackey's defense on February 15, 2023, had slipped their minds when they represented to this Court on March 23, 2023 [T 629], that they first learned of it during opening statement. Rather than address or even mention the notice in their brief, these prosecutors ignore it, as if it will thereby magically disappear, and this Court will adopt their revisionist history that they suddenly learned of it "at the same time everyone did" in opening statement.

Even then, these prosecutors did not turn *"them"* over *"at that point"* (upon hearing defense counsel's opening statement) as they represented to this Court [T 629], but initially turned over reports *only* for Employee One and *only* after counsel's reference to her on cross-examination of Mr. Cotler [*see* Mackey Br at 18] created the perceived risk that their deliberate non-disclosure of Employee One's interviews might come to light. Contrary to yet another misrepresentation to this Court [Gov't Br at 5-6], these prosecutors did not disclose the fact of other interviews when producing the reports for Employee One, but only disclosed them later upon defense counsel's demand for "any" and all other reports of interviews of the Clinton Campaign. Exhibit H. The calculated treachery of these prosecutors bespeaks consciousness of guilt of deliberate non-disclosure no less than it would for non-prosecutors making false or misleading statements, even if not to a federal judge. Here, as with non-prosecutors, their attempted cover-up helps prove guilty intent and knowledge.

Whether or not these prosecutors sought out and first met Ms. Rocketto on March 10, 2023, to find a representative of the Clinton Campaign to their liking to counter Mr. Mackey's defense as noticed on February 15, 2023, they should already have produced the interviews noted in Mr. Mackey's Exhibit F (Mr. Mackey's proposed stipulation). Even apart from the Campaign's observations that coordination was belied by the volume and timing of

vote-by-text memes (if not other indicia), these prosecutors knew that Ms. Rocketto's colleagues had already contradicted her passionate testimony that misappropriation of the Campaign's graphics and hashtag was such a "big deal" and so "jarring" that "you have to make a decision about what to do about something like this." T 76, 78, 84-85. *See Stickler v. Greene*, 527 U.S. 263-81-82 (1999) (evidence is favorable if it is either exculpatory or impeaching); *Mahaffy*, 693 F.3d at 127.

It is not that the suppressed reports *"could"* have put the whole case in a sufficiently different light to cause the deadlocked jury to reach a different result after the Court's *Allen* charge. *See Mahaffy*, 693 F.3d at 127 (quoting *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006). To be sure, that standard is amply met by (1) interviewed witnesses themselves; (2) potential witnesses mentioned in the reports and other leads therefrom; (3) records created by the Campaign in realtime of precisely the social media at issue; and/or (4) informed cross-examination of Ms. Rocketto - - at Mr. Mackey's first opportunity, not after supplemental prosecutorial preparation to channel her palpable enthusiasm to the government's liking. Instead, it is that the government sought out and first met Ms. Rocketto on the literal eve of trial and called her to testify *because* they believed that they could sit on the contradicting interviews, which would remain undiscovered; these prosecutors would not otherwise have called her. They should not be permitted to argue that the interviews had no value to the defense after hiding them *because* of their perceived value.

It may not have been obvious mid-trial that these distinctly thorough prosecutors deliberately sat on their reports of interviews of the Clinton Campaign precisely because they recognized their materiality to the defense before trial and then dissembled to avoid inferences of

8

deliberate deceit, but it is obvious now and, most respectfully, should be obvious to the Court. *See Triumph Capital*, 544 F.3d at 161 (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976) ("The assessment of materiality is made in light of the *entire record*.") (emphasis added). Interviews (beginning in 2021) that the Clinton Campaign saw no coordination of vote-by-text memes in realtime and recognized them as disparate shitposts squarely "harmonize[d]" with Mr. Mackey's defense (noticed on February 15, 2023) and was consistent with inferences from *the government's own evidence* (discussed above) that Mr. Mackey, like @nia4_trump, was *not* coordinating with Mr. Microchip or anyone else.

The law in this Circuit is *not* whether part or all of undisclosed material may be theoretically "consistent with the government's factual narrative" [Gov't Br at 10], but whether the material "harmonizes" with the defense. *See Mahaffy*, 693 F.3d at 130 (*citing United States v. Triumph Capital*, 549 F.3d at 164). The Second Circuit has rejected precisely the type of prosecutorial "excuses" advanced here [*see, e.g,* 693 F.3d at 130] that short-circuit defense investigation and fair fact-finding. The proper time for prosecutors to parse and attempt to neutralize exculpating inferences [*see* Gov't Br at 11-13] is during trial after timely disclosure, not after prosecutors secure ill-gotten gain. Prosecutors may not be permitted to hide exculpatory material and cross their fingers that it will go undiscovered, believing that the odds of defending an ill-gotten verdict are far better than winning in the first place after a truly fair trial. *See* Gershman, *Litigating Brady v. Maryland* at 563 ("A prosecutor's attempt to defeat a post-conviction *Brady* claim by arguing lack of prejudice simply duplicates the prosecutor's gamesmanship in concealing evidence from the defendant in the first place)." *See also Triumph Capital*, 544 F.3d at 163 (even if "[i]t is by no means certain that" arguments based on

wrongfully withheld evidence "would have swayed the jury . . . [the question is whether] it is a real enough possibility to undermine confidence in the verdict.").

Availing himself of the Court's suggestion [*see* T 635-37], Mr. Mackey at trial proposed a stipulation as a remedy for the prosecutors' non-disclosure, but they rejected it (and refused to call any further witnesses if requested, Docket No. 108), not unlike physicians withholding the ointment after causing the injury.  The limited stipulation to which they agreed was at most a makeshift tourniquet barely covering any of the wound.  It did not address Employee One's report that she specifically searched the Internet for vote-by-text memes; observed a volume of memes on at least one media (4chan, where Mr. Mackey found two of the three memes) that was "insane;" people regularly met to "shit-post;" concluded from firsthand observation that the memes were not orchestrated by one person or group, but multiple layers of "individuals;" and the Campaign did not see the memes as part of a conspiracy.  Nor did the government's limited stipulation address, among other things, information from the Campaign's Senior Social Media Strategist that she was mocked for taking the memes seriously; the Deputy Digital Director who knew that the hashtag had been commandeered; and reports that the Campaign did not deem the memes sufficient to alert authorities or Twitter and were "no big deal."  Even then, the reports did not necessarily constitute the universe of favorable material, but themselves established that there were other witnesses to be interviewed, leads to be explored, and records to be subpoenaed - - all to be developed by a constitutionally-informed defense.

The Court would not be alone in resisting inferences of deliberate connivance by these prosecutors.  While contesting the government's theories of liability and venue from the beginning, even the defense resisted its worst suspicions until prosecutorial deceit was

10

undeniable.  The "entire record" leaves the prosecutors little wiggle room to deny the type of "measured half truths" which caused Judge Nathan to call out the government in *United States v. Nejad*, 521 F. Supp. 3d 438, 450 (S.D.N.Y. 2021), a case neither cited nor addressed by these thorough prosecutors in their brief, as if (like the notice of Mr. Mackey's defense, Docket No. 60) they can magically make Judge Nathan's wisdom disappear by ignoring it.  By the time these prosecutors reached out to and first met Ms. Rocketto on March 10, 2023, the literal eve of trial, they had (1) amassed evidence in which Mr. Mackey touted his reputation as a "shitposter" and described 2016 as the "shitposting election" (Mackey Ex A; GX 200-E at 14; GX 200-D at 13; GX 200-36); (2) simultaneously interviewed other witnesses from the Clinton Campaign that vote-by-text memes appeared to be uncoordinated shitposts; and (3) received notice of Mr. Mackey's defense through notice of Professor Hawley's testimony.  After defense counsel mentioned Employee One's name on cross-examination of Mr. Cotler because it appeared in an a report of his interview [*see* Mackey Br at 18], they tried to cover their tracks by disclosing only Employee One's reports and have since been tripping over themselves trying to explain it all away.  If prosecutors are presumptively deserving of judicial deference, such presumption in this case now stands rebutted; we should never enlist the fox to inventory the henhouse.

       Though the Court noted mid-trial that some issues can sometimes arise favoring a mid-trial ruling [T 607-08], Mr. Mackey had not then marshaled all of his arguments as he so specifically alerted the Court [T 607], and so the Court permitted Mr. Mackey to revisit the issue [*see* Docket No. 108), as he does here, *and as the law requires*.  *See Triumph Capital*, 544 F.3d at 161 ("The assessment of materiality is made in light of the *entire record*.") (emphasis added).  While not necessarily a perfect analog, the law does not require victims to realize all ingredients

11

and consequences of fraud at the moment of first suspicion, but re-starts the statute of limitations in part so that all deceptions can be unraveled, and supporting arguments can be marshaled. *See* N.Y. CPLR 213(8). The Court now has the "entire record" [*Triumph Capital*, 514 F.3d at 161], including corroborating context from other treachery of these prosecutors, discussed next.

B.      *The Government's "Measured Half Truths" to Judge Garaufis*

More alarming than the response of these prosecutors to their half-truths to Judge Garaufis in securing Mr. Microchip's testimony is their shameless and studied defense of the indefensible [Gov't Br at 19-26], evincing an apparent confidence that they can dance their way around deliberate deception with impunity. This Court should disabuse them - - and any of their colleagues within this District and Circuit who may be listening - - of such misplaced confidence with more than a judicial furrowed brow.

Despite uber-fastidious command of the voluminous reports, records, tweets, and chats throughout this case, the prosecutors claim - - **buried in the third paragraph of a footnote on page 26 of their Brief** - - that they surely meant to disclose Mr. Microchip's pre-motion tweeting in February 2023 that they directed him to stop (which they do not deny), but there was (whoops) a "typographical error" in *an account code* disclosed **on March 10, 2023**, the literal eve of trial [Gov't Br at 26 n. 12] (the same March 10, 2023, when they first met and decided on Ms. Rocketto in lieu of her previously-interviewed colleagues). This singular and distinctly uncharacteristic (and curiously-timed) whoops aside, how do these prosecutors explain their oddly-phrased objection to DX R ("I don't see the relevance *just from reading the tweet*") as if seeing it for the first time, after not fronting Mr. Microchip's recent tweets from February 2023 on direct examination to soften their sting? How do these prosecutors explain their direction to

12

Mr. Microchip to stop tweeting two days before filing their motion to Judge Garaufis and their delay of their disclosure of their interviews of Mr. Microchip until *after* Judge Garaufis ruled in their favor? The explanation from these prosecutors? A stew of silence and a shrug.

When Judge Garaufis ruled on the government's motion for Mr. Microchip, his Honor had every reason to expect complete truth, not "measured half truths," just as this Court presumably has that expectation on these motions. It is bad enough that these prosecutors purportedly buried (and misidentified **on the eve of trial**) **an account code** for the perpetually tweeting Mr. Microchip, who himself attested to "thousands" of tweets *weekly* in just the fall of 2016 *alone*. T 485. *See, e.g., United States v. Thomas*, 981 F. Supp. 2d 229, 239 (S.D.N.Y. 2013) ("the Government cannot hide Brady material as an exculpatory needle in a haystack of discovery materials"); *United States v. Hsia*, 24 F. Supp. 2d 14, 29-30 (D.D.C. 1998) ('the government cannot meet its Brady obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack").[1]

It is a breach of trust of a greater and truly unfathomable magnitude for these prosecutors to direct Mr. Microchip to stop tweeting two days before submitting a motion on his behalf to Judge Garaufis, while simultaneously delaying disclosure of reports of Mr. Microchip's interviews until after Judge Garaufis ruled. Serendipity is the reason that the Court (and Mr. Mackey) now know about these tweets from February 2023, not prosecutorial candor nor

---

[1] It is likewise constitutionally unacceptable for these prosecutors to justify suppression of the reports of interview of the Clinton Campaign because the names of two who provided exculpatory information appeared in reports of interview (one of which was produced during jury selection) with no indication of the exculpating information discussed herein.

constitutional compliance, as demonstrated in the chronology in Exhibit J hereto, proffered for the Court's convenience.

These prosecutors deserve gold medals for chutzpah by claiming that the tweets and Mr. Microchip's interviews were immaterial to Judge Garaufis [*see* Docket No. 82] after burying the tweets and delaying disclosure of the interviews - - all precisely *because* their materiality undermined the government's professed predicate for the motion. The government's representations to Judge Garaufis might fairly qualify as Judge Nathan's "measured half truths," but only thematically, not when considered mathematically. The suppressed information was not ancillary to the motion, as these prosecutors blithely assert, but contradicted the proffered bases for it. Judge Garaufis was entitled to know that Mr. Microchip desperately sought anonymity *not* (or principally) because of fear of theoretical assailants who might seek him out for hypothetical reprisal (of which the government proffered no credible evidence). Instead, Mr. Microchip feared that potential clients of his self-employment might shun him and compromise his livelihood and capacity to repay tax and bankruptcy debts because he was a drug addict, as he described himself in his government-terminated tweets (and as it appeared from his affect at trial and presumably during his twenty pretrial meetings with the government); and *volunteered* to work for the government because it provided him valuable "structure," presumably to counterbalance the affects of his addiction and/or, as he put it, his "crazy."

Likewise, Judge Garaufis had no reason to doubt the government's representation that Mr. Microchip had communications with Mr. Mackey "discussing the creation and dissemination of deceptive images concerning the time, place and manner by which voters could cast a vote in the 2016 presidential election" [Docket No. 66 at 2], which, to be fair, was not a

14

half-truth. It was *a non-truth*. The government claims that Mr. Microchip would have testified even if not permitted to do so anonymously [Gov't Br at 27] - - which itself colors the picture presented to Judge Garaufis. But the lengths to which these prosecutors went to provide a federal judge with a cherry-picked sliver of the truth belie that claim, which is based on the say-so of these prosecutors and Mr. Microchip, who have not proven to be reliable guardians of truth.

It is bad enough that the advanced predicate for the motion was contrived to conceal Mr. Microchip's true reason for anonymity. *See* Docket 82 at 3 ("[T]he very starting point in exposing falsehood and bringing out the truth through cross-examination must necessarily be to ask the witness who he is and where he lives.") (Judge Garaufis quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)). It is even more insidious that the government deceived Judge Garaufis for the same reason it dissembled to this Court about the interviews of the Clinton Campaign. The indictment in this case required proof of Mr. Mackey's knowledge of and participation in a criminal agreement. Because inferences of Mr. Mackey's participation in a criminal conspiracy are non-existent (or untenably fanciful), these prosecutors schemed so that Mr. Microchip could testify to a "silent agreement" with Mr. Mackey, who (like @nia4_trump) was not present for chats about vote-by-text memes, and with whom Mr. Mackey never otherwise directly interacted. And they buried their interviews of the Clinton Campaign, replacing them with the enthusiastic Ms. Rocketto, and thereafter dissembled when Mr. Mackey stumbled onto the truth.

The pivotal issue in these post-verdict motions is not the credibility of Mr. Microchip [*see* Gov't Br at 23 ("[t]he defendant argues that the government should have provided the Court with impeachment material related to Microchip"), but the credibility of *these*

15

*prosecutors* in pressing half truths (and non-truths) to Judge Garaufis, to this Court in explaining their cherry-picked disclosures from the Clinton Campaign, and to the jury in pressing fanciful inferences of conspiratorial agreement. Due process and fundamental fairness are not satisfied by half truths, non-truths, silence, and shrugs.

C.  *The Evidence Did Not Show a Clearly Established Violation of Section 241*

As Mr. Mackey explained in his motion, it is hardly "clearly established," *United States v. Lanier*, 520 U.S. 259, 270 (1997), that Section 241 forbids political misinformation. To the contrary, the text, structure, history, precedent, and applicable canons of construction all point against giving the statute such sweeping breadth. The government does not engage with that argument, instead stating only that Judge Garaufis's opinion at the motion to dismiss stage was "correctly decided" and should not be "disturb[ed]." Gov't Br at 34. But a pretrial ruling on the papers does not control this post-trial motion, and the government does not claim otherwise. Further, since Mr. Mackey filed his motion, the Supreme Court has reiterated that statutory verbs like those in Section 241 should be given a narrow, contextual construction when necessary to avoid First Amendment overbreadth. *See United States v. Hansen*, 2023 WL 4138994 (U.S. June 23, 2023). That approach, applied here, means that Mr. Mackey's conduct did not violate Section 241, and he is accordingly entitled to acquittal or a new trial.

D.  *Venue Was Not Proper in this District*

Likewise as to venue, the government refuses to engage on the merits, instead urging the Court to adhere to the "interpretation of the law" that Judge Garaufis adopted pre-trial. Gov't Br at 34-35. But Judge Garaufis noted that the propriety of venue would ultimately turn on the evidence adduced at trial. Docket No. 54 at 11, 18-20. And the government's

recitation of that evidence (Gov't Br at 35) only confirms that it is advancing an unprecedented and unbounded theory of criminal venue under which any crime committed over the internet could be prosecuted virtually anywhere in the country at the discretion of prosecutors. That theory is untenable, and the Court should reject it. *See United States v. Brennan*, 183 F.3d 139, 147 (2d Cir. 1999) (venue rules "should not be so freely construed as to give the Government the choice of a tribunal favorable to it"). For this reason too, Mr. Mackey is entitled to post-trial relief of dismissal or a new trial.

## Conclusion

Mr. Mackey's true challenge on this motion is not showing the insufficiency of the government's evidence of Mr. Mackey's knowledge of and participation in a criminal agreement, nor the fact of the government's unfathomable deceit to secure a conviction despite the insufficiency. Mr. Mackey's challenge is breaking through traditional reflexive deference to the government which cultivates conditions from which federal prosecutors too often believe that judges have their backs. On this particular issue, the Court should give voice to the wisdom of the Public Integrity Section of the Department of Justice, the mastermind of Mr. Mackey's prosecution,[2] in *United States v. Arturo C. Cuellar, Jr.*, 7:19-cr-00522 (S.D. Tex.). This past January, upon the sentencing of County Commissioner Cuellar for taking bribes in Weslaco, Texas, the Public Integrity Section said, "This case has an enormous potential for a deterrent effect . . . 'Remember what happened in Weslaco' . . . That's what people will say after today."

---

[2] *See, e.g., https://www.reuters.com/business/media-telecom/us-steps-up-pursuit-far-right-activists-2016-voter-suppression-probe-2021-05-26/*

*See "Former Hidalgo County commissioner sentenced to 20 years in Weslaco water treatment plant bribery case,"* Progress Times, Mission, Texas, Jan. 18, 2023.[3]

   Mr. Mackey's case likewise "has an enormous potential for a deterrent effect" on unconstitutional prosecutorial gamesmanship, which this Court forgoes to the peril of us all. "[T]he 'game' will go on, but justice will suffer." *See United States v. Starusko*, 729 F.2d 256, 265 (3d Cir. 1984).

   Dismissal on insufficiency of the evidence of conspiracy (with or without assessing sufficiency of the evidence and admissibility of statements under Rule 801(d)(2)(E) after striking Mr. Microchip's testimony) would remedy irreparable prejudice to Mr. Mackey, while permitting this case to be a teaching moment for these prosecutors. But if the Court does not see the providence of dismissal for insufficient evidence or otherwise on the record as it stands, it should create a proper record for the Circuit, by requiring all three prosecutors to submit "declarations under penalty of perjury" and convening a fact-finding hearing where they can be cross-examined either by Mr. Mackey's counsel or another experienced attorney appointed by the Court.[4] Allowing the verdict to stand on this record without subjecting these prosecutors to proper scrutiny would serve to license prosecutorial perfidy, even if accompanied by a judicial finger wag - - a tolerable prosecutorial cost of securing a conviction. The type of

---

 [3] *See https://www.progresstimes.net/2023/01/18/former-hidalgo-county-commissioner-sentenced-to-20-years-in-weslaco-water-treatment-plant-bribery-case/*

 [4] This District's F. Turner Buford joined the government's team late [*see* Docket No. 51] replacing an AUSA who left his Office and did not conduct the examinations of Mr. Microchip, Ms. Rocketto, or Mr. Cotler (all three conducted by the Public Integrity Section's William J. Gullotta, *see* T 75, 96, 479).

misconduct in this case must be called out and stopped, and the resulting verdict based on insufficient evidence should be vacated and the case dismissed.

Dated: July 12, 2023

                                                Respectfully submitted,

                                                */s/ Andrew J. Frisch*
                                                The Law Offices of Andrew J. Frisch, PLLC
                                                40 Fulton Street
                                                New York, New York 10038
                                                *Attorney for Douglass Mackey*