

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

271 Cadman Plaza East
Brooklyn, New York 11201

RCH:EDP/WJG/FTB
F. #2018R02250

October 3, 2023

<u>By ECF and E-mail</u>

The Honorable Ann M. Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    <u>United States v. Douglass Mackey</u>
              <u>Criminal Docket No. 21-080 (AMD)</u>

Dear Judge Donnelly:

      The government respectfully submits this letter in advance of the sentencing hearing for the defendant Douglass Mackey in the above-referenced case, which is currently scheduled for October 10, 2023. On March 31, 2023, following a three-week trial, a jury found the defendant guilty of the sole count in the indictment, which charged him with conspiring with others to interfere with the rights of United States citizens to vote in the 2016 presidential election, in violation of 18 U.S.C. § 241. For the reasons set forth in greater detail below, the government respectfully requests that the Court impose a sentence within the modified Guidelines range of 6-12 months, which the government submits would be sufficient, but not greater than necessary, to serve the ends of justice.

    I.    <u>The Offense Conduct</u>

      As described in the Presentence Investigation Report dated September 8, 2023 ("PSR"), and proven at trial, the defendant had established himself in the months leading up to the 2016 presidential election as a highly influential user of the social media application Twitter. (PSR ¶ 4). The defendant used Twitter to disseminate political messaging to his many followers and, given the scope of his influence, to affect the political discourse occurring in other media. (<u>Id.</u>). The defendant's political stature had been documented in a study conducted by researchers at the Massachusetts Institute of Technology ("MIT"), which found that the defendant had an ability to influence the 2016 election through Twitter on par with well-known public figures and major new organizations. (<u>Id.</u>; GX 1001). The defendant was aware of this study's findings concerning his ability to influence the 2016 presidential election. (PSR ¶ 4).

In addition to his public Twitter account, the defendant also belonged to a number of private, invitation-only direct-message ("DM") groups on Twitter. (PSR ¶¶ 9, 13-14). In these DM groups, the defendant and others discussed and agreed on the coordinated dissemination through their public Twitter accounts of misinformation intended variously to provoke, mislead, and, in some cases, deceive voters in the 2016 presidential election. (Id. at ¶¶ 13-14). Among the strategies discussed and agreed upon was a plan to distribute a series of images designed to look like official pronouncements of the Hillary Clinton campaign advising supporters that they could cast a valid vote in the 2016 presidential election by including a particular hashtag on a social media post or sending an SMS text message to a text code identified in the fraudulent images. (Id. at ¶¶ 10-15).

Acting on this shared plan, on or about November 1, 2016, the defendant distributed via his Twitter account two images that purported to be official announcements from the Hillary Clinton campaign. (PSR ¶¶ 6-7). The first image urged Clinton supporters to "avoid the line" and "vote from home" by sending a text message to an identified text code. (GX 720; PSR ¶ 6). The second image featured similar instructions but was written in Spanish. (GX 721; PSR ¶ 7). Both images contained graphics that mimicked the Clinton campaign's official logo and other images frequently used by the Clinton campaign. (PSR ¶¶ 6-7). Both images were also distributed by the defendant with hashtags used by the Clinton campaign and its supporters, meaning that the images the defendant sent out would be visible to anyone searching Twitter for those hashtags. (Id.).

In addition to these two images, the defendant also re-tweeted a third, similar image that had previously been sent by a co-conspirator. (GX 722). The defendant sent these images with the intent that they would trick Clinton supporters into casting their votes in a legally invalid manner (i.e., by text message), thereby reducing the number of votes for Clinton in the 2016 presidential election to the advantage of the defendant's preferred candidate, Donald Trump. (PSR ¶ 15). The defendant's co-conspirators, including members of the DM groups discussed above, disseminated similar images around the same time. (PSR ¶¶ 10-11).

The Clinton campaign, having observed the spread of this type of misinformation over social media prior to the defendant's tweets, had alerted the company that owned the text code depicted in the fraudulent images to the attempted fraud on voters. (PSR ¶ 8). As a result, the company put in place an automatic response that would be sent to anyone attempting to cast a vote by text, advising the texter that the code was not in fact associated with the Clinton campaign. (Id.).

II.     The Guidelines Calculation

The PSR concludes that the appropriate Guideline for the defendant's offense is section 2H2.1, and the government agrees.[1] That Guideline applies to the offenses involving "obstructing an election." It provides for a base offense level of 12, if the obstruction occurred by "fraud" or "deceit," which is the case here. See § 2H2.1(a)(2). As the PSR correctly notes, the defendant is not eligible for a reduction of the offense level for acceptance of responsibility. The PSR concludes that the defendant falls within Criminal History Category I, and both parties agree. An offense level of 12 therefore yields an advisory range of imprisonment under the Guidelines of 10-16 months.

In his objections to the PSR, the defendant argues that the offense level should be reduced based on the defendant's having played a minor role in the offense pursuant to section 3B1.2 of the Guidelines. To qualify for a reduction, the facts must show that the defendant was "substantially less culpable than the average participant in the criminal activity." See Application Note 3(A). Here, the object of the conspiracy was to disseminate misinformation in such a way as to make it go "viral" and spread as far as possible. The defendant's outsized influence on Twitter, as documented in the MIT study described above, made him a uniquely valuable member of the conspiracy because of his established ability to spread misinformation to the widest possible audience, even if the defendant did not personally create the misinformation. Under these circumstances, the government submits that the reduction should not apply.

The government anticipates that the defendant will soon qualify for an additional two-level reduction to his offense level as a result of the proposed "Zero Point Offender" amendment to the Guidelines, which will go into effect in November 2023. The government has no objection to the Court factoring that anticipated Guidelines reduction into its sentence, on the understanding that the defendant agrees that he will not later seek a resentencing based on the retroactive application of that amendment. Accordingly, although the government agrees that the correct Guidelines range at the date of sentencing will be 10-16 months, the government has no objection to the Court sentencing the defendant as if the Guidelines range were 6-12 months, which corresponds to total offense level 10 ("hereinafter, the "modified Guidelines range").

---

[1]     Section 241 punishes conspiracies and does not establish an underlying substantive offense. Section 2X1.1 of the Guidelines provides that the appropriate Guideline for the object of the conspiracy should govern the calculation of the offense level, and here section 2H2.1 should apply to the object of this conspiracy: to interfere with the exercise of the right to vote in an election. Because the defendant and his co-conspirators completed "all the acts the conspirators believed necessary on their part for the successful completion" of the conspiracy, the defendant should not be eligible for a reduction of three points pursuant to section 2X1.1(b)(2).

III.     The Appropriate Sentence

   A.     Legal Standard

The standards governing sentencing are well-established.  In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision.  Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007).

Although the Guidelines are no longer mandatory, they continue to play a critical role in trying to achieve the "basic aim" that Congress sought to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." Booker, 543 U.S. at 252; see also United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. Molina-Martinez v. United States, 136 S. Ct. 1338, 1345-46 (2016) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in 18 U.S.C. § 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).  Section 3553(a) further directs the Court, "in determining the particular sentence to impose," to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Guidelines; (5) the Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).

In light of Booker, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.  See Crosby, 397 F.3d at 103.  First, the Court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." Id. at 112.  Second, the Court must consider whether a departure from that Guidelines range is appropriate.  See Crosby, 397 F.3d at 112.  Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. Id. at 113.

4

B. Discussion

   a. The Right to Vote is of Paramount Importance, and the
      Defendant Sought to Undermine that Right

The defendant stands convicted of conspiring to corrupt the 2016 presidential election with false information concerning how voters could and should cast their ballots. The defendant and his co-conspirators tried to lure voters into placing their ballots into a fake virtual ballot box, knowing that such votes would not count. His conduct was tactical – he wanted to trick only those who would vote for Hillary Clinton because the defendant wanted her to lose the election. In so doing, the defendant sought to undermine the sacred right that secures all other rights—the right to vote. Wesberry v. Sanders, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.")

For well over a century, the courts in this country have steadfastly protected the right to vote against infringements of all kinds, including non-violent acts that interfered with an individual's right to vote. "We regard it as … unquestionable that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box." United States v. Saylor, 322 U.S. 385, 387 (1944), citing United States v. Mosley, 238 U.S. 383, 386 (1915). "[T]he elector's right intended to be protected is not only that to cast his ballot, but that to have it honestly counted." Id. at 388. "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." United States v. Classic, 313 U.S. 299, 315 (1941). "Free and honest elections are the very foundation of our republican form of government. Hence any attempt to defile the sanctity of the ballot cannot be viewed with equanimity." Id. at 329 (Douglas, J., dissenting).

These sentiments were echoed by Judge Garaufis when he was originally assigned to this matter: "[T]he right to vote is sacred. Many thousands of people have died to protect our constitutional right to vote in a democratic republic. I don't think there's anything more important that is done by the government than securing and protecting and promoting the right to vote." (Tr. at 27, Oct. 26, 2022 (Hearing on Defendant's Motion to Dismiss) (Garaufis, J.); see also id. at 26 ("[A] constitutional right is more sacred than money in the view of many people, including this Court.")).

Although the defendant does not deny the importance of voting, (Tr. at 27 (Oct. 26, 2022) (Mr. Frisch: "the right to vote is sacred …."))), he has attempted to minimize his acts by conflating them with political speech protected by the First Amendment. This is misplaced. The scheme hatched by the defendant and his co-conspirators had no relevant constitutional value of the kind typically protected by the First Amendment—it was just fraud. United States v. Douglass Mackey, 2023 WL 363595, *19 (E.D.N.Y. Jan. 23, 2023) (Garaufis, J.) ("This case is about conspiracy and injury, not speech."). The disinformation distributed by the defendant did not present a political critique, or make an argument, or present a position that, while perhaps unsavory, could have contributed to the marketplace of ideas. The defendant's disinformation did none of these things—it only sought to trick the overly credulous out of exercising their

constitutional right to vote. The government submits that the Court should recognize the acts of the defendant and his conspirators for what they were: valueless fraud, aimed at the heart of the constitutional right that ensures all other rights.

b.  The Defendant's Actions Were Deliberate and Calculated

As the government laid out at trial, the defendant's acts of deception were not aberrational: instead, they manifested the defendant's routinely expressed opinions about who should and should not be able to vote. Throughout the 2016 election season, the defendant's online commentary consisted not only of statements concerning political issues, but also statements claiming that certain groups of American citizens should not be permitted to cast ballots. Among other things:

- The defendant stated that he believed his primary political opponents were women and minorities, with an emphasis on black voters. GX 200-0098 ("The only thing standing in Trump's path is . . . black voters").

- The defendant stated that black people were unintelligent, easily fooled, and/or gullible. GX 200-112 ("Most gullible people ever"); GX 1005-24 ("meanwhile blacks have an average IQ of 85"); GX 1005-25 ("lol blacks literally believe everything they see on CNN"); GX 1005-27 ("Decent people are fed up with black people because they are lying and they will believe anything"); GX 1005-28 ("It is now officially impossible to argue that Blacks will not, on the whole, believe anything they are told."). He further noted his belief that black people believe everything they read on Twitter and, because of this, should not be allowed to vote. GX 1005-23 ("Black people will believe anything they read ok twitter, and we let them vote why?").

- The defendant stated that the Republican party should write-off the black vote and focus on depressing turnout. GX 1005-10 ("Trump should write off the black vote and just focus on depressing their turnout, and go all in on winning Whites/Hisp./Azn/Indians"); GX 200-110 ("Idea: Create #woke #BlackTwitter #nevervote memes, seed them in black social media spaces.").

- The defendant stated that that naturalized immigrants and their children could not be trusted to vote in the interests of the United States. GX 1005-33 ("Trump won natural-born citizens 50% to 45%. Naturalized citizens should not get the vote"); GX 1005-34 ("immigrants, the children of immigrants, et cetera cannot be trusted to vote in the interests of their new country").

- The defendant stated that universal suffrage was a "terrible thing," women should not vote, the 19th Amendment of the Constitution should be repealed, and it that was "impossible to have a functioning democracy when single women and single mothers vote. #Repeal19." GX 1005-21; GX 1005-19 ("Women are children with the right to vote"); GX 1003-A (podcast recording in which the defendant stated that women should not vote and that universal suffrage was a "terrible thing" and "you can't have it . . . because you can't let the people vote who aren't contributing.").

6

Although much of this evidence was presented at trial, some of it was not, as the Court held that a significant portion of the government's evidence was cumulative of the government's other evidence. This is itself illuminating and worth re-emphasizing: the evidence showing that the defendant believed that certain groups of American citizens should not be permitted to vote was sufficiently voluminous that the Court needed to exclude much of it as repetitive. In short, these were not aberrational thoughts or flip opinions—the defendant genuinely believed at the time he participated in the conspiracy that black people, women, immigrants and various other political opponents should be prevented from voting.

This context makes clear why the defendant chose to spread memes that targeted women, black people and foreign-language speakers. The defendant has made much of the fact that the two memes he chose to spread were not specifically shared in the groups to which he belonged, but that should not be surprising. The defendant was a member of the War Room, the group that his co-conspirator Microchip characterized as the central planning group. Microchip stated that when the group aimed to make something go viral, he (Microchip) would look for other iterations of on-message materials, including on websites like 4Chan, and spread them at the same time. The goal was to inundate the internet with similar iterations of the same messages (not necessarily the same, specific images discussed in the group), making those messages trend and go viral to everyone.[2] Given that context, it should not be surprising that, when the defendant chose to act at the same time as all the others, he chose images that furthered not just the group's goal of deceiving Clinton voters, but also targeted the specific people he himself repeatedly stated should not be voting.

c. The Defendant Has Minimized His Conduct

The defendant has continually attempted to minimize his actions toward this goal—probably best encapsulated in description of his actions as "two clicks." As an initial matter, this framing of his actions is inaccurate—the defendant did far more than click his mouse twice.[3] In addition, however, this framing also gravely understates what he and his co-conspirators had set in motion and the role that the defendant chose to play in the scheme.

---

[2] It is worth nothing that the members of the Twitter message groups did the exact same thing with the "DraftOurDaughters" meme that was spread just days earlier. Each of the Twitter DM groups discussed the meme and shared some variations of the message. What then followed, of course, was that each of the members—including the defendant—shared a wide variety of similar iterations of the same meme. Again, a significant portion of this evidence was excluded at trial as cumulative, but here the cumulative nature of it makes an important point. When the members of the group sought to push a particular message, they Tweeted publicly far more versions of the message than the specific ones they discussed within the DM group.

[3] As the "Vote from Home" messages were propagated more widely by his co-conspirators, the defendant did not just passively retweet the work of others (although he did that too). He appears to have gone onto 4Chan, selected an image he liked best, added it to a Tweet, and then typed out by hand two hashtags meant to attract voters for then-candidate Hillary Clinton. He then waited a number of hours and then did the whole process again. While such actions were not labor intensive, they certainly involved concerted effort and not just a pair

7

As the evidence at trial indicated, the defendant was rarely the creator of the various memes that he and his fellow group members discussed—he was the distributor. The defendant and his associates spoke frequently about the defendant's unusual ability to spread information and about his loyal army of followers. Like Microchip, the government's cooperating witness, the defendant's true power was his ability to spread messages—to convert his clicks into tens of thousands more. As the government noted at trial, there was no point to doing what the defendant and his co-conspirators were doing unless they hoped and expected that the messages would spread exponentially.

The defendant spread the disinformation when everyone else in the groups did, but it was the defendant's notoriety that appears to have contributed most significantly to making the fraudulent campaign go viral. It was no surprise that when these materials broke into the mainstream—provoking a response from Twitter and the mainstream media—it was because of the defendant. This was not an accident, or the unforeseeable consequence of two errant clicks. Rather, this was the behavior of someone who knew exactly what he was doing and knew exactly what would happen when he did it.

    d. <u>The Importance of General Deterrence</u>

There are many factors that go into a Court's assessment of an appropriate sentence, in this and in all other cases. The government submits that, for this particular crime, general deterrence is the most significant factor. The government submits that the crimes of the defendant and his co-conspirators were not aberrational acts of an unusual election season, but rather the leading edge of a growing problem. See National Coalition on Black Civil Participation v. Wohl, et al, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) (describing "robocall" scheme by defendants aimed at deterring citizens from voting). The sentence imposed by the Court will inevitably send a message to future Ricky Vaughns who may seek electoral advantage by defrauding people out of their right to vote. Cases such as these will likely remain difficult to prosecute, in no small part because of the potent anonymity that the Internet provides. The government submits that a message must be sent when such schemes are successfully uncovered, particularly when they are executed by individuals who had the power and reach of the defendant. The sentence requested by the defendant—namely, probation—would send the wrong message to all others contemplating similar schemes.

    e. <u>The Personal Characteristics of the Defendant Do Not Justify Leniency</u>

The defendant's sentencing submission focuses heavily on the defendant's current mental state, essentially arguing that the defendant is a changed man and that the Court need not impose a significant sentence to specifically deter him from such conduct in the future. As noted above, the government believes that the focus of this sentence should be on general, rather than

---

of haphazard clicks. Such a characterization is also broadly inconsistent with manner in which defendant generally conducted himself: other evidence presented at trial indicated that the defendant, a graduate of Middlebury College, was highly intelligent, measured and deliberate.

specific, deterrence.  It is worth observing, however, that to the extent the defendant has been brought to his current state, it was not by a self-realization that he should not be trying to defraud voters, but rather the personal anguish that came as a result of his very public doxing.

As noted in the defendant's submissions, the defendant retreated from public life after his doxing, and went into therapy.  Public reporting and the defendant's own submissions suggest this was an exceeding difficult time for him, as friends, family and co-workers came to learn about his alter-ego.  The defendant suggests that his doxing caused a reckoning, one that made him a very different person.  This may be true, although the government's confidence has been undercut by the defendant's efforts to hide his current activities from these sentencing proceedings, as well as his deeply problematic actions vis a vis certain media figures during trial.  Even if it is true, however, it is worth recognizing that this reckoning was motived not because he came to regret what he had done, but rather that he suffered the personal pain from having to answer publicly for his own acts and words.  The defendant has often cast his anonymity as a means for protecting his political speech, but the evidence suggests it was also used to evade any consequences for his venomous and abusive behavior.  As the Court assesses the defendant's alleged redemption story in light of the 3553(a) factors, the government submits that that Court consider that this redemption only came when he was forced to deal—against his will—with the consequences of his own actions.

IV.     Conclusion

As the Supreme Court has stated, the rights we hold as citizens "are illusory if the right to vote is undermined."  Wesberry, 376 U.S. at 17.  The government submits that this Court must send a clear message that efforts to defraud others of that foundational right will be met with significant consequences.  Toward that end, the government submits that an incarceratory sentence within the modified Guidelines range will be sufficient, but not more than necessary, to

meet the ends of justice. Accordingly, the government respectfully requests that the Court impose a sentence within the modified Guidelines range of 6 to 12 months.

Respectfully submitted,

BREON PEACE
United States Attorney

COREY R. AMUNDSON
Chief, Criminal Division
Public Integrity Section

By:   /s/
Erik D. Paulsen
F. Turner Buford
Assistant U.S. Attorneys
(718) 254-7000

William J. Gullotta
Trial Attorney
(202) 514-0047

cc:     Andrew J. Frisch, Esq. (by ECF and E-mail)
        U.S. Probation Officer Erica Vest (by E-mail)