```
1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------x
                                          21-CR-080(AMD)
3    UNITED STATES OF AMERICA,
                                          United States Courthouse
4              Plaintiff,                 Brooklyn, New York

5              -against-                  September 11, 2023
                                          11:00 a.m.
6    DOUGLASS MACKEY,

7              Defendant.
     --------------------------------x
8
             TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
9              BEFORE THE HONORABLE ANN M. DONNELLY
                 UNITED STATES DISTRICT JUDGE
10
     APPEARANCES
11   For the Government:        UNITED STATES ATTORNEY'S OFFICE
                                Eastern District of New York
12                              271 Cadman Plaza East
                                Brooklyn, New York 11201
13                              BY:  F. TURNER BUFORD, AUSA
                                     ERIC D. PAULSEN, AUSA
14                                   -and-
                                U.S.DEPARTMENT OF JUSTICE
15                              1440 New York Avenue NW
                                Washington, D.C. 20005
16                              BY:  WILLIAM J. GULLOTTA, ESQ.

17
     For the Defendant:        ANDREW J. FRISCH, ESQ.
18                             40 Fulton Street
                               New York, New York 10038
19

20   Court Reporter:           Georgette K. Betts, RPR, FCRR, CCR
                                Phone:  (718)804-2777
21                              Fax:    (718)804-2795
                                Email:  Georgetteb25@gmail.com
22

23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25
```

PROCEEDINGS

1                (In open court.)

2                THE COURTROOM DEPUTY:  All rise.

3                THE COURT:  Everybody can have a seat.

4                THE COURTROOM DEPUTY:  This is criminal cause for

5    oral argument.  Docket number 21-CR-80.  U.S.A. versus

6    Douglass Mackey.

7                Counsel, state your appearance, government first.

8                MR. BUFORD:  Good morning, your Honor.  It's Turner

9    Buford, Bill Gullotta and Eric Paulsen for the United States.

10               THE COURT:  Good morning.

11               MR. PAULSEN:  Good morning, your Honor.

12               MR. GULLOTTA:  Good morning, your Honor.

13               MR. FRISCH:  For Mr. Mackey who is present and

14   Andrew Frisch, good morning.

15               THE COURT:  Good morning.  Good morning, Mr. Mackey.

16               THE DEFENDANT:  Good morning.

17               THE COURT:  I'm just going to apologize in advance,

18   I had laryngitis and I don't think it will affect us today,

19   but it might.

20               Just a couple of housekeeping matters, there is one

21   exhibit that we don't have and I think it's large, it's GX1005

22   and if you can send us that through Box.com, I think it's kind

23   of large.  I could pretend that I know how to send that, but I

24   don't our law clerk does.

25               MR. BUFORD:  We can handle that.

PROCEEDINGS

1          THE COURT:  Okay.  And at some point -- well, we can

2     do this a little bit later, I want to get a handle on, I know

3     I put an order on about what needs to be sealed, I have a

4     couple of questions about the extent to those things need to

5     be sealed as well as a few other matters, but we can do that

6     at the end.

7          I don't see this as a particularly formal process, I

8     have a couple of questions for both sides based on the

9     submissions, and I guess we'll begin with the Brady question.

10    I think the real question -- I have a couple of questions

11    about precisely what the subject is but I think what I have to

12    decide is whether material that was disclosed, I think it was

13    on the second day of testimony; is that right?

14          MR. BUFORD:  Some of the material was the morning of

15    the second day and then the balance was over the lunch break,

16    your Honor.

17          THE COURT:  Okay.  And the question is whether that

18    was suppressed and then if it was suppressed whether there was

19    a reasonable opportunity to use the evidence either at the

20    trial or to use it to get additional evidence.  And so one

21    thing, it's unclear to me, I know, Mr. Frisch, that you

22    attached I think there are 17 302s.  Is it your position that

23    all of those constitute *Brady* material?

24          MR. FRISCH:  No, I attached all of them to be

25    complete.

PROCEEDINGS

1          THE COURT:  Okay.

2          MR. FRISCH:  But the ones that contain *Brady*

3   material are those the --

4          THE COURT:  I'm just going to stop you for one

5   minute.  Are we referring to these campaign workers by their

6   last names or -- I thought there was some question about that.

7   Sorry to cut you off, Mr. Frisch, I just want to...

8          MR. BUFORD:  Your Honor, we had asked that their

9   names be put under seal.  They had previously been discussed

10  to some extent on the record by name.

11         THE COURT:  Okay.

12         MR. BUFORD:  I think if we maybe did first name,

13  last initial for purposes of today's discussion.

14         THE COURT:  Let's just -- sorry about that,

15  Mr. Frisch.  Let's just do it that way, the first name and

16  last initial.

17         MR. FRISCH:  Would you permit me -- so just to

18  finish the thought, if I could.  So I attached all of them

19  just to be complete.  It's not my position that they are all

20  are problematic.  The ones that are problematic are the ones

21  cited in the draft stipulation that was submitted to the Court

22  either -- I can't remember if the whole thing was under seal

23  or I redacted the names, I don't remember.

24         So was there another question beyond that?

25         THE COURT:  Well, can you answer that one?  I don't

PROCEEDINGS

1    have your draft stipulation in front of me, so what I'm

2    assuming is that there is Amy K. is one of them.

3              MR. FRISCH:  That's true.

4              THE COURT:  Then a worker with the last name

5    beginning with a B, I think it's Timothy.

6              MR. BUFORD:  Timothy.

7              THE COURT:  Timothy B.

8              MR. BUFORD:  Your Honor, I'm sorry to interrupt, in

9    footnote five of our brief we list out I think the names of

10   employees that are identified in the draft stipulation.

11             THE COURT:  Okay.  I think there are four of them;

12   is that right?

13             MR. BUFORD:  We have one -- I think there's a total

14   of seven.

15             THE COURT:  Okay.  Well, I'll just look at the draft

16   stipulation then.

17             So just to kind of lay the factual ground work, the

18   government produced these 302s, I think I gave you a

19   continuance to review them and suggested multiple ways to

20   remedy, even assuming it was *Brady*.  So one of the solutions

21   was to recall the two campaign workers so you could continue

22   your cross-examination of them.

23             A second remedy would be for you to call these

24   campaign workers.

25             A third remedy was to have the government call them,

PROCEEDINGS

1    and the fourth remedy was to enter into stipulation.  And you

2    did enter a stipulation about Amy K.

3             So I still don't understand why -- as I recall your

4    request was that I permit you to open again and then instruct

5    the jury that the government had delayed or suppressed certain

6    information.  It seems to me in your submissions you take the

7    position that that wouldn't have been sufficient either; is

8    that right?

9             MR. FRISCH:  Yes.

10            THE COURT:  Okay.  So let's begin then, putting

11   aside the question of whether this is actually *Brady*, why

12   weren't those methods enough?

13            MR. FRISCH:  Well, if you'll permit me, you know,

14   I've had obviously a number of months to think about this

15   issue and sharpen perhaps the way I would express it -- and

16   I'm not trying to -- I want to get to your question, I know

17   you don't like it when I go off on tangents, I promise you if

18   I can just this point --

19            THE COURT:  You can make the point, but I'm just

20   telling you and I am not being sarcastic, I am a simple

21   person, and I like to get the answer to the question.

22            MR. FRISCH:  I understand.  But I think that --

23            THE COURT:  You want to answer it a different way,

24   go ahead.

25            MR. FRISCH:  And I'm kind of a simple person

PROCEEDINGS

1  myself --

2          THE COURT:  No, you aren't --

3          MR. FRISCH:  Well --

4          THE COURT:  I'm kidding.  Go ahead.

5          MR. FRISCH:  -- I think so.  But I think there is

6  something that I need -- and I know you know this, but I think

7  that if I can set this as kind of the foundational

8  introduction, everything else will flow from it.  I'm not

9  going to waste your time.  I'm not here to say things that are

10  extraneous.

11          THE COURT:  I've got plenty of time.

12          MR. FRISCH:  During the course of trial when I made

13  a motion for a mistrial, your Honor said, well, I don't think

14  this is *Brady* material, I don't see how it's *Brady* material.

15  And put aside the timing of that and put aside whether

16  materiality needs to be assessed at the end when everything is

17  in, just put that to the side for a second, there is a general

18  reason both why these seven 302s in the aggregate are *Brady*

19  material and why there is no real remedy available, certainly

20  the ones your Honor suggested were not sufficient, in my view.

21  I did my best, I capitalized on your Honor's suggestion that

22  we do a draft stipulation, it was rejected and I had -- I

23  wrote a letter where I suggested some other things to which

24  your Honor just made reference and that wasn't good.  The

25  other remedies wouldn't do the trick.

8

PROCEEDINGS

1      THE COURT:  What if I had done that, what if I had

2 let you open again, would you still be making this motion?

3      MR. FRISCH:  If I had opened -- well, I think it

4 depends.  Here's -- so I'm going to put aside my foundational

5 stuff and here's the problem, first of all, I believe the

6 government knew -- certainly if they didn't know in March 2021

7 when they interviewed the first of these witnesses or the

8 woman referred to as Amy K., sometime between March 2021 and

9 before the start of trial, I believe they knew or should have

10 realized that this was *Brady* material, I'll come to why.

11 Here's the problem --

12      THE COURT:  Did you know about her -- I recall you

13 cross examining I think it was Mr. Cotler about her, asking

14 questions about her.

15      MR. FRISCH:  That's right, because her name appeared

16 in a 302 for Mr. Cotler as someone -- and it was one sentence

17 in his 302 and it was that one of the things she did was look

18 at social media.  I mean, I think that 302 may be part of the

19 record and if not we can make it part of the record, and to be

20 honest I didn't give that question much thought.  I think I

21 decided the day before or that morning I should ask him about

22 that.  I had no understanding of who she was or what her role

23 was.

24      Here's the problem, putting aside my introduction,

25 which will be helpful --

PROCEEDINGS

1          THE COURT:  I think I understand -- I mean, you can

2   give your introduction.  I haven't read --

3          MR. FRISCH:  Let me --

4          THE COURT:  Okay.

5          MR. FRISCH:  I want to answer your question.

6          THE COURT:  All right.

7          MR. FRISCH:  I know I'm -- I'm trying to be simple.

8          THE COURT:  You're trying to be what?

9          MR. FRISCH:  Simple.

10          THE COURT:  Okay.

11          MR. FRISCH:  The defense has a right to view these

12   people for itself.  I don't have to take their 302s as gospel

13   and say I think I want to call Amy K.  And I can imagine the

14   situation where there is one piece of evidence or one witness,

15   I think in Triumph Capital, a Second Circuit case, it was a

16   agent's handwritten notes about a 302.  I mean, I can see a

17   smaller universe where there might be something prophylactic,

18   if that's the right word to use in this context, that you can

19   do during the course of the trial, but here's the problem

20   here.  Let's put aside the import of this stuff, let's just

21   talk about the mechanics.

22          You have a number of witnesses, I now know it's

23   seven but I had 17 reports to read through and think through,

24   now months later after trial I can tell you for sure it's

25   seven, the defense in any case like this has a right to reach

PROCEEDINGS

1     out and conduct its own examination of any of these people

2     and --

3                THE COURT:  I just want to stop you there.  Correct

4     me if I'm wrong about timing, but my recollection was that you

5     rejected those remedies that I suggested fairly quickly --

6                MR. FRISCH:  Yes.

7                THE COURT:  -- without interviewing those witnesses.

8                MR. FRISCH:  Well, perhaps -- so here's -- let me

9     answer that.  There's seven of them --

10               THE COURT:  Yes.

11               MR. FRISCH:  -- and not only do I have a right to

12    interview them and interview what leads I might develop from

13    them, I have a right to subpoena and try and find the various

14    compilations or PowerPoint or Slack channels that were

15    referred to in these reports.  I have a right -- you know, one

16    of the people referred to, who I assure you I would have to

17    tried to reach out to, is a public figure who's identified in

18    those 302s.  He himself was not interviewed, but he was

19    referred to as having a particular position on these memes.

20    So I hear you.

21               One of the things in theory that somebody could do

22    is adjourn the trial and conduct an investigation, interview

23    all these people, see what they say, interview other people to

24    whom they may make reference or to which these 302s made

25    reference, see which of these documents are still available,

PROCEEDINGS

1    review them, and perhaps the law is that that's what a defense

2    lawyer in that position is required to do, but I don't think

3    that's right.

4            We're talking about a four-day trial where the

5    jurors are told it's not going to be more than two weeks.

6    We're told about this the second day of trial and it came to

7    me inadvertently.  I mentioned Amy K. in cross as an

8    afterthought because I didn't understand how important she and

9    everything she had to say was.  And so I disagree, and I don't

10   think it's the law, that under all of these circumstances in a

11   short trial -- I'll get to the government what I think was

12   deliberate suppression in a moment which is a factor here -- I

13   don't think it's appropriate having already opened, having

14   already spent so much time -- I promise you as an officer of

15   the court we prepared for this trial as fastidiously as we

16   possibly could -- and then find two days in the trial it's

17   all, I don't want to say something that's too hyperbolic and

18   then get caught on it, but really upset the apple cart when

19   this should have been turned over certainly beginning March

20   2021 and I'll explain why, I don't think that's the law.  I

21   think it imposes an unfairness on the defense in this case and

22   generally for that to be the law.  It's restarting -- it's not

23   the equivalent of starting from scratch, but that's an awful

24   lot of work to have to start two days into a trial and adjourn

25   the trial to do this when I've already opened and it should

PROCEEDINGS

1    have been turned over before.  I just don't think that's the

2    law.  And I don't think I should be required or a defendant in

3    any case under these circumstances should be required to do

4    that.

5            THE COURT:  So do you -- I know you cite *Mahaffy*,

6    but *Mahaffy* is really quite different.  *Mahaffy* was after two

7    trials and the material was quite obviously exculpatory.  It

8    was -- and somebody on the prosecution's own team had told

9    them either between the trials or at some point that they

10   should turn this over.  So *Mahaffy* is factually different

11   in -- I just don't see many analogies, but is there a case

12   like this where it's, I'll call it mid trial, I don't know if

13   it counts as mid trial if it was the second day, but it was

14   after the trial started, is there a case that supports your

15   view that a judge under these circumstances is obligated to

16   declare a mistrial, and I haven't even gotten to whether this

17   exculpatory or not or impeachment material, but when you're

18   presented by an array of options, is there a case that says

19   that's not enough?

20           MR. FRISCH:  There is no case that I have found

21   where material of this sort, under these circumstances was

22   withheld.  The law is clear and it's been reinforced time and

23   time again of late.  When the government has material which it

24   knows or should know is favorable to the defense or harmonizes

25   with the defense, you turn it over at the earliest opportunity

PROCEEDINGS

1   so the defense can make use of it.  Making use of it at the

2   earliest opportunity -- and we'll talk about why this is

3   important, I want to address that, why the substance is

4   important, is not satisfied after all the time that we spent

5   preparing this case, going through all the memes, all the

6   chats, this was an incredible undertaking to prepare for this

7   trial.  And then to be given this stuff, which we found

8   inadvertently and I believe was deliberately suppressed and

9   have to start from scratch in a short trial, I don't believe

10  that's the law.  The law is clear and it's reinforced time and

11  time again by the Courts and in DOJ training.

12          If it's favorable --

13          THE COURT:  But that's sort of broad things about

14  *Brady* in general.  I'm just asking specifically under these

15  circumstances I think Courts are instructed that the mistrial

16  is the last and it's the most drastic remedy.  I just want to

17  make sure I understand what your argument is on the question

18  of whether this is exculpatory.

19          As I understand it, the first argument is that the

20  302s reflect that campaign workers who were tasked with

21  monitoring social media viewed the memes as pervasive, and so

22  in your view that undercuts the conspiracy claim; is that

23  correct?

24          MR. FRISCH:  I don't disagree with that but I think

25  there's a broader way of saying it, if you'll permit me --

PROCEEDINGS

1    THE COURT:  Let me just give you the second reason

2  and then you can tell me where I'm wrong about it, okay?

3    Then the second reason is, as I understand from your

4  submissions, is that the 302s support your defense that the

5  underlying conduct was merely intended to distract or to rile

6  up the Clinton campaign so that they had to divert resources

7  that it might have otherwise used for getting out the vote

8  efforts, and that's I think the theory behind that is that

9  certain senior campaign officials did not take the memes

10  seriously enough to take action about them.

11    Do I have that right?

12    MR. FRISCH:  As far as you've spoken it, but the

13  context is greater.  And I think what *Brady* stands for is

14  different than -- is different and more robust than how you've

15  expressed it, if I might.  If I can just have a shot --

16    THE COURT:  I was just trying to say what your

17  arguments were.

18    MR. FRISCH:  I understand.

19    THE COURT:  Okay.

20    MR. FRISCH:  I understand.  I just want to sort of

21  make this point and maybe I can say it better than I have

22  previously, maybe not, but let me try.

23    One of things the government says in its papers in

24  opposition is, all of this stuff is consistent with their

25  theory, but that's not the standard.  If that were the

PROCEEDINGS

1  standard, you could never have *Brady* material in a case where

2  there is a valid conviction.  In theory wherever there is a

3  valid conviction, the government can find a way to make the

4  *Brady* material consistent with its theory.  And if that were

5  the standard, we really wouldn't need *Brady*, because once

6  they've made a decision to charge they can find a way to

7  theorize, in most cases, why it's consistent.

8            Here's what the standard is and how it applies here.

9  Let me just start with a more concrete example than our facts,

10 which we're so immersed in.  Two examples.  If you have a

11 witness who identifies the defendant at a lineup, but she

12 equivocates for two hours before she does it, she may be right

13 that that's the defendant, but the defense is entitled to know

14 that she equivocated for two hours, or if you have a lineup

15 and one person did not identify the defendant, for whatever

16 reason, but two or three or four people did, you get that

17 evidence.  It doesn't mean that it's inconsistent with the

18 government's theory it means you can't -- I always get this

19 backward, you can't put the cart before the ox.  You have to

20 allow the fact finding process to emerge by arming the

21 defendant with the favorable evidence or what harmonizes with

22 the defense.

23            Now, you don't need a videotape of someone else

24 pulling the trigger and killing the victim.  You need

25 favorable evidence and here's why we turn to the evidence, the

PROCEEDINGS

1  particular evidence here.  And a couple of points.  And

2  there's more than just little pieces here, this is in the

3  aggregate.  This to me -- and I know you think I'm just being

4  an advocate, but I really believe this.  To me, it's mind

5  boggling that you can't look at Ms. Rocketto's testimony and

6  see it as diametrically opposed to the 302s they did not turn

7  over.  Remember, they reached out to Rocketto and first

8  interviewed her, as far as we know, on the Friday before jury

9  selection when they had begun interviewing Clinton people in

10  March of 2021, two years before.  So if it were only Rocketto,

11  maybe these prophylactic things might work, but it's not.  She

12  said this was a big deal, those are her words.  People said in

13  the 302s using those words, it's not a big deal.  She said

14  it's so jarring you have to make a decision about what to do

15  about this.  Multiple witnesses in the 302s say that's not so.

16           THE COURT:  I don't really think that's an accurate

17  description of the 302s though.  The 302s reflect that some

18  people in the campaign didn't take it as seriously, but they

19  event -- they reported it and I mean you gave the example of a

20  lineup.  To me, I think maybe the more appropriate example is

21  if you have a bank and an employee tells the higher ups that

22  the locks on the door don't work very well and the employer

23  says, oh, they're fine, and then somebody robs the bank, I

24  don't think that's exculpatory.

25           MR. FRISCH:  I refer you to the seventh of the seven

PROCEEDINGS

1    302s referred to in my draft stipulation.  The initials of the

2    speaker are A.W.  And she said, when these text by memes --

3    I'm paraphrasing, when these texts by memes were referred to

4    senior and executive staff, the general approach was

5    lackluster as though, quote, this was no big deal, question

6    mark.

7              THE COURT:  Why is that exculpatory?  Why is their

8    opinion of this exculpatory?

9              MR. FRISCH:  First of all, it's contrary to what

10   Ms. Rocketto said, number one.  Number two --

11             THE COURT:  Well, she thought it was a big deal --

12             MR. FRISCH:  That's right.

13             THE COURT:  -- and some people didn't, but why is

14   that exculpatory?

15             MR. FRISCH:  So why don't I get the people who don't

16   think it's a big deal?  Why shouldn't I get all of the other

17   stuff which shows that people who took this seriously were

18   mocked?  Why am I stuck with the government's witnesses or the

19   witnesses perceived by the government as favorable to them who

20   saw this as a problem, why should I be --

21             THE COURT:  Why is that -- I still don't understand

22   why someone's opinion about what was going on is relevant to

23   your client's intent.

24             MR. FRISCH:  Why is --

25             THE COURT:  I mean, lots of people in any kind of

PROCEEDINGS

1    criminal context could think that conduct was or wasn't

2    criminal but that's not for -- that's not really an

3    appropriate question for the jury, I don't think --

4            MR. FRISCH:  Well, the government asked --

5            THE COURT:  -- any more than having a parade of

6    people come in here and say, you know, this is terrible.

7            MR. FRISCH:  The government asked Ms. Rocketto those

8    questions on their direct examination --

9            THE COURT:  And you didn't object --

10           MR. FRISCH:  -- and elicited --

11           THE COURT:  -- and I stopped her.  And so -- I mean,

12   I don't think in the context of the case whatever Ms. Rocketto

13   thinks is relevant, but then the next question is you didn't

14   even interview these people.  And I gave you -- we took some

15   time off in the trial, you didn't even have them into

16   interviews, so I don't know how we jump from, putting aside

17   whether this exculpatory at all, how we jump from 302s that

18   are turned over on the second day of trial, how we jump from

19   there to the only remedy is a mistrial.

20           MR. FRISCH:  So let me -- there are two or three

21   questions baked into that, let me take them one at a time.

22           Number one, if your Honor sustains the conviction

23   and this case goes to the circuit, perhaps the circuit will

24   say under these circumstances it's incumbent on the defense

25   attorney to stop to request the Court and the Court to grant

PROCEEDINGS

1   the request to stop the trial and conduct this kind of

2   interview mid trial.  I just don't think --

3              THE COURT:  I basically gave you that.  I said --

4              MR. FRISCH:  And I don't think --

5              THE COURT:  -- the government can call them, you can

6   call them and I think there was maybe 10 minutes before you

7   said that you didn't want to do it.  So --

8              MR. FRISCH:  Because -- first of all, the government

9   said they would not call anyone else if I requested them, but

10  I think -- and if this were only Ms. Rocketto --

11             THE COURT:  Right.

12             MR. FRISCH:  -- perhaps there is an argument that I

13  could recall her, but this is bigger than that.  These 302s --

14  look, we may just disagree about this, we may not reach a

15  meeting of the minds, that can happen, but I don't believe a

16  defense attorney should be in the position mid trial of a

17  four-day trial when the government's had these things -- had

18  some of them for two years, some of them more recently and

19  they go to Ms. Rocketto at the last minute -- should have to

20  commence an investigation and redo everything on the

21  assumption that they can get it done in an hour or two.  We're

22  talking at the time seventeen 302s, I now believe that it's

23  only seven.  We're talking different types of documents that I

24  have to go find and look at which are not just documents, they

25  are memorializations or compilations or some sort of paper

PROCEEDINGS

1    based on people looking in realtime about the crime.  This

2    should have been given over long before the second day of

3    trial because I inadvertently stumbled on it.

4              Let me make two other points --

5              THE COURT:  Can I just ask you one other question,

6    you keep saying it was a four-day trial.  I think -- I don't

7    know that I ever put that cap on it.  I think that the jurors

8    were told it was going to be two weeks.  I don't think anybody

9    ever said this trial has to end after -- I don't think it

10   did --

11             MR. FRISCH:  No, no.  Fair enough.

12             THE COURT:  -- wasn't it like nine days or

13   something?

14             MR. FRISCH:  But it's a short trial and it is, in my

15   view, and I think it's the law that under these circumstances

16   where something like this happens -- and I want to answer the

17   other parts of your Honor's initial question -- you have to

18   start investigating all this anew just because a jury was

19   chosen.  I don't think that's -- I don't think the law

20   requires a defense lawyer under these circumstances, given all

21   the work that we did, given the fact that we already opened,

22   just given the prejudice of the delay while the jury is

23   sitting there.

24             We spent -- I don't think it's in dispute, I think

25   it was evident from the way we presented ourselves in trial,

PROCEEDINGS

1   Mr. Mackey and I spent so much time going through all of their

2   Tweets and all of the memes and all of the chats which were in

3   the hundreds and hundreds and hundreds.  What was admitted at

4   trial was a fraction of everything that's out there, and

5   midway through the trial, whether it's two weeks or four days,

6   that's not what this turns on, you have to upset the apple

7   cart and go back to the drawing board and do it under the time

8   pressure that -- while a jury is waiting.  Maybe that's the

9   law and maybe if your Honor sustains this for all the other

10  reasons that we're seeking to dismiss the case and this case

11  goes to the circuit, the circuit will say that's what a

12  defense lawyer has to do, but I don't think it is.

13           THE COURT:  Can I just ask one other question about

14  that.  I mean, jurors have to wait all the time in trials

15  where there are delays and I'm pretty sure that I instructed

16  them that this happens with regularity.  I don't think -- I

17  just want to make sure that we're on the same page factually

18  about what happened.  There was never any sense that the jury

19  was sitting back there drumming their fingers.  I think I gave

20  them instructions that sometimes this happens.

21           So I understand your positions, speaking as a

22  reformed trial lawyer myself, I'm well aware of the pressures

23  that lawyers face when they are on trial, but this is what I'm

24  trying to get at is -- and I think some of these arguments you

25  have formed since that time, I'm not sure -- I mean, I told

PROCEEDINGS

1    you could, that you could make new arguments about it.  I

2    recall at the time the trial, for example, you didn't think

3    this was intentional, now you do, and I don't really think

4    there's much point in going into that.  I don't really -- I

5    guess they can say it was not intentional --

6              MR. FRISCH:  Let me --

7              THE COURT:  -- and you can say it was.

8              Go ahead, if you want.  Go ahead.

9              MR. FRISCH:  Again my --

10             THE COURT:  I'm confusing you.

11             MR. FRISCH:  There is a queue of airplanes in my

12    head waiting to take off, so let me deal with the first one

13    and then I'll get to that.

14             Why is this important?  Why are the opinions -- as

15    you call opinions, why are these 302s, why should they have

16    been put turned over, putting aside what I believe is

17    deliberate misconduct.

18             First of all, the crime is being, essentially, the

19    crime or the conduct constituting the crime whether, it's by

20    Mr. Mackey, is being surveilled on a daily basis by people

21    with the savvy, the expertise and the motivation to understand

22    what it is, analyze what it is and evaluate its effect.  And

23    that wasn't turned over to the defense, that's number one.

24             Number two, there is kind of a hodgepodge of

25    different verbs and adjectives and descriptions of this in the

PROCEEDINGS

1    Clinton 302s, that's kind of the point.  Because the election

2    of 2016 was different in this regard because of social media,

3    forgive me, because shit posting was kind of a new concept at

4    the time and why is it fair for the government to withhold the

5    fact that Clinton people are trying to get their arms around

6    what this is and what it means and whether it's a conspiracy

7    or not and whether there's intent or not.  That's exactly

8    where Mr. Mackey was.  This is happening for the first time,

9    and so to withhold from the defense this confusion or this

10   varying of opinions or this uncertainty about what it all

11   means, to withhold that from Mr. Mackey and then hold him to a

12   standard that he knows what this means, that he understands

13   the certainty of it, strikes me as another reason why it

14   should have been turned over.

15          THE COURT:  And then you did have a stipulation.

16   Your position is that wasn't sufficient; is that right?

17          MR. FRISCH:  That is correct.  And I'll come to that

18   in a second, if I could.

19          THE COURT:  Okay.

20          I mean, you can't make people stipulate so...

21          MR. FRISCH:  No, and that's right.  Look, I offered

22   a stipulation because your Honor said maybe the parties can

23   work out a stipulation, so I drafted a stipulation, they

24   rejected it.  When we agreed to a certain language, and this

25   is page 819 of the record, I said, look I'll take -- I think

PROCEEDINGS

1   I'm paraphrasing myself but I said, I'm going to take

2   advantage of the two sentences to which they'll agree, but it

3   doesn't address all the problems.  I said that.

4          THE COURT:  Well, there is clearly some things in

5   those 302s that were not helpful to you that you didn't want

6   in the stipulation.

7          MR. FRISCH:  And that's what *Brady* doesn't require.

8          THE COURT:  Right, but I'm just saying --

9          MR. FRISCH:  I agree with you, I agree.  I did the

10  best I could to put up a stipulation and they said we're not

11  going to stipulate.  This is why this should have been given

12  over in advance so we're not haggling about the language of

13  the stipulation.  Everyone's armed with the same facts and we

14  have it out in front of the jury.

15         The government spends a lot of its papers explaining

16  the consistency of their view with these 302s.  The time to do

17  that is to arm the what -- after the defense is armed with

18  this stuff, make your arguments in front of the jury.  Maybe

19  you'll have a sufficient case.  But to put the defense at this

20  disadvantage, all the time we spent preparing, knowing -- and

21  I want to come to this, I want to spend time on this --

22  knowing that they should have turned it over and that calling

23  Rocketto was with the hope that we'd never discover the rest,

24  is not the way to do it.  And it's --

25         THE COURT:  Why would they turn it over at all?

PROCEEDINGS

1          MR. FRISCH:  Because --

2          THE COURT:  Maybe my imagination isn't good enough,

3     but if you attribute the worse motives to them, why turn it

4     over at all?

5          MR. FRISCH:  Because when I mentioned her name on

6     cross, when I mentioned Amy's name on cross they turned it

7     over, they turned over just her 302s and made no mention of

8     any others.  And I put that in a sworn declaration to the

9     Court.  I seriously --

10          THE COURT:  No, I know it.  They conceded --

11          MR. FRISCH:  Let me finish.  Let me finish.

12          THE COURT:  They conceded.  Well, no --

13          MR. FRISCH:  They turned it over because --

14          THE COURT:  But get to the point here.  They turned

15     it over, then you requested additional materials which they

16     gave you.

17          MR. FRISCH:  We'll come to that.  The reason they

18     turned it over -- I did their job for 11 years.  I was in the

19     public integrity section, among others.  They turned it over

20     because they knew -- and I'll back this up, they knew that if

21     I reached out to her and -- or an investigator reached out to

22     her and found out she had been interviewed the first time in

23     March 2021, to paraphrase Ricky Ricardo, they'd have "some

24     splaining to do."  So they turned it over, and just those two,

25     to sort of forestall that and then at that lunch break I

PROCEEDINGS

1    requested any others that they had, and that's when we got the

2    rest of them.

3           I want to talk about -- and I want to make this

4    point and -- because I did say during trial, I think during a

5    sidebar about the Tweets, Microchip's Tweets, I did say these

6    guys have been good to work against.  I'm not manufacturing

7    indignation about this and I want to talk about that, about

8    why I believe this is one of the dispositive factors here and

9    why it is intentional.

10          There can't be -- we can't -- and I want to say this

11   respectfully and I've tried to be as careful about this as I

12   can, notwithstanding how it may appear, we can't have what I

13   call inference by seating chart.

14          THE COURT:  What does that mean?

15          MR. FRISCH:  I'll explain.  We can't draw inferences

16   from dissembling or a coverup or false statements or

17   misleading statements or misrepresentation by omission based

18   on where your chair is in the courtroom.

19          THE COURT:  Who does that?  No one does that.  Are

20   you saying that I do that?

21          MR. FRISCH:  No, I'm not saying you do that, I'm

22   saying that if the inference -- if we draw inferences against

23   defendants generally, I don't mean this case and I don't mean

24   your Honor, if we draw inferences against defendants, and we

25   do it all the time, when they lie -- I don't mean Mr. Mackey,

PROCEEDINGS

1   I mean generically, if you lie, if you're a defendant and you

2   lie or you cover up or you make a false statement, the fact

3   finder is entitled to draw inferences against you.  But if you

4   sit on that side of the room and you're making false

5   statements about the production of these 302s and there's

6   multiple of them -- and we'll get to Microchip later if we

7   have time, you have to understand why they're doing that.  Why

8   did they say, well, we heard Mr. Frisch's opening and so we

9   decided to let him -- give him these two and let him know

10  about the others.  There's multiple false statements baked

11  into that statement.  And the rules of inferences of

12  misconduct don't just exist in this courthouse -- I'm not

13  talking about your Honor or Mr. Mackey, for people who sit on

14  this side of the room.

15          They had to have understood -- this is conspiracy

16  case there is someone -- there's a witness who is saying it

17  wasn't seen as a conspiracy, they had to have known -- you

18  have discovery where Mr. Mackey repeatedly touts himself as a

19  shit poster, including after November 8th when he says this

20  was the shit posting election.  I'm not saying that's

21  dispositive, but it has to put them on notice that what

22  they're hearing from these witnesses is exculpatory.  And the

23  fact -- and here's why Rocketto was important in addition to

24  what I've said.  The fact that they reached out to Rocketto at

25  the last minute, whether it's admissible or not, and they

PROCEEDINGS

1    elicit evidence contrary to the words in the 302s they're not

2    turning over, should indicate that they know that they had to

3    turn it over.  The fact that they gave me the Amy 302s is to

4    create plausible deniability in case -- oh, we gave you the

5    Amy 302s.  As soon as we heard the opening statement we knew

6    you wanted it, well that's not what happened.  That's not what

7    happened.  It wasn't opening statement, it was after I

8    mentioned her name.

9         Look, I want to say something else about this, and

10   this is why -- and this is important, everything I say is

11   important, but this especially important.  It's difficult

12   enough to be a defense attorney in any case, but defense

13   lawyers are not fraud examiners.  We all have to presume

14   prosecutorial candor and transparency and integrity.  We have

15   to assume that what we're hearing and what we're getting and

16   the way the cases are prosecuted are on the up and up.  We can

17   fiercely disagree about what inferences to draw from the

18   facts, but a defense lawyer can't be sitting here on this side

19   of the room thinking what are they hiding, how are they

20   defrauding me.

21        It took me -- and Mr. Mackey and I had an ongoing

22   conversation about this after the trial, it took me a while to

23   think -- first to have the complete record, but also to think

24   through all the conversations I had from the beginning with

25   them.  And how this is so plain to me, it became plain to me

PROCEEDINGS

1   that this was deliberate, that they understood -- and if you

2   look at the deceptions about Microchip and you look at these

3   deceptions it's all about either making affirmative

4   misrepresentations or affirmative omissions about whether or

5   not there is a conspiracy.  Whether or not Mr. Mackey -- I

6   don't mean to say whether there was a conspiracy, but whether

7   Mr. Mackey participated in a conspiracy, knew that there was

8   one.

9           THE COURT:  Let me go to this question of Microchip

10   because I'm unable to find an opinion, and maybe because I

11   just haven't looked hard enough, but are there any other cases

12   applying *Brady* analysis to an application like this?

13           MR. FRISCH:  Yes.

14           THE COURT:  So just timing wise, the government

15   applied to have the witness testify anonymously.  Judge

16   Garaufis ruled, I think on March 8th, and the Jencks

17   disclosure about Microchip is March 10th, and you clearly

18   cross examined Microchip on this.

19           MR. FRISCH:  Hundred percent.

20           THE COURT:  Did you go back to Judge Garaufis to ask

21   him to revisit the question of whether Microchip's credibility

22   affected whether he should be permitted to testify

23   anonymously?

24           MR. FRISCH:  I did not.  And I shouldn't have to and

25   here's the reason --

PROCEEDINGS

1            THE COURT:  But I mean --

2            MR. FRISCH:  Let me --

3            THE COURT:  No, I -- you keep --

4            MR. FRISCH:  -- you're --

5            THE COURT:  -- saying you don't have to do it, but I

6   just don't --

7            MR. FRISCH:  With --

8            THE COURT:  First of all, I don't understand what

9   the witnesses' credibility has to do with -- I mean,

10  presumably informants have credibility issues all the time,

11  cooperators have credibility issues all the time, but what

12  does the witness' credibility have to do with deciding whether

13  or not the person should be permitted to testify anonymously,

14  whether there are considerations that outweigh the right of

15  the defendant to ask in his name, and also to be clear I think

16  you had the identity for attorneys' eyes only; is that right?

17            MR. FRISCH:  I knew his identity independent of the

18  government.

19            THE COURT:  And these are -- we're talking about

20  public Tweets that he posted, the things that you say are

21  *Brady* are things that he said about himself, right?  I've just

22  never seen --

23            MR. FRISCH:  I'm trying --

24            THE COURT:  -- *Brady* applied in this context.

25            MR. FRISCH:  I think your Honor's framing of the

PROCEEDINGS

1    issue -- I disagree with the way your Honor has framed --

2              THE COURT:  Okay.

3              MR. FRISCH:  -- the issue and I disagree with the

4    language you're using.

5              You have to take a step back.  We may just disagree,

6    I get it, that's what happens.

7              THE COURT:  It's not that, it's just that --

8              MR. FRISCH:  Well, let me try.

9              THE COURT:  Okay.

10             MR. FRISCH:  Let me try.

11             THE COURT:  Okay.

12             MR. FRISCH:  I'm not, I'm --

13             THE COURT:  I take the argument about Microchip to

14   be part of your deception argument as opposed to some

15   independent issue that the government is required to give all

16   of its Jencks material over before making the application.

17   I'm not aware of that rule.

18             MR. FRISCH:  There is no such rule, and you're

19   missing --

20             THE COURT:  I'm missing what?

21             MR. FRISCH:  -- with all due respect I think you're

22   missing the point.  You can rule against me and we'll have it

23   out in the circuit if so, but I, respectfully, think you're

24   missing the point.

25             When the government makes an application to a judge,

PROCEEDINGS

1    whether it's Judge Garaufis or you or anyone else in this

2    building or in this country, you cannot withhold from the

3    judge what they know, whether they know it from the

4    February 2023 Tweets, which they told him to stop two days

5    before they made the motion, or -- and/or they know it from

6    the 302s.

7              When they went to Judge Garaufis and they made the

8    application for his anonymity, they knew and did not tell

9    Judge Garaufis that Microchip had told them or -- and they

10   otherwise had reason to know, he's an addict, in his words

11   he's crazy and insane, that's just not on the February 2023

12   Tweets, and that he wanted to work for them because it gave

13   him structure, because he was either an addict or crazy and he

14   was scared, not necessarily because of reprisals, physical

15   reprisals from the political world, but because it would

16   affect his self employment if it sullied his reputation.

17             So you're right, I think, and I wouldn't disagree,

18   that Microchip was effectively cross-examined, but for two

19   things.  Number one, his testimony laid the ground work for

20   admission of co-conspirators statements.  Without him -- I

21   don't think there was an adequate basis, with due respect, to

22   admit as many of the co-conspirator statements as your Honor

23   admitted, but certainly without him there's no basis at all,

24   and so however I cross-examined him has nothing to do with

25   whether or not he should testify.  But here's the bigger

PROCEEDINGS

1    issue --

2            THE COURT:  Can I just ask you one other question,

3    it's just because we lose the thread.  For *Brady* you have to

4    show that the result would have been different.  Is it your

5    position that Judge Garaufis would not have granted the

6    government's application for the witness to testify

7    anonymously if Judge Garaufis had known when he made the

8    ruling that the witness had posted these things on which you

9    cross-examined?

10           MR. FRISCH:  Here's my position.

11           THE COURT:  Okay.

12           MR. FRISCH:  When there's prosecutorial fraud, all

13   bets are off.  You may be able to fix it, there could be a

14   case, for example -- I'm just hypothesizing, where there are

15   eight undercover buys and the government is not being truthful

16   about one of them but still has seven, but when the government

17   does what it did here with regard to that application for

18   anonymity, and they are not telling the judge all the facts

19   that are in their possession, one way or the other or both

20   ways, that's a fraud on the Court.  And we do the system a

21   disservice and we encourage shenanigans if we just try and

22   parse how or whether the judge would have ruled differently,

23   that's number one.

24           And number two --

25           THE COURT:  Doesn't *Brady* require me to do that

34

PROCEEDINGS

1    though?  Doesn't *the Brady* -- assuming *Brady* even applies

2    here, doesn't that require me to determine A, whether there

3    was exculpatory material withheld on an application to permit

4    a witness to testify anonymously which is one question, but I

5    think you still have to show the result would have been

6    different.

7              MR. FRISCH:  Well, the result is that he testified.

8    We do not know that he would have testified had anonymity not

9    been granted, and your Honor predicated admission of

10   co-conspirator statements on his testimony.

11             THE COURT:  Right.  But just this one specific

12   question.  Are you saying that Judge Garaufis would have ruled

13   differently if he had known when he made whatever impeachment

14   material was out there about the witness.

15             MR. FRISCH:  I think there is a reasonable

16   probability in this context that the entire tenor of the

17   argument and Judge Garaufis' approach could have been

18   different.  I don't have to get into Judge Garaufis' mind nor

19   would I ever do so and tell you how he would or would not have

20   ruled --

21             THE COURT:  So then --

22             MR. FRISCH:  -- but I will tell you there's a

23   reasonable probability that things could have been different.

24             THE COURT:  So didn't you then have an obligation,

25   when you got this material two days after the decision, to go

PROCEEDINGS

1   back to Judge Garaufis and say, your ruling would clearly be

2   affected by this, I'd like you to reconsider it.

3          MR. FRISCH:  Frankly, there's two answers to that.

4          THE COURT:  Okay.

5          MR. FRISCH:  Number one, where the prosecutor

6   engages in what I consider to be prosecutorial fraud, I get to

7   cross examine the witness before I call all this out and get

8   the advantage of revealing who he is, that's number one.

9          Number two -- and this is really important and this

10  goes back to what I started to talk about.

11         THE COURT:  Just explain what you mean by that.  You

12  get the advantage.

13         MR. FRISCH:  I chose to cross -- when you have a --

14  we may disagree as to the foundation --

15         THE COURT:  I don't understand what you said.  You

16  said --

17         MR. FRISCH:  I understand that.  Let me just finish.

18  We may disagree about the foundation as to whether or not

19  there's a fraud here on the Court.  We may disagree on that

20  and if we do, a lot of -- your Honor may have -- may rule a

21  certain way than not, I get it.

22         But -- listen, I've been trying to make this point

23  now for -- in -- for a couple of -- before -- I just said

24  during the course of the trial this guys were good to litigate

25  against, I said it on the record.  Before I stand up and argue

36

PROCEEDINGS

1  that I know that I'm right, that something has changed or that

2  I think the judge was deceived or that he wasn't given the

3  full picture or that there's not really a basis to revisit the

4  ruling, I have to be sure in my mind, every defense lawyer has

5  to be sure in his or her mind that before you make such

6  argument that you feel confident about it.  And before it

7  wasn't until time went on that I felt comfortable and

8  confident saying what I'm saying in my papers and saying what

9  I say now.

10         Might I have said to him, wait a minute, what's

11  going on here, the government didn't tell you this.  I might

12  have, but I don't think I was required to do so because I

13  have -- before I stand up in a court and say I think there's a

14  real problem here, I think it's monumental, it effects

15  Mr. Mackey and it effects the way we conduct cases in this

16  circuit, I have to be confident about it.  And I will -- and I

17  mean nothing -- I want to say this carefully because it

18  involves a matter under seal, but even with regard to the

19  matter that we discussed in the sealed proceeding, your Honor

20  evinced a certain point of view about that even as to that one

21  fact.  So if the answer is, when you see this, you have to go

22  right at it and you have to call attention, and whether it's

23  prosecutorial fraud or not it doesn't matter, then to the

24  extent your Honor is making a point in your question, that's

25  the answer, but I don't think it is.

PROCEEDINGS

1          THE COURT:  So again, your view is, I think I

2    understand this now, that there's just been this systemic

3    fraud on the Court and because of that the usual rules that

4    might apply, like so for example, let's say that there was no,

5    what you say, intent to defraud the Court in connection with

6    that application to Judge Garaufis, if you saw -- if you saw

7    these Tweets -- I, frankly, don't know the substance of what

8    was turned over, you said you found out things about him

9    independently, but you think because this was just such a

10   systemic problem that that relieves you of an obligation that

11   you might otherwise have to alert Judge Garaufis to what you

12   think would have changed his decision, and I want to make sure

13   I understand because, generally the *Brady* analysis does

14   require if you find a violation, you also have to show that

15   the outcome would have been different --

16          MR. FRISCH:  Well --

17          THE COURT:  -- and when you have the judge there

18   available to present the material that you claim is

19   exculpatory, it would have given Judge Garaufis the

20   opportunity to revisit his judgment if he thought that was

21   appropriate.  And that's all I'm asking.  I'm -- you keep

22   acting like I'm -- you know, you keep speaking in broader

23   terms, I just want the specifics.

24          MR. FRISCH:  First of all --

25          THE COURT:  You're saying that this is such a

PROCEEDINGS

1   systemic problem that that general requirement to show that

2   the outcome would have been different is not the prevailing

3   consideration, it's protecting the system from, you know,

4   prosecutors who willfully sit on exculpatory material.

5          Do I have -- is that right?

6          MR. FRISCH:  In -- in the main, but I would tweak it

7   a little bit.  Number one, the standard isn't it would have

8   been different, the standard is whether a different outcome is

9   a real enough possibility to undermine confidence in the

10  verdict --

11         THE COURT:  Precisely.

12         MR. FRISCH:  -- and of course here we have a

13  deadlocked jury --

14         THE COURT:  We didn't have a deadlock jury --

15         MR. FRISCH:  -- who required an *Allen* charge.

16         THE COURT:  Oh, I see what you mean.  I see.  We did

17  have a verdict though.

18         MR. FRISCH:  We're here, so we did.

19         Second, I just want to remind your Honor that the

20  government didn't respond to this in their papers, maybe they

21  will today.  But when we approached to discuss my ability to

22  cross examine Mr. Microchip about those Tweets, your Honor

23  said something like, oh, they've seen them.  I hadn't.  I

24  found them.  I'm not complaining, I found them.  They didn't

25  turn those February 2023 Tweets over even though two days

PROCEEDINGS

1    before they made their motion to Mr. Microchip they said stop

2    tweeting to Mr. Microchip.  The Tweets that I cross-examined

3    him about, I found those independently without the help of the

4    government.

5              THE COURT:  Well, I mean but that's not *Brady*

6    material.  I mean, it might be helpful for your

7    cross-examination but it's not only within their control if

8    you're going on, if you're doing a Google search --

9              MR. FRISCH:  With due respect, I think you're

10   looking at it too narrowly.

11             THE COURT:  Okay, that's *Brady*?  What somebody

12   writes on --

13             MR. FRISCH:  No, no, no, no.

14             THE COURT:  -- on the chat room?  Okay.

15             MR. FRISCH:  If you're a prosecutor, if you're

16   prosecutor, a federal prosecutor and you are making an

17   application to a judge as to why this person needs to be

18   anonymous, you better be sure you're telling the judge all the

19   information that's relevant to that, whether it's the Tweets

20   or -- and/or whether it's the 302s, you better make sure the

21   judge knows the whole landscape.  Maybe he'll reach the same

22   result, maybe he won't, but it is going to be a different

23   discussion.  And this is precisely why what commentators talk

24   about and the case law talks about.  Because when you get away

25   with it, you're in this position where you're arguing to undue

40

PROCEEDINGS

1   something as opposed to having a fair fight armed with all the

2   information at the relevant time.

3           That goes for the anonymity and the Clinton 302s.

4   All of this should have happened initially before Judge

5   Garaufis and, second, before the jury.  And under these

6   circumstances sometimes Mr. Defense lawyer, Ms. Defense

7   lawyer, you could have fixed this, that or the other thing, I

8   don't remember what language you just used, but there is so

9   much here that just undoes what is an unusual case -- and I

10  hope we'll have time to talk about insufficiency of the

11  evidence and insufficiency of venue, it's on that record that

12  we're talking about these things.  And I submit that the

13  reason these things happened, it didn't happen coincidently,

14  it wasn't an oversight, it wasn't my dog ate it, it's because

15  the government realized there's problems with this case, a

16  high publicity case and the only way to get to the promised

17  land was to do what they did.  And if the evidence were

18  stronger, if there eight undercover buys, and we're talking

19  about one or whatever metaphor you want to use, that's one

20  thing, that's not our case.

21          THE COURT:  Can I just ask you, then, if I were

22  to -- like I said, I'm not aware of any case that requires the

23  government to turn over Jencks material before they make an

24  application for a witness to proceed anonymously, but assuming

25  that's not currently the rule, sounds like I would be breaking

PROCEEDINGS

1    new ground -- I wouldn't?

2              MR. FRISCH:  No.  Prosecutors have a duty of candor

3    to the Court.  This isn't about technical timing of disclosure

4    of 302s, it's about making --

5              THE COURT:  I'm talking about the Microchip.

6              MR. FRISCH:  I am too, I am too.  It's about making

7    an application to a federal judge and not telling that federal

8    judge all the facts that you know about.  They didn't have to

9    give over the 302s.  They could have summarized them and put

10   them in the substance of their motion.

11             THE COURT:  I'm just talking about Microchip right

12   now.  There's no 302 with Microchip, is there?  Oh, there are.

13   Sorry about that.  Okay.

14             MR. FRISCH:  The point --

15             THE COURT:  But the only thing I'm asking is, as far

16   as I know you haven't cited it, there's no case specifically

17   relating to the obligation when you're making an inquiry about

18   anonymity, which has specific factors for the judge to

19   consider.  I don't recall that the witness' credibility is one

20   of those factors.  So it sounds to me as though, if I were to

21   make this ruling that I would be perhaps establishing a new

22   standard for them.  You're saying it's not.  You're saying

23   this falls under the umbrella of candor to the Court about

24   everything, which means that they had an obligation before

25   they made the application to turn over all the material about

PROCEEDINGS

1    the witness.

2              MR. FRISCH:  They didn't have to turn over the 302s

3    before they made their application to Judge Garaufis.

4              THE COURT:  Okay.

5              MR. FRISCH:  What they were obliged to do is tell

6    Judge Garaufis the truth.

7              THE COURT:  About?

8              MR. FRISCH:  They were -- about the reasons about

9    who Mr. Microchip was, what he told them, what they knew he

10   told them was the reason why he wanted anonymity.  Remember,

11   it isn't just the fact that the real reason for anonymity was

12   not as they -- certainly not as completely as they

13   represented, but they also told Judge Garaufis that

14   Mr. Microchip and Mr. Mackey had direct conversations about

15   these memes; they didn't.  So -- and they knew that when they

16   made the application.

17             I'm not asking you to make any new law about the

18   timing of 302s or what necessarily needs to be in a motion for

19   anonymity, I'm asking you to require the prosecutors be honest

20   and fulsome when they make any application to a federal judge,

21   anonymity or otherwise.

22             THE COURT:  Okay.  So it's 10 past 12, we've been

23   going for an hour and 10 minutes and your adversaries haven't

24   had a chance to say anything, so I'll hear from you, first of

25   all, on the response -- let's start with the -- well, where

PROCEEDINGS

1  would you like to start?

2          I think, as I understand it, the application is

3  based on sort of an overarching failure to live up to your

4  ethical standards as prosecutors, which is a very serious

5  accusation, but it is in the context of the Clinton campaign

6  staff about turning those over and also with respect to your

7  application to have the witness testify anonymously.

8          MR. BUFORD:  We're happy to start wherever the Court

9  would like to direct us.  Suffice it to say, our view is that

10  we complied with our discovery obligations and did not act in

11  bad faith throughout this process.

12          I guess with respect to the Clinton 302s, we start

13  from the premise that it's not an element of the charged crime

14  for the government to prove that the opposition campaign had

15  any particular reaction to the actions of the defendant, or

16  even that they were aware of them.  That I think distinguishes

17  virtually all of the *Brady* cases that are cited in the defense

18  papers where the information goes to some critical element of

19  the charged crime such that it would have relevance.

20          I think the internal deliberations and machinations

21  of Clinton campaign, as they were trying to decide whether and

22  how to respond to misinformation, is categorically irrelevant,

23  as your Honor ruled during the course of the trial and alluded

24  to earlier today.  The analogy of the locks on the bank, it is

25  Hornbook law that the negligence of the victim is not a

44

PROCEEDINGS

1    defense, even if you accept in our view the dubious

2    proposition that the Clinton campaign is somehow a surrogate

3    victim here.

4            There are certain facts that are not in dispute and

5    were disclosed by the government I think in multiple different

6    ways before the trial, which is that misinformation was

7    spreading across the internet, in chat rooms and social media

8    prior to the defendant's tweeting about it, and that the

9    Clinton campaign observed that misinformation, not the

10   defendant's Tweets because they responded before the defendant

11   tweeted and took action.  Those two facts might be relevant,

12   but again they were disclosed by the government in multiple

13   different ways before the trial to include the 3500 of Lloyd

14   Cotler, which references some of the Clinton campaign staffers

15   that were involved by name and describes that it was their job

16   to monitor some of these social media websites.  And to the

17   extent those facts were deemed relevant by the defense, they

18   were available to them, or to use the language of the

19   doctrine, the defense was on notice of the essential facts

20   that they might want to use for their defense.

21           To your Honor's point, again, the two facts that

22   memes were pervasive and that the underlying -- that the

23   senior officials observed it, those facts were disclosed and

24   also the subject of the stipulation that we put in because the

25   defense thought that it would be important to have those facts

PROCEEDINGS

1   before the jury to the extent the evidence didn't organically

2   establish them already.

3        And with respect to the notion that the defense

4   inadvertently stumbled upon this information, to be clear,

5   Mr. Paulsen disclosed these reports to the defense

6   unilaterally the morning of the second day of trial.  I don't

7   know that this point is significant, your Honor, but we will

8   represent to the Court Mr. Paulsen's memory is that he orally

9   advised Mr. Frisch there were additional reports that he could

10  have if he wanted them.  This is not to say that anyone is

11  misrepresenting anything.  Mr. Frisch doesn't remember

12  Mr. Paulsen saying that, but I remember Mr. Paulsen telling me

13  shortly after he turned them over that he orally advised

14  Mr. Frisch as such, but I don't know that it's ultimately

15  significant, but all the reports were disclosed by lunchtime

16  that day.

17       And again, to the extent beyond the sort of two core

18  facts, to the extent the defense is interested in sort of the

19  internal thinking of the Clinton campaign that some staffers

20  didn't react as rapidly as other staffers might have wanted,

21  that just strikes us as categorically irrelevant.  There's no

22  latches defense in a crime, even if you were to put the

23  Clinton campaign in the shoes of a victim here.

24       And we certainly think the government didn't make

25  any false statements with respect to the 302s.  The Court may

PROCEEDINGS

1    very well determine that they should have been turned over

2    sooner, but they were turned over and we didn't lie about

3    them.

4           THE COURT:  What's your position about -- I mean, I

5    think -- I think one -- I was looking at the record, I also

6    think one of the things that I suggested that could be done is

7    directing the government to call the witnesses, which I think

8    was not something Mr. Frisch wanted done.  I think that was

9    one of the remedies that I suggested.

10          What about this issue of the application to Judge

11   Garaufis?

12          MR. BUFORD:  Your Honor, if the Court will permit,

13   Mr. Gullotta would like to speak to that.

14          THE COURT:  Sure.

15          MR. GULLOTTA:  Thank you, your Honor.  I think the

16   Court has already zeroed in on the fatal flaws of that argument

17   made by the defense.  The attempt to sort of conflate *Brady*

18   jurisprudence with the government's obligations in its

19   application to Judge Garaufis.

20          The Court is well aware, the defense is well aware,

21   Judge Garaufis had to perform a balancing test and determine

22   first whether or not the government had provided evidence that

23   there was a legitimate concern for the defendant potential

24   harassment, retaliation, annoyance were he to testify and give

25   his true identity at trial.  That evidence was produced to the

PROCEEDINGS

1    Court and the Court determined that there was a real

2    nonspeculative concern of that.

3            The second part of the analysis is whether the

4    witness' true identity has any materiality to the

5    determination of guilt or innocence at trial.  And as everyone

6    knows who has followed this case, Microchip used that

7    pseudonym at all times.  He communicated with his

8    co-conspirators under the name Microchip, he communicated with

9    the defendant under -- in the chat rooms and elsewhere under

10   the name Microchip and never used his true identity, so the

11   defense was unable to meet its burden to demonstrate that his

12   true identity was material to guilt or innocence in any way.

13           What has been cited in the post-trial briefing is

14   impeachment material, which was provided to the defense well

15   in advance of the trial and the defense used to impeach the

16   witness.  It has absolutely nothing to do with the anonymity

17   analysis, with the confrontation clause analysis.  We didn't

18   tell Judge Garaufis what Microchip's favorite color was either

19   because it has nothing to do with the analysis.

20           THE COURT:  I don't think that's what counsel is

21   saying.  I think what he's saying is, if there is material

22   there that suggests -- I think this is right, I'm positive

23   Mr. Frisch will tell me if I'm wrong, but I think the claim is

24   that perhaps there is something in that material that

25   undercuts his concern about retaliation.

PROCEEDINGS

1          MR. GULLOTTA:  No, I don't think that's the position

2     he's --

3          THE COURT:  That's not your position?

4          MR. FRISCH:  It is my position and there's other

5     reasons --

6          THE COURT:  I don't think that was something you

7     argued in the brief, but I could be wrong about that.  But I

8     think I understand your point.  Go ahead.

9          MR. GULLOTTA:  Let's look at what he did cite in the

10    brief.  Microchip used drugs twenty years ago.  That he had

11    debts owed to the IRS.  That he made comments about whether or

12    not there was a grand plan when they were conspiring.  That he

13    worked with the government.  None of that has anything to do

14    with either of those two parts of the analysis, so that's why

15    I say no, there's nothing in that information that affects

16    whether or not Microchip had a concern about his safety, about

17    retaliation or annoyance or whether or not his true identity

18    had any materiality to guilt or innocence.  None of that is

19    relevant to the analysis and that's why it wasn't a part of

20    it.

21          And it's worth mentioning, 99 plus percent of the

22    Microchip Jencks was produced years ago.  It's the Twitter

23    statements, it's his DMs and things like that.

24          On February 13th, the government notified the

25    defense that Microchip was the cooperating witness so the

PROCEEDINGS

1    defense knew as early as February 13th that if went and looked

2    back at everything Microchip said, that's Jencks as to the

3    government's cooperating witness.

4         Some of what was in his DMs and public facing Tweets

5    was vile, antisemitic, racist, misogynist, that's all

6    information the defense knew before the government filed its

7    motion seeking protective measures.

8         If the defense's position was that Microchip would

9    be embarrassed if his true identity were associated with his

10   name, they had all of the ammunition they needed to make that

11   argument before Judge Garaufis, because they knew all the

12   horrible things that Microchip had said, which for whatever

13   reason never really came out on cross.  So none of what the

14   defense pulled from the 302s that were produced after Judge

15   Garaufis' ruling relates in any way to the analysis that Judge

16   Garaufis had to perform in order to determine whether or not

17   to grant the government's motion.

18        As the Court pointed out, even after we produced

19   those 302s, again well in advance of trial so they could use

20   them as impeachment material, the defense did not say, hey,

21   Judge Garaufis, you should have known this, I'm here to tell

22   you now this will effect your analysis.

23        The defense likewise did not raise that with your

24   Honor prior to Microchip's testimony.  And the reason for that

25   is because this information has nothing to do with that

PROCEEDINGS

1   analysis and it knew that the Court, whether Judge Garaufis or

2   your Honor upon hearing that information, would reach the same

3   conclusion.  The best thing to do is to grant --

4        THE COURT:  I think what about the larger point that

5   Mr. Frisch is making that I think he has taken the position

6   now that these were all intentional efforts to withhold

7   material information and I'm not sure that I think the

8   argument is part of the larger argument that systemically

9   there was something wrong with this trial, and what's your

10   response to that.

11        MR. GULLOTTA:  Well, with respect to the Microchip

12   information, the argument doesn't make sense and I think

13   Mr. Frisch is tying himself in knots trying to answer the

14   Court's question, because it's only misconduct if there was

15   some duty to tell Judge Garaufis this information and there

16   wasn't because it's completely irrelevant.

17        There was a duty to provide it to the defense so

18   that they could impeach Microchip with it and we did that.

19   There is no claim that we failed to meet our *Brady* obligations

20   with respect to Microchip.

21        What the defense is trying to do is import some

22   *Brady* obligation to Judge Garaufis in the context of the

23   confrontation clause analysis that he had to perform upon

24   receiving our motion, and the two things don't mesh.  There

25   was no obligation to provide impeachment material to Judge

PROCEEDINGS

1    Garaufis unless it impacted either of those parts of the

2    analysis, the potential for him to face harassment or the

3    materiality of his true identity, and none of this information

4    is in any way relevant to either of those two things.

5              THE COURT:  I don't know which one of you wants to

6    answer this, but what about Mr. Frisch's point that, you know,

7    he spent all this time preparing for the trial and finding out

8    about these, I think we'll agree the disputed 302s there are

9    seven of them -- how many pages are we talking about there?

10   Are they maybe 30 pages, between 20 and 30 pages

11   approximately?  I mean -- and I don't think that's so

12   important as what he's saying is the content of those just

13   completely upset his defense and the trial and all of that and

14   he shouldn't have to, even though the Court offered some

15   curative approaches, he shouldn't be required to accept any of

16   them because you should have turned it over earlier.

17             MR. BUFORD:  Your Honor, again, I think what we

18   would say is that the contents of the reports track the kind

19   of undisputed factual chronology that the government had

20   disclosed well in advance of trial.  So I don't know that it

21   requires the kind of wholesale revisions or bombshell

22   revelations that Mr. Frisch is describing now.

23             Again, the government's proffered evidentiary

24   presentation that it put on, was that misinformation was

25   spreading on the internet prior the defendant's Tweets, the

PROCEEDINGS

1   Clinton campaign observed that misinformation on the internet

2   and social media prior to the defendant's Tweets.  The Clinton

3   campaign took action to put in place a corrective plan prior

4   to the defendant's Tweets, and the two Clinton staffers the

5   government did call, as I think the Court observed at the

6   trial, didn't offer their freestanding opinions about whether

7   these Tweets were good, bad or indifferent.  They just

8   described what they saw and the response that they put in

9   place.  That's why they were called to testify as opposed to

10  the others.

11          So the fact that, as the Court said, there may have

12  been some discussion internal to the Clinton campaign to which

13  the defendant was indisputably not privy about how to respond

14  to misinformation generally, and even maybe this

15  misinformation specifically, doesn't have any legal

16  significance.

17          THE COURT:  What about his claim that uncertainty

18  or -- I'm not sure, I think some of the content of those 302s

19  reflected that some of the senior people were less technically

20  savvy than the -- maybe that's not right, but what about his

21  point that well, in his notice claim he says that Mr. Mackey

22  didn't have fair notice that he could be prosecuted under this

23  statute and -- that's really not a jury question though, I

24  mean, that's more of a legal question, but I think that's the

25  argument that if people on the campaign didn't think it was

PROCEEDINGS

1  important, does that go to his intent.

2          MR. BUFORD:  We certainly don't think it goes to his

3  intent, your Honor.  Again, there is no suggestion that anyone

4  on the campaign was in direct communication with him or a

5  percipient witness to his own thinking somehow about how to do

6  this.  I think, as I understood it, the argument from the

7  defense was, something like, well, social media and its impact

8  on the election was all kind of new, and this was uncertain

9  terrain for everybody and to the extent the Clinton campaign

10  was trying to figure out the appropriate response to

11  misinformation somehow that might be relevant.  Again, your

12  Honor, we just don't see how that could be because it's not an

13  element of the crime.

14          I also think, for what it's worth, your Honor, that

15  that somewhat mischaracterizes the nature of the reports.

16  Where at least all of the people who were interviewed by the

17  government I think expressed concern about the effect of

18  misinformation and concern that it could confuse voters and

19  the challenge is how to respond to it in realtime without

20  accidentally amplifying it by calling attention to it as you

21  come down the stretch.  And that's the other thing I think the

22  interview report shows in context, the campaign is it's crunch

23  time, it's frantic.  Every minute, every dollar is precious at

24  this point and the question is where to allocate resources,

25  and I think there is a strong flavor of that in the reports.

PROCEEDINGS

1   But whether --

2          THE COURT:  Well, that's his other defense is that

3   all he was trying to do was rile up the campaign, although I'm

4   not sure that those two things are mutually exclusive.

5          MR. BUFORD:  Well, your Honor, if that is the

6   defense, the government's own witnesses testified about that

7   defense.  They described the actions that they took in

8   response to this and if the defense was, they took the bait,

9   this is a triumph, that Ms. Morales Rocketto was duped into

10  believing this was a serious attempt to fool voters and wasted

11  her otherwise precious time responding to it.  That defense

12  came out on the direct examination of Ms. Morales Rocketto who

13  said exactly that.

14         THE COURT:  All right.  As I said, I have paid

15  careful attention to everyone's position, I just wanted to

16  make sure that I understood.

17         There are two other issues that are addressed.  The

18  venue issue, I understand your position, I don't think -- I

19  think I get what you're saying.  Are you saying that with

20  respect to venue that it should have been prosecuted I guess

21  in the Southern District?

22         MR. FRISCH:  It could have been prosecuted in the

23  Southern District, yes.  If I can talk about venue, and I'll

24  be brief, but I think this is really important.  And I don't

25  mean -- I shouldn't be as loquacious on this as I would like

PROCEEDINGS

1    to be, but let me make this point about venue.

2              At page 19 of Judge Garaufis' opinion on venue,

3    which I think is docket 54, he said the government needs to --

4    I'm paraphrasing -- and this isn't the only thing he said,

5    it's 50 -- it's a lengthy memorandum.  But he said in

6    substance, the government needs to prove that the images were

7    viewed in the Eastern District.  Essentially he was denying

8    the pretrial challenge to venue with an understanding the

9    government could introduce evidence at trial greater than what

10   was in their particularization and so forth; they didn't.  The

11   government did not prove that anyone saw the particular memes

12   in this case in this district.  Even Ms. Rocketto and

13   Mr. Cotler did not testify that they saw the particular memes

14   at issue.  They saw text by -- vote by text memes, but they

15   didn't see Mr. Mackey's memes, they didn't testify.  And they

16   didn't testify that they saw them in this district.  And that

17   may seem hyper technical, but we're talking about jurisdiction

18   on which the Court's construe very strictly.

19             And so what you're left with in terms of venue for

20   this case now, now that the record is complete, is that when

21   you -- is that because of technology, advances technology

22   essentially even if you're not targeting a particular person

23   in a district, even if there is not a point to point

24   communication with someone in the district, as soon as you

25   tweet something or send something that has national reach, the

PROCEEDINGS

1  government can choose where to bring the case for venue

2  purposes.  Well, first of all, we've had advances in

3  technology for at least a decade, 15 years, and no court has

4  ever held that successfully, and, second, that can't be the

5  law.  It can't be that technology undoes literally 200 years

6  of developing jurisprudence about the requirement that

7  prosecutors pick the right venue, and I understand that

8  because of all the things we're talking about, how interesting

9  some of the issues are in this case, that venue seems to be

10  somewhat technical and somewhat -- well, I'll leave it at

11  that, somewhat technical.

12          THE COURT:  The only thing that I'll say about these

13  issues is I'm not sure that it's appropriate for me to make

14  these decisions.  I think that the -- you know, you made the

15  fair warning arguments in the application to Judge Garaufis

16  and I think these are really questions that are probably

17  appropriate on appeal rather than on a motion -- I mean, the

18  evidentiary question surely is something that I can consider

19  whether there was sufficient evidence of a conspiracy, but the

20  question of venue I think is not an appropriate one to review

21  on a post-trial motion.  I think that's an appellate issue.

22          MR. FRISCH:  Well, I have to make my record on that.

23  Number one, Judge Garaufis said that his issue was limited to

24  the defendant's pretrial motion to dismiss and that the

25  government still had to prove venue at trial.

PROCEEDINGS

1          THE COURT:  But you're just talking about whether

2     there was sufficient proof of venue, whether the evidence -- I

3     can review the evidence on it.

4          MR. FRISCH:  Well, that's true.  And, second, let's

5     just say hypothetically that the Second Circuit agrees with

6     the defense that there was no venue here and that all or part

7     of Judge Garaufis' ruling was wrong, I don't think you're

8     bound to follow it if it's wrong.

9               In any event, they didn't prove what he said they

10    had to prove, which is, they have to prove that the images

11    were viewed in the Eastern District.  I think of all the

12    issues in this case, and there's a lot of them, there's a lot

13    here, right?  If the Court sustains the conviction and this

14    case goes up, there's an awful lot for the Second Circuit to

15    look at but I think venue is going to be number one on their

16    list.  I'm humble about what the circuit might or might not do

17    or consider important, but I think it's the big one of all the

18    big issues in this case.

19         THE COURT:  Do you think that Judge Garaufis' --

20    that that was the only way they could do it if somebody --

21         MR. FRISCH:  No.  I think to the extent Judge

22    Garaufis said -- and there's a line in there, to the extent

23    that Judge Garaufis' position is in the digital age when you

24    put something out nationwide the prosecutor can pick what

25    district to use, whether or not it's targeted, whether or not

PROCEEDINGS

1    there is a point to point communication, whether or not it's a

2    financial crime, to the extent that he said that and that's

3    his position as to how you could have venue, respectfully,

4    great respect for Judge Garaufis, he has that wrong.  No court

5    has ever held that.  I don't think any court ever will.

6              But in any event, he did say the government needs to

7    prove that the images were viewed in the Eastern District and

8    there is no evidence that these images were viewed in the

9    Eastern District or whatever images were seen by Ms. Rocketto

10   and Mr. Cotler were seen in this district.

11             THE COURT:  All right.  Do you have anything you

12   want to say about venue.

13             MR. PAULSEN:  Your Honor, I would just add what I

14   believe your Honor had focused on is that, we had proposed

15   four different ways to establish venue.  Judge Garaufis

16   endorsed three of them.  One of which I think was the most

17   straightforward one, the fact of the electronic communications

18   passing through the district.  We presented four separate

19   witnesses to make sure that was belt and suspenders as clear

20   as possible.  We believe the rest of the evidence also met the

21   other standards, but I think venue was factually clearly

22   proved as we articulated it in our brief.

23             THE COURT:  I just have a couple of factual

24   questions about, I understand your arguments about the

25   evidence of a conspiracy.  I just want to make sure I

PROCEEDINGS

1    understand factually something about the chat groups.

2         So GX200 is the War Room, the Mad Man Group or

3    Microchip.

4         MR. PAULSEN:  It's none of those, your Honor.

5         THE COURT:  What is it?

6         MR. PAULSEN:  GX200 was a compilation of various

7    direct messages, so one on ones involving the defendant or in

8    some cases some smaller groups that had two or three or four

9    individuals in it.  They were broken up actually by letters,

10   but thematically I think it was 200-A, dash B but then they

11   were combined into one.  I believe when we cited it we used

12   the letters, when Mr. Frisch cited it he just said 200 and

13   then the raw page number.  We can provide you though both

14   those versions if your Honor needs them.

15        THE COURT:  Okay, it's just a little bit confusing.

16   GX400 is the War Room?

17        MR. PAULSEN:  That's the War Room, your Honor.

18        THE COURT:  GX410 is Micro Chat.

19        MR. PAULSEN:  Yes, your Honor.

20        THE COURT:  GX430 is the Mad Man chat?

21        MR. PAULSEN:  I believe it's -- I think it's 420 and

22   430 are the two Mad Man, one of them they kind of

23   reconstituted themselves and I think one was called Mad Man 1

24   and Mad Man 2.

25        THE COURT:  Okay.  Then the just in terms of the

PROCEEDINGS

1    dates that Mr. Mackey was a member of those chat groups, is it

2    any date that he wasn't suspended?

3              MR. PAULSEN:  Yes, your Honor.  So the War Room is

4    the one that he was in most consistently.

5              THE COURT:  Was he a member of the War Room from

6    October 27th to November 2nd?

7              MR. PAULSEN:  Yes.  But not the other two.

8              THE COURT:  Not the other two.  And Micro Chat he

9    didn't rejoin after he got suspended; is that right?

10             MR. PAULSEN:  He did not rejoin the Micro Chat.  He

11   did rejoin the War Room -- I'm sorry, the Mad Man chat but at

12   the very end, about a week after the election.

13             THE COURT:  Okay.  Just on that question, do you

14   differ as a factual matter with the dates that he was

15   suspended?

16             MR. FRISCH:  I don't have those dates in mind.  I

17   can sort of get the minutes and go back and look, but I don't

18   have those exhibits or those dates in mind.

19             THE COURT:  Okay.

20             MR. FRISCH:  While we're talking about it, can I

21   make one other -- I don't mean to -- if I can address one

22   other issue.

23             As I look back and try to put my appellate hat on

24   and look at this case, I think venue is the biggest problem

25   the government had.  There's a lot of problems here, I don't

PROCEEDINGS

1    mean to -- I'm not saying that to be theatrical, I think

2    there's a lot of problems here.

3           I think, number one, because it affects so much

4    going forward in the Circuit and in the United States, venue

5    is number one.

6           I think number two is the insufficiency of the

7    evidence.  And, you know, because the courts, district judges

8    and appellate judges defer to the finder of fact and try to

9    look at the light most favorable to the government, it's

10   difficult to prevail when evidence is insufficient -- on a

11   claim that is evidence insufficient, but I think it really is

12   insufficient here.  And I think it's insufficient because the

13   entirety of the relationship between Mr. Microchip and

14   Mr. Mackey is, because they were sometimes in the same chat

15   room, they don't know each other, they didn't have any other

16   direct communications and Mr. Mackey was not present when the

17   chatters discussed these memes nor did he share those

18   particular memes.  There's just no evidence that he knew about

19   this criminal conspiracy.  And then they bring us Tia,

20   whatever her name was, but T-I-A, Tia, and her meme, we don't

21   know where she got it from, she wasn't part of that Micro chip

22   chat, whatever the right way to describe that chat is and it

23   was automatically sent to Mr. Mackey's avatar because she

24   mentioned his name.  That's their evidence of how Mr. Mackey

25   participated in a conspiracy by sharing these three memes.

PROCEEDINGS

1          The most you could say, if you want to be generous

2     to the government, is that there's an inference of conspiracy,

3     but it's equal to or outweighed by the inference of shit

4     posting.  I get that insufficiency of the evidence is a

5     difficult thing to show after a jury has found the defendant

6     guilty, but, man, I think we've got it.  I think the evidence

7     here is insufficient.

8          THE COURT:  All right.  I understand your arguments

9     and I'm taking them seriously.  I do want to, just on this

10    question of things that are sealed, I know I'm still waiting

11    for a letter from you -- I don't know if you want to address

12    it without --

13          MR. FRISCH:  To be honest, I spent my weekend

14    preparing for today --

15          THE COURT:  Sure, that's fine.

16          MR. FRISCH:  -- and I'm going to look at those

17    letters this afternoon.

18          THE COURT:  Okay.

19          MR. PAULSEN:  Your Honor, can I add one more thing

20    before we move off the substance of this?

21          THE COURT:  Yes.

22          MR. PAULSEN:  I think my colleagues are more

23    generous than I am about this, I've been rather surprised at

24    the intensity of the accusations that were made toward us in

25    this.  I think they said there was a scheme to defraud the

PROCEEDINGS

1    defendant, that almost everything we did was dripping with bad

2    faith.

3         As Mr. Gullotta noted, we endeavored to turn over

4    things quite early in this case to give him nearly everything

5    we had and I think -- I thought we were dealing at a collegial

6    way with him.  I've been rather surprised by the venomous

7    accusations we've received here, and I would just -- to the

8    extent to make the record clear, we did not in any way commit

9    a fraud on the defendant, on the Court.  We tried to play this

10   as straight as possible and we are dismayed at the way in

11   which he's characterizing this case.

12        THE COURT:  These are extremely serious accusations

13   and may warrant if -- I don't know if you've referred it to

14   the grievance committee but, you know, if you're making those

15   accusations I think the government is entitled to respond and

16   I really haven't given you much chance to do that.

17        Is there something else you want to say about it?

18        MR. PAULSEN:  No, your Honor.  We're trying to

19   provide the facts so your Honor can decide, but the venom

20   that's been used has been shocking to us.

21        MR. FRISCH:  I stand by it a hundred percent and I

22   take this job very seriously, as I'm sure --

23        THE COURT:  I have to say --

24        MR. FRISCH:  I --

25        THE COURT:  -- I think everybody in the courtroom

GEORGETTE K. BETTS, RPR, FCRR, CCR
Official Court Reporter

PROCEEDINGS

1    takes the job seriously.

2              MR. FRISCH:  I appreciate that.

3              THE COURT:  And I think you have to be careful when

4    you are leveling accusations of this kind at your adversaries.

5    If you think that's -- I'm not telling you can't do it, but it

6    is -- I mean -- they are pretty intense accusations and I

7    understand that you stand by them.

8              MR. FRISCH:  I assure your Honor, I assure your

9    Honor that I don't make allegations of this sort without

10   really thinking it through and vetting it and making sure I'm

11   confident in my position and I stand by it.

12             THE COURT:  Okay.  The second question I have is

13   with respect to the sealed proceeding.  There has been

14   references to it in some of the submissions.  My question is,

15   does it have to be sealed still and if portions -- or can

16   portions of it be redacted if there's some concern about some

17   of the content of it?  If you want to think about that, you

18   can surely think about it and let me know.  It seems to me

19   that the entire thing doesn't have to be sealed.  It struck

20   me, I can't remember who the submission it was, that somebody

21   might have intended to refer to that, the things that led up

22   to the -- that necessitated that sealed proceeding.  So if you

23   can let me know, can you let me know tomorrow?

24             MR. PAULSEN:  Yes, your Honor.  We did refer to it

25   in our letter as the portion that we thought still should be

PROCEEDINGS

1    under seal because your Honor placed that entire proceeding

2    under seal.  But I suspect we agree that we don't think it

3    needs to be under seal or at least the majority does not need

4    to be.

5            THE COURT:  I don't know if you have a position on

6    it?

7            MR. FRISCH:  You know, I've begun to think about it

8    but let me address the sealing issues, this one and the others

9    this afternoon and I'll let the Court know.

10           THE COURT:  All right.  I was going to suggest that

11   you could see if you agreed on anything, but I think that's

12   probably not going to work.

13           Give me just one second.

14           (Pause in proceedings.)

15           THE COURT:  I think Probation Department has

16   completed the presentence report.

17           MR. BUFORD:  Yes.

18           THE COURT:  And I think it might have mooted

19   whatever your concern was with regard to information in the

20   presentence report, but...

21           MR. FRISCH:  I don't think so.  To be honest, I

22   didn't look yet at the PSR with care.  I don't think it moots

23   it, but we're going to provide and we have ready to provide to

24   the officer certain redacted documents.  We'll do that very

25   shortly.

66

PROCEEDINGS

1           THE COURT:  All right.  Anything else?

2           MR. BUFORD:  Not from the government, your Honor.

3           THE COURT:  Is there still an open question about

4    that, if -- I think probation responded to your letter to me

5    about certain steps you wanted them to take so I don't think

6    there's anything for me to decide.

7           MR. FRISCH:  There is nothing for you to decide on

8    that.

9           THE COURT:  Okay.  Thanks so much everybody.

10          (Matter concluded.)

11               *     *     *     *     *

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

13

14   s/ Georgette K. Betts              September 18, 2023

15   GEORGETTE K. BETTS                 DATE

16

17

18

19

20

21

22

23

24

25