```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2    -----------------------------x
                                        21-CR-80(AMD)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4             Plaintiff,                Brooklyn, New York

5             -against-                 March 27, 2023
                                        9:30 a.m.
6    DOUGLASS MACKEY,

7             Defendant.

8    -----------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                         JURY PRESENT
10          BEFORE THE HONORABLE ANN M. DONNELLY
                  UNITED STATES DISTRICT JUDGE
11                     BEFORE A JURY

12   APPEARANCES

13   For the Government:      BREON S. PEACE, ESQ.
                              UNITED STATES ATTORNEY
14                            Eastern District of New York
                              271 Cadman Plaza East
15                            Brooklyn, New York 11201
                              BY:  ERIK DAVID PAULSEN, ESQ.
16                                  F. TURNER BUFORD, ESQ.
                                    WILLIAM J. GULLOTTA, ESQ.
17                            Assistant United States Attorneys

18   For the Defendant:       ANDREW J. FULTON, ESQ
                              40 Fulton Street
19                            New York, New York 10038

20

21   Also Present:            DOUGLASS MACKEY, DEFENDANT

22   Court Reporter:          AVERY N. ARMSTRONG, RPR
                              Phone:  718-613-2419
23                            Fax:    718-613-2639
                              Email:  Aarm.edny@gmail.com
24
     Proceedings recorded by mechanical stenography.  Transcript
25   produced by computer-aided transcription.
```

PROCEEDING                                818

```
1                (In open court; Jury not present.)

2                THE COURTROOM DEPUTY:  All rise.

3                THE COURT:  Hi.  Everybody can sit down.  All right.

4     I've received Mr. Frisch's letters.  I think, though, let's

5     just deal with the -- let's see.  I don't know what time this

6     one was sent.  But it's the -- oh, there are two things.

7     There's a mistake in the transcript which says "October 25th,"

8     and it should be "October 5th."

9                Does anybody object to that?

10               MR. PAULSEN:  No, Your Honor.

11               THE COURT:  All right.  And then the second thing is

12    number four in that letter, was a move to strike the word

13    "Muslim" from one of the exhibits.

14               And I think the Government agrees to that; is that

15    right?

16               MR. PAULSEN:  We don't think there's a problem with

17    it, but we don't have an objection.

18               THE COURT:  And then just Mr. Frisch is not calling

19    Special Agent Rees, and will rest this morning.  And then

20    there's a summary of some of the options that we discussed in

21    connection with the motion for a mistrial.  And Mr. Frisch --

22    I think we went over this already, but Mr. Frisch is not

23    calling witnesses who worked on the Clinton campaign and wants

24    to supplement his motion for a mistrial in a Rule 29 motion,

25    should there be a guilty verdict.
```

PROCEEDING                                  819

1           And Mr. Frisch is also renewing the motion as though

2     it were made after the defense rests this morning.  Anything

3     that you want to add to any of what's in this letter?

4           MR. PAULSEN:  Your Honor, only that the portion

5     about the stipulation.  There was some technical difficulties

6     over the weekend where it appears Mr. Frisch tried to send us

7     a draft that wasn't received.  We're working on it right now,

8     and I think we've agreed to a very short two-line stipulation.

9           THE COURT:  Okay.  And what is it?  I mean, you

10    agree to this two-line stipulation?

11          MR. FRISCH:  I do.  I mean, I still want to brief,

12    if it's necessary, more fulsomely, my arguments, but I'm not

13    going to -- I certainly want to take advantage of the

14    Government's agreement to these two sentences.

15          THE COURT:  Okay.  All right.  So anything else

16    before we bring in the jury?

17          MR. FRISCH:  There were two things:  First of all, I

18    think we need to get the stipulation printed out, so I have it

19    in the form of an exhibit which I don't think will take more

20    than a few minutes.

21          MR. BUFORD:  We have it drafted, Your Honor.  We

22    were working on it right up until the Court came in.

23          THE COURT:  All right.  That's fine.

24          MR. FRISCH:  But then I have some additional things

25    to put on the record about the Court's charge.

AVERY N. ARMSTRONG, RPR
OFFICIAL COURT REPORTER

PROCEEDING                              820

```
1            THE COURT:  So I'm just going to say, I'll listen to

2   them of course.  But I've given out basically the same version

3   of this charge, I want to say, four times.  And the reason I

4   do it ahead of time is so that you'll let me know what the

5   problem is.  So just start -- is it going to take a long time?

6            MR. FRISCH:  No.

7            THE COURT:  So what page do we want to start on?

8            MR. FRISCH:  Well, the first one has to do with the

9   definition of "venue."

10           THE COURT:  And the page?

11           MR. FRISCH:  Hold on one second, Judge.  I'm sorry.

12           So I'm not objecting to any language that's on

13  page 17 where "venue" starts.  However, because the definition

14  of "venue" includes the waters that surround Manhattan, I

15  would ask for an instruction what the island of Manhattan is

16  within the Southern District of New York.

17           THE COURT:  Do you have any objection to that?

18           MR. PAULSEN:  No, Your Honor.

19           THE COURT:  Okay.  All right.  So I'm going to,

20  right after "district" on the bottom of that page, I'll say,

21  "The island of Manhattan is in the Southern District," right?

22           MR. FRISCH:  Yes.

23           THE COURT:  Okay.  Hold on a sec.  Okay.

24           MR. FRISCH:  And, Your Honor, the only other

25  objection I have -- and I think this is just making sure that
```

PROCEEDING                              821

1    I objected, I think you've already ruled on this, I think the

2    definition of the crime conflates different parts of the

3    statute, number one.

4         Number two, I think the use of the four verbs in the

5    statute, even in the conjunctive, informs how a jury should

6    consider the definition of "injury."  Number three, I think

7    the last paragraph on page 25 -- or rather, the last sentence,

8    I beg your pardon, on page 25, with respect is an incorrect

9    statement of the law.

10        And, finally, I think some of the words used to

11   describe "injury" such as:  Hinder, make slow, hamper, make

12   difficult, are among words and terms that dilute or at least

13   change what Congress intended by the first sentence or the

14   first part of Section 241.

15        THE COURT:  What's your response to that?

16        MR. PAULSEN:  Your Honor, we briefed and argued

17   these issues before Judge Garaufis.  And he issued a long

18   opinion clarifying these points in particular.  And I believe

19   Your Honor's instruction tracks that opinion, and so we would

20   object to the defendant's characterization.

21        THE COURT:  Just so the record is clear, I think

22   Judge Garaufis' opinion was based on precedent and definitions

23   in other cases; is That Right?

24        MR. PAULSEN:  Right, Your Honor.  There are a

25   hundred years of 241 cases with jury instructions to match.

PROCEEDING                    822

1          THE COURT:  All right.  Well, if I didn't -- I

2    thought we had this conversation when we talked about it

3    before, but definitely I think the record is preserved.  And

4    so you have an exception.

5          Just one question.  And the only other thing is with

6    respect to the verdict sheet, I'm not going to separate out

7    the question of venue from the basic question of how the jury

8    finds.  I'm not aware of any case law that requires that, and

9    it's just another element that the jury has to find, albeit by

10   a different standard.  So you have an exception to that, as

11   well.

12         MR. PAULSEN:  Thank you, Your Honor.

13         THE COURT:  All right.  How are we doing on that

14   stipulation?

15         MR. BUFORD:  We just need him to print it, Your

16   Honor.

17         THE COURT:  Okay.  Do you want to e-mail it to us

18   and we'll print it?

19         THE COURTROOM DEPUTY:  She did, I just haven't

20   received it yet.

21         MR. PAULSEN:  Your Honor, for summations, do you

22   want us to wear a microphone when we're near the jury?

23         THE COURT:  I want to make sure everybody can hear

24   you.  And I think that's probably a good idea because we do

25   have an overflow room, and I also don't want to make it

PROCEEDING                                         823

1   difficult for the court reporter.

2              THE COURTROOM DEPUTY:  Judge, we don't have an

3   overflow.

4              THE COURT:  Oh, we don't.  We don't have an overflow

5   room.

6              Also just a reminder, possibly another triumph of

7   hope over experience, but if you could make sure that you

8   don't speak too quickly.

9              MR. PAULSEN:  I'm going to try, Your Honor.

10             THE COURT:  No, you're going to do it.  Just write

11  yourself a big note in red.

12             MR. BUFORD:  Your Honor, I don't know that it's

13  worth putting it on the record.  We just have one or two very,

14  very minor comments on the jury instruction for your

15  consideration.  It's just minor stuff.

16             THE COURT:  Well, do you want to put them on the

17  record or not?

18             MR. BUFORD:  No, Your Honor.

19             MR. FRISCH:  I don't think it's necessary.

20             THE COURT:  Wait.  What do you want me to do?

21             MR. FRISCH:  These are all nits, Judge.  These are

22  all, like, just little nits.

23             THE COURT:  Oh, typos and things like that?

24             MR. BUFORD:  Yes.

25             THE COURT:  Oh, we'll fix those.  Do you agree to

PROCEEDING                               824

1  those?

2          MR. FRISCH:  I agree to all of them.

3          THE COURT:  Okay.  Oh, good.  Well, thanks for

4  finding those.

5          MR. BUFORD:  And, Your Honor, the last version we

6  got in the instructions had instructions about calling out

7  venue separately on the verdict form, but we assume that's

8  going to come out --

9          THE COURT:  Yeah.

10          MR. BUFORD:  Okay.  Thank you.

11          THE COURT:  Are we good to go?

12          MR. BUFORD:  We're ready.

13          MR. FRISCH:  We're ready.

14          THE COURT:  All right.  Let's get the jurors.

15          (Pause in the proceedings.)

16          THE COURTROOM DEPUTY:  All rise.

17          (Jury enters the courtroom.)

18          THE COURTROOM DEPUTY:  You may be seated.

19          THE COURT:  All right.  Good morning, jurors.

20          THE JURY:  Good morning (unanimously).

21          THE COURT:  I hope you had a good weekend.  We are

22  ready to continue with the trial.

23          Mr. Frisch, do you wish to call any additional

24  witnesses or put on any additional evidence?

25          MR. FRISCH:  Your Honor, I have no additional

PROCEEDING                                    825

1    witnesses.  But I would like to read a stipulation to the

2    jury.  May I do it from the podium?

3              THE COURT:  You can do it from there.  It's fine.

4              MR. FRISCH:  So this is a stipulation signed by the

5    lawyers.

6              In the months prior to the 2016 presidential

7    election, means containing misinformation concerning how to

8    vote were posted and shared on political messaging boards such

9    as 4chan.  At least one member of the Clinton campaign staff

10   observed these means containing misinformation concerning how

11   to vote on 4chan in the months prior to the 2016 presidential

12   election and brought them to the attention of other staff

13   members after she observed them.

14             It is further agreed that this stipulation marked as

15   Defense Exhibit BB is admissible as evidence at trial.

16             And I offer this stipulation into evidence, Your

17   Honor.

18             THE COURT:  All right.  I think I told you about

19   stipulations before, so that's also in evidence for your

20   consideration.

21             (Defense Exhibit BB, was received in evidence.)

22             THE COURTROOM DEPUTY:  And does this conclude the

23   defense presentation?

24             MR. FRISCH:  Your Honor, it does.  Mr. Mackey rests.

25             THE COURT:  All right.  Anything further from the

PROCEEDING                                        826

1    Government?

2              MR. PAULSEN:  No, Your Honor.

3              THE COURT:  All right.  So at this point in the

4    trial, ladies and gentlemen, the lawyers have the opportunity

5    to address you in closing arguments or summation.  And the way

6    that works is the Government will present its argument first,

7    then the defense will present its summation, and then the

8    Government has the opportunity to address you again.

9              I've told you at several points during the trial

10   that what any lawyer says during the course of the trial, and

11   that includes summations, is not evidence.  You are the judges

12   of the facts, and it is your recollection of the facts that

13   control.  And as I've also mentioned at various points in the

14   trial, if you need to have your recollection refreshed about

15   what testimony was or what a particular exhibit was, you'll

16   have access to all of that during the course of your

17   deliberations.  But the purpose of summation is for the

18   lawyers to review the evidence and suggest to you the

19   conclusions that you can draw from it.

20             So with that, we will begin with the summation by

21   the Government.  Go ahead.

22             MR. PAULSEN:  Thank you, Your Honor.  Good morning.

23             THE JURY:  Good morning (unanimously).

24             MR. PAULSEN:  Over the last week, we presented you

25   with evidence showing what the defendant, Douglass Mackey also

SUMMATION - MR. PAULSEN                    827

1   known as Ricky Vaughn, entered into a conspiracy against

2   rights.  The defendant joined with others in a plan to

3   distribute disinformation that he hoped would trick people out

4   of casting their votes.  And not just any people.  He targeted

5   his disinformation at his political opponents, voters of

6   Hillary Clinton, focusing on Black people and women.

7           The evidence shows why he did this.  He did it

8   because he thought those groups were important to the

9   election, he did it because he thought the election would be

10  very close.  And, fundamentally, he did it because he thought

11  it would work, and because he didn't particularly respect

12  those he was trying to trick.

13          The evidence we have shown you proves beyond a

14  reasonable doubt that the defendant did these things, and,

15  importantly, that he didn't do it alone.  Now, over the past

16  week you've heard a lot of evidence.  You've heard testimony

17  from about 20 witnesses, you've seen countless documents,

18  you've seen several stipulations.  You've heard recordings,

19  and you've seen a lot of images.

20          All of that evidence came in for a reason.  And I'd

21  like to show you how we think it fits together.  However,

22  before we weighed into the key evidence and the key arguments

23  in this case, I think it's worth going over a few things that

24  are not actually in dispute here.  First off, there's no real

25  dispute what the defendant Douglass Mackey is the individual

SUMMATION - MR. PAULSEN                    828

1   known as Ricky Vaughn.  You heard the parties enter into a

2   stipulation.

3            Donna, may I publish?

4            THE COURTROOM DEPUTY:  What are we using?

5            MR. PAULSEN:  There we go.  Thank you, Donna.

6            (Exhibit published.)

7            MR. PAULSEN:  You heard the parties enter into a

8   stipulation which just means we agreed to something, that the

9   defendant used the three important Twitter accounts in this

10  case, Ricky Vaughn 99, the Ricky Vaughn, and Return of RV.

11  Although the Government always has the burden of proof in this

12  case, the defendant decided to concede this rather than having

13  the Government go through the process of proving this to you.

14           But I submit to you that the defendant conceded this

15  because there was really no reason to fight it.  As the

16  Government was going to establish this point beyond a

17  reasonable doubt.  You heard testimony that the defendant was

18  anonymous during the election and then he continued to be

19  anonymous for about a year and a half following the 2016

20  election.

21           But you heard what happened next.  His true identity

22  was revealed against his will.  He got doxed in 2018.  That's

23  the word that's used for it.  Now you saw how is true identity

24  was revealed.  The defendant was working for Paul Nehlen who

25  was a congressional candidate who you heard from at this

1    trial.  Paul Nehlen had hired Ricky Vaughn.  They got in a

2    dispute and Nehlen revealed the defendant's identity to the

3    world.

4            Now, that fact was quickly confirmed by

5    Loren Feldman who was a filmmaker that you also had heard

6    from.  Loren Feldman had met Ricky Vaughn in person, and he

7    filmed a documentary with him, but he didn't know his real

8    name.  So basically you had two pieces of evidence:

9    Paul Nehlen knew that Douglass Mackey -- the real name was

10   Douglass Mackey but Loren Feldman had seen his face.  A

11   journalist put these two things together and matched it up.

12   His identity was revealed.

13           Now, this was a surprise to many people, even his

14   roommate at the time, Marc Bertucci who you heard from.  He

15   didn't know this at all.  Now it was only then when his

16   identity was revealed that the investigation into the

17   defendant could begin.

18           And that investigation still had to prove that it

19   was really Douglass Mackey that was using all those accounts.

20   I believe you got a sense of how the Government was going to

21   prove that.  Special Agent Anthony Cunder, our summary

22   witness, told you that even though the defendant never used

23   his real name in any of his private messages, he dropped lots

24   of bread crumbs about himself, things that could connect

25   Ricky Vaughn to Douglass Mackey.

SUMMATION - MR. PAULSEN                     830

1          You might recall that he mentioned his age, he

2   mentioned that he lived in New York City, he mentioned that he

3   lived in Manhattan on the Upper East Side.  He said he was

4   from Vermont.  He said he went to Middlebury College.  He even

5   said what his best time was when he ran on the track team.

6          Significantly, in all these accounts, he used the

7   same e-mail accounts and Facebook account to link those

8   Twitter accounts, which enabled the Government to tie them

9   together.  All those facts connected Douglass Mackey to the

10  Ricky Vaughn accounts.  Now, the defendant is admitting this.

11  It's not really in dispute anymore, and that's his choice.

12  But I submit to you that he's admitting it because there was

13  no point in denying it.

14          That brings us to the second big thing not in

15  dispute here.  The defendant isn't really contesting that he

16  sent these fake ads.  He agreed the Twitter accounts are his.

17  He agreed that the records are authentic.  And he took the

18  stand and he told you he did it.  Again, that's his choice.

19  But I would submit to you that the reason that he's admitting

20  this is that there's no point in denying it.

21          So okay, what's in dispute here?  The first thing I

22  expect the defendant's going to dispute is whether this is the

23  proper venue for the case.  Now, for reasons I'm about to

24  describe, I don't think this is really in dispute.  But I

25  think it makes sense to address this first, get it out of the

SUMMATION - MR. PAULSEN                831

1    way so we can address the key issues in this case.  Part of

2    what you have to determine, as the jury, is whether any part

3    of the crime, any part of the crime happened in this district.

4    That's what venue means.

5           Unlike the ultimate question in this case, you only

6    have to find facts establishing venue by a preponderance of

7    the evidence.  That means more likely than not.  You heard

8    from several witnesses in this trial who provided bits and

9    pieces of evidence that clearly establishes that venue is

10   proper here.

11          Now, first, I think you heard the pretty obvious

12   reason why this case is here in New York.  The defendant lived

13   in New York.  Prior to the 2016 election, he was a New York

14   City resident.  He lived in Manhattan, and he worked in

15   Brooklyn just down on Court Street a few hundred feet from

16   this courthouse a few months before the 2016 election.  This

17   is where he lived.  And it's where he committed the crimes

18   charged in this case.

19          Now, the evidence indicates the defendant was living

20   in Manhattan on November 1st and 2nd, 2016, when he sent out

21   the two fake ads that Robert McNees showed you.  You saw that

22   in Stipulation 904.  He says he was here at the time.  You

23   also heard that from his roommate, Marc Bertucci who said he

24   lived with the defendant just prior to the election.

25          Now, the main reason his roommate was here, though,

SUMMATION - MR. PAULSEN                    832

1    was to tell you a specific fact, how they got their Internet.

2    They got their Internet through Spectrum.  Bertucci told you

3    that they used Spectrum cable for Wi-Fi, and that information

4    is highly relevant to establishing venue.  Now, you heard from

5    a few witnesses who came to share some technical knowledge

6    about how the Internet works around New York City.

7           Now, that evidence was presented to you because I

8    expect the Court is going to instruct you what the defendants

9    tweets which contain the fake ads if they pass through the

10   Eastern District of New York where we are now, venue is

11   established.  And the Court's going to tell you that the

12   Eastern District the New York includes the waters that

13   surround Manhattan.  I submit what the evidence that is fake

14   ads, passing through this district is entirely clear, but I'd

15   like to briefly put it together for you.

16          First, John Hendrickson of Spectrum testified.

17   That's a bit of his testimony on the screen.  He testified

18   because Marc Bertucci told you he and the defendant used

19   Spectrum.  He told you that any signal sent over Spectrum

20   systems from Manhattan would have to pass through the big

21   fiberoptic cables that connect Manhattan to the rest of the

22   Internet.  You see Manhattan is an island of course.  And just

23   like there are only certain places where cars can pass in and

24   out of Manhattan, it's the same with Internet signals.

25   They're basically the same places.  It's the bridges and the

SUMMATION - MR. PAULSEN                          833

1      tunnels.  Those fiberoptic cables run along the bottom of the

2      rivers, under the bridges as they leave Manhattan.

3            Now, Joel DeCapua of the FBI also testified.  He

4      testified as an expert.  He told you much of the same things

5      that John Hendrickson told you.  But he also clarified that if

6      the electronic communications were sent over a phone system,

7      it would be the same.  That those signals would have to move

8      through those same fiberoptic cables on their way off of

9      Manhattan.  Both told you this would be true no matter where

10     you are in Manhattan where the defendant stipulated he was.

11           And, of course, where was the final destination of

12     these messages?  You heard from Michael Anderson who was an

13     engineer at Twitter.  He was here to tell you that those

14     messages were sent to Atlanta, Georgia, and Sacramento which

15     is where they kept their servers.  So anything sent from

16     Manhattan would have to go there.  He also told you that he

17     reviewed Twitter's records, and he showed that one of the

18     tweets was sent from a desktop computer, another from a mobile

19     device, so we have it both ways.

20           Now, I expect that you'll be instructed that this --

21     these facts, if you credit it, is enough on its own.  The

22     evidence, the testimony of Bertucci, Hendrickson, DeCapua, and

23     Anderson all have technical evidence wasn't really challenged

24     in this case which is why I said to you that I don't think

25     this fact is seriously in dispute.  But of course, even if

SUMMATION - MR. PAULSEN                834

1    those signals were not entirely sufficient on their own, which

2    I submit to you they are, you don't really need more than

3    that.

4              It's not the only connection to this district.  Even

5    without the defendant's residence in this area, his home city,

6    the Judge will tell you that the materials of this conspiracy

7    were -- the Judge will tell you that if the materials of this

8    conspiracy were foreseeably sent and received into this

9    district, that also establishes venue.

10             You heard from Microchip, the cooperating witness.

11   He told you the purpose of the conspiracy was to spread the

12   fake ads everywhere, to make them go viral so they would be

13   seen by as many people as possible.  Those places would

14   include Brooklyn and other places in the Eastern District of

15   New York.  So I submit to you what the fact what the fake ads

16   with those very same text codes were seen by people in

17   Brooklyn, like the people right across the street at the

18   Clinton campaign, would have been foreseeably expected by the

19   co-conspirators.

20             Okay.  Let's get to the heart of the evidence,

21   though.  You heard from Robert McNees who was in Chicago at

22   the time.  He was an active Twitter user in 2016.  He saw

23   these events while they were happening.  He took screenshots

24   of what he saw that day, the tweets that we put on these

25   boards.

SUMMATION - MR. PAULSEN                    835

1            Let me put one up for you.  Now, you saw a few

2    versions of these.  We're going to put up on the screen, the

3    two electronic versions but you can see the poster boards

4    below, as well.  He also took another screenshot.  That was

5    this one.

6            Now, this one is worth looking at again, and it's on

7    the screen right now.  But we'll discuss it again in a moment.

8    It was sent by nia4_trump, a name that should sound familiar

9    to some of you.  Among other things she was a member of the

10   War Room, one of the direct-message groups that the defendant

11   was part of, the same one that Microchip, the cooperating

12   witness, was part of.  She sent out different fake ads than

13   the ones selected by the defendant.  She thanked Ricky Vaughn

14   for spreading the word, and then he re-tweeted her, sending

15   the information to his army of followers, spreading it

16   further.

17           Now, before we move on, I think it's worth pausing

18   here and taking a look at the fake ads the defendant sent.  I

19   think it's worth pausing and taking a good look.  I'd like you

20   to think what this is.  It's not funny.  There's no really

21   joke here.  It's not making fun of anybody.  It's not satire

22   of a politician or a political position.  It's not trying to

23   drive debate.  It's not even a smear or a personal attack.

24   There's none of that.

25           It's just fraudulent information about how to vote.

SUMMATION - MR. PAULSEN                    836

1    And more than that, it looks like a campaign document.  It

2    looks like something the campaign might have made itself.

3    Take a look at bottom.  It has the campaign logo.  It has a

4    sort of fine print that you'd see on official documents

5    telling you who can and can't take advantage of whatever's

6    being offered.  It even says, Paid by Hillary for President

7    2016.

8            Now, before we consider the rest of the evidence in

9    this case, I think it's fair to ask, why do this?  The

10   defendant said he was trying to bother the campaign or

11   something to that effect.  But can you do that in a lot of

12   ways.  You can mock a candidate, you can talk about her

13   policies, you can highlight embarrassing things she's done or

14   said.  This has none of that.  I submit to you that it is what

15   it is.  It's going after voters.

16           Then we have the second one, the one here.  This one

17   is in Spanish, and you heard the translation.  The information

18   is about the same.  Like the other ones, it uses the hashtag,

19   I'm with her, which is one of the hashtags the campaign used.

20   You heard Jess Morales Rocketto talk about that hashtag, and

21   you heard Microchip talk about it.  It was a hashtag the

22   campaign used.  It was one you would search to get information

23   about the Clinton campaign at the time.

24           And I submit to you, this is one of the hashtags you

25   would use if you wanted to put something in front of the eyes

1    of people who liked then candidate Clinton or supported her.

2    Now, and finally, looking at these two, the two on the screen,

3    what else do we know?  So neither is a re-tweet, although he

4    did that too, and we'll talk about that in a moment.  These

5    were tweets what the defendant made.

6              In his opening, the defendant talked about two

7    clicks, I think that's how he described it, two clicks.

8    That's not really true, is it?  He had to get these pictures

9    from somewhere, grab them, copy them, manually upload them, he

10   had to type in the hashtag and the rest of the message.  He

11   did that, waited seven hours, and did it again.

12             Now, part of your job as a juror is to use your

13   judgment as you weigh through the evidence and argument, your

14   tasked with applying common sense, the common sense you would

15   use for any other important decision in your life.  The judge

16   will read you in some instructions to that affect.

17             Now, I submit to you that even if you didn't know

18   anything else about the defendant, you didn't know anything

19   about his agenda, his plan, his preferences, his politics, I

20   think you would know why he sent that.  I think it's worth

21   dwelling on that for a moment before shifting our focus to

22   what else you learned about the defendant, because I submit to

23   you that everything else you learned in this case reinforces

24   that common sense.  Everything else in this case reinforces

25   the conclusion that the defendant did this for the simplest

SUMMATION - MR. PAULSEN                    838

1    and most straightforward reason of all, he wanted people to

2    fall for it.

3            Now, you heard from a number of people who were

4    involved, who saw these fake ads and took action, and it was

5    these people who frankly ensured what the scheme didn't get

6    off the ground, that it was foiled as it began.

7            You first heard from Jess Morales Rocketto, one of

8    the staffers at the Clinton campaign.  She told you she was

9    sitting across the street here in Brooklyn when the fake ads

10   were brought to her attention as a member of the staff.  She

11   told you that she thought they had looked like they had come

12   from the campaign but they obviously weren't.  The word she

13   used was "sneaky."  It copied the looks, the colors, even the

14   fonts that the campaign used, and it used one of their

15   hashtags, I'm with her.

16           The next person you heard from was Lloyd Cotler,

17   Lloyd Cotler was another staffer, he worked for her.  He

18   worked for Jess morales Rocketto.  Now, he had the same

19   impression, but he was very experienced in the text code

20   world.  And so he was able to look up and find out who had

21   this text code.  Now, remember, this is a couple of days

22   before the defendant sends these out.  This is around

23   October 29th, October 30th.

24           Now, Cotler contacted a company called Upland

25   Communications that he used to work with.  He met somebody

SUMMATION - MR. PAULSEN                    839

1    named Matias Ty Chesley, who you heard testify, who he thought

2    could help him figure out who had this text code, and they

3    found the right person.

4          They found it belonged to a company called iVision.

5    Now, you heard from the CEO of iVision, Omar Samiri, who came

6    and testified in this trial, he ran that company.  You'll

7    recall, he was really frustrated with this happening.  He told

8    you he thought the fake ads were fake too.  But he also had

9    sort of a personal concern here.

10         He was concerned that it looked, to the outside

11   world, that his company was participating in this, that the

12   people who were trying to send this false information about

13   voting were his customers.  He was worried about this because

14   he was afraid that the phone carriers would cut him off, and

15   so just like the others, he snapped into action.

16         Now, this is all happening just in the days before

17   the defendant sends this out.  Rocketto, Cotler, Chesley,

18   Samiri had all been collectively figuring out what was

19   circulating in some of these areas.  And they were getting in

20   touch with the right people, and they were in a position to do

21   something when it was necessary.

22         So you saw what happened next.  The defendant sends

23   these things out soon thereafter.  Each one about seven hours

24   apart.  Now, they had the same text code as the materials that

25   Rocketto, Cotler, Samiri, and Chesley had seen.  It's the same

SUMMATION - MR. PAULSEN                    840

1    text code owned by iVision, same hashtag being used.  But

2    within a very short time, Samiri who ran the company was able

3    to put a warning into place.

4           The warning basically said, this is fake, this is

5    not a real voting initiative, this is not what you think it

6    is.  He was able to act quickly because they saw this coming,

7    and they were ready to respond.  That is they were ready to

8    respond when the defendant sent his out.

9           Now, over the next few days, thousands of numbers

10   texted the code and nearly all of them, about 98 percent, come

11   after the warning is in place.  Now, at this point, people

12   could have seen the fake ads in a few places.  They were still

13   being forwarded around Twitter.

14          You may recall that Mr. McNees showed you these.  He

15   took a screenshot on election day.  He had been personally

16   told by Jack Dorsey, the CEO of Twitter, that these violate

17   the terms of service, but things were still swimming around.

18   Now, you've seen both these fake ads before.  One of them is

19   right here.  It's the same one that nia4_trump sent out that

20   the defendant reforwarded, the other one you saw in the War

21   Room and you saw in the Micro Chat.

22          The text is a little hard to read from here, but you

23   can see one of the people is saying, it's not fair that Trump

24   voters can't do this.  The other people are just saying vote

25   from home, do it this way.  All three are acting like it's a

SUMMATION - MR. PAULSEN                          841

1    real thing, telling people to do it.

2              Now, at the exact same time, this scheme is being

3    publicized on T.V. and newspapers.  You heard from

4    Ms. Rocketto, this was deliberate.  They were trying to

5    publicize that this was happening.  Now, without a doubt,

6    people would have seen it there, too.  The important thing

7    however is that the scheme was undermined, the plan was foiled

8    just as it was getting off the ground.  And, as a result,

9    nearly anybody who would have texted it, would have gotten the

10   warning.

11             Now, the Court is going to give you detailed

12   instructions on the elements of the crime in this case.  The

13   crime charge is conspiracy which means a criminal agreement.

14   The judge will instruct you in the law.  And you should only

15   follow what the Court says.  If I say anything different, you

16   should obviously listen to the Court.  But I expect that the

17   Court will tell you that there are a few primary elements to

18   this crime.

19             First, you have to determine that the conspiracy

20   existed.  The Court will tell you that a conspiracy is just

21   two or more people having a meeting of the minds and then

22   working together for an unlawful purpose.  The conspiracy

23   itself is the crime.  The Government doesn't have to prove the

24   conspiracy achieved its aims or really if it worked at all.

25             Instead, the Court will tell you -- or rather the

SUMMATION - MR. PAULSEN                    842

1    Court will tell you that it's not necessary that everybody in

2    the conspiracy got together and had a formal meeting to decide

3    who would do what.  Common sense will tell you that in

4    criminal conspiracies, many portions of it are left unsaid and

5    much of it is secret.  The important thing, however, is that

6    there was a mutual understanding.

7              Second, the Court is going to tell you that you have

8    to determine that the defendant intentionally joined the

9    conspiracy with the objective of injuring the right to vote.

10   The Court will tell you that the defendant didn't have to know

11   everybody in the conspiracy, didn't have to know the true

12   identities of everybody, didn't have to know every role that

13   everyone else was playing.  Whether he's in a conspiracy is

14   not determined by how long he was there.

15             The important thing -- and I expect the Court will

16   say something exactly to this affect, is that the defendant

17   participated with the knowledge of at least some of the

18   purposes and objectives of the conspiracy and with the

19   intention of aiding the accomplishment of those unlawful acts.

20             Finally, the Court will tell you what it means to

21   injure the right to vote.  Injure can mean a number of things,

22   can mean obstruct, hinder, prevent, frustrate, make difficult,

23   among other meanings.  It's enough that someone tried to

24   prevent voters from exercising that right.

25             Okay.  So let's get into the evidence now.  Let's

1    review what we learned in this case.  First and foremost, the

2    investigation found that in the lead-up to the 2016 election,

3    when this happened, the defendant was involved in three

4    separate groups, all private, that were involved in creating

5    this disinformation, strategizing over this disinformation,

6    and distributing this disinformation.  He was involved in

7    three separate private groups that spent large parts of 2016,

8    organizing their members to spread information in the most

9    affective way possible.

10          They were working together, using and highjacking

11   hashtags in an effort to bend Twitter to their will, to make

12   their own materials go viral, and to spread things everywhere.

13   You saw a lot of information about these groups.  And I know

14   it came to you a bit fast and all at once.  Let me recap it a

15   little bit.

16          One group was called the War Room.  This was the

17   group that the defendant was always part of.  It was the group

18   that was styled as a strategy group.  It's the one that

19   Microchip was part of, as well.  You may recall this language

20   from the first message when the War Room started.  The first

21   message in the group stated, quote, We have to work together

22   like a unit, so keep this group open and use it like our

23   strategy war room.

24          The next group was the Micro group, another one that

25   Microchip and other members of the War Room and Madmen group

SUMMATION - MR. PAULSEN                    844

1    used.  The defendant was in that one, too but then didn't

2    return after he was kicked off Twitter.

3              And then there were the two Madmen groups, Madmen

4    One and Madmen Two.  The defendant was part of both of those

5    groups from the beginning, as well.  But he was also out of

6    that group for a time after he was suspended.

7              You may recall that that group is the one where they

8    were pushing celebrity Photoshops of people with hats way

9    before the election.  But that's also the group where some of

10   the vote by text ideas seem to have taken hold very early.

11   That's the one where they were building on what happened in

12   Brexit.

13             Now, nothing about the defendant's involvement in

14   any of these groups would have been visible to the outside

15   world while it was happening.  The evidence of the discussions

16   in these groups gives you a window in to what was happening

17   behind the scenes in private when the defendant and his

18   co-conspirators were sending things like this out.

19             Now, as I just mentioned, the crime here is only one

20   count, one count of conspiracy.  In essence, a criminal

21   agreement.  Now, the charge of conspiracy is particularly

22   fitting here because nothing in this trial makes sense without

23   a conspiracy.  The activity you've seen laid out only makes

24   sense with a conspiracy because coordination is not a side

25   effect of this, it's the whole point.  I think that's worth

SUMMATION - MR. PAULSEN                845

1   repeating here.  Coordination is not a side effect here, it's

2   the whole reason they're doing this.

3           If the defendant does one thing and Microchip does

4   another, and the 20 or 30 other members of the group do their

5   own things, their activities disappear as noise.  They shout

6   different things at different times.  Their messages and

7   statements get lost.  But not when they work together.  When

8   they work together, their messages reinforce each other.

9   Their shouts become a chorus and you heard why that is.  The

10  defendant and his co-conspirators didn't join together merely

11  because they thought 20 or 30 or 50 is better than one.  I

12  mean, that's certainly true, but that's not why they acted

13  that way.  They joined together and worked together to repeat

14  the message over and again at the same time because when they

15  do that, Twitter notices.

16          The brain behind Twitter, the computer algorithms

17  sees a message getting traction all of the sudden, and they

18  make a trend.  Twitter then sends the message to more and more

19  people.  It displays the hashtag to more and more people as

20  Microchip told you.  The defendants and his associates had

21  figured something out.  They had figured out they could force

22  the messages they wanted on the wider public if they all

23  worked together and acted in unison.

24          You know all of this because Micro told you.  He

25  walked you through how they did it.  But you also know it

1    because the defendant and the members of this group talked

2    about it all of the time.

3

4                    (Continued on the following page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUMMATION - MR. PAULSEN                    847

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Summation - Paulsen                    848

1    (Continuing.)

2            MR. PAULSEN:  Put simply, I submit to you that there

3    was no point of doing this activity alone to only makes sense

4    of a conspiracy.

5            Now, during this trial you've seen the conspiracy in

6    action.  You've seen discussions behind the scenes.  You've

7    seen the people who crafted these messages.  You've seen

8    people who've shared these messages, discussed how to make

9    them better and when to release them.  And you've heard from

10   Microchip, one of the central members of some of these groups.

11           Now there were different groups, but they all had

12   overlapping memberships.  The defendant has a common presence

13   and, frankly, a common interest of all the members of the

14   groups.

15           So how do we know the defendant was part of this

16   conspiracy?  First, and this is sort of a basic point, we know

17   the defendant didn't act alone.  There's no indication he made

18   any of these images.

19           Here's one of the Government's exhibits, 200-D-10.

20           The defendant says:  I can get anything I want

21   Photoshopped in one hour.

22           There's a lot of statements like this.  The

23   defendant wasn't the Photoshop guy.  He's not the one making

24   any of these things.  You saw numerous occasions he asked

25   people to create things and they did.  He said the same on

Summation - Paulsen                        849

1   direct examination.  Here, and as in all of the earlier

2   occasions, he's pushing the work of others.  Others who had

3   the same intent.  Everyone had a role, and the defendant

4   wasn't the artist here.  The defendant was instead using his

5   particular power occupying his particular role that he was

6   most suited to play.  When the defendant sent out the fake ads

7   far and wide, he was using that power, his ability to spread

8   things everywhere on the kind of materials that his

9   co-conspirators had been working on.

10          Now, Microchip told you that the War Room, which we

11  just showed a moment ago, was a place for people with

12  particular skills.  He said:  Everyone there had brought

13  something to the table, had some reason for being there.

14          The defendant's particular skill is that he had the

15  megaphone.  He and Microchip actually had that in common.  The

16  defendant could blast things further and farther and more

17  effectively than the others, and Microchip had a similar

18  ability.  Their great skill was distribution, not creation.

19  But you didn't need Microchip to tell you that.  You saw the

20  defendant in his own words -- his own words, excuse me, and

21  the conversations he had with others in these private groups

22  about his unique ability and his army of followers.

23          Here we have some of the defendant's statements.  He

24  says he's got the most loyal army on Twitter and the most

25  active fans.  Here he says:  It's like at any one time there's

Summation - Paulsen                    850

1    an army of a hundred of my followers ready to swarm.

2              He knew this, and everyone knew this about him.

3              And this wasn't just perception.  It's not like they

4    were wrong about this.  It was actually true.  You heard the

5    people who worked at the Laboratory for Social Machines, which

6    was a part of MIT, which is a very big engineering and

7    computer science school.  They did a study in 2016 well before

8    the election on people who were influencing discussion more

9    than everyone else.  You saw how that project intersected with

10   the facts of this case.  Bill Powers told you that they did

11   the project in part as they wanted to see who was actually

12   driving discussion and debate, and he was curious to see it

13   was the usual suspects or if there were new people given

14   social media's power.  He told you he remembered Ricky Vaughn

15   being on the list.  He said he had no idea who that was.  But

16   he thought it was interesting that there were people on this

17   list that he hadn't heard of.

18             Now, Google scientist Eric Chu came and testified as

19   well.  He's the one who actually did the programming for it.

20   He told you that they had a few different ways of measuring

21   activity for this list.  He said sometimes you would get a

22   high rating out of a centrality in the news if your name was

23   mentioned a lot.  I think the example that was given was

24   Ronald Reagan.  Ronald Reagan is still mentioned a lot, but

25   he's not tweeting anything.  He's dead.  But he still appears

Summation - Paulsen                    851

1    a lot because he's important and his name has resonance.

2             Ricky Vaughn made the newspapers every once in a

3    while, but that's not why he's on this list.  He's on this

4    list because of how people acted through the things he sent,

5    his army of followers.  You saw that effect that the MIT

6    ranking had on the people in his groups.  They were impressed,

7    and for good reason.  You saw the defendant was fairly proud

8    of it as well.  This was but one example where he talked about

9    it.  And Microchip told you as well, he said that people in

10   the group knew this and they were impressed as well.

11            Now, the MIT decision shouldn't have been a

12   surprise.  Everyone in these groups knew that the defendant's

13   power of distribution was potent.  They were making fake ads

14   and fake things like that, but the defendant's role was to

15   push things.  That's what he was best at.

16            Now, before we talk more about the conspiracy,

17   there's one think we should quickly address.  The defendant

18   and Microchip had one other thing in common, one key

19   similarity.  They both had red hats on their avatars.  You

20   might remember this.  The left is Microchip; the right is

21   Ricky Vaughn.

22            Defense counsel has hinted that the presence of this

23   red hat is somehow a problem.  The defendant said the same

24   thing when he testified.

25            Now, I think the argument is why send things that

Summation - Paulsen                                   852

1   you want Clinton voters to see if you have a red hat on your

2   avatar, but you heard Microchip's answer.  That wasn't a

3   problem.  I think you can use your common sense here.  I think

4   it's fair to say that the first thing that the defendant and

5   Microchip wanted were for things to spread everywhere.  The

6   first thing that was going to happen is their own followers,

7   the people that they were aligned with, were going to spread

8   things, and those folks weren't going to have any issue with a

9   red hat.  But Microchip was asked about this.

10           QUESTION:  In the tweet in which you encouraged

11  people to vote my hashtag you were wearing a MAGA hat in your

12  profile picture; correct?

13           Correct.

14           Didn't you think that since the tweet was directed

15  at Clinton supporters that might tip them off that it was a

16  hoax in some way?

17           ANSWER:  It could, but I have multiple strategies in

18  doing something that.  Part of that was a tweet like that

19  would be copied by somebody else and spread like wildfire.

20  That was the intention.  It doesn't really -- I want people to

21  see that tweet obviously, but having that tweet out there

22  attached to a MAGA hat doesn't mean it will stay there.  My

23  intention with all of this was to spread that information as

24  far as it could go.  If somebody picked that up without a MAGA

25  hat or if a Clinton supporter picked that up and say I found

Summation - Paulsen                    853

1    this thing, I guess we can vote by hashtag.

2            Microchip figured that once things got widespread

3    and trended on Twitter as the groups had hoped, the fake ads

4    would be spread beyond the tweets.  The more people it got to,

5    the more likely it would separate from its original source.

6    Microchip spread this kind of disinformation about as well as

7    the defendant did and he didn't think twice about this.

8            Let's get back to the conspiracy, though.

9            How else do you know he was acting in furtherance of

10   the conspiracy?  Well, first off, you know he agreed with at

11   least one other person.  This was shown a few times in

12   evidence, but I want to underscore its importance.

13           Now, Robert McNees was taking screenshots of the

14   fake ads.  He grabbed this one as well.  This is not the one

15   the defendant sent.  It's the one he re-tweeted.  Now you've

16   seen nia4_trump a few times.  Here she is just before he

17   re-tweeted this.  The defendant was forwarding some of her

18   DraftOurDaughters materials.  They were both in the War Room.

19           Now, what do we see in the fake ad?  We see

20   nia4_trump thanking Ricky Vaughn for what he had done earlier

21   that day.  And of course what does the defendant do?  He

22   re-tweets her sending it out to his followers as well.

23           Now, the deceptive ad that nia4_trump sent isn't the

24   one the defendant sent, it's not one of those two, but you've

25   seen it before.  It was shared in the Madman Group the same

Summation - Paulsen                           854

1    day.  You see it on the screen.

2            Now, where else of course do we see nia4_trump?  She

3    was in the War Room.  This is her responding to the Aziz

4    Ansari memes that Microchip had shared, the ones in which he

5    said people should vote by hashtag.  Here she is talking to

6    Microchip after Microchip shared yet another.  Now, what does

7    she say?  She says:  I got suspended, Micro, for posting that

8    text vote meme.

9            She says:  No, don't.  Ricky and I got suspended for

10   that.

11           Now, Robert McNees screenshotted this, and the

12   screenshot shows the defendant and Nia working together, both

13   War Room members, both amplifying each others disinformation

14   about voting.  The judge will instruct you that a conspiracy

15   only requires two people.  Two people agreeing with each other

16   to further the criminal plan is enough.  There's much, much

17   more to this case than that, of course, but I submit to you

18   that what you see here on its own is enough to show that

19   common criminal plan in action.  Two members of the War Room

20   working together trying to trick people out of voting.

21           Now, the defendant amplifying the messages of the

22   others in these groups like nia4_trump in the War Room

23   shouldn't surprise you.  That was the defendant's specialty.

24   It was his way of using his one particular power.  When people

25   reached out to him asking that he boost the message, he would.

1   It was understood that the defendant could make things move

2   like no one else.  And the defendant understood what Microchip

3   told you as well; the key to making Twitter work was to work

4   in that sort of coordinated way.  Coordination is always what

5   mattered.

6           Now, Special Agent Cunder showed you a chart.  It

7   was Government's Exhibit 500.  You saw the purpose of this

8   chart.  On several occasion when members of the groups

9   discussed pushing a message under a specific hashtag, Special

10  Agent Cunder would check to see what the defendant did.

11  Sometimes it was the defendant initiating a hashtag in one of

12  these groups; sometimes it was the defendant chiming in on

13  something somebody else introduced; and sometimes the

14  defendant said nothing at all.  But in each case, the

15  defendant was out there using his megaphone to help the

16  messages trend.  This is just a sample of what Special Agent

17  Cunder saw.

18          Now, most of the time they were doing this, the

19  messaging was regular politics.  Nothing unlawful.  We showed

20  you all this activity not because there's anything criminal

21  about any of that.  For example, Photoshopping a red hat on

22  some celebrity.  Like here.  We showed it to you to give you a

23  window of how the defendants in the other groups were

24  operating together.  The groups chose a target, created some

25  memes, sent them all at once and held off the next target

Summation - Paulsen                          856

1    until it was time to go.  They wanted to be in sync working

2    together.  And ideally, when they found the right target, in

3    words said by a member of the group that the defendant would

4    have heard:  You gotta go for someone with dumb fans, though.

5           Now, I submit to you that the evidence you've seen

6    in this case showed that their techniques stayed the same

7    whether the activities were legal or illegal.

8           Take an example from October just before the

9    election, the DraftOurDaughters memes that we saw a moment

10   ago.  This was not an effort to injure the right to vote.

11   This was not criminal.  It was a political speech.  But what

12   did we see there?  We see it get discussed and workshopped

13   [sic] in all three groups at the same time; the War Room, the

14   Micro Chat, and the Madman groups.  We see discussions on how

15   to make it most effective.

16          Look at this discussion in the War Room where the

17   defendant is present.  You have Microchip saying:  Some of

18   these memes alienate women, so sift through them.  We want the

19   war message, not the, quote, females shouldn't be what they

20   want to be angle, at least in my opinion.  I'm a dude, so I

21   have no idea.

22          He's excited it's trending.

23          They also mentioned that they're getting them from

24   4Chan.  It say:  4Chan rocked this.

25          I think the evidence indicates that 4Chan was a

Summation - Paulsen                    857

1   place where they would get a lot of these things.

2          Now, let's jump to the Micro Chat.  We have a

3   similar conversation.  We have a user, again, concerned that

4   it might not work right:  The ones with chicks with guns, that

5   can have kind of the opposite emotional effect we want.  It

6   can give women the, quote, yeah, tough chicks feeling.

7          That's not what they wanted, and so they're

8   discussing, how do we modify these, how do we change our

9   messaging to make sure it works.  Now, in this one right

10  there, the defendant is not actually present when that

11  conversation is happening, but Microchip is there,

12  HalleyBorderCol, and various other members of the other groups

13  he's in.  Again, the discussion is about how to make it work.

14         And then these memes are discussed much less so but

15  a little bit in the Madman Group as well.

16         Now, the defendant -- defendant is in the War Room

17  at this time and he doesn't say anything in particular about

18  these particular images.  But you know what he does?  You saw

19  this in the chart that Special Agent Cunder told you.  He does

20  what he always does.  He's out spreading materials exactly at

21  the same time the War Room is talking about it.  And you saw

22  the examples of who he's spreading it with.  Here he is

23  spreading things that Microchip posted.  Here he is spreading

24  -- HalleyBorderCol spreading things that Microchip posted.

25  Here you have HalleyBorderCol and Microchip again.  Here you

Summation - Paulsen                         858

1  have the defendant forwarding nia4_trump.  All four members of

2  the War Room.  Even though the defendant wasn't talking about

3  this meme at that moment, he acted just like he always did,

4  spreading things with his group.

5          Now, the vote by text ads at the core of this case

6  were distributed to the groups at around the same time as

7  these, just a little bit after, and it's the same people that

8  were just pushing the DraftOurDaughters stuff.

9          I just showed you the HalleyBorderCol one.  You

10 might recall she's the one who brought them into the War Room

11 group.  Nia4_trump, the individual that Ricky Vaughn forwarded

12 here, the same person that, just days before, he was

13 forwarding with the DraftOurDaughters materials.

14         And then we have Microchip.  You saw Microchip

15 discussing the vote -- disinformation in detail in the War

16 Room.  I think it's worth going over what he says here.  This

17 is October 30th, so a couple days before the defendant sends

18 these out.

19         What does Microchip say?  He says:  He sends out a

20 tweet and he sends it to the group.  Immediately one of the

21 members there says:  Micro, I like that idea, but what if we

22 made it more believable by acting like it's unfair that they

23 can text and vote and we can't?

24         Micro says:  Fuck yeah -- or somebody else says:

25 Fuck yeah, Greg.  Smart.

Summation - Paulsen                    859

1          And Microchip says:  Yeah, true, Greg.  I'm working

2    on it.  Let me see what I can come up with.

3          But you see what happens next.  Somebody responds to

4    Microchip, and somebody named LaurenNann says:  We should do

5    our own for real Donald Trump.

6          Microchip is concerned.  He says:  Here's what I'm

7    worried about, Greg.  People on the Trump side thinking this

8    is legit and they stay home.  I'm plotting.  We'll have

9    something soon.

10          UnityActivist chimes in again and says:  Micro, what

11   about if we say something like:  It's too late because we

12   didn't register for it, we have to do it next election or some

13   shit.

14          And Micro says:  Yeah, I think so.

15          They are play testing their messages and seeing if

16   they're malfunctioning and then talking how to fix them.

17          Now, Microchip testified and told you about this.

18   What he told you was what the documents already told you.  He

19   took the stand and told you what your common sense would have

20   told you.

21          QUESTION:  Why did you tweet this?

22          Because the hope would be that Hillary Clinton

23   voters see this and then vote incorrectly.

24          He wanted to trick the right people.  He wanted to

25   trick the voters of Hillary Clinton.

Summation - Paulsen                           860

1            Now, the defendant took the stand and said that he

2    got his fake ads off 4Chan.  You heard what 4Chan was.  It was

3    a message board where things like this could be found.  That's

4    not really in dispute here.  Microchip talked about that.  He

5    also got things from 4Chan.

6            Now, when asked about this.

7            QUESTION:  If you saw an idea that was important to

8    you that you liked in the War Room, would you search other

9    places like 4Chan to maybe find content that was like the idea

10   shared in the War Room?

11           ANSWER:  Yeah, sure, yeah.  If you got an idea there

12   like -- I mean, just like this -- in the case with the Hillary

13   Clinton meme.  Yeah, you would want to go out there and see

14   what other content's out there.

15           This is also the sort of thing that they talked

16   about in the groups.  I've circled on these two portions of

17   the War Room right around this time where in each case

18   Microchip himself says:  There's a whole series of 4Chan

19   tactical nook memes like this.  And, yeah, 4Chan rocked this.

20           There was a pollination between the work that the

21   groups were doing and 4Chan.

22           Now, of course, the War Room wasn't the only place

23   this was happening.  The defendant was part of two other

24   groups where these materials were distributed.  The first one

25   was the Micro Chat.  The defendant had been a member of that

1    chat for a while, and he was removed when he got kicked off

2    Twitter.  He didn't rejoin.

3           Now, as the defendant told you on the stand, though,

4    he was still in touch with the people in these groups, even

5    when he got kicked off.  Here's a member saying -- name

6    Vendetta saying:  He replied to me on a message on Facebook.

7    I was showing him some of the fan art and the memes.

8           They are still talking with each other, and he told

9    you on the stand that that was the case.

10          Now, who else was in this group?  Microchip was

11   there, of course.  He told you that.  HalleyBorderCol, she's

12   the one who shared the vote by text and vote by hashtag memes

13   to the War Room.  She shares the same ones at almost the exact

14   same time as the Micro Chat giving them to those people as

15   well, keeping things coordinated.

16          There are people like this individual,

17   DonaldJBismarck.  He's sharing the fake ad that the defendant

18   shared.  He says:  I know why Ricky was suspended.  He was

19   posting this shit and people freaked out.

20          What does DonaldJBismarck then say?  He says:  There

21   are some libs who are really pissed I was tweeting these pics.

22          He's doing the same thing.  Again, the groups are

23   acting together.

24          Now we get to the Madman Group.  The Madman Group

25   you saw is two parts, part one 1 and part 2 that overlapped a

Summation - Paulsen                    862

1    little bit.

2            Now, Special Agent Cunder told you about some of the

3    individuals that had memberships in a lot of these places.

4    Baked Alaska, the name you might remember, he was a member of

5    the War Room but also a member of the Madman Group.  There was

6    a individual Urpochan, PaulTown, AlwaysSmooth.  Those are

7    members of the Madman Group, but also in the Micro Group, and

8    the defendant was in all three.

9            Now, from the very beginning, he's there at the

10   ground floor of this group.  He says he's honored to be in the

11   group.  He's called the leader of the movement.  We showed you

12   a lot of this group, a lot of prologue of this group to give

13   you a sense of the role that he was playing there.  He did all

14   the things we see in the other direct message groups; they

15   push hashtags, they discuss strategy, he brags about his MIT

16   ranking and all the members talk about the attention he gets.

17   All things you've seen before.

18           Baked Alaska says:  Guys, we are controlling the

19   narrative.  This is amazing.

20           Ricky_Vaughn says:  We are running Twitter right

21   now.

22           It's much of the same things you've seen.  The

23   groups are all working to push the same messages and hack

24   Twitter.

25           Now, the defendant is here in this group when the

1    discussions about voting disinformation begin, and it happens

2    here earlier in the other groups.

3             In July we see 1080p, which is one of the names that

4    you may remember as being the individual who seems to have

5    created a lot of these images.  He's talking about that he's

6    stealing fonts from the Hillary Clinton campaign.  He says:  I

7    pulled from the Hillary Clinton ad.  I need to know what font

8    this is.

9             And he's asking the group, what is it.  They're

10   giving ideas trying to guess what the right font is.  I think

11   you know why they want that.

12            Now, in late September, you see this.  An individual

13   from Urpochan -- named Urpochan sends a screenshot of

14   something from Facebook concerning Brexit, which was a big

15   vote that happened the earlier summer in June of 2016.  It

16   says:  Save yourself a trip.  You can now vote online via

17   social media.  Simply post "vote remain" on your Facebook or

18   Twitter account with the following hashtag, EUReferendum, on

19   23rd June between 7:00 a.m. and 10:00 p.m.  Vote remain 23rd

20   June.

21            And then it has some logos of the British labor

22   party.

23            Urpochan says:  Can we fake something like this for

24   Hillary?

25            And then you see a long list of people texting it

1    in.  The bottom, one of the members of the group says, while

2    the defendant is in this room:  Typical that all the dopey

3    minorities fell for it.

4            This is the beginning, the defendant gets kicked off

5    Twitter about ten days later, and he doesn't return to this

6    group until November 9th, around about the end of the

7    election.  But it's here that many of the deceptive ads seem

8    to have been created.

9            Now, I'm not going to go through all of them.  I

10   think you saw them during Special Agent Cunder's direct

11   examination.  There is a lot of them.  This is a sample of

12   them.  They continue from mid-October all the way through the

13   election.

14           Now, even when the defendant isn't there, though,

15   they're paying attention to him.  They talk about him when

16   he's out.  One of them says:  My old timeline is Ricky

17   avatars.

18           Urpochan, the individual who sent that Brexit photo,

19   is confirming for others that what -- what the new Ricky

20   Vaughn account is confirming that it's right.

21           Now, you are going to have these ads in the grand

22   jury room, so I won't belabor them.

23           Now, the defendant hasn't yet returned to this

24   group, but certain things are happening at the same time in

25   all the groups.  You might remember this one, the Aziz Ansari

Summation - Paulsen                    865

1   meme.  This is the one where he's a fairly famous comic and

2   there was a mock-up of him saying you can vote from home.

3              It pops up in the Madman Group.  One of the

4   individuals CurveMe is showing that he's getting responses

5   from individuals saying:  Is this real?

6              It then gets sent to the Micro Chat and the War Room

7   at about the same time.

8              Here's the one again that he re-tweeted from

9   nia4_trump popping up in the War Room around this time.  You

10  saw that a moment ago.

11             And of course members of the Madman Group in both

12  the public group and in some of their side conversations are

13  discussing when to do this.

14             Here's the Madman Group saying:  Don't post it yet,

15  though.  A week or less before the election.

16             Election year that -- day that year was

17  November 8th.  A week before was November 1st.

18             1080p talking with somebody in a private

19  conversation sends one of these fake ads and he asks:  When do

20  you think we should start posting these?

21             And the response is:  November 1st.

22             Again, what day did the defendant send his first

23  one?  It's November 1st.

24             Now, you know what happened next.  The defendant was

25  banned from Twitter for sending these fake ads.  1080p in the

Summation - Paulsen                          866

1    Madman Group sent an article about it to everyone and laughed
2    about it.  The defendant comes back into the Madman Group
3    about a week later.  Before then, however, he goes back into
4    the War Room.  He comes back using his new account, and you
5    saw what happens:  Sup Ricky.  Ricky.  Ricky in here, right?
6    Welcome back, bro.  Welcome back, Ricky.  Ricky.  Aww, Ricky,
7    we love him, LOL.  Can't keep a good man down.

8           He comes down to celebrate.  He just got caught
9    sending these things and his first action is to come back to
10   the War Room and celebrate as a returning hero.

11          Now, I submit to you that the evidence that I just
12   laid out shows beyond any reasonable doubt that a criminal
13   conspiracy existed and the defendant was part of it.  As I
14   said before, none of this makes sense without a conspiracy.
15   Coordination is everything that matters here.  That was the
16   whole point.  But I would like to now talk about the other
17   evidence in this case that shows why the defendant did what he
18   did.

19          I submit that the evidence you've seen demonstrates
20   important things in this case.  It shows that they were
21   working together.  It shows that they wanted to be effective.
22   It shows them concerned with tweaking the language to make it
23   work better.  It shows them understanding how powerful and
24   influential the defendant was in spreading things.  And for
25   that reason, it's not a surprise that the defendant was the

Summation - Paulsen                              867

1    one who got attention on CNN and places like that when he did

2    it.

3             But I want to come back to the beginning and discuss

4    common sense.  When I started I had asked you just to look at

5    these images and think to yourself, why would somebody do

6    this.  But of course you don't just have your common sense

7    here.  You have the evidence I just laid out for you, the

8    evidence from the DM groups.  But you have a lot more than

9    that, too.  You know a lot more about the defendant and you

10   know a lot more about what he stood for.  And I submit to you

11   that these other things that you do know now make it crystal

12   clear why the defendant acted the way he did.

13            This case unavoidably touches on politics.  This can

14   be an awkward mix because much of the evidence that you saw in

15   this case is political activity that is clearly protected by

16   the First Amendment.  Defendant was a big fan of Former

17   President Donald Trump.  But that's not unusual.  He shares

18   that with approximately half the voters in this country.  The

19   defendant isn't here because of his politics.  He is not and

20   frankly cannot be prosecuted for what he believes, and that's

21   really worth repeating.  He cannot be prosecuted for what he

22   believes.  But here's the important part.  What he believes is

23   clearly relevant to how and why he acted.  The judge will

24   instruct you that conspiring to injure the right to vote is a

25   crime and that you, as the jury, need to decide if the

Summation - Paulsen                    868

1    defendant meant to do that.  You are the finders of fact.  The

2    evidence of this earlier political activity and his personal

3    opinions were presented to you to give you a window into why

4    the defendant acted the way he did.

5              Now, the defendant took the stand and he told you he

6    didn't put any thought into this.  Or if he did have a

7    thought, it was about undermining the Clinton campaign.  I

8    think he said both.  I don't doubt that he wanted to undermine

9    the Clinton campaign.  So did Micro.  He told you as much.  He

10   said that was his life's work, frankly.  I'm sure that goes

11   for everybody in those chat rooms.  But the defendant also

12   said, unlike Microchip, that he didn't want to fool anybody

13   out of voting.  Seemingly alone, among the people in those

14   rooms, he apparently didn't want this to work.

15             I submit to you that his testimony on that point was

16   simply not credible and it doesn't match the evidence.  To the

17   contrary, I submit that the evidence shows the defendant's

18   motivations in doing this could not have been clearer.

19             The evidence you've seen demonstrated the

20   defendant's beliefs about the election.  First, the defendant

21   had a clear view of who the opposition was.  He wrote:  If the

22   democrats have their way, they will form a permanent majority

23   of unmarried white women and minorities.

24             The only thing standing in Trump's path was the

25   black voters.

Summation - Paulsen                    869

1            He understood who his opposition was.

2            Second, the defendant was preoccupied with turnout.

3    He believed that most people's opinions were not going to

4    change.  What was going to matter is who showed up to vote

5    and, perhaps more significantly, who didn't.

6            Now, I showed you this with Special Agent Cunder,

7    and Special Agent Cunder showed you that he said things like

8    this all the time.  Here's an example from November 2nd:

9    Obviously we can win Pennsylvania.  The key is to drive up

10   turnout with non-college whites and limit black turnout.

11           The key was to limit black turnout.  He said this

12   lots and lots of times, including numerous times the day he

13   sent his first tweet, November 1st.  The evidence shows that

14   this was on his mind.

15           And, third, he thought the election would be really

16   close.  He said it over and other again.  And in retrospect,

17   he was right.  In a close election, a small number of votes

18   matter.  You don't have to change many people's minds or trick

19   many people to make a difference.  He told you that, too,

20   right?  Very slight changes in the electorate will lead to a

21   Trump landslide.  Small increase in white non-college voters.

22   Small decrease in blacks.

23           He said that the day he sent out the fake ads.  This

24   is November 1st, the day that people in Madman Chat said you

25   should send it.  All that was needed was a small decrease in

1   blacks.

2           Now, this brings us to the final piece of evidence,

3   and I don't think it's worth beating around the bush here.  I

4   submit to you that the evidence shows that the defendant would

5   not have hesitated to undermine the voting rights of people

6   who thought differently than him.  As I said at the onset, I

7   think your common sense might tell you that whoever sends that

8   might think that way, but the defendant told you so.  He chose

9   these two fake ads; one black person, one Spanish speaker,

10  both women.  He had firm opinions about those groups that

11  directly indicate where his head was at on November 1st, 2016.

12  I will use his own words.  He thought black people were

13  gullable and he thought they were stupid.  On the stand he

14  called that an exaggeration.  Nearly every time he was

15  confronted with one of these, he said it was an exaggeration,

16  but I don't think his testimony matched the evidence.  This is

17  a private conversation.  This is with Amy Stephen, who you

18  heard testify.

19          He said how gullable black people are, the most

20  gullable people ever.  He didn't just say it privately.  He

21  said it in tweets.

22          Here are two examples:  No, you're dead wrong.

23  Decent people are fed up with black people because they will

24  believe anything.  Meanwhile blacks have an average IQ of 85.

25          The top one was sent a year before the election.

1    The bottom one, a couple of weeks before the election.  This

2    was an opinion of his that wasn't changing.

3            He said that his side should write off the black

4    vote and just focus on depressing their turnout.  He said that

5    they should create memes that would -- they would seed into

6    areas where black people would read them to encourage them to

7    #nevervote.

8            And in a statement that really couldn't be more on

9    the nose, he said the following:  Black people will believe

10   anything they read okay Twitter, and we let them vote why?

11           The defendant testified that he didn't think anybody

12   would fall for the fake ads, but I submit to you that this

13   evidence shows that the defendant of all people believed that

14   certain people -- certain people they were aimed at would have

15   fallen for it.

16           Now, of course, the defendant said much more than

17   this.  There were other groups connected to these false

18   advertisements that he also didn't think should vote at all.

19   You may remember that I asked him whether he thought

20   immigrants should vote.

21           QUESTION:  What about immigrants, did you think

22   immigrants should vote?

23           His answer was:  As long as they are legal.

24           QUESTION:  I mean legal immigrants.

25           And he said:  Yes.

Summation - Paulsen                     872

1           Now, of course that wasn't his opinion.  When he

2    said that, I don't think he knew what the information was I

3    was about to show him.  But you know what he said:  Trump won

4    natural-born citizens 50 percent to 45 percent.  Naturalized

5    citizens should not get the vote.

6           Immigrants, the children of immigrants, et cetera,

7    cannot be trusted to vote in the interests of their new

8    country.

9           He saw both of those and then he acknowledged it.

10   There wasn't any point denying it.  This is where his head was

11   at when he sent this.

12          Now, in last but not least, we come to his feelings

13   about women and voting.  Here are just a few examples of them,

14   which are just a few of many:  Women are children with the

15   right to vote.

16          It's impossible to have a functioning Government

17   when single women and single mothers vote.

18          And he added the hashtag "repeal the 19," which I

19   think it's fair to say means the Nineteenth Amendment of the

20   Constitution, which gave women the vote.

21          Finally, you heard the recording.  I think it's

22   worth playing it again, it's only 45 seconds, now that you've

23   heard him testify.

24          (Audio played; audio paused.)

25          MR. PAULSEN:  Now, I submit to you that the ideas he

Summation - Paulsen                      873

1    expressed in that recording weren't thoughts off the cuff.

2    They weren't exaggerations.  They weren't slips of the tongue.

3             As I said a moment ago, the defendant is not on

4    trial for what he believes, but what he believes is highly

5    relevant to why he acted.  I asked you to consider the

6    defendant's statements both public and private when you decide

7    what the person who sent those who wanted to spread them far

8    and wide was hoping to accomplish.

9             You are soon going to deliberate, and your task is

10   to find the facts.  I submit to you that the facts presented

11   to you show that beyond a reasonable doubt that the defendant

12   joined a conspiracy, when he did so, to injure the right to

13   vote.  Find him guilty because he is guilty.

14            THE COURT:  All right.  Ladies and gentlemen, I just

15   want to make sure you get a chance to stretch your legs a

16   little bit, so I think we will take just about a ten-minute

17   break.  Please don't talk about the case at all or look

18   anything up.  We'll see you in about ten minutes.

19            THE COURTROOM DEPUTY:  All rise.

20            (Jury exits.)

21            THE COURTROOM DEPUTY:  You may be seated.

22            THE COURT:  Okay.  Just for scheduling purposes, do

23   you have a sense of how long you are going to be?

24            MR. FRISCH:  You know, give or take about an hour.

25            THE COURT:  Okay.  I'm just trying to figure out --

Proceedings                                          874

1    I know you don't know how long your rebuttal is going to be,

2    but we'll figure out --

3              MR. GULLOTTA:  It sort of obviously depends on the

4    defense closing, but I wouldn't imagine it's going to be much

5    longer than 20 minutes.

6              THE COURT:  Okay.  All right, so we'll regroup in

7    about ten minutes.

8              (Continued on the following page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SUMMATION - MR. FRISCH                    875

1              THE COURT:  Are we ready for the jury?

2              MR. PAULSEN:  Yes, your Honor.

3              MR. FRISCH:  Yes, your Honor.

4              (Jury enters the courtroom.)

5              THE COURTROOM DEPUTY:  You may be seated.

6              THE COURT:  All right.  Ladies and gentlemen, we're

7    ready to assume with the summation by Mr. Frisch.

8              Go ahead.

9              MR. FRISCH:  Your Honor, thank you.

10             Ladies and gentlemen, good morning.  Please allow me

11   to begin by proposing a way that you might consider to

12   evaluate all the information that you have.  I propose that

13   you consider thinking about this case as a triangle, three

14   sides, three points.

15             One of the three points is the constitutional right

16   to vote.  The right to vote in the United States of America is

17   sacred.  For our rights, including the right to vote, people

18   have fought in wars and died.  For the right to vote, people

19   have marched.

20             One of the great people in our history is a man

21   named John Lewis.  Before John Lewis was a Congressman from

22   Georgia who marched in 1965 for the right to vote across the

23   Edmund Pettus Bridge in Selma, Alabama.  At a defining moment,

24   a moment that would define him forever, John Lewis had the

25   courage and the confidence and the faith to stand up to march

SUMMATION - MR. FRISCH                    876

1    for the right to vote even though the bridge was controlled

2    that day by law enforcement officers who awaited him on the

3    other side.  When John Lewis passed in 2020 a horse-drawn cart

4    carried his casket across that same bridge on which he had

5    marched 50 years before.  The right to vote, one of the three

6    points of the triangle.

7            Another point on the triangle of this case is the

8    constitutional right to speech and expression, freedom of

9    speech, freedom of expression.  For this right as well, people

10   have fought in wars and died.  For this right as well people

11   have marched, stood up to Governments, risen to the moment.

12           My purpose is not to defend the memes themselves.

13   They are offensive, in bad taste, they crossed the line of

14   decency.  No registered voter was tricked, but as I said to

15   you in opening statement, someone conceivably could have been

16   tricked.  Someone voting for the first time, it's possible.

17           It's not that speech or expression can never be a

18   crime.  It is illegal, for example, to call in a bomb threat.

19   There has been times and places in history, it still happens

20   in some places, where people get a knock on the door at seven

21   in the morning, like Doug Mackey got a knock on the door in

22   Florida January 27, 2021, and it's eight to ten law

23   enforcement officers there to arrest you.  But none of them

24   have friendly faces like Agent Granberg, seated behind me, or

25   Agent Cunder or Agent DeCapua.  The agents and law enforcement

SUMMATION - MR. FRISCH                877

1  officers who knock on your door at seven in the morning, are

2  not there to take you away to see a judge in West Palm Beach.

3         It's not just other times and other places in

4  history.  Today in the United States books are being banned.

5  It's 2023, we're in the United States of America, and they are

6  banning books, kids books, history books, poetry.  It's

7  happening today.

8         Today there are places in the United States, today,

9  where people have, or are trying to, regulate what a school

10  teacher can say, to make it illegal for example for a school

11  teacher even inadvertently to reveal things about their lives.

12         And the people who show up at seven in the morning

13  to arrest people for something expressed, they think they are

14  right.  They think it is imperative to control everything.  To

15  them, their point of view is righteous.  The people who are

16  banning books right now, kids books, history books, poetry,

17  they think they are right.  That the need for control is

18  obvious to them, their point of view is righteous.  The people

19  trying to regulate what a school teacher says, they think it's

20  obvious.  They believe they are doing God's work.

21         Freedom of speech and expression, speaks to a better

22  way, freedom of speech speaks to a better way.

23         The marketplace of ideas.  Not a quite farmer's

24  market on a country road on a Sunday morning, but a crowded

25  and noisy market in the middle of a bustling place where

1   everyone is talking almost all at once.  Sometimes someone

2   shows up in the marketplace and sets up a folding table and a

3   folding chair and they try and sell a bad idea, or something

4   in bad taste, or offensive, or that crosses the line of

5   decency, and is noxious and could be misleading.  And what

6   happens?  No one buys it.  The bad idea may generate some

7   traffic for a while, some people may be attracted by a new

8   voice and may be interested to see what it's all about.  But

9   they listen, they hear it, and they walk away.  Because the

10  idea is bad and no one buys it.

11          Speech regulates itself.  Expression regulates

12  itself.  If you give it air, it will suffocate.  No one will

13  give it oxygen, it will die.

14          There is another way.  Take the bad idea, take it to

15  the basement, stick it in the corner, the darkest, dankest

16  dampest corner of the basement, deny it air.  And what?

17  Happens.  The bad idea festers.  It becomes mold or worse, and

18  you've got a problem.

19          Here is another way of looking at it.  At some point

20  in our lives kids break away from parents.  It starts when

21  teenagers are going to parties and dating, and continues into

22  their 20s when they leave home and begin to live

23  independently.  All parents can do is set a good example,

24  steer their kids in the right direction, guide them.  But

25  there comes a time when your kids are on their own and all you

SUMMATION - MR. FRISCH                    879

1    can do is cross your fingers and pray.  Almost always, it

2    works out.  Kids figure it out on their own.  We figure it out

3    on our own.  Kids may not express gratitude to their parents

4    for their example, for all the guidance, but the thanks is in

5    knowing that your kids figured out.  They are safe.  They'll

6    be okay.

7            Here too, there is another way.  Take your kid, lock

8    them in their room, don't let them out.  It's a guarantee that

9    nothing bad will happen, except you're creating a monster, a

10   person filled with rage who will never figure out things on

11   their own, and never truly be safe.

12           We need the freedom to figure things out for

13   ourselves.  It's like the marketplace of ideas, speech

14   regulates itself.  Expression regulates itself.  If you give

15   bad ideas oxygen, they suffocate, they die.

16           If you stifle ideas, however noxious, they simmer,

17   they seethe, you breathe rage and resentment not resolution.

18           We all know a great example of how speech regulates

19   itself.  How expression regulates itself.  Every one of us

20   right here, right now, knows a great example of how speech

21   regulates itself.  It's this case.

22           The two memes that Mr. Mackey found on 4chan and

23   shared on Twitter, were up maybe an hour before Professor

24   McNees saw them and complained to Twitter.  Memes like it were

25   already viral.  The third meme was a retweet, that means it

SUMMATION - MR. FRISCH                    880

1    was already on the Internet when Mr. Mackey retweeted it.  The

2    media, Wired, Buzzfeed, CNN the Washington Post began covering

3    the memes within a day.  It was a national news story.  Page

4    513 of the transcript, quote, "basically every media

5    organization out there," close quote, was covering the memes.

6           These memes were a bad idea.  And the marketplace of

7    ideas killed them almost instantaneously; think of it,

8    instantaneously.

9           Three points on the triangle, the constitutional

10   right to vote, the constitutional right to freedom of speech

11   of expression.  And now the third point on the triangle, the

12   constitutional right to due process.

13          If it's the Government's idea to charge you with a

14   crime, it's on the Government to back it up.  For this right

15   as well people have fought in wars and died.

16          At defining moments in their lives here too, people

17   around the world with courage and confidence and faith have

18   stood up to control, have stood up to the Government.

19          I told you in my opening statement that the

20   Government could not prove its charge by any standard.  A jury

21   must find guilt beyond a reasonable doubt and Mr. Mackey

22   should be afforded every constitutional right to which he's

23   entitled.  But I will now show you why this case is a

24   nonstarter, why the Government is trying to force a square peg

25   into a round hole.

SUMMATION - MR. FRISCH                    881

1          The charge in this case is conspiracy, so let's

2     start with Mr. Microchip.  Why was it necessary for the

3     Government to bring Mr. Microchip into this courtroom?

4          On February 4, 2021, just a week after the media

5     publicized Mr. Mackey's arrest a week earlier, Mr. Microchip

6     reached out to the Government.  Mr. Microchip knew that

7     Mr. Mackey was arrested and he knew what for.

8          Exhibit H, February 4, 2021:  My lawyer is hard to

9     get a hold of sometimes.  I called him and left a message that

10    you'd be contacting him.  But if you can't get a hold of him

11    after a few days let me know, and I'll ring his cell and other

12    partners to get his attention.

13         For Mr. Microchip, this was a matter of urgency.

14    It's not because he feared he would be arrested next, as he

15    testified, he had already spoken to the Government once or

16    twice and he was not arrested.  It was a matter of urgency

17    because Mr. Microchip feared that his identity would be

18    revealed.  Mr. Microchip had debts to the IRS and bankruptcy.

19    He is self-employed and relies on customers to hire him, to

20    have confidence that he's the right person for the job.

21         He offered his services to the FBI.  The idea was

22    his, page 563, he was willing to work for the FBI for free.

23         When Mr. Microchip met with the Government in

24    April 2021, he knew that the Government would ask him about

25    the memes.  He had seen the media coverage of Mr. Mackey's

Case 1:21-cr-00080-AMD   Document 186   Filed 04/12/24   Page 66 of 147 PageID #: 3484

SUMMATION - MR. FRISCH                    882

1    arrest.  He had plenty of time to think about what he had to

2    say, he had already consulted with a lawyer by this time.

3    Think what you will about Mr. Microchip, but he's not stupid.

4    April 2021 after consulting with a lawyer, three months after

5    Mr. Mackey had been arrested for the memes, plenty of time to

6    think about them, plenty of time to read in the media what it

7    was all about, Mr. Microchip told the Government, beginning at

8    538 to 545 of the transcript:  That the participants in the

9    chats were not as organized as many people believed.  There

10   was not any grand plan to stop people from voting.  The focus

11   was not on one message, it was pushing out as much content as

12   possible.

13           It had not been his intent to put specific groups of

14   people in a box and stop that group from voting.  Not his

15   intent.  All of that is within pages 538 to 545 of the

16   transcript.

17           So how did Mr. Microchip get from those views of the

18   memes in April 2021 to his testimony here two years later?

19   According to Mr. Gullotta, Mr. Microchip had just forgotten.

20   Mr. Microchip had not recalled the time that he committed a

21   crime until, quote, "more recently," close quote when he sat

22   with the Government at meetings and reviewed his tweets and

23   his messages, page 595.

24           Mr. Gullotta:  Did that help refresh your

25   recollection of your intent at the time in 2016?

*Rivka Teich CSR, RPR, RMR, FCRR*
*Official Court Reporter*

SUMMATION - MR. FRISCH                    883

1        Answer:  That's exactly what it did, yes.

2        Mr. Gullotta:  So as you sit here today, rather as

3  you testify here today, is your memory of what you were doing

4  you when were tweeting in 2016 better than it was in

5  April 2021?

6        Answer:  Yes, very much so.

7        So Mr. Microchip's memory is better now than it was

8  before.  How did that happen?  It happened while meeting with

9  the Government, which had the power to charge Mr. Microchip

10  with a crime which would reveal his identity and generate the

11  same kind of publicity as when Mr. Mackey was arrested.  It

12  happened while meeting with the Government, which had the

13  power to prosecute him and expose him to a sentence of prison

14  of ten years under the statute.  It happened while meeting

15  with the Government which had the power to offer him a

16  cooperation agreement and assure his anonymity and help him

17  qualify for a lenient sentence.  All of a sudden Mr. Microchip

18  remembers about what really happened in 2016.

19        To borrow from Mr. Paulsen, perhaps the timing of

20  Mr. Microchip's refreshed recollection was just a coincidence.

21        Mr. Mackey never met Mr. Microchip.  Before

22  Mr. Microchip walked into this courtroom, Mr. Mackey had no

23  idea what Mr. Microchip looked like, had never heard the sound

24  of his voice, had no idea how Mr. Microchip presented, how he

25  might come across in-person, face-to-face.  Mr. Mackey never

SUMMATION - MR. FRISCH                884

1    had an opportunity to evaluate Mr. Microchip, to take the

2    measure of the man.  But the people seated behind me did.

3    They know him.

4              Page 439 to 480 of the transcript:

5              Micro, have we met before?

6              Answer:  We have.

7              Mr. Gullotta:  Have we met multiple times?

8              Answer:  Many times, yes.

9              The Government met with Mr. Microchip about 20

10   times.  Mr. Microchip knows agent Maegan Rees as Meg, Maegan.

11   The Government and Mr. Microchip are on a first-name basis.

12             Days before the Government applied on

13   Mr. Microchip's behalf for permission for him to testify

14   anonymously, Mr. Microchip stopped tweeting.  Exhibit P:  Good

15   night.  I'm not coming back.  This is my final tweet.  This

16   was just a month ago, February 22, 2023.  Why did

17   Mr. Microchip stop tweeting just days before the Government

18   applied for permission for him to testify anonymously?  Was it

19   the hope that no one would see Mr. Microchip's most recent

20   tweets as the date for trial approached; meaning, that you

21   would not see them?

22             Defense Exhibit U, February 2023:  I have the crazy.

23             Defense Exhibit R, February 2023:  I'm now 36 hours

24   into my Adderall marathon.

25             Defense Exhibit W, February 2023:  My IQ is so high

SUMMATION - MR. FRISCH                    885

1    right now, you have no idea.

2             Defense Exhibit S, February 2023:  I drink black

3    rifle coffee, wear a fishnet trucker hat, have a Jesus tattoo

4    and inject testosterone.

5             Defense Exhibit X, not seven years ago in 2016,

6    seven weeks ago, in February 2023:  3,109 crazy tweets over

7    two weeks.  What can I say, I'm insane, on pills, don't

8    shower, can barely take care of myself, hear voices, talk to

9    the walls, and can predict the future.

10            You saw Mr. Microchip.  Mr. Gullotta introduced him

11   to you after Mr. Gullotta and the Government had met with him

12   about 20 times.  They know who he is; Mr. Mackey did not.

13            I showed you Mr. Microchip's tweets, not

14   Mr. Gullotta.  I told you about Mr. Microchip's drug use, not

15   Mr. Gullotta.  Mr. Microchip admitted to using heroin, powder

16   cocaine, methamphetamine, mushrooms, pain killers, steroids.

17   According to Mr. Microchip, he used all of those drugs just

18   within 2002/2003.  According to Mr. Microchip, FBI agent

19   Maegan Rees was incorrect in writing that Mr. Microchip said

20   that he used drugs from 2002 or 2003 all the way until 2014.

21            Mr. Microchip testified that he had, in his words, a

22   silent agreement with Mr. Mackey; a silent agreement, with a

23   stranger on the Internet.  But Mr. Microchip and Mr. Mackey

24   never had a phone call, never even had a one-on-one message.

25   There is not even a one-on-one direct message between

1    Mr. Microchip and Mr. Mackey.  Not even one.

2          With respect, the only secret agreement in this

3    case, the only secret agreement is Mr. Microchip's implicit

4    understanding with the Government that he will say what the

5    Government needs him to say so that his true name is not

6    revealed.  So that he won't lose potential clients when the

7    world finds out that the man who authored so many tweets that

8    crossed the line of decency is him.  So he can pay off his IRS

9    and bankruptcy debts.  So he can continue to work for the FBI

10   for free, because the FBI can protect his identity providing

11   him, as he put it on page 564, with structure.  So that the

12   FBI will not abandon him.  Because it is no exaggeration to

13   say that Mr. Microchip needs that structure to remain whatever

14   measure of sanity he may have left.

15         So why was it necessary to bring Mr. Microchip into

16   this courtroom?  It's because the Government charged and must

17   prove a conspiracy.  Without Mr. Microchip claiming to have

18   had a secret agreement with Mr. Mackey, there is no proof of

19   conspiracy.  Without Mr. Microchip all of these people on the

20   Internet in chat rooms are just people on the Internet in chat

21   rooms.

22         Or as Mr. Microchip put it, back to Exhibit P, when

23   he tweeted his final tweet, hoping that you folks would not

24   his tweets from February 2023:  I wish that we could have been

25   more than e-friends, but this is the Internet after all.

SUMMATION - MR. FRISCH                    887

1          If you find Mr. Microchip to be unreliable, not

2     someone on whose word you can rely on in a matter of great

3     importance, if you find that he is not credible, there is no

4     case against Mr. Mackey.

5          There is no one claiming it's a conspiracy.  No one

6     saying anything about some sort of silent agreement with a

7     stranger online.

8          Without the Government embracing Mr. Microchip and

9     bringing him to this courtroom, all you have are charts

10    amongst strangers on the Internet.  Stuff posting.  Or as

11    Mr. Microchip told the Government in April 2021, even after he

12    knew that Mr. Mackey had been arrested and even after he

13    consulted with a lawyer:  The participants in the chats are

14    not as organized as many people believed.  There was not any

15    grand plan to stop people from voting.  The focus was not on

16    one message, it was pushing out as much content as possible.

17    It had not been his intent to put specific groups of people in

18    a box and stop that group from voting, page 538 to 545.

19         Mr. Microchip told that you his talent -- his words

20    not mine -- is to make things weird and strange.  He told you

21    how he used bots to create the false impression, as he put it

22    his words not mine, to create the false impression that he had

23    something interesting to say so that people would fall for it

24    and follow him.

25         But if you elect not to follow him, if instead you

SUMMATION - MR. FRISCH                    888

1    find him to be inherently unreliable and not someone on whose

2    word you can rely in a matter of great importance, like this

3    trial, there is no evidence of conspiracy, just haphazard

4    stuff posting and chats of strangers who Mr. Mackey did not

5    know, for whose words Mr. Mackey is not responsible, and most

6    important of which, he never saw.

7              Here is something else that Mr. Gullotta asked

8    Mr. Microchip in the context of the memes, this is page 484.

9              Mr. Gullotta:  State the obvious.  Did you think

10   that was a valid way of voting?

11             Answer:  Not at all.

12             State the obvious?  How contact Government ask its

13   star witness to state the obvious that you can't vote by text

14   or hashtag anonymously for president without proof that you're

15   registered to vote, a citizen of the United States, old enough

16   to vote, and all the rest.  How can the Government ask its

17   star witness to state the obvious and then allege that

18   Mr. Mackey intended to trick voters?

19             But let's assume that Mr. Microchip more recently

20   truly remembers what he was thinking in 2016.  Let's assume

21   that Mr. Mackey truly saw the chats that he did not see.  How

22   can Mr. Mackey be responsible for what a stranger says on the

23   Internet where these peoples were already viral by the time he

24   saw them?

25             Consider this, you're on a ferry with others.  Are

1   you liable for what the other passengers are thinking because

2   you share the same destination?  Or you're a member of an

3   online book club.  Everyone may have agreed to read and may

4   like the same book, are you responsible of someone else's

5   interpretation of one chapter?

6          Mr. Mackey was a member of dozens of chat rooms,

7   that's how he made the MIT list about the same level as

8   Senator Elizabeth Warren and Cher.  Fifty people can be in a

9   chat room.  Mr. Mackey was receiving and seeing hundreds of

10  things every day, at least.  Not one quiet conversation on a

11  country road on a Sunday morning, but a crowded and noisy

12  market in a middle of a bustling place.  It was a marketplace,

13  a place for good ideas, bad ideas, noxious issues ideas, great

14  ideas.  It was no criminal conspiracy.  It was the Internet.

15         But there is more.  If you have any doubt that there

16  is no case here by any standard, let alone proof beyond a

17  reasonable doubt, ask to see the following exhibits.

18  Government Exhibit 430-44 to 430-64.  Ask to see Government

19  Exhibits 200-124 to 200-132.  They are also in evidence as

20  200-P-1 to 200-Q-5.  Ask to see Government Exhibit 410-4 to

21  410-12.  Mr. Mackey is not there.

22         Regarding 430-44 to 430-64, this is where others are

23  work shopping the vote-to-text memes, the so-called Madman #2

24  chat.  The dates of these pages span October 5 to November 2.

25         Now look at Agent Cunder's testimony starting on

SUMMATION - MR. FRISCH                890

1    page 449.  The defendant is not in this group.  As of

2    October 5, that's when he was suspended from Twitter.

3            Now look at Cunder's testimony at page 457.

4    Mr. Mackey gets back in the room on about November 9.  The

5    Government put 430-44 to 43-64 in front of you, but Mr. Mackey

6    has nothing to do with these.

7            Now look at Government Exhibit 200-124 to 200-132.

8    These are one-on-one direct messages; that is, messages

9    between two people, one-on-one, not groups.  Mr. Mackey has

10   nothing to do with it.  This is the one where there is a

11   reference to the idea about posting on November 1.  Mr. Mackey

12   is not involved in this.  This is not a group.  This is

13   one-on-one.

14           It's not a coincidence.  It's not a question of

15   whether this is a coincidence or not.  Mr. Mackey is not

16   there.

17           If Ricky Vaughn is in these chat rooms where these

18   other memes are being circulated, why doesn't he circulate

19   those?  He finds his memes on 4chan where they are already

20   viral.  And no one was tricked.

21           Mr. Gullotta questioning Mr. Samiri, page 137 of the

22   transcript.

23           Mr. Gullotta:  And with respect to the cause of the

24   surge in inbound text messages, do you know for sure that it

25   was the Wired Magazine or some other media publication?

1          Mr. Samiri:  I do not.

2          Mr. Gullotta:  Could it have been because somebody

3    was sharing this on Twitter?

4          Mr. Samiri:  Could very well be a result of the

5    Twitter.

6          Could it have been?  The Government flew witnesses

7    for you to hear, for you to meet, from Wisconsin, Nebraska,

8    North Carolina, Cape Cod, Washington DC, three from

9    California, and two from Chicago.  The Government has the list

10   of telephone numbers.  The Government has devoted unlimited

11   resources to this case.  The Government assigned the five

12   federal employees seated behind me to work on this trial.  And

13   in addition to Agent Granberg, you met Agent DeCapua and Agent

14   Cunder.

15         If a single registered voter was tricked, the

16   Government would have called that registered voter as its

17   first witness.  If the crime is just a conspiracy, if that's

18   all that matters, why call Mr. Samiri at all?  Why put the

19   numbers in evidence?

20         The Government a criminal case may not ask you to

21   speculate about whether any registered voter was tricked based

22   on a spreadsheet of telephone numbers without connecting up

23   even one of those telephone numbers with even one actual

24   registered voter who was tricked; let alone one who was

25   tricked because of one of the memes that Mr. Mackey shared

SUMMATION - MR. FRISCH                892

1    when the memes were already going viral.

2              Could it have been is not proof by any standard, let

3    alone proof beyond a reasonable doubt.

4              Mr. Mackey's avatar was a fictional character in a

5    red MAGA cap.  When he shared these memes within an hour of

6    Professor McNees seeing them, his avatar was the same

7    fictional character tar but this time wearing a mask of Bane a

8    nemesis of Batman.  The Government claims the Mr. Mackey did

9    so expecting that his followers would run with it or that they

10   would cut and paste them without the masked avatar, or

11   whatever the Government's theory is about pushing these

12   hashtags that everyone would know, all these people, would

13   know exactly what to do.  Just because he shared them.

14             Those claims, with due respect, is the Government

15   stuff posting.  If it's viral, it's viral.  Everyone is going

16   to see it.

17             Mr. Mackey did not say that the memes themselves

18   were funny or hilarious, LOLOLOL.  He was commenting in 2016,

19   seven years ago on Twitter about the media claiming that the

20   memes could be considered voter misinformation.  What

21   Mr. Gullotta acknowledges is stating the obvious.  You can't

22   vote that way.

23             Look at Defense Exhibit C.  This is a comedian

24   telling Trump voters they can vote by text.  Here is why this

25   is important.  You'll have this if you want it in the jury

SUMMATION - MR. FRISCH                    893

1    room.  You can see that this meme was posted on November 8,

2    2016.  It's still up on March 2, 2023.  It's still up as of

3    March 2, 2023, the date is on the top.  None of this should

4    have been on Twitter, it shouldn't be there now.  And none of

5    this is funny.

6              But the Government cannot on the one hand

7    acknowledge that it's obvious that you cannot vote by text,

8    and simultaneously press an inference of criminal intent.

9              Did Mr. Mackey conspire to injure the right to vote?

10   What does it mean to injure the right to vote?  Can you injure

11   the right to vote by sharing memes like this on Twitter?  Is

12   Mr. Mackey a Government official closing polling places so

13   that minority voters have to travel hours to vote?  When the

14   closing of polling places results in waiting on lines for

15   hours in southern states, is Mr. Mackey an elected official

16   making it illegal to hand out bottles of water to people on

17   line?  Is Mr. Mackey an elected official who took mailboxes

18   out of neighborhoods to frustrate voters from mailing their

19   ballots?

20             In the face of all these types of actions, by

21   Government officials, how can it be that Mr. Mackey a guy with

22   a laptop in Manhattan sharing two memes that were already

23   viral and were instantaneously shut down, how can it be that

24   he intended to injure the right to vote when even the

25   Government acknowledges it would be stating the obvious that

Case 1:21-cr-00080-AMD   Document 186   Filed 04/12/24   Page 78 of 147 PageID #: 3496

1    you cannot cast an official ballot for president anonymously,

2    without proof of registration, and all the rest.

3           Why is this case in Brooklyn, in the Eastern

4    District of New York?  The charged crime is conspiracy, but

5    none of the alleged conspirators had any connection to this

6    district.

7           During the charged conspiracy, during the period

8    September to November 2016, and that's what you have to find,

9    not whether Mr. Mackey worked in Brooklyn before, whether the

10   conspiracy, venue for the conspiracy, during the charged

11   period, September to November 2016.  Mr. Mackey lived and

12   tweeted from Manhattan, which is the Southern District of New

13   York.  Neither Microchip nor any other alleged conspirator

14   tweeted from here.  If any conspirator tweeted from the

15   Eastern District of New York during the period of the

16   conspiracy, you can be sure the Government would have told you

17   about it.

18          The Government called no registered voter nor anyone

19   else who texted from this district.  Nor did the Government

20   even try to show that anyone actually texted from this

21   district, even if they used a phone with a 718 or 516 area

22   code.

23          The issue of venue is very much in dispute.  The

24   Government must prove that it was foreseeable to a cooperator

25   that an act in furtherance of the charged crime, in

SUMMATION - MR. FRISCH                895

1    furtherance of the charged crime, during the period of the

2    charged conspiracy would occur in this district, in

3    furtherance of the charged crime.  The only connection between

4    this case and this district was the headquarters of the

5    Clinton campaign in Brooklyn.  But the Clinton campaign was

6    not the object of any criminal conspiracy.

7           The Clinton campaign is Mr. Mackey's defense.  He

8    shared the memes with the intent to get media coverage and get

9    the Clinton campaign off-message.

10          If there is venue wherever Twitter travels, then

11   there is venue in every district around the country.  So when

12   determining whether the Government proved venue you should

13   consider, why Brooklyn?  Perhaps it's no more fair for me to

14   tell you what the Government must have been thinking in

15   choosing Brooklyn for this case than it is for the Government

16   to tell you what Mr. Mackey must have been thinking when he

17   shared the two memes.

18          What is fair?  Is to show why it was not reasonably

19   foreseeable to Mr. Mackey, or anyone else, to think about the

20   Eastern District of New York; and why venue is just another

21   way of showing that the Government cannot prove guilt by any

22   standard.

23          A triangle, three sides, three points.

24          The Government is right about the right to vote.

25   It's sacred.  But so is the right to freedom of speech and

1    expression.  And so is the right to due process.  If it's the

2    Government's idea to charge you with a crime, it's on the

3    Government to back it up, to prove every fact necessary to

4    constitute the crime.  A square peg does not fit into a round

5    hole.  Nor does a triangle.

6            If you ever watched a trial, including this one,

7    you've heard lawyers -- you've heard a lawyer today talk about

8    common sense.  Lawyers trying to lay claim to common sense as

9    confirmation of their position.

10           You probably have come to realize that common sense

11   means different things to different lawyers.  I want to talk

12   about common sense from a time just two weeks ago, before you

13   heard from any of the lawyers in this case, when Magistrate

14   Judge Reyes told you about this case.  Did you think the trial

15   would be about memes on Twitter?  After such memes had already

16   begun going viral, which were publicized as a national news

17   story almost instantly, shared by a guy with a famous online

18   Twitter avatar, who was in dozens of chat rooms and post3ed

19   hundreds of things every day knowing that people were watching

20   him?  Did you think that this trial would feature a witness

21   who boasted about a 36-hour Adderall marathon days before

22   signing off from Twitter before the Government applied to

23   protect him from publicly stating his name, all with the hope

24   that no one would find his tweets, that the jury would not see

25   them, the ones where he said:  I have the crazy, I'm 36 hours

1   into my Adderall marathon, my IQ right now is so high you have

2   no idea.  I'm insane, on pills, hear voices, talk to the walls

3   and can predict the future.

4                    (Continued on next page.)

1    (Continuing.)

2            MR. FRISCH:  When you first heard about this case,

3    did you think the Government would show you a list of

4    telephone numbers, rather than produce any registered voter

5    who was actually tricked?

6            Did you think that the only true connection with

7    Brooklyn, with this district, would be the headquarters of the

8    Clinton campaign which is the theory of the defense, not the

9    theory of the prosecution?

10           You may now realize why jury selection took some

11   time.  Fair and impartial jurors for this case needed to be

12   able to put aside political beliefs, discomfort with the

13   profanity, strong disagreement with views.  You all promised

14   Magistrate Judge Reyes that you would decide this case, decide

15   this case just on whether the Government proved that

16   Mr. Mackey participated in a conspiracy with others online

17   with intent to injure the right to vote.  You all promised, in

18   substance, that you would have the courage, the confidence,

19   and the faith to stand up and tell the Government, not guilty,

20   if the Government failed to prove its case.

21           The Doug Mackey who sits across from you right now

22   in 2023 is not Ricky Vaughn from 2016.  The last time anyone

23   heard from Ricky Vaughn was April 2018 when Mr. Mackey, on his

24   own, relocated to Florida, checked himself in for two months

25   of intensive inpatient psychotherapy followed by outpatient

SUMMATION - MR. FRISCH                   899

1   psychotherapy.  He did it on his own.  He met a woman with

2   whom he fell in love, they married, and their first child is

3   on the way.  Doug had the freedom to figure things out for

4   himself, and he did.  Doug Mackey may be a better person in

5   2023 than he was seven years ago in 2016, but he's not

6   perfect, nor anywhere near it.  He's a work in progress.  As

7   we get older, we don't become perfect, maybe we become more

8   accepting of our imperfections, more willing to acknowledge

9   them, more willing to work on them.  At this trial, I have not

10  been perfect.  If you think I screwed up something or should

11  or should not have asked a particular question, please blame

12  me, don't hold it against Doug.

13          All of the people whose words endure tell us, have

14  taught us, continue to teach us, how to conquer bad ideas, big

15  bad ideas, like racism and misogyny, and other bad ideas like

16  incivility, immaturity, vulgarity.  People whose good ideas

17  and words endure like John Lewis, Christ, Gandhi, and more

18  recent people like John Lennon, Michelle Obama.  It is not a

19  coincidence, it is not a coincidence that their message is the

20  one that always resonates beyond the moment, that the idea

21  that they offer has always and continues to draw, by far, by

22  far, the biggest crowd in the marketplace.  Their idea

23  resonates and the endures in the marketplace because their

24  idea has always been and remains and will always be the best

25  way, the only truly effective way to conquer bad ideas.  The

REBUTTAL SUMMATION - MR. GULLOTTA          900

1    courage, the confidence, the faith that truth will prevail, to

2    stand up with courage and confidence and faith, even when it's

3    difficult, even when it's excruciatingly difficult, to have

4    the courage and confidence and faith to stand up to control,

5    to permit truth to prevail because with freedom, truth always

6    prevails.

7               THE COURT:  Thank you, Mr. Frisch.

8               Is the Government ready to proceed with your

9    rebuttal summation?

10              MR. GULLOTTA:  Yes, Your Honor.

11              THE COURT:  All right.

12              MR. GULLOTTA:  Good afternoon, ladies and gentlemen.

13              THE COURT:  Did you get a microphone?  I think it's

14   best.

15              MR. GULLOTTA:  Oh, I'm sorry.  We'll try that again.

16              Good afternoon, ladies and gentlemen.

17              THE JURY:  Good afternoon (unanimously).

18              MR. GULLOTTA:  Certainly did not expect to hear my

19   name that much.  Not sure I would have ever expected to hear

20   my name in the same breath as John Lewis, Jesus Christ, and

21   Microchip, but here we are.  I want to take a little bit

22   about -- first of all, I don't want to take up too much more

23   of your time.  I know you've been sitting patiently this

24   morning and throughout all of last week.  But I do want to

25   take a moment to respond to a few of the things the defense

1    raised in its closing.

2          First of all, let's be clear, this case is not about

3    speech.  It's not about political speech, okay.  Let's look at

4    these fake ads.  There's no speech, okay.  There's nothing in

5    these that is political speech.  This is false information

6    about how to vote, the sacred right to vote, one of the sides

7    on defense counsel's triangle.  And the law permits certain

8    restrictions on speech.  Fraud, for example.  You can't use

9    words to commit fraud on her people and steal their money.

10   Threats.  You can't use your words to threaten other people.

11   So there are some limitations on speech.  This is one of them.

12   You can't use speech, you can't use words to trick people out

13   of their sacred right to vote.  That is illegal.  Imagine a

14   country in which that is legal, where you can be tricked out

15   of your right to vote.

16         The defense has made a point about portraying the

17   defendant as someone just online and somehow that's supposedly

18   less serious than a person who's on a street corner handing

19   out flyers or putting up signs with the wrong times or

20   locations of the polling place.  We submit that it's worse.

21   The defendant acting online put himself on 10,000 street

22   corners across America.

23         You heard the defense argue that the defendant

24   didn't mean to trick any voters.  That was not his intent, he

25   just wanted to rile up the campaign and maybe get some media

1    attention.

2           Ladies and gentlemen, I submit to you that the

3    evidence shows that that simply is not believable.  My

4    colleague and Special Agent Cunder walked you through a

5    mountain of evidence that showed you that the defendant spent

6    month after month after month tweeting and messaging with

7    others in the groups to find ways to reduce votes for Hillary

8    Clinton.  Reducing the votes for Hillary Clinton was his goal,

9    not riling up the media or antagonizing the campaign.  This

10   isn't shit-posting.  There's nothing in here that smears

11   Hillary Clinton.  There's nothing in here about a

12   controversial political topic, like, war or immigration.

13   There's nothing in here that would cause her voters to think

14   twice about voting for her.  There's nothing about these that

15   will rile up a campaign or get media attention, unless these

16   are attempts to trick people out of their right to vote.  That

17   is what matters and that is exactly what the defendant was

18   trying to do.

19          The evidence showed that one of the defendant's

20   primary purposes throughout the campaign was to reduce

21   turnout.  The defendant told you that on the stand.  Microchip

22   told you that on the stand.  Turnout was a major emphasis for

23   the defendant and the others in his group.  Over and over and

24   over, he harped on turnout, including, in the days he was

25   posting these, and primarily, depressing turnout for Candidate

REBUTTAL SUMMATION - MR. GULLOTTA          903

1    Clinton.  Like the defendant even testified, if you don't get

2    turnout, you lose.  Those are his words.  And that was his

3    goal.  If he could trick voters with these fake ads, turnout

4    for Clinton would be lower.  Are we really supposed to believe

5    he didn't hope people would fall for this?  The other group

6    members involved all certainly seemed to want it to work.  The

7    activists you saw in the conversation with Microchip, let's

8    see if we can make this more believable.  Mr.CharlieCoker,

9    another member of the groups, he hoped some stoners would fall

10   for it maybe in Colorado.  And Microchip unequivocally told

11   you that he treated his hashtag to vote treat so people would

12   fall for it, so they would be tricked.

13        So the defendant wants you to believe that out of

14   all the people involved in this, he was the only one that did

15   not want it to work.  Yet, we know how he felt about likely

16   Clinton voters.  We know he thought women shouldn't be voting.

17   We know he thought that black voters were more likely to

18   support Clinton, that they were gullible, he thought they were

19   stupid, and that they shouldn't vote.  We know that he thought

20   that naturalized citizens and the children of immigrants

21   shouldn't vote, yet we're supposed to believe that he posted

22   these two fake ads that clearly target those groups without

23   the intent to trick anybody?  Come on, ladies and gentlemen.

24   Let's use our common sense.  I'm sure he enjoyed getting some

25   media attention out of this.  Maybe he delighted in the panic

1    that these things caused people, but that doesn't mean that he

2    didn't intend to trick them, to trick voters too.  They hoped

3    it would.  They thought that would be funnier.  It's like the

4    arsonist who delights in watching the firefighters race to put

5    out the fire.  He enjoys seeing that, sure, but he intended

6    the building to burn.  Maybe the defendant thought this was

7    funny in some way, but he also wanted to trick voters.  Now,

8    you heard the defendant also say he didn't think anybody could

9    fall for this, it's so ridiculous that nobody in the entire

10   country could fall for it.

11            Let's look at these.  These look believable.  They

12   have the campaign's campaign logo, each one, the H with the

13   arrow.  They've got the font that the campaign was using,

14   they've got the, "I'm with her" hashtag, all the colors, as

15   Ms. Rocketto showed, the red and blue boxes.  One of them even

16   has the dash H that they used to sign text messages that were

17   sent by Candidate Clinton.  That's down here on the Spanish

18   language one.  Witnesses testified that the campaign texted

19   supporters with information about how to vote and they used

20   graphics like these.  Ms. Morales Rocketto said these fake ads

21   were sneaky because they were made to look like they came from

22   the campaign.  They even have disclaimers at the bottom to

23   make them look real.

24            Nobody could fall for this?  Really?  Nobody in the

25   entire country could fall for these?  That's what the

REBUTTAL SUMMATION - MR. GULLOTTA                905

1    defendant was supposedly thinking.  We all maybe would have

2    known this was a hoax when we saw it, but we also all know

3    that one person, a friend, a family member, somebody who

4    clicks on links that come in text messages from unknown

5    senders or opens those strange looking e-mails, right.  We all

6    know somebody like that.  That person wouldn't be tricked by

7    something like this?  Of course that person would, and the

8    defendant was counting on it.  He believed that there were

9    certain people out there who were not as smart, who were

10   gullible, and they just might fall for this.  He hoped they

11   would fall for this.  And he knew the election was close.

12   We've heard that today, we've heard it through this entire

13   case.  It was on a knife's edge.  He didn't need 10 million

14   people to fall for this.  He hoped some would.

15           And we know the campaign worried that people would

16   be fooled by these.  Ms. Morales Rocketto said she didn't take

17   ever issue to her supervisors, especially in the week before

18   the elections, because everybody was so busy.  It was a

19   firehose of information.  But she took these to her

20   supervisors because these were important to her.  So when you

21   go back to the jury room to deliberate, look at these again.

22   Look at these again and ask you, is the defendant believable

23   when he says he thought no one in the entire country could

24   fall for them.

25           Now, one of the reasons the defense claims that no

REBUTTAL SUMMATION - MR. GULLOTTA          906

1   one could fall for these is because of his avatar which is in

2   both, the profile picture with the red MAGA hat.  But that

3   argument conveniently misses the point.  The defendant did not

4   need to use his account to trick every single potential voter,

5   because he knows as soon as he pushes this out, his followers

6   will take it and tweet it without his image.  So as these fake

7   ads get blasted far and wide, the fake ads get further

8   separated from his profile picture, the red hat fades back

9   into the distance.  And he knows this.

10          He knows that anyone who sees these fake ads and

11  saves them to share elsewhere, whether on Facebook, somewhere

12  else on Twitter, in an e-mail, in a text message, that image

13  is going to be sent without his red hat, without his avatar.

14  And that was the point.  The avatar let's his followers know

15  that this is a Ricky Vaughn post, this is a Ricky Vaughn

16  tweet, take it and spread it.  His loyal army, that's what

17  they do.  And don't forget that Micro testified and told you

18  this too.  His profile picture had a MAGA hat on.  He texted

19  or he tweeted a hashtag "to vote," "fake ad," with that red

20  hat, and he told you he wasn't concerned about that because he

21  knew it would get re-tweeted and tweeted and tweeted further,

22  and that his image would be separated from the message.  We

23  also heard the defense argue that the defendant just didn't

24  give these fake ads any thought which is a little bit

25  inconsistent with some of the other defenses.  It was a split

REBUTTAL SUMMATION - MR. GULLOTTA          907

1   second, a couple of clicks.  But we know that's not true.  We

2   saw a mountain of evidence of how deliberate and careful the

3   defendant was when coming up with strategy and plans

4   throughout the election.  He was constantly planning and

5   thinking, what works, what doesn't work.  He wants you to

6   believe that these are the only two instances, the two tweets

7   that landed him in federal court are the only times he wasn't

8   actually thinking about it, it was just a couple of quick

9   clicks.  But we know that he posted this one at 5:30 p.m. on

10  November 1st, just a couple of days after it was being talked

11  about in war room and other groups and he says he got from

12  4Chan.

13          So we know he had to at least go from Twitter to

14  4Chan and start searching for the kinds of images he wanted.

15  4Chan is his supply store, I guess, for this sort of thing.

16  He also took the time when he posted it to write, I'm with

17  her, at the top.  And we know that he took the time to find a

18  particular version of these fake ads that suited his goals and

19  his interest and his beliefs.  Odds are not high that he

20  logged or opened 4Chan all of a sudden the first image he saw

21  was the one he wanted.  He went and searched for it.  And then

22  he tweeted it out.  And then about seven hours later, he went

23  back and found another one that features Spanish -- that

24  targets Spanish speaking voters and is written in Spanish.  We

25  know that this is another group of voters the defendant

1  believes should not be voting.  So these are several steps

2  taken over the course of hours, gave this more than a split

3  second thought.

4          The defendant also argues that even if you find that

5  he did intend to fool voters with these fake ads, he did not

6  conspire or agree with anybody else, he did this on his own.

7  He says he didn't see all those conversations in the War Room.

8  He was a member of that group.  He was not suspended and

9  removed from that group during those conversations.  He says

10 he didn't see them.  He does remember conversations about the

11 celebrities with the Photoshopped hats, he remembers

12 conversations in the group about DraftOurDaughters, he

13 remembers conversations about the MIT rankings, he remembers

14 conversations about converting Amy Stephen.  He remembers all

15 that; doesn't remember these.  Okay.

16         That is inconsistent with the evidence.  The

17 defendant's efforts for months were coordinated with group

18 members.  As he and Micro told you, everything was more

19 powerful when it was coordinated.  Tweeting alone was like

20 screaming into the void.  So they relied on the power of the

21 large group acting together in order to trigger Twitter's

22 algorism to cause these things to trend.  You heard Micro

23 describe that in detail.  He did this many times with many

24 pushed hashtags, the Podesta e-mails, DraftourDaughters, the

25 debates, all coordinated, all pushed simultaneously in unison.

1   And it was no different with these fake ads.  The pattern was

2   the same.  They were talking about it in the groups, in Madman

3   and in War Room.  The defendant was in war room when

4   HalleyBorderCol shared those two other fake ads.  She shared

5   those on October 29th, just a few days before the defendant

6   tweeted these out.  He was apart of War Room the next day when

7   the group members starting discussing and work shopping

8   Micro's fake ad, and he was apart of War Room when Micro

9   shared with them his concern about the Trump supporter had

10  been fooled by Micro's tweet.  The defendant then tweeted his

11  out a couple of days later.

12          And after he was suspended and he returned, he

13  returned, he returned to the group to take a victory lap to

14  receive.  This is exactly how the groups functioned throughout

15  this entire campaign cycle.  He didn't have to comment on this

16  in the group.  As Micro told you, there was a silent

17  agreement.  It was expected that group members would see ideas

18  in the chats and then go out and tweet them.  Use their own

19  versions.  Micro did the same thing.  HalleyBorderCol put a

20  couple of images that were like these into War Room, but he

21  didn't use those.  He's a text guy, so he went out the next

22  day and he tweeted in the way that he likes to which was just

23  text.  The defendant did the same thing.  It was not just a

24  coincidence that they were all doing it at the same time, just

25  the same way they had been for months.  It's because they were

REBUTTAL SUMMATION - MR. GULLOTTA          910

1   talking about in the War Room and the defendant knew it.

2           And defense counsel said that there were ads like

3   these already viral swirling around to give you the impression

4   that the defendant maybe didn't see these or at least get the

5   idea from War Room, he got it from somewhere else.  But ask

6   yourself then, if these were swirling around for some period

7   of time before these guys all talked about it in War Room, why

8   didn't the defendant tweet his images out much earlier?  Why

9   didn't he tweet them out on election day some time much later

10  than when he actually did?  Why did he tweet his out only

11  after and right after the idea was shared and discussed in War

12  Room?  And why did he tweet his out only after and right after

13  Micro did?  His versions.

14          Oftentimes, the obvious answer is the correct one.

15  It's because a bunch of his friends and followers in the

16  groups were talking about this and he saw it and he tweeted it

17  out.  Whether he got these from 4Chan or somewhere else is not

18  relevant.  Micro told you that's how the War Room functioned,

19  ideas why discussed and people went out and got content for

20  those ideas in other places including 4Chan.

21          And the judge will instruct you on conspiracy.  And

22  the instructions will be lengthier than what I'm going to

23  recite for you here, and as my colleague said, the way the

24  judge instructs is what you should listen to.  But know this,

25  we believe the Courts' instructions will tell you, among other

REBUTTAL SUMMATION - MR. GULLOTTA          911

1    things, a conspiracy by its very nature is almost invariably

2    secret in both origin and execution.  Therefore, it is

3    sufficient for the Government to show that the conspirators

4    somehow came to a mutual understanding, even if tacitly,

5    silently, to accomplish an unlawful act by means of a joint

6    plan or common scheme.  And this is exactly what Micro told

7    you about, a silent agreement.  The group members conspired to

8    trick people out of their right to vote and the defendant

9    joined that conspiracy.

10           Now, other name we heard a lot today is Microchip.

11   The defendant obviously wants to distance himself from

12   Microchip.  Understandable.  Microchip has admitted what he

13   did.  He's admitted what his co-conspirators did.  He's taken

14   responsibility and he came here to tell you about it.  And he

15   may not have used his real name, but he pleaded guilty and he

16   now has a criminal conviction.  And he was prepared as he told

17   you, to testify whether he had anonymity or not.

18           We believe the judge will instruct you to evaluate

19   the credibility of all of the witnesses you saw and heard,

20   including Microchip, including the defendant.  You'll have to

21   decide whether they're telling the truth.  Defense has pointed

22   out a meeting in April of 2021 to suggest that Microchip's

23   story maybe has changed over time.  Micro told you that he had

24   not reviewed his tweets, his DMs and other Twitter records at

25   that meeting.  That was five years or so after the events at

1    issue.  Much later, when he came to New York, he had an

2    opportunity to review his tweets and his DMs, and as he

3    testified, his memory today after having done that work is

4    clearer than it was in April of 2021.  He also plead guilty

5    over a year ago.  In order to plead guilty, he had to know

6    what he did and explain it to a judge, and his agreement

7    requires him to tell the truth.

8         Now, you might not like either one of them after

9    seeing what we've seen over the past week, Microchip or the

10   defendant, but consider their demeanors when they testified.

11   Ask yourself, which one of them looked at ease up there

12   testifying and which one looked like he was forcing out a

13   rehearsed story.  The defendant was tieing himself up in knots

14   to avoid stating the obvious to try to explain how he could

15   have wanted all of these group of people to not have the right

16   to vote, but somehow he was not using these to intentionally

17   trick them out of that right to vote.  Ask yourself who was

18   telling the truth.  Micro told you the clear intent was to

19   fool voters and the defendant denied that.  And now, when I

20   said to state the obvious, just to clarify the record, to

21   Micro, Microchip had already testified that it was their

22   intent to fool voters and trick them out of their right to

23   vote.  So we were stating the obvious because he had just

24   testified to it.

25         The defense has made a point about the lack of

REBUTTAL SUMMATION - MR. GULLOTTA          913

1   witnesses testifying that they were tricked out of their right

2   to vote.  First of all, it's irrelevant if the conspiracy is

3   successful.  That is a distraction.  If you find beyond a

4   reasonable doubt that the defendant intended to trick voters

5   and he conspired with others to do it, then the Government has

6   met its burden.  He's guilty of the crime charged.  Also, we

7   don't know who was and who wasn't tricked, right.  And that's

8   because the good guys acted to put measures in place to foil

9   the scheme.  Ms. Rocketto and Mr. Cotler and other

10  professionals at the campaign, Mr. Chesley and Mr. Samiri at

11  the shortcut companies, and some folks in the press responded

12  to try to prevent the defendant and is co-conspirators from

13  succeeding.  They set up warning messages and they shared them

14  widely so anyone who saw these and believed this they could

15  text their vote would know it's a hoax.  The safeguards were

16  put in place as the defendant was launching these ads into the

17  Twittersphere.  In other words, the fire department was on the

18  scene putting out the fires when the defendant lit his match,

19  but that doesn't excuse what he did.

20          Mr. Samiri testified that he was concerned in part

21  because the way technology was advancing so quickly, it would

22  not be out of the realm of possibility that a person would

23  think this is possible.  He was also concerned that his

24  company would be associated with this hoax.  Professor McNees

25  was concerned that people would fall for this.  We know that

REBUTTAL SUMMATION - MR. GULLOTTA                914

1    thousands of people texted Hillary, the short code Hillary to

2    59925 after the defendant posted his tweet.  And what is the

3    more likely reason that those people texted Hillary to 59925?

4    Because they read an article somewhere that said do not do

5    this, it's a hoax, you can't vote this way, so they would have

6    to think -- they would have to realize that they're sending

7    their personal cell phone number to something they've just

8    been told is a hoax, or because they saw these glossy real

9    looking campaign ads that told them they could vote that way.

10   Regardless, whether anyone was tricked into texting the number

11   because if the defendant's post does not matter.  What matters

12   is the defendant's intent.

13           Ladies and gentlemen, before I conclude, let's be

14   clear, the Government bears the burden to prove beyond a

15   reasonable doubt each element of the offense charged, and we

16   embrace that burden.  Throughout this trial, the evidence made

17   it clear that the defendant and other members of his Twitter

18   groups wanted to cut down the number of votes for Hillary

19   Clinton.  They tried a number of ways.  They tried by smearing

20   Candidate Clinton with embarrassing or controversial

21   information.  That's legal.  That's not what this case is

22   about.  They tried to scare her voters into thinking they or

23   their daughter or somebody else might get drafted into a war

24   if Candidate Clinton were to win.  That is legal.  You may not

25   like it, but that is legal, and that is not why we are here.

PROCEEDINGS                              915

1   And then they tried to trick some voters out of their right to

2   cast their votes altogether, and that went over the line, that

3   was criminal, and that is what this case is about.

4           So we ask to you look at the evidence with clear

5   eyes and use your common sense and you will arrive at the only

6   conclusion that makes sense, that the defendant and his

7   co-conspirators agreed to try to trick some voters out of

8   their right to vote.  We ask you to return the only verdict

9   consistent with the evidence.  It's a verdict of guilty.

10  Thank you.

11          THE COURT:  Thank you.  All right, folks.

12          The next stage of the proceedings will be my charge

13  on the law.  I'm going to give you your lunch break before we

14  do that.  It's not terribly lengthy, but I really want to make

15  sure that you're, you know, not hungry or tired.  So we'll see

16  you at 2:00 o'clock.

17          Please do not talk about anything having to do with

18  the case or permit anyone to approach you about the case.

19  Don't look anything up.  But have a nice lunch.  I'll see you

20  at 2:00 o'clock.  Thank you.

21          THE COURTROOM DEPUTY:  All rise.

22          (Jury exits the courtroom.)

23          THE COURTROOM DEPUTY:  You may be seated.

24          THE COURT:  All right.  Anything before we break for

25  lunch?

PROCEEDINGS                              916

1              MR. BUFORD:  No, Your Honor.

2              THE COURT:  I know you're shaking your head, I just

3    want the record to be clear.

4              MR. FRISCH:  I said no.

5              THE COURT:  Okay.  All right.  See you at

6    2:00 o'clock.

7              (A luncheon recess was taken.)

8

9              (Continued on the following page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                              917

```
 1              A F T E R N O O N   S E S S I O N

 2            (In open court; jury not present.)

 3            THE COURT:  Hi.  Everyone can sit down.

 4            All right.  Anything before we bring in the jurors?

 5            MR. BUFORD:  Your Honor, just one minor application.

 6            Would the Court consider, in addition to the

 7   instructions reminding the jury of its instruction with

 8   respect to permitting one witness to testify anonymously?

 9            THE COURT:  Don't I have that in there?

10            MR. BUFORD:  You have it with respect to anonymity

11   being a protected right under the First Amendment, but

12   specifically when Microchip testified, the Court gave an

13   instruction that, you know, sometimes the Court will allow a

14   witness to testify anonymously --

15            THE COURT:  Oh, just to repeat that instruction?

16            MR. BUFORD:  Yes.

17            THE COURT:  You don't have any problem with that, do

18   you?  I mean, I ordinarily probably would have put it in when

19   I -- I've done it before.  It's true.

20            MR. FRISCH:  You already gave the instruction.

21            THE COURT:  All right.  But I don't see any harm in

22   repeating it.  Where do you have in mind adding that?

23            MR. BUFORD:  Your Honor, I would consider either --

24            THE COURT:  Credibility?

25            MR. BUFORD:  Yes.  Or after the cooperating witness
```

1    instruction, Your Honor.

2              THE COURT:  Hold on for just one second.

3              All right.  What I said before was that the Court

4    permitted the witnesses to testify anonymously, which is not

5    an unusual practice, especially when there's media attention

6    in a case, and you shouldn't be concerned with why the Court

7    is keeping the witness's identity confidential.

8              I think probably in the credibility section is where

9    this belongs, just so it doesn't -- anything else before we

10   bring in the jury?

11             MR. BUFORD:  Not from the Government, Your Honor.

12             MR. FRISCH:  Your Honor, is the language that you

13   are using on that issue the same language you used during the

14   course of the trial?

15             THE COURT:  Yes.  Which was -- well, this is exactly

16   what it is.  It had an introductory sentence that he was

17   testifying using his online name, and that the Court is

18   permitting the witness to testify anonymously.  The practice

19   is not unusual, especially when there is media attention in a

20   case, and that you should not be concerned with why the Court

21   is keeping the witness's identity confidential.  And then it

22   said:  You should evaluate the witness's testimony -- well, I

23   didn't actually say this last line because he's a cooperator.

24   I didn't say that you should evaluate him the way you evaluate

25   any other witness.  So I just said that the Court was keeping

Proceedings                                              919

1    the witness's identity confidential and they weren't to

2    speculate why.

3              MR. FRISCH:  I object to that in light of now that

4    we have his testimony on the record, I think -- I think Your

5    Honor now has a better sense of -- this gentleman having

6    testified, I think the issue is now in different focus,

7    perhaps.  Perhaps the Court would consider saying the

8    Government is -- the Court is permitting it on the

9    Government's application or something like that.

10             THE COURT:  I won't say that because the reason why

11   the witness was, as far as I know, was permitted to testify

12   anonymously because he faced threats, and that's the nature of

13   the case.

14             Now, obviously, testimony about that didn't come

15   out, and you attributed a reason for him testifying

16   anonymously, but this is just saying that it's not an unusual

17   practice.

18             MR. FRISCH:  I understand Your Honor's position.  It

19   may not be the most -- the biggest issue in this case.  At the

20   same time, I think -- for the record, I respect Your Honor's

21   ruling, however, I think under the circumstances of this case,

22   it's highly unusual, and I don't believe he's been threatened.

23   The Government fears threats.

24             THE COURT:  What do you mean, you think it's highly

25   unusual?

Charge of the Court                          920

1          MR. FRISCH:  I don't think it's highly unusual --
2     I'm sorry, I think it is highly unusual for a witness like
3     this to be testifying anonymously.  I think that is unusual.
4          THE COURT:  Well, I mean, I think that there are --
5     Judge Garaufis was the person who made the decision, but I
6     think that the record was made before him that given the --
7     you know, the circumstances surrounding the case, that there
8     was a danger to him to be -- to being publicly identified, and
9     it's a concern that I've addressed recently in this case, and
10    so I don't think it's unusual at all.
11         Anything else you want to say about this?
12         MR. BUFORD:  No, Your Honor.
13         THE COURT:  Okay.  All right.
14         I also want to make it clear that it's the Court's
15    decision.  I mean, I think it's appropriate that it's the
16    Court's decision.  I'm not saying that -- I mean, I'm saying
17    that, but because that's accurate.
18         All right.  Let's get the jury, please.
19         THE COURTROOM DEPUTY:  All rise.
20         (Jury enters.)
21         THE COURTROOM DEPUTY:  You may be seated.
22         THE COURT:  All right, ladies and gentlemen, welcome
23    back.
24         We are now in the stage of the trial where I
25    instruct you on the law.  You have heard all of the evidence

Charge of the Court                                   921

1    in the case, as well as the lawyers' arguments and you've paid

2    close attention to this case, and I ask you to continue to do

3    that as I give you these instructions.

4            Now, the instructions that I'm going to give you are

5    divided into three parts.

6            First, I'm going to talk to you about the general

7    rules that define and govern your duties as jurors in a

8    criminal case.

9            In the second portion of the charge, I will give you

10   instructions about the crime that's charged in this case and

11   the elements that the Government must prove beyond a

12   reasonable doubt.

13           Finally, I will give you some general rules about

14   the process of your deliberations.

15           Let me begin by reminding you of your role as jurors

16   and my role as the judge.

17           As I mentioned in my opening instructions, your duty

18   is to find the facts from all the evidence in the case.  You

19   are the sole judges of the facts and it is for you, and you

20   alone, to determine the weight to give to the evidence to

21   resolve any conflicts in the evidence, and to draw those

22   inferences that you believe are reasonable and warranted from

23   the evidence.

24           My job is to instruct you on the law.  You must

25   follow the law as I give it to you and apply the law to the

1    facts as you find them to be.  It is your sworn obligation to

2    follow the law as I give it to you whether you agree with it

3    or not.  You should not be concerned about the wisdom of any

4    rule of law that I describe for you regardless of any opinion

5    that you might have about what the law is, or what you think

6    it should be, you would violate your oaths as jurors if you

7    were to base your verdict on anything other than the law as I

8    define it for you.

9            If the lawyers had said something about the law that

10   is different from my instructions, you must ignore it and be

11   guided by only what I instruct you on the law.  You should not

12   single out any one instruction, but consider the instructions

13   as a whole.  Since it is your job and not mine to determine

14   what the facts are, I have not expressed or implied an opinion

15   about how you should decide the facts of the case.  You should

16   not conclude from anything that I have said or done during

17   this trial, including in these instructions that I have any

18   opinion about the facts of the case or the merits of the case.

19   For example, please don't assume that I have an opinion about

20   the case because I might have asked a witness a question.

21   When I did that, if I did it, I did it only to make something

22   clearer or to move the trial along.

23           In determining whether the defendant is guilty or

24   not guilty on any of these charges, don't consider anything

25   that I have done.  I don't have any view about the defendant's

Charge of the Court                               923

1    guilt or innocence.  It is your function to determine the

2    facts, not mine.

3          The fact that the Government is prosecuting this

4    case in the name of the United States of America should not

5    affect your evaluation of the evidence and the facts before

6    you.  The Government is not entitled to greater consideration

7    than the defendant.  By the same token, it is entitled to no

8    less consideration.  All parties, Government or individuals,

9    stand as equals in this court and are entitled to equal

10   consideration.  Neither the Government nor the defendant is

11   entitled to any sympathy or favor.

12         It is your responsibility to decide the facts with

13   complete fairness and impartiality and without any bias or

14   prejudice or sympathy for any party you must perform your duty

15   as a juror with complete fairness and impartiality.  You must

16   consider the evidence carefully and impartially, follow the

17   law as I give it to you, and reach a just verdict regardless

18   of the consequences.  It would be improper for you to consider

19   any feelings that you might have about the defendant's race,

20   religion, national origin, ethnic background, occupation,

21   gender, age, or political views.  Each person is entitled to

22   the presumption of innocence and the Government has the same

23   burden of proof with every defendant.

24         It would also be improper for you to allow any

25   feelings you have about the nature of the crime charged to

1    influence your decision-making process.

2              The indictment is the document that the Government

3    uses to give the defendant notice of the charge against him

4    and to bring him before the Court.  The indictment is an

5    accusation and nothing more.  It is not evidence, and it is

6    entitled to no weight in your determination of the facts.

7              The defendant has pled not guilty to the indictment.

8    The burden is on the Government to prove the defendant guilty

9    beyond a reasonable doubt.  This burden never shifts to the

10   defendant.  He does not have to prove that he is innocent.  He

11   doesn't have to present any evidence at all.  If the

12   Government does not meet its burden of proving the defendant's

13   guilt beyond a reasonable doubt, you must reach a verdict of

14   not guilty.

15             The defendant is presumed to be innocent of the

16   charges against him.  The presumption of innocence alone,

17   unless overcome by proof beyond a reasonable doubt, is

18   sufficient to reach a verdict of not guilty.  The defendant is

19   presumed innocent unless and until you decide unanimously that

20   the Government has met its burden and proven him guilty beyond

21   a reasonable doubt.  This presumption was with the defendant

22   when the trial began and remains with him now and will

23   continue into your deliberations unless and until you are

24   convinced that the Government has proved his guilt beyond a

25   reasonable doubt.

Charge of the Court                    925

1          So what is a "reasonable doubt"?  A reasonable doubt

2     is a doubt that's based on reason and common sense.  It's the

3     kind of doubt that would cause a reasonable person to hesitate

4     to rely on it and act on it in a matter of importance in his

5     or her personal life.

6          A reasonable doubt is not a caprice or a whim; it is

7     not speculation or suspicion.  It is not an excuse to avoid an

8     unpleasant duty.  Proof beyond a reasonable doubt is not proof

9     beyond all doubt.  Rather, it is proof that is so convincing

10    that a reasonable person based on that proof would not

11    hesitate to draw the conclusion offered by the Government.

12         If after fair and impartial consideration of the all

13    of the evidence you have heard in this trial you have a

14    reasonable doubt, it is your duty to acquit the defendant.

15         On the other hand, if after fair and impartial

16    consideration of all of the evidence you have heard, you are

17    satisfied of the defendant's guilt beyond a reasonable doubt,

18    you should vote to convict.

19         Under your oath as jurors, you are not permitted to

20    consider the question of the punishment that the defendant

21    will receive if he is convicted.  It is my duty, and my duty

22    alone, to impose the sentence if the defendant is convicted.

23    It is your job to weigh the evidence in the case and determine

24    whether the defendant is guilty beyond a reasonable doubt

25    solely on the basis of the evidence.

Charge of the Court                    926

1           I'm now going to speak to you about what evidence is

2     and how you should consider it.

3           You must determine the facts in this case based only

4     on the evidence that was presented and on the inferences that

5     can reasonably be drawn from that evidence.  The evidence

6     includes testimony from the witnesses on direct and

7     cross-examination, the physical exhibits that were admitted

8     into evidence, and the stipulations between the parties.  As I

9     have mentioned a couple times, the stipulation is an agreement

10    between parties that certain facts are true, and you should

11    regard those agreed facts as true.

12          There are things that are not evidence and you

13    should disregard them in deciding what the facts are in this

14    case.

15          First, the arguments and statements by the lawyers,

16    including opening and closing arguments are not evidence.  If

17    a lawyer said something about the evidence in an opening

18    statement or in summation that conflicts with your

19    recollection of the evidence, it is your recollection that

20    governs.

21          Second, questions that a lawyer asked a witness that

22    the witness did not answer are not evidence.

23          Third, objections to questions or to exhibits are

24    not evidence.  Also, any statements the lawyers made when they

25    objected are not evidence.  As I mentioned in opening, my

Charge of the Court                    927

1    opening instructions to you, the lawyers have a duty and a

2    right to object and ask for a sidebar question -- sidebar

3    conference if they believe that a question is improper or if

4    evidence should not be received.  Don't be influenced by any

5    objections or by any of my rulings on the objections.  If I

6    sustain an objection, ignore the question.  If I overruled an

7    objection, treat the answer like any other answer.

8              Fourth, testimony or exhibits that I have stricken

9    from the record and told you to disregard are not evidence.

10             And anything that you may -- the final thing -- the

11   fifth thing is that anything that you might have seen or heard

12   outside this courtroom is not evidence.  Your verdict must be

13   based solely upon the evidence presented in this trial or the

14   lack of evidence.  In this regard, I have instructed you not

15   to read any newspaper articles or watch any television or

16   radio -- listen to the radio news or look up anything on the

17   internet or read anything on the internet.  That instruction

18   continues to the very end of the case until after you have

19   reached a verdict -- until after you've reached a verdict and

20   rendered a verdict.

21             Now, there are generally two types of evidence,

22   direct evidence and circumstantial evidence.  You may use both

23   kinds of evidence in reaching your verdict in this case.

24             Direct evidence is testimony from a witness about

25   something the witness knows from his or her own senses,

1    something the witness has seen, felt, tasted, touched, or

2    heard.

3            Circumstantial evidence is proof of a chain of

4    circumstances that point to the existence or nonexistence of

5    certain facts.  In this courthouse, we use a very simple

6    example to describe circumstantial evidence.

7            Let's suppose that you came to court on a day when

8    the weather was clear and sunny and dry, but after you've been

9    sitting in this windowless courtroom for a while, you see

10   someone coming in wearing a wet raincoat and another person

11   shaking a wet umbrella.  Now, you can't look outside the

12   courtroom and see for yourself if it's raining, and so you

13   have no direct evidence that it's raining.  But it would be

14   reasonable and logical for you to infer from the circumstances

15   that I describe, the wet coat and the dripping umbrella, that

16   it rained outside while you were sitting in court.  That's all

17   there is to circumstantial evidence.  It's on the basis of

18   reason, experience, and common sense you may infer the

19   existence or nonexistence of a fact from one or more

20   established facts.  Inferences are conclusions that reason and

21   common sense lead you to draw from the facts that were

22   established by the evidence.  Use your common sense in drawing

23   inferences.  An inference is not a suspicion or a guess.  It's

24   a reason, a logical decision, to conclude that a disputed fact

25   exists based on the existence of another fact that you know

1    exists.  So while you are considering the evidence that was

2    presented to you, you are permitted to draw reasonable

3    inferences from the proven facts in this trial.

4            Our law makes no distinction between the weight to

5    be given to direct evidence or to circumstantial evidence.

6    One kind of evidence is not better than the other.  You must

7    base your verdict on a reasonable assessment of all of the

8    evidence in the case.  I remind you that whether based upon

9    direct or circumstantial evidence or upon logical, reasonable

10   inferences drawn from the evidence, you must be convinced of

11   the defendant's guilt beyond a reasonable doubt before you may

12   convict.

13           Now, the Government has presented exhibits in the

14   form of charts or summaries.  These were shown to you in order

15   to save time to make certain evidence more meaningful and to

16   help you in considering the evidence.  It's for you to decide

17   whether the charts or summaries correctly present the

18   information that's included in the testimony and in the

19   exhibits on which they were based.  Because these charts and

20   summaries were admitted into evidence, you may consider them

21   as evidence, but you are to give them no greater consideration

22   than you would give to the evidence upon which they were

23   based.

24           Now, you've seen evidence of instances in which

25   Twitter did or did not suspend users for violating the terms

1    of service.  Twitter is a private company.  Neither its

2    internal rules nor its administration of these rules bear on

3    whether the users' conduct, including the defendant's,

4    violated the law.

5              Now, I think I spoke to you about this a little bit

6    in my opening instructions, but as the sole judges of the

7    facts, you are also the sole judges of the witnesses'

8    credibility and the weight that their testimony deserves.

9    There is no magical formula that you use to judge a witness's

10   testimony.  You all make these decisions in your own lives,

11   and the standard you use in your own lives to make these

12   decisions are the same standards that you should use here.

13   Your determination of a witness's credibility depends upon the

14   impression that the witness made to you on -- the impression

15   that the witness made on you as to whether the witness was

16   telling the truth or giving you an accurate version of what

17   occurred.  One of the best tools you have in making these

18   decisions is your common sense.  In making your decision, you

19   can consider any number of factors, including the following:

20             Did the witness have the opportunity to see, hear,

21   and know about the events that the witness described?

22             Could the witness remember and describe these things

23   accurately?

24             How did the witness testify?  Was the witness honest

25   and forthright?  Did it seem like the witness was hiding

1    something?  Was the witness evasive?  Did the witness testify

2    differently on direct examination than on cross-examination?

3              Was the witnesses' testimony reasonable in light of

4    all the other evidence in the case?

5              Did the witness have a possible interest in the

6    outcome of the case?

7              Was the witness's testimony contradicted by the

8    witness's other testimony by what the witness said or did on a

9    previous occasion, or by other witnesses' testimony, or by

10   other evidence?

11             Now, inconsistencies or discrepancies in a witness's

12   testimony or between or among the testimony of different

13   witnesses may or may not cause you to discredit a witness's

14   testimony.  If there is a discrepancy or an inconsistency, you

15   should consider whether it relates to an important fact or

16   whether it is an unimportant detail, whether it was

17   intentional, or whether it was a result of an innocent

18   mistake, and whether the witness had a common sense

19   explanation for the inconsistency.  If you determine that a

20   witness has purposely lied to you, that is important and you

21   should consider it seriously.

22             A witness's testimony may be discredited or

23   impeached by showing that the witness previously made

24   statements that are inconsistent with the witness's testimony

25   in front of you.  It is your job to determine the weight, if

1    any, to be given to all or part of a witness's testimony who

2    has been impeached by prior inconsistent statements.  You

3    should first determine whether the prior statement was

4    inconsistent.  If you find that the witness made an

5    inconsistent statement, you may consider that fact in

6    assessing the witness's credibility.  You may consider whether

7    you believe the witness and accept the witness's testimony

8    even though there was a prior inconsistent statement.  In

9    making this determination, you should consider the importance

10   of the subject matter of the statement.  If you were to find

11   that the matter is relatively unimportant, you may decide not

12   to attach much significance to the inconsistency.

13          If you find that the matter is important, you may

14   decide that it casts substantial doubt on the witness's

15   credibility.  If you find that a witness's testimony on the

16   stand is false in whole or in part, you may disregard the

17   particular part of the testimony that you find to be false or

18   you may disregard the witness's entire testimony.

19          Now, the Court permitted the witness Microsoft [sic]

20   to testify anonymously.

21          As I mentioned, I think before he began his

22   testimony, this is not an unusual practice, especially when

23   there is media attention in a case, and you should not be

24   concerned with why the Court is keeping this witness's

25   identity confidential.

Charge of the Court                        933

1          THE COURT:  Now you heard expert witness testimony

2    from FBI Special Agent Joel DeCapua, who is a cyber crimes

3    expert, who testified about cellular data infrastructure in

4    the New York City area.

5          An expert witness is allowed to express an opinion

6    about which the witness has special knowledge or training.

7    Ordinarily witnesses are limited to testify about matters of

8    fact and the rules of evidence don't permit the witness to

9    testify about their opinions.  Expert witnesses are the

10   exception to this rule.  If specialized knowledge will help

11   you as jurors understand the evidence, or decide a disputed

12   fact, a witness who is qualified as an expert by knowledge,

13   skill, experience, training or education may testify about

14   that evidence or facts in the form of an opinion.

15         You should consider the expert testimony you heard

16   in this case and give it the weight you think it deserves.  In

17   weighing expert testimony you may consider the expert's

18   qualifications, the expert witness's opinion, the expert

19   witness's demeanor and reasons for testifying, as well as all

20   of the other considerations that ordinarily apply when you are

21   assessing a witness's credibility.

22         If you decide that the expert witness's opinion is

23   not based on sufficient education and experience, or that the

24   reasons the witness gave in support of the opinion are not

25   sound, or that the expert's opinion is outweighed by other

1   evidence, you may disregard the opinion entirely.  In short,

2   the expert witness is the same as any other witness.  You

3   should not accept the testimony of an expert witness merely

4   because the witness is an expert or merely because I permitted

5   the witness to testify as an expert about his or her opinion;

6   nor should you substitute it for your own reason judgment and

7   common sense.  The determination of the facts in this case

8   rests solely on you.

9         You also heard the testimony of law enforcement

10  agents.  You should evaluate these witnesses' testimony in the

11  same way that you evaluate the testimony of any other witness.

12  The fact that a witness is a law enforcement agent does not

13  mean that you should give the witness's testimony any more or

14  less consideration than any other witness.  You should use all

15  of the tests of credibility that I just discussed with you to

16  evaluate the law enforcement witness's testimony.  It is up to

17  you to decide, after reviewing the evidence, whether to accept

18  the testimony of law enforcement witnesses and to give that

19  testimony the weight you believe it deserves.

20        You did hear the testimony of the witness Microchip,

21  who testified pursuant to a cooperation agreement with the

22  Government after he pleaded guilty to a federal crime.  The

23  Government argues, as it is permitted to do, that it must take

24  the witness as it finds him.  The law permits the Government

25  to use the testimony of alleged accomplices and

Charge of the Court                    935

1    co-conspirators.  Indeed, it is the law in federal court that

2    the testimony of an accomplice or co-conspirator may be enough

3    in and of itself for conviction if the jury finds that the

4    testimony establishes guilt beyond a reasonable doubt.

5            The cooperation agreement was between Microchip and

6    the Government and not with the Court.  Any promises made were

7    not formal orders of immunity from the Court but were arranged

8    directly between the witness and the Government.  You must

9    scrutinize the testimony of a cooperating witness with great

10   care and view it with particular caution when you decide how

11   much of that testimony to believe.

12           I've already given you instructions on evaluating a

13   witness's credibility and those instruction as apply here.

14   There are a few additional considerations that are specific to

15   cooperating witnesses that you may wish to consider in your

16   deliberations.

17           You should ask yourselves whether the witness would

18   benefit more by lying or by telling the truth.  Was his

19   testimony made up in any way because he believed or hoped that

20   he would somehow receive favorable treatment by testifying

21   falsely.  Or did he believe that his interests would be best

22   served by testifying truthfully.  If you believe that the

23   testimony was motivated by hopes of personal gain, was the

24   motivation one that would cause him to lie or was it one that

25   would cause him to tell the truth?

Charge of the Court                    936

1          You have also heard testimony that Microchip was

2     promised that if he provides substantial assistance to the

3     Government and testifies truthfully, completely and fully, the

4     Government will present to the sentencing Court what is called

5     a 5K1.1 letter.  The 5K1.1 letter sets forth the cooperating

6     witness' criminal acts as well as the substantial assistance

7     that the witness had provided.  I instruct you that the 5K1.1

8     letter does not guarantee the cooperating witness a lower

9     sentence.  This is because the sentencing Court may, but is

10    not required, to take the 5K1.1 letter into account when

11    imposing sentence on the cooperating witness.  The Court has

12    discretion, whether or not there are is a 5K1.1 letter, to

13    impose any reasonable sentence the Court deems appropriate up

14    to the statutory maximum.  The final determination as to the

15    sentence to be imposed rests with the Court, not with the

16    Government.

17          In sum, you should look at all of the evidence in

18    deciding what credence and what weight, if any, you want to

19    give to the cooperating witness.

20          The defendant in a criminal case never has any duty

21    to testify or to come forward with any evidence.  This is

22    because, as I have told you, the burden of proof beyond a

23    reasonable doubt remains on the Government at all times.  And

24    the defendant is presumed innocent.

25          In this case, the defendant did testify and was

Charge of the Court                     937

1   subject to cross-examination, like any other witness.  You

2   should examine and evaluate his testimony just as you would

3   the testimony of any witness within an interest in the outcome

4   of the case.

5          The parties have stipulated to certain facts in this

6   case.  As I told you before, that's just an agreement among

7   the parties that a certain fact is true.  When the attorneys

8   on both sides stipulate and agree to the existence of a fact,

9   you must accept the stipulation as evidence and regard that

10  fact as proved.

11         There was testimony at this trial that attorneys

12  interviewed witnesses when preparing for the trial and during

13  the trial.  You must not draw any unfavorable inference from

14  that fact.  On the contrary, lawyers are obliged to prepare

15  their case as thoroughly as possible.  And in discharging that

16  responsibility, it is appropriate that they interview

17  witnesses in preparation for trial and during the trial.

18         There are witnesses whose names you've heard during

19  the course of the trial but did not testify.  I instruct you

20  that each party had an equal opportunity or lack of

21  opportunity to call any of these witnesses.  For that reason

22  you should not draw any inferences or reach any conclusions

23  about what the witnesses would have testified to had they been

24  called.  Their absence should not affect your judgment in any

25  way.

Charge of the Court                                            938

1          Remember that a defendant in a criminal case does

2     not have any burden to call witnesses or produce evidence.

3          Although the Government bears the burden of proof

4     and although a reasonable doubt can arise from a lack of

5     evidence, the law does not require that the Government to

6     prove its case through any particular means.  Law enforcement

7     techniques are not your concern.  You are not to speculate as

8     to why the Government used the techniques that it did, or why

9     it did not use other techniques.  Your concern is to determine

10    whether, based on all of the evidence presented in this case,

11    the Government has proved the defendant's guilt beyond a

12    reasonable doubt.

13         Now you've also heard evidence during the trial

14    about some investigative techniques and methods of collecting

15    evidence.  I instruct you that any evidence that was presented

16    to you, was obtained legally and you can consider it.  The

17    methods used to collect evidence or to investigate should not

18    enter into your deliberations in any respect.

19         There has also been evidence that other people were

20    involved in the crime charged in the Indictment.  These

21    individuals are not on trial before you, and they are not your

22    concern.  You should not speculate about why these people are

23    not on trial before you.  The fact that these individuals are

24    not on trial before you, should not control or influence your

25    verdict as to the defendant who is on trial.  The only issue

Charge of the Court                                939

1    in this case is whether the Government has proven the charge

2    against this defendant beyond a reasonable doubt.  Your

3    verdict should be based solely on the evidence or lack of

4    evidence as to this defendant in accordance with my

5    instructions, and without regard as to whether other people's

6    will guilt has or has not been proven.

7          Now, among the exhibits that came into evidence

8    there are some exhibits that have been redacted, that means

9    that a portion of the document was taken out.  The redacted

10   portions of exhibits are not evidence, and you should only

11   concern yourself with the part of the exhibit that's been ad

12   might into evidence.  You should not speculate as to why the

13   exhibit was redacted or about what might be in any of the

14   redacted portions of the exhibits.

15         You have heard testimony and seen some exhibits

16   related to what might be the defendant's political views.

17   Treat this evidence with caution.  This evidence alone is not

18   a basis to find the defendant guilty of the offense charged in

19   the Indictment.  You may consider it however for limited

20   purposes, including considering the context in which the

21   statements were made, what the defendant intended in making

22   the statements, and his expectations regarding the affects of

23   the statements.  You cannot find the defendant guilty because

24   you disagree with his political views or find them

25   distasteful.

Charge of the Court                           940

1          The First Amendment to the United States

2     constitution protects the right to publish anonymously.  The

3     defendant's general exercise of that right is therefore not in

4     and of itself evidence of guilt.  You may consider evidence

5     about the defendant's efforts to remain anonymous only to the

6     extent that you find that the defendant's anonymity furthered

7     the charged conspiracy or to assess any defenses the defendant

8     has raised.

9          The next portion of the charge is the portion in

10    which I'll explain to you the elements of the crime charged in

11    the Indictment that the Government must prove beyond a

12    reasonable doubt.

13         The Indictment charges that conduct occurred in or

14    about and between certain dates.  The Government does not have

15    to establish the exact date of an offense, of an alleged

16    offense, or that the defendant committed the crime charged

17    throughout the entire period.  It is sufficient if the

18    evidence establishes beyond a reasonable doubt that the

19    offense was committed during any part of the charged time

20    frame.  The law only requires substantial similarity between

21    the dates alleged in the Indictment and the dates established

22    by the testimony and exhibits.

23         Although the Indictment charges that the statute was

24    violated by acts that are connected by the word and, it is

25    sufficient if the evidence establishes violations of the

1    statute by any one of the acts charged.  Of course, this must

2    be proved beyond a reasonable doubt.

3            Venue refers to the location of the charged crime.

4    The Indictment alleges that the crime charged occurred, in

5    part, in this judicial district, which is the Eastern District

6    of New York.  This district encompasses the boroughs of

7    Brooklyn, Queens, and Staten Island, as well as Nassau and

8    Suffolk Counties on Long Island.  And the waters within

9    Manhattan and the Bronx, which include the waters surrounding

10   the island of Manhattan that separate Manhattan from the outer

11   boroughs of New York and from the state of New Jersey.  As

12   well as the air space above the district or the waters in the

13   district.

14           The island of Manhattan itself is in the Southern

15   District of New York.

16           To establish a venue for a crime in this district,

17   the Government must prove that some act in furtherance of the

18   crime happened in the Eastern District of New York.  This

19   means that with respect to the crime charged, even if other

20   acts were committed outside this district, or if the crime was

21   completed elsewhere, venue is established in the Eastern

22   District of New York so long as some act in furtherance of the

23   crime took place in this district.  Indeed, a defendant need

24   not personally have been present in this district for venue to

25   be proper.  Venue turns on whether any part of the crime or

Charge of the Court                                    942

1    any act in furtherance of the offense was committed in this

2    district.  Venue is proper in a district where the defendant

3    intentionally or knowingly causes an act in furtherance of the

4    charged offense to occur, or where it is foreseeable that such

5    an act would occur in the district.

6              In a conspiracy, such as the one charged here,

7    actions of co-conspirators as well as actions caused by

8    co-conspirators may be sufficient to confer venue if it was

9    reasonably foreseeable to the defendant that the acts would

10   occur in the Eastern District of New York.

11             In determining whether some act in furtherance of

12   the crime you are considering occurred in the Eastern District

13   of New York, you may consider a number of things.  Venue can

14   be conferred based on physical presence or conduct, and

15   passing through a district including through or over waters is

16   sufficient to confer venue.  Venue can be based on electronic

17   impulses, including electronic communications or data

18   transfers, passing through a district.  Venue lies in any

19   district where electronic communications are sent or received,

20   and any district through which electronic communications are

21   routed.  Venue can also lie where a telephonic communication

22   in furtherance of a crime was made and where it was received.

23             The Government need not prove all of these bases of

24   venue; any one is sufficient.  It is up to you to determine

25   whether the Government has proved them.

Charge of the Court                    943

1        So in this case you may conclude venue is proper if

2   you find that the evidence established any of the following:

3   Either the defendant or a co-conspirator or an innocent

4   non-conspirator caused to act by members of the conspiracy

5   tweeted an allegedly deceptive image into the Eastern District

6   of New York in furtherance of the alleged scheme; provided

7   that, if tweeted by someone other than the defendant, that act

8   was reasonably foreseeable to the defendant.

9        Second, the allegedly deceptive images sent by the

10  defendant in furtherance of the conspiracy had passed through

11  the Eastern District of New York as they were transmitted to

12  Twitter's servers and beyond.

13       Or if the deceptive images sent by others in

14  furtherance of the conspiracy had foreseeably passed through

15  the Eastern District of New York as they were transmitted to

16  Twitter's servers and beyond.

17       Or that the allegedly deceptive images were viewed

18  in the Eastern District of New York and that such viewing,

19  even if innocent, was a foreseeable overt act furthering the

20  ends of the conspiracy.

21       While the Government's burden as to everything else

22  in the case is proof beyond a reasonable doubt, a standard

23  that I've already explained to you, the Government must prove

24  venue by the lesser standard, a preponderance of the evidence.

25  To establish a fact by preponderance of evidence, means to

Charge of the Court                            944

1    prove the fact is more likely true than not.  A preponderance

2    of the evidence means the greater weight of the evidence, both

3    direct and circumstantial.

4           Now you will also hear me use the word intentionally

5    during these instructions, so I want to define that term

6    before I go to the individual charge.  As a general rule, the

7    law holds individuals accountable only for the conduct they

8    undertook intentionally.  Thus, before you can find the

9    defendant guilty of the crime charged, you must be satisfied

10   that he was acting intentionally.  The issue of intent

11   requires you to make a determination about a defendant's state

12   of mind, something that can rarely be proved directly.  A wise

13   and careful consideration of all the circumstances before you;

14   however, may permit you to make a determination as to the

15   defendant's state of mind.

16          Indeed, in your every day affairs you are frequently

17   called upon to determine a person's state of mind from his

18   words and actions in any given circumstances.  And that's what

19   you're asked to do here.

20          I have admitted into evidence other people's acts

21   and statements because these acts and statements were

22   committed by people whom the Government charges were also

23   confederates or co-conspirators of the defendant.  The reason

24   for permitting this evidence has to do with the nature of the

25   crime of conspiracy.  A conspiracy is often referred to as a

1  partnership in crime.  Thus, as in other types of

2  partnerships, when people enter into a conspiracy to

3  accomplish an unlawful end, each and every member becomes an

4  agent for the other conspirators in carrying out the

5  conspiracy.  Accordingly, the reasonably foreseeable acts,

6  declarations, statements and omissions of any member of the

7  conspiracy and in furtherance of the common purpose of the

8  conspiracy, are deemed under the law to be the acts of all of

9  the members, and all of the members are responsible for such

10  acts, declarations, statements and omissions.  If you find

11  beyond a reasonable doubt that the defendant was a member of

12  the conspiracy charged in the Indictment, then any acts done

13  or any statements made in furtherance of the conspiracy by

14  persons that you find have been members of that conspiracy,

15  may be considered against the defendant.  This is so even if

16  the acts were done and the statements were made in the

17  defendant's absence and without his knowledge.

18          The Indictment charges that from on or about and

19  between September 2016 and November 2016, both dates being

20  approximate and inclusive, within the Eastern District of New

21  York and elsewhere, the defendant, Douglass Mackey, also known

22  as Ricky Vaughn, together with others conspired to injure,

23  oppress, threaten and intimidate one or more persons in the

24  free exercise and enjoyment of a right and privilege secured

25  to them by the constitution and laws of the United States; to

Charge of the Court                     946

1    wit, the right to vote.

2         The relevant statute is Section 241 of Title 18 of

3    the United States Code, which is entitled conspiracy against

4    rights.  It provides in relevant part:  If two or more persons

5    conspire to injure, oppress, threaten or intimidate any person

6    in the state, territory, Commonwealth, possession or district

7    in the free exercise or enjoyment of any right or privilege

8    secured to him by the constitution or laws of the United

9    States or because of his having exercised the same, they shall

10   be punished.

11        I instruct you that the right of qualified voters to

12   vote in a federal election is secured to them by the

13   constitution and the laws of the United States.

14        In order to establish that the defendant entered

15   into a conspiracy against rights, as charged in the

16   Indictment, the Government must prove each of the following

17   elements beyond a reasonable doubt.

18        First, that two or more persons entered into the

19   particular unlawful agreement charged.

20        Second, that the defendant knowingly and

21   intentionally became a member of the conspiracy.  I'm going to

22   describe each one of those elements in more detail.

23        The first element requires that the Government prove

24   that at least two conspirators had a meeting of the minds, and

25   that they agreed to work together to accomplish the object of

Charge of the Court                                947

1    the charged conspiracy.  A conspiracy is an agreement by two

2    or more people to accomplish some unlawful purpose.  It is

3    sometimes referred to as a criminal partnership.  The

4    conspirators do not have to agree on every detail of their

5    venture, but they must agree on the essential nature of their

6    plan to achieve a specified unlawful act.  Nor does the

7    Government have to prove that each member of the conspiracy

8    knew all the other members of the conspiracy, or was aware of

9    their roles.

10           A conspiracy is in and of itself a crime.  The

11   Government does not have to prove that the ultimate objectives

12   of the conspiracy were successfully accomplished.  It is

13   enough if the Government has proved that two or more people,

14   one of whom is the defendant, in any way expressly or

15   impliedly came to a common understanding to commit an unlawful

16   act.

17           The United States Congress has deemed it appropriate

18   to make conspiracy a separate crime.  That is because

19   collective criminal activity poses a greater threat to the

20   public safety and welfare than individual conduct, and

21   increases the likelihood of success of a particular criminal

22   venture.

23           To establish a conspiracy the Government is not

24   required to prove that the conspirators sat around a table and

25   entered into a solemn contract, orally or in writing, stating

1    that they formed a conspiracy to violate the law, setting

2    forth details of the plans the means by which the unlawful

3    project is to be carried out or the part to be played by each

4    conspirator.  Common sense suggests that when people do in

5    fact undertake to conspiracy, much is left to an unexpressed

6    understanding.  A conspiracy by its very nature is almost

7    invariably secret, in both origin and execution; therefore, it

8    is sufficient for the Government to show that the conspirators

9    somehow came to a mutual understanding, even if passively, to

10   accomplish an unlawful act by means a joint plan or common

11   scheme.

12          Because conspiracy is usually characterized by

13   secrecy, you may infer its existence from the circumstances

14   and the conduct of the parties and others involved.  The

15   agreement of the parties may be implicit in a working

16   relationship between them that has never been articulated, but

17   nevertheless amounts to a joint criminal effort.  You may

18   consider the actions and statements of any purported

19   co-conspirators in deciding whether a common design existed to

20   act together for the accomplishment of an unlawful purpose.

21          In short, you may consider all the evidence before

22   you and the reasonable inferences that may be drawn from this

23   evidence.

24          The second element requires that the Government

25   prove that the defendant became a member of the conspiracy

1  with knowledge of its criminal goal and intending by his

2  actions to help it succeed.  That is, you must determine

3  whether he knowingly and intentionally became a participant in

4  the conspiracy.  A defendant generally acts knowingly if he

5  acts purposely and voluntarily and not because of ignorance,

6  mistake, accident or carelessness.  A defendant generally acts

7  intentionally when the defendant's conduct is the product of

8  the defendant's conscious objective, rather than the product

9  of mistake or accident.  The defendant's knowledge is a matter

10 of inference from the facts proved.

11         To become a member of the conspiracy, the defendant

12 did not have to know the identities of every member, nor need

13 he have been apprised of all of their activities.  The

14 defendant need not have been fully informed of all of the

15 details or the scope of the conspiracy in order to justify an

16 inference of knowledge on his part.

17         The defendant need not have joined in all of the

18 conspiracy's unlawful objectives.  A conspirator's guilt is

19 not measured by the extent or duration of his participation.

20 In other words, the law does not require the defendant to play

21 an equal role in the conspiracy as another defendant or

22 conspirator.

23         (Continued on next page.)

24

25

PROCEEDINGS                                    950

1    (Continuing.)

2              THE COURT:  Some conspirators may play major roles,

3    while others may play minor roles.  Each member may perform

4    separate and distinct acts and may perform them at different

5    times.  Even a single act maybe sufficient to draw the

6    defendant within the circle of a conspiracy.  A person who

7    intentionally joins an existing conspiracy is charged with the

8    same responsibility as if he or she had been one of the

9    originators or instigators of the conspiracy.

10             Thus, if you find that the conspiracy existed, and

11   you further find that the defendant participated in it

12   knowingly and intentionally, the extent or degree of his

13   participation is not material.  The Government also need not

14   prove that the defendant actually committed the unlawful act

15   or acts charged as the objective of the conspiracy.  Instead,

16   the Government must prove beyond a reasonable doubt, only that

17   the purpose of the conspiracy was to commit an act or acts

18   that are unlawful.

19             I want to caution you, however, that the defendant's

20   mere presence at the scene of criminal activities or at

21   locations frequented by criminals does not by itself make him

22   a member of the conspiracy.  Similarly, mere association with

23   one or more members of the conspiracy does not automatically

24   make the defendant a member.  A person may know or be friendly

25   with a criminal without being a criminal himself or herself.

PROCEEDINGS                                    951

1    Indeed, a person may be a criminal without being a member of a

2    charged conspiracy.  Mere similarity of contact or the fact

3    that individuals may have assembled together and discussed

4    common aims and interests, does not necessarily establish

5    proof of the existence of a conspiracy.

6              I further caution you that mere knowledge or

7    acquiescence without participation in the unlawful plan is not

8    sufficient.  The fact that the defendant's acts merely

9    happened to further the purposes or objectives of the

10   conspiracy, without his knowledge, does not make the defendant

11   a member.  More is required under the law.  What is necessary

12   is that the defendant must have participated with knowledge of

13   at least some of the purposes or objectives of the conspiracy,

14   and with the intention of aiding in the accomplishment of

15   those unlawful ends.  Thus, while someone who is present

16   during a conspiracy is not necessarily a member, you may find

17   that the defendant knowingly and willfully became and was a

18   member of a conspiracy if you find that his presence was

19   purposeful.  That is, the defendant's presence on one or more

20   occasions was intended to serve the purposes of the

21   conspiracy.

22             The indictment charges that the objective of the

23   charged conspiracy was to injure, oppress, threaten, or

24   intimidate one or more persons in the free exercise and

25   enjoyment of their right to vote.  The Government must,

PROCEEDINGS                                952

1    therefore, prove beyond a reasonable doubt that the defendant

2    knowingly and intentionally joined the conspiracy with the

3    intent to further that objective.  In this case, the

4    Government has alleged that the object of the conspiracy was

5    specifically to injure one or more persons in the free

6    exercise and enjoyment of their right to vote.  I instruct you

7    that the statute covers conduct intended to obstruct, hinder,

8    prevent, frustrate, make difficult or impossible, or

9    indirectly, rather than directly assault free exercise of the

10   right.

11         For example, hinder, is defined as to make slow or

12   difficult, the process of, to hamper, to hold back, to

13   prevent, to check.  It does not require the possibility of

14   physical force or physical harm.  Thus, conduct that makes the

15   right to vote more difficult or in some way prevents voters

16   from exercising their right to vote can constitute an injury

17   within the meaning of the law.

18         I further instruct you that the Government must

19   prove that the intended victims of the conspiracy were present

20   in any state, district, or territory of the United States.

21   Although, I again, remind you that the Government does not

22   have to prove that the conspiracy actually succeeded in

23   accomplishing its unlawful goal for you to find the defendant

24   guilty.

25         The key inquiry is whether the defendant joined the

PROCEEDINGS                         953

1    conspiracy charged in the indictment with knowledge of the

2    basic aim and purpose of the unlawful agreement and with the

3    intent to help it succeed.  If, upon considering all of the

4    evidence, direct and circumstantial, you are not satisfied

5    beyond a reasonable doubt that the defendant knowingly became

6    a member of the conspiracy charged in the indictment, then you

7    cannot find him guilty.  On the other hand, upon considering

8    all of the evidence, if you find that the Government has met

9    its burden of proving that the defendant knowingly became a

10   member of the conspiracy charged in the indictment, then you

11   should render a verdict of guilty.

12          All right.  I'm now in the final part of the

13   instructions.  In a few minutes, you will begin your

14   deliberations.  I'm going to give you some general

15   instructions regarding your deliberations.  Just a reminder

16   that nothing that I've had during the course of these

17   instructions is meant to suggest in any way what I think your

18   verdict should be.  That is entirely for you to decide.

19          In order for your deliberations to proceed in an

20   orderly way, you must have a foreperson.  It's the custom in

21   this courthouse that Juror Number 1 acts as the foreperson.

22   But if when you begin your deliberations, you decide that you

23   want to select another foreperson, you may do that.  The

24   foreperson will be responsible for signing all communications

25   to the Court and for handing them to the deputy marshal during

PROCEEDINGS                                    954

1    your deliberations.  Of course, the foreperson's vote is

2    entitled to no greater weight than the vote of any other

3    juror.

4             Your duty is to reach a fair conclusion from the law

5    as I have given it to you, and the evidence presented in this

6    case.  This duty is important.  When you are in the jury room,

7    listen to one another and discuss the evidence and issues in

8    the case among yourselves.  It's the duty of each of you as

9    jurors to consult with one another and to deliberate with a

10   view towards reaching an agreement on a verdict, if you can do

11   that without violating your individual judgment.  No one

12   should surrender conscientious convictions of what the truth

13   is and what the weight and effect of the evidence is.  Each of

14   you must decide the case for yourself and not merely acquiesce

15   in the conclusion of your fellow jurors.  You should examine

16   the issues and the evidence before you with candor and

17   frankness, and with proper deference and respect to the

18   opinions of your fellow jurors.

19            You should not hesitate to reconsider your opinions

20   from time to time and to change them if you become convinced

21   that you were wrong.  However, do not surrender an honest

22   conviction about the weight and effect of the evidence simply

23   to reach a verdict.

24            The decision that you reach must be unanimous.  Each

25   of you must agree.

PROCEEDINGS                                955

1          Now, as I've expressed throughout the trial, but

2     it's slightly different here, it is very important that you

3     not communicate with anyone outside the jury room about your

4     deliberations or about anything related to this case.  You may

5     not use an electronic device or media like a telephone, cell

6     phone, smart phone, smart watch, tablet, computer, the

7     internet, any text or instant messages service, blog, or

8     social networking site to communicate with anyone regarding

9     any information about this case or to conduct any research or

10    do any kind of investigation about the case until after I

11    accept your verdict.

12          There is only one exception to this rule.  If you

13    have a question for me, or if it becomes necessary for you to

14    communicate with me, then you may send a note through the

15    deputy marshal that your foreperson signs.  No members of the

16    jury should attempt to communicate with me except by a signed

17    note, and I will never communicate with any members of the

18    jury on any subject touching upon the merits of the case other

19    than in writing or here in open court.

20          If during your deliberations, you have questions

21    about the law or if you want further explanation as to the

22    law, you may send me a note.  You will also be permitted to

23    review any of the exhibits admitted at the trial, as well as

24    transcripts of the testimony.

25          The Government must prove the defendant's guilt

PROCEEDINGS                                  956

1    defendant as we have already discussed.  If you find that the

2    Government meets this burden, then your verdict should be

3    guilty.  If the Government does not meet its burden, your

4    verdict should be not guilty.  To reach a verdict, you must be

5    unanimous.

6         I have prepared a verdict form for you that may help

7    in your deliberations.  The form is in no way intended to tell

8    you how to deliberate or to decide the facts of the case.  The

9    foreperson should use a check mark in the appropriate space

10   for guilty or not guilty.  The foreperson should also put his

11   or her initials and the date besides the check mark on the

12   verdict form.  Again, the verdict form must reflect your

13   unanimous verdict.

14        As we talked about, each of you is entitled to your

15   opinion, however, you should consult with one another and

16   reach an agreement based solely and wholly on the evidence if

17   you can do that without contradicting your individual

18   judgment.  Each you must decide the case for yourself after

19   consideration with your fellow jurors.  However, if after

20   carefully considering all of the evidence and the arguments of

21   your fellow jurors, your view is different from your fellow

22   jurors, you should not change your opinion just because you

23   are outnumbered or because it's late.  Your final vote must

24   reflect your conviction as to how the issues should be

25   decided.  When you have reached a verdict, simply send me a

PROCEEDINGS                           957

1    note that's signed by your foreperson that says you have

2    reached a verdict.  Do not write down on the note what the

3    verdict is.  You should never give a numerical count of where

4    the jury stands in its deliberations in any communications

5    with the Court.

6           The Government, the defendant, and the Court rely

7    upon you to give full and conscientious deliberation and

8    consideration to the issues and the evidence before you.  By

9    doing so, you carry out your oaths as jurors to render a true

10   verdict.

11          I'm going to ask you to just sit tight for just a

12   minute.  I want to talk to the lawyers to see if there's

13   anything I've forgotten or anything further that we need to

14   discuss.  I'll be back with you in just a moment.  If I could

15   have the court reporter come over with the parties.

16          (Continued on the next page.)

17          (Sidebar conference.)

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                958

1            (The following occurred at sidebar.)

2            THE COURT:  All right.  Any exceptions by the

3    Government or requests, additional request?

4            MR. PAULSEN:  No, Your Honor.  No additional

5    requests.

6            THE COURT:  Mr. Frisch?

7            MR. FRISCH:  No.

8            THE COURT:  All right.  I guess send them back.

9            MR. FRISCH:  Can I ask Your Honor what your practice

10   is with regard to alternates?

11           THE COURT:  We keep them in a different place.  I

12   don't excuse them, but they won't be deliberating.

13           MR. FRISCH:  I see.

14           (End of sidebar conference.)

15           (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS                          959

```
 1              (In open court; Jury present.)

 2              THE COURT:  Would the U.S. Marshal please come

 3     forward.

 4              THE COURTROOM DEPUTY:  Raise your right hand for me,

 5     please.

 6              (Whereupon, the marshal was sworn.)

 7              THE MARSHAL:  I do.

 8              THE COURTROOM DEPUTY:  Thank you.

 9              THE COURT:  All right.  Ladies and gentlemen, I'm

10     going to ask the 12 regular jurors to go with the marshal to

11     begin your deliberations, and the alternates will be in a

12     different place.

13              Go ahead.

14              THE COURTROOM DEPUTY:  All rise.

15              (The jury retired to commence deliberations at

16     3:20 p.m.)

17              (Jury exits.)

18              THE COURT:  All right.  Everybody can have a seat.

19              I know you all spoke with Ms. Greene about getting

20     the exhibits together.

21              Are those all in a way that can be sent back to the

22     jury?

23              MR. FRISCH:  Not yet.  We're still reviewing the

24     Government's binder of its exhibits.  It won't take too much

25     longer.
```

PROCEEDINGS                              960

1          THE COURT:  Okay.  And then is it necessary for the

2     jurors to have a laptop to look at anything?

3          MR. BUFORD:  Your Honor, the only exhibit I think

4     would be the audio recording, the 45 seconds --

5          THE COURT:  Right.  Do you have something that they

6     can --

7          MR. BUFORD:  We don't have a laptop.  I suppose we

8     could put it on a media so if they do have a laptop, it could

9     be put on there.

10         THE COURT:  Well, when Ms. Greene gets back.

11    Usually the Government provides that.  I think we can do it,

12    though.  I probably should have mentioned it before, I just

13    didn't think it was necessary.  So when she gets back, we'll

14    see about that because they have to have a way to listen to

15    that.  I'm not going to bring them in here to do it because

16    they won't be able to talk about it.  So hold on for one

17    second.

18         (Pause in the proceedings.)

19         THE COURT:  All right.  I hope this is coming along

20    expeditiously.  To be fair, it would have been before this

21    point, but that's all right.  And Ms. Greene will get a laptop

22    from our -- they're getting the computer, from IT.  Thank you.

23         (Pause in the proceedings.)

24         THE COURT:  Is any part of it ready to go back?

25         MR. PAULSEN:  Your Honor, I think it's almost

PROCEEDINGS                    961

1    entirely ready.  Some redactions didn't go all the way

2    through.

3              THE COURT:  Okay.  That's fine.

4              MR. PAULSEN:  So we want to make sure they're

5    fully --

6              THE COURT:  Okay.

7              MR. PAULSEN:  Your Honor, we redacted the transcript

8    with all the sidebars out, so it's ready to go.

9              THE COURT:  Okay.  Good.  Mr. Frisch, did you look

10   at the transcripts that they've taken everything out?

11             MR. FRISCH:  I haven't.  I'm going to start doing

12   that as soon as I can.

13             MR. PAULSEN:  Your Honor, the exhibits are ready.

14             THE COURT:  All right.  As soon as -- is that right,

15   Mr. Frisch?

16             MR. FRISCH:  It is.

17             THE COURT:  All right.  As soon as Ms. Greene gets

18   back here with the laptop -- do you have whatever it is

19   that --

20             MR. PAULSEN:  The hard drive?

21             THE COURT:  Yes.

22             MR. PAULSEN:  Yes, it's in there, as well.

23             THE COURT:  All right.  She should be here any

24   minute.

25             MR. PAULSEN:  Thank you, Your Honor.

PROCEEDINGS                          962

1            THE COURT:  I think we'll have the exhibits taken

2    back and as soon as Ms. Greene gets here with the laptop,

3    we'll take that back separately.

4            MR. PAULSEN:  That's fine, Your Honor.  Thank you.

5            THE COURT:  Oh, here she is.  They're all set.

6            All right.  So I guess I don't have to tell you to

7    not go that far, and then, you know, when we get a note, we'll

8    let you know.

9            THE COURTROOM DEPUTY:  Leave your contact.

10           THE COURT:  Oh, yeah.  Just leave cell phone numbers

11   and things.

12           (Off the record.)

13           (Time noted:  5:35 p.m.)

14           THE COURTROOM DEPUTY:  All rise.

15           THE COURT:  Hi.  Everybody can sit down.  All right.

16   It's about 25 before 6:00, so I think it's time to excuse the

17   jurors for today.  So unless anybody has anything they want to

18   raise, I'll bring them in and excuse them.

19           MR. FRISCH:  No.

20           MR. PAULSEN:  No, Your Honor.

21           THE COURT:  Okay.

22           THE COURTROOM DEPUTY:  All rise.

23           (Jury enters the courtroom.)

24           THE COURTROOM DEPUTY:  You may be seated.

25           THE COURT:  All right, ladies and gentlemen.  It's

PROCEEDINGS                                          963

1    about 20 minutes before 6:00.  It's been a long day, so I'm

2    going to have you stop your deliberations for the evening, and

3    we'll resume tomorrow morning.

4              You can only deliberate when all 12 of you are in

5    the jury room alone together without anyone else there.  So

6    obviously, you're not going to talk about the case anymore

7    tonight, even amongst yourself.  You'll resume that tomorrow.

8    Once again, please do not look anything up on the internet,

9    don't discuss the case with anybody, and don't permit anyone

10   to approach you to discuss the case with you.  But do have a

11   good night, and you can get started again tomorrow morning at

12   9:30.  Obviously, remember we can't start until you all are

13   here.  All right.  Have a great night.  Thanks so much.

14             THE COURTROOM DEPUTY:  All rise.

15             (Jury exits the courtroom.)

16             THE COURT:  Okay.  Everybody can have a seat.

17             All right.  Anything before we break for the night

18   from the Government?

19             MR. PAULSEN:  No, Your Honor.

20             THE COURT:  Mr. Frisch?

21             MR. FRISCH:  No.

22             THE COURT:  All right.  I'll see everybody tomorrow.

23   5:41 p.m.

24                     *    *    *    *    *

25             (Proceedings adjourned at 5:41 p.m. to resume on
     March 28, 2023 at 9:30 a.m.)